UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATHANIEL FELBER by his legal guardians JOSEPH FELBER and JUDI FELBER, JOSEPH FELBER, JUDI FELBER, DANIEL FELBER, and ADINA FELBER, Plaintiffs, | : | **COMPLAINT** |
| | : | **Case No. 19-cv-1027** |
| -against- | : | |
| ISLAMIC REPUBLIC OF IRAN<br>Ministry of Foreign Affairs<br>Khomeini Avenue<br>United Nations Street<br>Tehran, Iran, Defendant. | : | |

Plaintiffs Nathaniel Felber, Joseph Felber, Judi Felber, Daniel Felber, and Adina Felber, by their attorneys, allege the following:

## NATURE OF THE ACTION

1. This is a civil action pursuant to the provisions of the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq*. ("FSIA"), including the terrorism exception to sovereign immunity, 28 U.S.C. § 1605A, against the Islamic Republic of Iran ("Iran"), a designated State Sponsor of Terrorism.

2. Defendant knowingly provided material support to the U.S.-designated Foreign Terrorist Organization ("FTO") Islamic Resistance Movement ("HAMAS"), which perpetrated the December 13, 2018 terrorist attack at the Givat Assaf Junction in the Palestinian Territories (the "Attack") in which Nathaniel Felber, a U.S. national, was grievously injured and two others were killed.

3. The United States designated Iran a State Sponsor of Terrorism on January 19, 1984, pursuant to § 6(j) of the Export Administration Act, § 40 of the Arms Export Control Act, and § 620A of the Foreign Assistance Act. This designation has remained in effect since that time.

4. The United States designated HAMAS an FTO (as that term is defined in 8 U.S.C. § 1189) in 1997. This designation has remained in effect since that time.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this matter and over Defendant pursuant to 28 U.S.C. §§ 1330(a), 1330(b), 1331, and 1605A(a)(1).

6. 28 U.S.C. § 1605A(c) provides a federal private right of action against a foreign state that is or was a State Sponsor of Terrorism, including its officials, employees or agents while acting within the scope of their office, employment or agency, for wrongful death, personal injury,

and related torts.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(f).

## THE PARTIES

### A. The Plaintiffs

8. Plaintiff Nathaniel Felber is a citizen of the United States and of the State of Israel and is a resident of Israel. As a result of the severe injuries he sustained in the terrorist attack described below, he was rendered comatose and has not regained full consciousness; he is in a state of minimal consciousness; his parents therefore bring this action on his behalf as his legal guardians.

9. Plaintiff Joseph Felber is a citizen of the United States and of the State of Israel and is a resident of Israel. He is the father of Nathaniel Felber.

10. Plaintiff Judi Felber is a citizen of the United States and of the State of Israel and a resident of Israel. She is the mother of Nathaniel Felber.

11. Plaintiff Adina Felber is a citizen of the United States and of the State of Israel and a resident of Israel. She is the sister of Nathaniel Felber.

12. Plaintiff Daniel Felber is a citizen of the United States and of the State of Israel and a resident of Israel. He is the brother of Nathaniel Felber.

### B. The Defendant

13. At all times relevant to this Complaint, Defendant Iran was a foreign state within the meaning of 28 U.S.C. § 1603 and a designated State Sponsor of Terrorism.

14. Iran knowingly provided material support and resources to HAMAS which was responsible for the acts of extrajudicial killing and attempted extrajudicial killing within the meaning of 28 U.S.C. § 1605A that caused Plaintiffs' injuries.

15. The Government of Iran is politically and ideologically hostile to the United States and its allies and has consistently sponsored acts of international terrorism against the United States and its allies and their citizens, particularly through one of its main Palestinian terrorist proxies, HAMAS.

16. Iran's support for terrorism is a key part of its attempts to spread the principles underlying its 1979 Islamic revolution throughout the region. Iran's paramilitary force, the Islamic Revolutionary Guard Corps ("IRGC"), is tasked with defending and exporting Iran's Islamic revolution. This includes providing funding, training, weapons, and other support on Iran's behalf for terrorist groups throughout the Middle East, including HAMAS.

17. The IRGC supports terrorist groups primarily through its "Qods Force" division, ("IRGC-QF"), which was designated a Specially Designated Global Terrorist ("SDGT") by the United States pursuant to Executive Order 13224 on October 25, 2007.

18. On August 2, 2017, the Countering America's Adversaries Through Sanctions Act ("CAATSA") expressly extended findings relating to the IRGC-QF to the IRGC as a whole: "The IRGC, not just the IRGC–QF, is responsible for implementing Iran's international program of destabilizing activities," including "support for acts of international terrorism." Pub. L. 115-44, § 105(a)(3), 131 Stat. 886, 892 (Aug. 2, 2017).

19. The U.S. Department of the Treasury designated the IRGC an SDGT under Executive Order 13224 on October 13, 2017 for providing support for Iranian terrorism, including to HAMAS.

20. In designating the IRGC an SDGT, Treasury Secretary Steven T. Mnuchin said, "[t]he IRGC has played a central role to Iran becoming the world's foremost state sponsor of

terror," and participated in the IRGC-QF's "support for a number of terrorist groups, including . . . Hamas."

21. The U.S. State Department's annual report "Patterns of Global Terrorism" (later, "Country Reports on Terrorism") states that Iran has supported HAMAS – including providing "weapons, training, and funding" – from nearly HAMAS's inception to the present day.

22. Iran directed and encouraged HAMAS to carry out terrorist attacks on Israelis and others in Israel, and paid HAMAS members for committing attacks.

23. Iran's support grew exponentially after HAMAS won the 2006 Palestinian legislative election, and even more so after HAMAS ousted its rival Palestinian party, Fatah, from the Gaza Strip. HAMAS leadership, based in Syria, repeatedly visited Tehran, and HAMAS operatives have trained at IRGC camps in Iran.

24. On April 8, 2019, the U.S. Department of State announced that is would designate the IRGC as an FTO effective April 15, 2019.

## FACTUAL ALLEGATIONS

### A. The Attack

25. Assam Barghouti, a HAMAS operative from the West Bank village of Kobar, was freed from an Israeli prison in April of 2018 after serving an 11year sentence for terrorist activities, including planning to abduct Israeli soldiers.

26. Assam Barghouti is the son of Omar Barghouti, a senior Hamas operative who previously served a total of 28 years in Israeli prisons.

27. Assam Barghouti, together with his brother Salah Barghouti carried out a terror attack on December 9, 2018, at a junction, outside of the town of Ofra on Route 60 in the Palestinian Territories. The brothers shot seven people including a pregnant woman whose baby

was delivered prematurely and died.

28. They were part of a HAMAS cell said to be responsible for a series of terror attacks in prior months in the Ramallah region of the West Bank.

29. After the shooting, the brothers fled and went into hiding.

30. On December 12, 2018, Salah Barghouti was shot and killed by Israeli security forces.

31. HAMAS's *Izz al-Din al-Qassam Brigades* ("Qassam Brigades") later claimed Salah Barghouti as one of their "martyrs."

32. On December 13, 2018, Assam Barghouti decided to carry out another terror attack and become a "shahid" ("martyr").

33. He drove to the junction outside the town of Givat Assaf on Route 60. Givat Assaf is 3.7 miles from Ofra where he carried out his previous attack 4 days earlier.

34. When Barghouti arrived at the junction on December 13, 2018, he saw Israeli soldiers standing at the bus stop.

35. Plaintiff Nathaniel Felber, who was serving in the Israeli military at the time, was stationed near that bus stop on Route 60 outside the town of Givat Assaf.

36. Assam Barghouti drove his car up to the bus stop and stopped. He got out of the car with his AK-47 automatic assault rifle and opened fire on the soldiers.

37. Two Israeli soldiers, Yosef Cohen and Yovel Mor Yosef, were killed and Plaintiff Nathaniel Felber was shot in the head. A civilian standing at the bus stop was also injured.

38. Barghouti fled from the scene after the attack and went back into hiding.

39. On January 8, 2019, Assam Barghouti was arrested by the Israeli Security Agency. After his arrest, the Qassam Brigades posted an article on its website, www.alqassam.net, about

Assam Barghouti, praising his family, in particular his father, brother and uncle, who were all members of the organization.

40. On March 11, 2019, Assam Barghouti was indicted by the State of Israel for 3 counts of murder and multiple counts of attempted murder.

**B. The Felber Family**

41. As set forth above, on December 13, 2018, Nathaniel Felber was shot in the head. He was rushed to Hadassah Hospital in Jerusalem.

42. Nathaniel Felber has been unconscious since the shooting. He spent two and a half months in the intensive care unit at Hadassah hospital where he underwent multiple surgeries and procedures.

43. On February 27, 2019, Plaintiff Nathaniel Felber was moved to a rehabilitation facility for further care. He remains in a state of minimal consciousness and it is unknown if or when he will regain full consciousness.

44. Plaintiff Nathaniel Felber has been approved by the Israeli Ministry of Defense to receive 24/7 one-on-one care in addition to the care he already receives in the rehabilitation facility, due to the severity of his condition.

45. Plaintiffs Joseph and Judi Felber were at home in Ra'anana, Israel, when they learned of the attack that injured their son.

46. After news of the attack emerged, Joseph and Judi were asked by a family member if Nathaniel was okay. Joseph and Judi tried to call Nathaniel to see if he was safe but they received no answer. Knowing from prior experiences that Nathaniel was not good about answering his cellphone, they were not initially greatly concerned.

47. Shortly thereafter they heard a knock at their door. The Israel Defense Forces ("IDF") sent soldiers to notify them that Nathaniel had been seriously wounded.

48. They were advised to pack a bag immediately and accompany the soldiers directly to the hospital in Jerusalem.

49. Daniel Felber is a student at Hebrew University in Jerusalem.

50. After the IDF notified Judi and Joseph at their home, Judi and Joseph immediately called Daniel to tell him what happened. Daniel told his parents that he would get on a bus to the hospital immediately but the IDF officer who was with Joseph and Judi instructed Daniel to take a taxi to the hospital and not a bus due to the life-threatening nature of Nathaniel's injuries.

51. Adina Felber is a flight attendant for El Al airlines and was preparing to board a flight from Hong Kong to Tel Aviv at the time of the shooting.

52. Adina received a message after she had boarded the flight from her cousin saying that there had been a terror attack and asking if Nathaniel was okay.

53. The pilot of the flight that Adina was on was notified by the IDF that Adina's brother had been gravely wounded in a terror attack.

54. The flight crew did not want to notify Adina that her brother was gravely wounded until the flight landed so as not to distress her during the long flight.

55. However, having been told by her cousin that a terror attack had taken place in Israel, Adina tried to get onto the on-flight internet (the flight that she was working on had WiFi).

56. At the time, Adina did not know that the flight crew decided to shut down the WiFi on the plane until they landed in Tel Aviv.

57. During a break in her shift, she started to cry, worried that perhaps her brother had been injured.

58. An hour before the flight landed, Adina was asked to come to the front of the plane and was notified that her brother had been shot and his life was in danger.

59. When the flight landed, Adina (who got engaged exactly one week before the shooting) and her fiancé (who was waiting at the airport for her) were met at the airport by the IDF and rushed to Hadassah Hospital.

60. Adina Felber took a leave of absence from work after the shooting. She has spent much of her time since the shooting in the hospital and then the rehabilitation facility.

61. The family has taken turns and shifts at the hospital and then at the rehabilitation facility to be with Nathaniel and assist with his care.

62. Initially, the doctors did not know if Nathaniel would survive. He is now in what is considered a state of minimal consciousness, where he will occasionally open his eyes and move his foot.

63. As a direct and foreseeable result of the Attack and Iran's provision of material support for HAMAS, Plaintiff Nathaniel Felber has experienced severe physical and psychological injuries, as well as economic losses. Plaintiffs Joseph, Judi, Adina and Daniel Felber have experienced severe mental anguish and extreme emotional distress. Adina Felber has also suffered economic losses as a direct and foreseeable result of the Attack and Iran's provision of material support for HAMAS.

**C. <u>HAMAS</u>**

64. Several prominent terrorist organizations operate in Palestinian-controlled territory, most notably HAMAS.

65. HAMAS is an acronym for "Harakat al-Muqawama al-Islamiyya" – in English, the Islamic Resistance Movement. HAMAS which was founded in the Gaza Strip in December 1987 by Sheikh Ahmed Yassin.

66. It is an offshoot of the Muslim Brotherhood, a radical Islamic group founded by Hassan al-Banna in Egypt in 1928.

67. HAMAS is a radical Islamist terrorist organization committed to the globalization of Islam through violent "jihad" (holy war).

68. It is formally committed to the destruction of the State of Israel and to achieving its objectives by violent means, including acts of terrorism. The HAMAS charter states that HAMAS's very purpose is to create an Islamic Palestinian state throughout Israel (not just the Palestinian areas) by eliminating the State of Israel through violent jihad.

69. HAMAS also uses violence, principally suicide bombings, shootings and rocket attacks along with threats of violence to pressure Israel to cede territory to the Palestinian Authority or Hamas.

70. HAMAS also uses money, including money it receives from Iran, to pay the families of captured or killed terrorists in order to incentivize Palestinians to commit more terrorist acts.

71. On January 25, 1995, HAMAS was designated a Specially Designated Terrorist ("SDT"). On October 8, 1997, by publication in the Federal Register, the U.S. Secretary of State designated HAMAS an FTO pursuant to Section 219 of the Immigration and Nationality Act and the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996). HAMAS has remained designated an FTO continuously since 1997 and appears on the current list published by the U.S. State Department's Office of the Coordinator for

Counterterrorism. On October 31, 2001, pursuant to Executive Order 13224, HAMAS was designated an SDGT.

72. HAMAS began committing terrorist attacks in 1989, including suicide bombings and shootings. Since September 2000, when a violent uprising erupted against Israel (commonly known as the "Second Intifada" or "al-Aqsa Intifada"), HAMAS has launched hundreds of terrorist attacks targeting civilians that have killed and injured hundreds of people. These attacks include over 20 mass murders that have killed more than 370 civilians, including numerous American citizens.

**D. <u>Iran's Material Support for HAMAS</u>**

73. Since shortly after HAMAS's founding in 1987, Iran has provided significant material support and resources to it, including military training, weaponry, bases for training and storing weapons and explosives, safe havens, communications equipment, financial support and services, and transportation. *See* U.S. Dep't of State, Country Reports on Terrorism 2015 ("Iran has historically provided weapons, training, and funding to Hamas and other Palestinian terrorist groups . . . . These Palestinian terrorist groups have been behind a number of deaths from attacks originating in Gaza and the West Bank.").

74. Iran provides substantial aid, assistance and encouragement to HAMAS, and provided massive financial and other forms of material support to HAMAS, and has thereby aided and abetted HAMAS, all with the specific intention of causing and facilitating the commission of acts of extrajudicial killing, hostage taking and international terrorism against civilians and soldiers in Israel. Iran does so with actual knowledge that HAMAS had killed and injured numerous U.S. citizens in terrorist bombings and that additional U.S. citizens and other innocent civilians would

be killed and injured as a result of Iran's aiding, abetting and provision of material support and resources to HAMAS.

75. Iran has knowingly and willingly conspired, agreed and acted in concert with HAMAS, pursuant to the common plan, design, agreement and goals set out herein, to cause and facilitate the commission of acts of extrajudicial killing, hostage taking and international terrorism. Iran did so with actual knowledge that HAMAS had killed and injured numerous U.S. citizens in terrorist bombings and that additional U.S. citizens and other innocent civilians would be killed and injured as a result of Iran's conspiracy with HAMAS.

76. This Court has repeatedly held that Iran is liable to victims of state-sponsored terrorism, including for terrorist acts committed by HAMAS. *See*, *e.g.*, *Bennett, et al. v. Islamic Republic of Iran, et al.*, 507 F. Supp. 2d 117 (D.D.C. 2007); *Bodoff, et al. v. Islamic Republic of Iran, et al.*, 424 F. Supp. 2d 74 (D.D.C. 2006); *Campuzano, et al. v. Islamic Republic of Iran, et al.*, 281 F. Supp. 2d 258 (D.D.C. 2003); *Stern, et al. v. Islamic Republic of Iran, et al.*, 271 F. Supp. 2d 286 (D.D.C. 2003); *Weinstein, at al. v. Islamic Republic of Iran, et al.*, 184 F. Supp. 2d 13 (D.D.C. 2002); *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88 (D.D.C. 2017).

77. Iran's financial support to HAMAS has been provided continuously, routinely and in furtherance and as implementation of a specific policy and practice established and maintained by Iran, in order to help HAMAS achieve goals it shared with Iran. These goals included terrorizing the Jewish civilian population in Israel and the Palestinian Territories and weakening Israel's economy, social fabric, and military strength and preparedness. Iran's support for HAMAS has continued to the present.

78. Their relationship experienced some strain due to their opposing positions on the Syrian civil war.[1] However, HAMAS continued to benefit from Iran's significant support. In a November 25, 2014 speech, Iran's Supreme Leader, Ayatollah Khamenei, highlighted Iran's military support to "Palestinian brothers" in Gaza and called for the West Bank (where Givat Assaf is located) to be similarly armed. In December 2014, HAMAS Deputy Leader Moussa Abu Marzouk announced bilateral relations between Iran and HAMAS were "back on track."

79. According to the State Department's Country Reports on Terrorism 2015:

> Although Hamas's ties to Tehran have been strained due to the Syrian civil war, both sides took steps in 2015 to repair relations. Iran continued to declare its vocal support for Palestinian terrorist groups and its hostility to Israel in 2015. Supreme National Security Council Secretary Admiral Ali Shamkhani sought to frame a series of individual Palestinian attacks on Israeli security forces in the West Bank as a new 'Intifada' in a speech on November 25.

80. The 2015 Report further found that "[i]n 2015, … Iran used the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) to implement foreign policy goals, provide cover for intelligence operations, and create instability in the Middle East. The IRGC-QF is Iran's primary mechanism for cultivating and supporting terrorists abroad."

81. In February 2016, senior HAMAS official Osama Hamdan thanked Iran for its support of the Palestinian people.

82. By 2017, any strain in relations between Iran and Hamas had dissipated. The State Department's Country Reports on Terrorism 2017 found that "Iran continued to provide weapons, training, and funding to Hamas . . . ."

83. The report further found that "Iran used the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) to provide support to terrorist organizations, provide cover for associated

---

[1] HAMAS, a Sunni Islamist group, has supported the largely Sunni Islamist rebels, while Iran, the world's center of Shi'a power, has supported the government's Shi'a-linked Alawite leadership.

covert operations, and create instability in the Middle East . . . . and the IRGC-QF is Iran's primary mechanism for cultivating and supporting terrorists abroad."

84. On April 8, 2019, the U.S Department of State announced that effective April 15, 2019, the IRGC, including its Quds Force, will be a designated Foreign Terrorist Organization.

85. The Fact Sheet issued by the U.S. Department of State on April 8, 2019, states that "The IRGC, with the support of the Iranian government, has engaged in terrorist activity since its inception 40 years ago."

86. The Fact Sheet goes on to say: "The IRGC continues to provide financial and other material support, training, technology transfer, advanced conventional weapons, guidance, or direction to a broad range of terrorist organizations, including Hizballah, Palestinian terrorist groups like Hamas and Palestinian Islamic Jihad, Kata'ib Hizballah in Iraq, al-Ashtar Brigades in Bahrain, and other terrorist groups in Syria and around the Gulf."

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### PERSONAL INJURY CAUSED BY IRAN'S MATERIAL SUPPORT FOR ACTS OF EXTRAJUDICIAL KILLING UNDER 28 U.S.C. § 1605A(c), CONSTITUTING INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND SOLATIUM (PLAINTIFFS JOSEPH FELBER, JUDI FELBER, DANIEL FELBER, AND ADINA FELBER)

87. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

88. Iran provided material support to HAMAS, intending that HAMAS would commit violent acts of terrorism in Israel and the Palestinian Territories, such as the attack in which Plaintiff Nathaniel Felber was gravely injured.

89. Further, Iran provided material support to HAMAS, intending that HAMAS would commit violent acts of terrorism that would cause severe emotional distress to the immediate family members of those killed and injured in such attacks.

90. Iran's conduct was outrageous and exceeded the bounds tolerated by decent society, and was performed willfully, maliciously and deliberately to cause Plaintiffs severe mental and emotional pain, distress, anguish, and the loss of enjoyment of life.

91. As detailed above, Yosef Cohen and Yovel Mor Yosef were murdered and Plaintiff Nathaniel Felber was gravely injured when Assem Barghouti, a HAMAS operative, opened fire with an AK-47 at the bus stop where Yosef, Yuval and Nathaniel were standing.

92. Plaintiffs Joseph Felber, Judi Felber, Daniel Felber and Adina Felber suffered the trauma of learning that their son and brother, Nathaniel Felber, was gravely injured in a terrorist attack.

93. As a direct and foreseeable result of the Attack and Iran's provision of material support for HAMAS's terror attacks in Israel and the Palestinian Territories, Plaintiffs Joseph Felber, Judi Felber, Daniel Felber and Adina Felber have each suffered non-pecuniary damages, including solatium, emotional pain and suffering, and mental anguish, in amounts to be proven at trial.

94. Adina Felber also suffered economic damages as a direct and foreseeable result of the Attack and Iran's provision of material support for HAMAS.

95. Further, Defendant's conduct was outrageous in the extreme, wanton, willful and malicious, and constituted a threat to the public at large, warranting an award of punitive damages pursuant to 28 U.S.C. § 1605A(c).

**SECOND CLAIM FOR RELIEF**

**PERSONAL INJURY UNDER 28 U.S.C. § 1605A(c), CONSTITUTING ASSAULT, BATTERY, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (PLAINTIFF NATHANIEL FELBER)**

96. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

97. Plaintiff Nathaniel Felber was shot in the head and remains unconscious, more than 3 months after the attack. He may never fully recover from the attack.

98. As a direct and foreseeable result of the Attack and Iran's provision of material support for HAMAS, Plaintiff Nathaniel Felber suffered non-pecuniary damages, including physical and psychological pain and suffering, and economic damages in amounts to be proven at trial.

99. Further, Defendant's conduct was outrageous in the extreme, wanton, willful and malicious, and constituted a threat to the public at large, warranting an award of punitive damages pursuant to 28 U.S.C. § 1605A(c).

**THIRD CLAIM FOR RELIEF**

**PREJUDGMENT INTEREST (ALL PLAINTIFFS)**

100. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

101. As described above, Iran's support for HAMAS injured Plaintiffs, warranting an award of prejudgment interest from the date of the Attack to the date of entry of judgment.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

(a) Accept jurisdiction over this action;

(b) Enter judgment against Defendant in favor of Plaintiffs for compensatory and punitive damages in amounts to be determined at trial;

(c) Enter judgment against Defendant in favor of Plaintiffs for prejudgment interest in an amount to be determined by the Court;

(d) Enter judgment against Defendant in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action; and

(e) Grant such other and further relief as justice requires.

Dated: April 12, 2019
Hackensack, NJ

**OSEN LLC**

By: /s/ Aaron Schlanger

Aaron Schlanger (DC Bar No. NJ007)
Michael J. Radine (DC Bar No. NJ015)
Cindy Schlanger (*pro hac vice* motion to be filed)
2 University Plaza, Suite 402
Hackensack, NJ 07601
Tel.: (201) 265-6400
Fax: (201) 265-0303

Attorneys for Plaintiffs