UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

-------------------------------------------------------x

NATHANIEL FELBER,  *et al.*          :
                                                    :     **Civil Action No. 19-cv-1027 (AJB)**
                              Plaintiffs,    :
                                                    :
              -against-                          :
                                                    :
ISLAMIC REPUBLIC OF IRAN,      :
                                                    :
                              Defendant.   :

-------------------------------------------------------x


## <u>DECLARATION OF ARIEH DAN SPITZEN</u>

I, Arieh Dan Spitzen, in Jerusalem, Israel, this 23rd day of July 2020, declare

under the laws of perjury of the United States that the following is true and correct:

### A.   <u>Professional Background</u>

1.        In 1970, I joined the Israel Defense Forces ("IDF"), serving in an elite

unit as the Israeli equivalent of a Navy Seal. In 1972, I transferred to the IDF's

Intelligence Unit, where I served until 1974. Then I enrolled at Hebrew University

in Jerusalem, specializing in the Middle East, Arabic, and Jewish History, and

graduating *cum laude* in 1976. I subsequently returned to the IDF, to its Palestinian

Affairs Department ("PAD") in the West Bank.

2.        In 1976, I established the Research Section of the Advisor for Arab

Issues in the Military Government in the West Bank (subsequently known as the

Civil Administration) and served as its Section Head until 1978. With the exception

of the years between 1978 and 1981, when I served as a researcher-assistant dealing

with issues concerning the integration of the Arab population within Israel's society and establishment, I remained in the PAD for the next 30 years.

3.      After returning to the PAD in 1981, I resumed my role as Section Head of the Research Section of the Advisor for Arab Issues in the Military Government in the West Bank until 1993. In that capacity, I dealt with socio-economic and political research regarding the Palestinians, focusing on political and social trends among the population. In that position, I wrote or oversaw the writing of hundreds of research papers, staff papers, articles, anthologies, and fundamental studies in civilian matters that served the decision-making echelons of various elements of the Israeli government including the Ministry of Defense.

4.      Between 1993-1996, I was assigned to the negotiation team for the Oslo Peace Accords and served as a member of teams that negotiated the transfer of civilian authorities from the Civil Administration to the Palestinian Authority. Between 1996-1998, I supervised the activity of civilian coordination in the West Bank vis-à-vis the PA's Ministry of Civil Affairs and other civilian offices. From 1998-2000, I was Department Head for Palestinian Issues in the West Bank at a rank of Colonel. As the senior consultant in the system, I served during the same period as the Coordinator for Arab Issues for the Operation Coordinator.

5.      From 2001-2009, I was Department Head for Palestinian Issues in the Administered Territories as the Coordinator of Government Activities in the Territories ("COGAT"). By virtue of this position, I was a professional instructor and the top authority regarding the socio-economic civilian situation in the Palestinian

arena in the West Bank and Gaza Strip. I wrote hundreds of surveys and studies about the civilian situation, the various political trends and how they were operationalized, the social trends, the economic atmosphere and its influence, and other diverse civilian issues connected to the civilian Palestinian realm, including terrorist organizations such as the Islamic Resistance Movement ("Hamas"). Among other things, I was responsible every year for writing and updating the fundamental survey regarding the civilian infrastructure of Hamas, known as the *da'wa*.

6.     I have been qualified as an expert witness about Hamas in ten federal civil terrorism cases in the United States: *Linde, et al. v. Arab Bank, Plc* (in which I testified exclusively about Hamas for 5 days in a 6-week jury trial in 2014); *Gill v. Arab Bank, Plc*; *Strauss, et al. v. Crédit Lyonnais, S.A.*; and *Weiss, et al. v. National Westminster Bank Plc* – all in the Eastern District of New York; *Fraenkel, et al. v. Islamic Republic of Iran, et al.*; *Braun, et al. v. Islamic Republic of Iran, et al.*; and *Force, et al. v. Islamic Republic of Iran, et al.* – all in the District of Columbia; and *Weinstock, et al. v. Islamic Republic of Iran, et al*; *Weinstock, et al. v. Mousa Mohammed Abu Marzook*; and *Weinstock, et al. v. Hamas* – all in the Southern District of Florida.

**B.     Nature of This Declaration**

7.     I have been asked by Plaintiffs' counsel in the case of *Felber, et al. v. Islamic Republic of Iran* to provide an expert opinion about whether Hamas was responsible for the December 13, 2018 terrorist attack at Givat Asaf (the "Givat Asaf Attack"). This declaration will include, *inter alia*, a description of the Givat Asaf

Attack; a profile of the perpetrator; a summary and analysis of the extensive preparation the perpetrator undertook for the Givat Asaf Attack; the manner in which the Givat Asaf Attack was executed; and my professional opinion as to whether the perpetrator was an operative of a terrorist organization (and if so, which one).

8.    I am being compensated $350 per hour for my work in this case, regardless of the outcome of the litigation. I have no prior or current professional or personal connection with any of the parties in this case precluding my ability to provide impartial evidence herein.

## C.    Methodology

9.    This declaration is based on my education, training, and experience. The methodology that I have used in this declaration includes collecting information from many sources, primary and secondary, and cross-referencing them. I prefer, whenever possible, to rely on primary sources – particularly police and court records – but acknowledge that they do not always provide a complete picture of events and must be assessed critically. I also cross-check police and judicial sources against the statements and claims of responsibility issued by Palestinian terrorist organizations and their spokesmen as well as statements made by alleged perpetrators, co-conspirators, and close relatives of both. Often, those statements provide additional context or background information not found in official court records. When assessing these statements, I consider the motivations the organization or witness may have to conceal facts or emphasize certain facts or de-emphasize others. When assessing secondary sources, I adopt a similarly critical perspective that considers the motives

and biases of the authors of the documents and their worldviews. My methodology is similar to that of many experts in the field, although my emphasis on the use of primary sources might be greater than that of other experts in the United States and Europe, due to my professional background and my knowledge of Arabic.

### D.   Evidence Considered

10.     In arriving at my professional assessment of the Givat Asaf Attack, I reviewed the following materials:

- The indictment of Asem Ummar Saleh al-Barghuthi dated March 11, 2019, Court file number 3112/19 (attached as <u>Annex 1</u> to this Declaration and referenced herein as "Annex 1");
- The verdict and sentencing of Asem Ummar Saleh al-Barghuthi dated June 24, 2020 (attached as <u>Annex 2</u> to this Declaration and referenced herein as "Annex 2");
- An appeal to the Israeli Supreme Court against the decision to demolish al-Barghuthi's house (Court file number 2356/19);
- The Court file including the March 15, 2006 verdict for Asem Ummar Saleh al-Barghuthi, Court file number 3549/05 (attached as <u>Annex 3</u> to this Declaration and referenced herein as "Annex 3");
- The Court file including the indictment and verdict for Asem Ummar Saleh al-Barghuthi (Court file number 2456/07 and 2458/07);
- The Court file including the verdict for Anas Mashal (Court file number 2457/07);
- The indictment of Jaber Mamduh Jaber Abdu (Court file number 1018/10);
- The Court decision in the case of Jaber Mamduh Jaber Abdu dated December 29, 2014 (Court file number 2160/14);
- The indictment of Jaber Mamduh Jaber Abdu dated February 20, 2019 (Court file number 1305/19);
- The verdict and sentencing of Musa Majdi Issa Khatib dated December 17, 2019, Court file number 3087/19 (attached as <u>Annex 4</u> to this Declaration and referenced herein as "Annex 4");
- The Court file of Musa Majdi Issa Khatib (Court file number 2507/14);

- The sentencing of Asef Ummar Saleh al-Barghuthi dated June 30, 2004, Court file number 1233/04 (attached as <u>Annex 5</u> to this Declaration and referenced herein as "Annex 5");
- The Court file including the verdict and sentencing of Khaled Kamel Rashid Nuibat, Court file number 1785/19 (attached as <u>Annex 6</u> to this Declaration and referenced herein as "Annex 6");
- The verdict and sentencing of Mahdi Abd al-Mu'min Ahmad Abu Rahma dated January 21, 2020, Court file number 2127/19 (attached as <u>Annex 7</u> to this Declaration and referenced herein as "Annex 7");
- A report by the Israel Security Agency;[1]
- A report by the Meir Amit Intelligence and Terrorism Information Center;[2]
- A report from the Israeli Ministry of Foreign Affairs;[3]
- Official websites, among them, the IDF Spokesman website and the Foreign Office website;[4] and
- Statements made on Hamas[5] and Izz al-Din al-Qassam Brigades ("Qassam Brigades")[6] official websites and forums.

## E.  <u>Summary of Conclusions</u>

11.    For the reasons set forth in this declaration, I conclude that Hamas was responsible for the Givat Asaf Attack and that it was perpetrated by a Hamas cell

---

[1]    https://www.shabak.gov.il/publications/Pages/איתור-המפגע-אשר-ביצע-את-פיגועי-הירי-בעפרה-ובגבעת-אסף.aspx.

[2]    https://www.terrorism-info.org.il/app/uploads/2018/12/H_307_18.pdf.

[3]    https://mfa.gov.il/MFA/ForeignPolicy/Terrorism/Pages/ISA-arrests-terrorist-who-carried-out-recent-shooting-attacks-8-January-2018.aspx.

[4]    *See* https://www.jdn.co.il/breakingnews/1082920/; https://mfa.gov.il/MFA/ForeignPolicy/Terrorism/Pages/ISA-arrests-terrorist-who-carried-out-recent-shooting-attacks-8-January-2018.aspx.

[5]    *See*   https://www.palinfo.com/news/2018/12/13/هنية-فتحنا-صفحة-جديدة-مع-الاحتلال-بالدم-; https://hamas.ps/ar/prisoner/882/خالد-كامل-رشيد-نوابيت; والنار.

[6]    *See*   https://www.alqassam.ps/arabic/news/details/15671   and   https://www.alqassam.ps/arabic/5399/كتائب-القسام-تزف-المجاهدين-صالح-القسام-بلاغات-بيانات-.

founded and commanded by Asem Ummar Saleh al-Barghuthi, an operative of Hamas's Qassam Brigades.

F.    **The Wider Context of the Attack**

1.    **Brief Background on Hamas**

12.    Hamas was founded in the Gaza Strip in December 1987, near the time when the violent events known as the First Intifada (1987-1993) broke out. The founders of Hamas were Sheikh Ahmed Yassin, who headed the Muslim Brotherhood in the Gaza Strip, and six other members of that organization.[7]

13.    The name "Hamas" is an Arabic acronym for "Islamic Resistance Movement" (*Ḥarakat al-Muqāwamah al-Islāmiyah*). As a word, "Hamas" in Arabic means zeal (as in battle) or heroism. Hamas established the Qassam Brigades at the beginning of the 1990s, initially in the Gaza Strip during the second half of 1991 and later in the West Bank in mid-1992. Since then, the Qassam Brigades has been responsible for committing numerous terror attacks that have injured and killed thousands of civilians in Israel, including United States citizens.

14.    Today Hamas is the largest and most significant Islamist organization on the Palestinian scene. Since its inception, the organization has seen itself as a direct competitor to the Palestine Liberation Organization ("PLO") and the

---

[7]    The Muslim Brotherhood is a fundamentalist Islamist organization that was founded in Egypt in 1928 by Hassan al-Banna. The organization hoped to reconstitute Muslim society in the spirit of ancient Islam and eventually to establish a large Islamic state that would expand Muslim rule into the rest of the world through jihad (holy war). The Muslim Brotherhood's extremist Islamic ideology, along with its physical, civil, and religious infrastructure, served as the basis for the founding of Hamas.

Palestinian Authority ("PA"), which the PLO established as part of the Oslo Peace Accords in the early 1990s.

15.     Even before the Oslo Peace Accords, Hamas made great (and largely successful) efforts to take over the student councils at universities throughout the West Bank and Gaza by developing its student organization, the "Islamic Bloc" (*Al-Kutla al-Islamiya*). *Al-Kutla* was instrumental in recruiting many Palestinian students to join Hamas and its Qassam Brigades. Hamas also prioritized taking over trade unions, commercial organizations, and the bureaucracies that control Palestinian communications institutions (such as the Palestinian Journalists' Syndicate). Later, after consolidating its control over those targets, Hamas increased its efforts and gradually began to take over many municipalities in the West Bank and the Gaza Strip.

16.     The Second Intifada ("al-Quds" or "al-Aqsa Intifada"), which broke out in September 2000, was an additional turning point in Hamas's history.

17.     The Second Intifada denotes an approximately four-year period marked by an intensive terror campaign spearheaded by Hamas (but joined by several other terrorist organizations) that involved hundreds of suicide bombings, car bombings and shooting attacks, principally targeting Israeli buses, cafes and other places where civilians gather in significant numbers.

18.     From that time, support by the Palestinian public for Hamas grew steadily (indicators of the growth in Hamas's power can be found in its successes in the elections in the universities, in the elections for the trade unions, and later in

municipal elections in 2005 and Legislative Council elections in 2006).

19.     With the end of the Second Intifada, toward 2005 Hamas became a large popular movement, both in the Gaza Strip and in the West Bank and was perceived by the Palestinians as free of corruption and attentive to the needs of the public. Following a series of successes in the elections for the trade unions and student unions in the West Bank and Gaza Strip ("Palestinian Territories"), Hamas was especially successful in the 2005 elections for the local municipalities, in which it took control of the principal municipal councils.

20.     In 2006, Hamas won the general PA elections, attaining a parliamentary majority, and in 2007 it seized power in Gaza after a violent coup. Its takeover of Gaza resulted in the expulsion of the PA from the region in May-June 2007. Subsequently, Hamas maintained absolute political and military control of the Gaza Strip.

### 2.     Hamas's Policy and Manner of Claiming Responsibility for Its Terrorist Attacks Over the Years

21.     Hamas considers terrorism – or "armed resistance" as it characterizes it – a central way of attracting political and financial support from the Palestinian public and larger Islamic world. During the Second Intifada (2000-2004), when competition among Palestinian terrorist organizations for committing terrorist attacks intensified, Hamas took tactical and operational considerations into account in determining whether (and when) to officially claim responsibility for terrorist attacks it committed. That said, Hamas did generally claim responsibility for attacks

that it committed, albeit occasionally belatedly.[8] Hamas's takeover of the Gaza Strip in 2007, thereby becoming an entity responsible for governing a population and managing a civilian infrastructure, and overseeing territory, led Hamas to exercise more caution in officially claiming responsibility for terrorist attacks that it perpetrated for fear of a harsh reprisal against the Gazan population it ruled.

22.     At a press conference in the Gaza Strip on December 25, 2010, Hamas provided a glimpse into the operational principles that have guided the terrorist organization's policy in determining the appropriate timing for announcing claims of responsibility for terror attacks, including in the Second Intifada. Abu Ubaida, the Qassam Brigades' official spokesman, addressed the media at that press conference to claim responsibility for a terrorist attack Hamas committed at the Merkaz HaRav Yeshiva in Jerusalem two years earlier.

23.     Explaining Hamas's delay in acknowledging its role in the attack, Abu Ubaida explained that Hamas policy necessitated postponing claims of responsibility when (1) conditions required protecting the security of its operatives and operations;

---

[8]     Examples of belated Hamas claims of responsibility for attacks it committed included the following: On March 8, 2004, the Qassam Brigades claimed responsibility for an attack at Mike's Place, a pub in Tel Aviv frequented by Americans, which was committed a year before on April 30, 2003. The attack killed three people. The Qassam Brigades' announcement said that it was being published late in order not to harm the security of the "fighters" *(mujahideen* in the original) and for reasons involving "security secrets." https://web.archive.org/web/20100601110109/alqassam.ps/arabic/statments.php?id=432; on June 7, 2008, the Qassam Brigades claimed responsibility for a series of attacks including, among others, the suicide attack at the Sheffield Club in Rishon Lezion which occurred on May 7, 2002. The attack killed 15 people. https://web.archive.org/web/20110211150612/alqassam.ps/arabic/statments.php?id=3921.

(2) withholding the announcement could protect jailed operatives who have not yet been sentenced by Israeli courts;[9] and (3) other unspecified reasons involving the continuing campaign of jihad (holy war) dictated. Abu Ubaida further announced that, in the future, the Qassam Brigades would continue to refrain from announcing information about their attacks before the organization deemed the time ripe, and on occasion that might mean delaying such announcements for months or years.

24.    In order to understand the care and caution that Hamas exercises in claiming responsibility for attacks, it is important to take into account that in the West Bank and Gaza Strip the Palestinian society lives and functions in a very intimate social framework where neighbors know one another, and extended families (or hamulah) live together. In many villages and even urban neighborhoods, there is very little anonymity and the political affiliations of various individuals are generally well-known to their communities. Thus, when a Palestinian is killed in the course of committing a terrorist attack or is arrested by Israeli security services for terrorist activity, once the terrorist's identity becomes known, his or her organizational affiliation is often ascertainable because the terrorist is identified by his or her own community as sympathetic to one organization or another.

---

[9]    For example, cell members that mounted an attack on June 20, 2008, in Wadi Zarka, confessed they had been recruited by Hamas and were operating under its aegis. Hamas has not publicly claimed responsibility for the attack, apparently because one of the cell members is a Palestinian security officer still jailed in Jericho as of this writing and has not been held to account for his deeds. The name of this operative appears on Hamas and Qassam Brigades websites as an operative of Hamas confined in a Palestinian prison.

25.     This social reality incentivizes the larger Palestinian terror organizations to be fairly rigorous in their public, official claims about terrorist attacks. This is particularly true of Hamas because credibility with its domestic audience is a key aspect of its "brand."

26.     As Hamas's power and political influence increased, its organizational structure and technology rapidly changed. For example, in the 1990s, after Hamas perpetrated terrorist attacks, it often issued written announcements claiming responsibility for them that it disseminated throughout the Palestinian Territories. Hamas also placed telephone calls to the Israeli and international media taking responsibility for these terrorist attacks and made announcements over the public address systems of mosques in Palestinian towns and villages, sometimes accompanied by the singing of religious hymns and the reading of verses from the Quran.

27.     Since the early 2000s, the internet began to play an increasingly important role in Hamas's public relations efforts and its claims of responsibility. Hamas's political bureau and its Qassam Brigades have long maintained their own separate official websites. Hamas commonly used these websites to issue official claims of responsibility for terrorist attacks that it perpetrated and cast them in a heroic light and to provide biographies glorifying the operatives who perpetrated them.

28.     These websites frequently contained reprints of suicide bombers' wills (explaining their motivation, religious and nationalist creed, and loyalty to Hamas)

12

and photographs of the perpetrators, including ones taken immediately before he/she was dispatched (often taken against a background bearing a Hamas flag or emblem). As the internet's capabilities grew, Hamas also began posting videos of suicide bombers taken before they were dispatched. Often, in these videos the [future] suicide bomber read a prepared speech or will announcing the operative's intention to become a "martyr" and perpetrate the attack. In later years, both before and after Hamas gained control of the Gaza Strip in 2007, it also operated television and radio stations, which broadened its ability to disseminate its message.

29.     However, some indicators of whether Hamas was responsible for a given terrorist attack remain constant regardless of evolving technologies. For example, funeral ceremonies for Hamas operatives are often ritualized with the body of the "martyr" carried by the mourners while wrapped in a Hamas flag. And Hamas funerals are usually marked by decoration of the mourners' coffin and tent with Hamas flags, and visits by Hamas leaders, particularly in Gaza. Another indicator of whether Hamas was responsible for a given terrorist attack that has not changed over time is where the arrested perpetrators of an attack are housed, because inmates in Israeli security prisons affiliated with different terrorist organizations are housed separately.

30.     Because Hamas generally publicized its role in terrorist attacks for political reasons and because, in many cases, at least one of the perpetrators of the attack was killed at the scene and could be clearly identified, it was also possible to compare those claims to the results of the investigations performed by the Israel

Security Agency and the Israel Police as well as judicial determinations regarding the criminal liability of various alleged operatives. Therefore, in many cases, the overwhelming evidence available made it relatively clear which terrorist organization was responsible for a particular attack.

## G.    The Attack: Preparation, Execution and Attribution

31.    The Givat Asaf Attack was the second of two terrorist attacks in December 2018 carried out by a Qassam Brigades cell commanded by Asem al-Barghuthi, a longtime Hamas operative who was previously convicted of terrorist activities several times and served long prison terms in Israeli jails.

32.    Among other things, Asem al-Barghuthi was previously convicted of being a member in the Hamas student's bloc, *Al-Kutla al-Islamiya*, and of planning to kidnap Jews to exchange for the release of Palestinian prisoners.[10]

33.    The first attack took place near the Ofra Junction (the "Ofra Attack") on December 9, 2018. That attack resulted in the murder of a baby and injuries to several other civilians.[11]

34.    Asem al-Barghuthi, the cell commander, was the gunman and shooter; his brother, Saleh al-Barghuthi, drove the car from which the shooting was carried out.[12]

---

[10]    *See* Annex 3, a verdict from March 15, 2006.

[11]    *See* Annex 2, verdict and sentencing of Asem Ummar Saleh al-Barghuthi, at ¶¶6-12.

[12]    For details of the cell's activities immediately following the attack, *see* Annex 2 at ¶¶13-14.

35.     On December 12, 2018, three days after the Ofra Attack, Saleh al-Barghuthi was killed in a clash with the IDF.

36.     According to Asem al-Barghuthi's March 11, 2019 indictment,[13] the same day that it became evident to him that Saleh, his brother and fellow partner in the Qassam Brigades cell, had been killed during a clash with the IDF, he decided to carry out another shooting attack.[14]

37.     On the same day, December 12, 2018, Asem al-Barghuthi fled to the house of his relative, Hasan Mansur, in the village of Bil'in.[15]

38.     According to Asem al-Barghuthi's subsequent indictment, his decision to carry out the Givat Asaf Attack was motivated, among other things, by his desire to avenge the death of his brother.

39.     Hamas issued an official claim of responsibility for the December 9, 2018, Ofra Attack on the Qassam Brigades website on December 13, 2018.[16]

---

[13]     *See* Annex 1, Asem al-Barghuthi's 2019 indictment, fifteenth count, article 4.

[14]     Throughout the years, Hamas operatives have carried out terrorist attacks to commemorate the period between December 9 and 14, when the organization was originally founded in 1987. Therefore, there is a significant possibility that the Givat Asaf Attack was planned independently of the fact that Asem's brother, Saleh al-Barghuthi, had been killed the day before.

[15]     A village located west of the city of Ramallah.

[16]     *See* https://www.alqassam.ps/arabic/-المجاهدين-تزف-القسام-كتائب/5399/القسام-بلاغات-بيانات-صالح.

40.     Asem al-Barghuthi committed the Givat Asaf Attack on the same day Hamas issued the official claim of responsibility for the December 9, 2018, Ofra Attack.[17]

41.     As with the Ofra Attack that was carried out under his command, Asem al-Barghuthi's approach to the Givat Asaf Attack was highly professional despite the fact that he and his cell were operating under time and operational constraints as a result of the IDF manhunt precipitated by the Ofra Attack.

42.     The preparations included: reconnaissance of the potential target, preparing and reloading of the weapons (Kalashnikov assault rifle and a pistol) that were used in the Ofra Attack, and the purchase of a vehicle used in the attack – all steps indicative of an established and organized terrorist cell.[18]

43.     On the morning of December 13, Asem al-Barghuthi left the village he was hiding in and drove on Route 60[19] to locate a suitable target to carry out his

---

[17]     The Hamas organization emphasized in its announcement that the person who carried out the attack was Asem's brother, Saleh al-Barghuthi, although this was not consistent with the facts. Hamas presumably did so, because Saleh was killed during a clash with the IDF and identifying him as the organization's operative would not have harmed him anymore. On the other hand, Asem, who was also the active shooter in the Ofra Attack, remained alive, escaped, and was later arrested and brought to justice. According to the Hamas organization's policy of not risking its own operatives, Hamas, therefore, avoided claiming specific responsibility for the Givat Asaf Attack that was carried out by Asem, but rather implied that Asem was the organization's operative while reporting about his arrest. In an official publication of the organization, he was titled *al-Muqawim* (**the Resistor**), which means a member of the Islamic **Resistance** Movement (Hamas). https://hamas.ps/ar/post/10067/-تصريح-صحفي-تعقيبا-على-اعتقال-عاصم-البرغوثي.

[18]     *See* Annex 2 at ¶17.

[19]     Route 60 is a road that crosses Israel from north to south. It begins in Nazareth

attack. When he noticed a group of soldiers and civilians standing at a hitchhiking stop at the Givat Asaf junction,[20] he made a U-turn and drove back, got out of the car and opened fire from short range towards the people who stood in the junction. As a result of the shooting, two other IDF soldiers were killed and Nathaniel Felber, who is one of the Plaintiffs in this case, was seriously injured. Another civilian in the hitchhiking stop was also injured. The terrorist took the personal weapon of one of the soldiers, an M-16 rifle, and fled in his car from the scene.

44.    From the descriptions of eyewitnesses that were published in the media, it becomes evident that Asem al-Barghuthi carried out the attack with determination and composure while he exploited the fact that some of the soldiers were at the time having their lunch break near a kiosk that is located permanently in the hitchhiking stop.[21] The skill Asem al-Barghuthi exhibited in using and shooting his weapon (a skill he acquired at a young age – *see* later in this declaration) was realized both in the execution of the attack (the deliberate and continuous shooting towards the people that were in the hitchhiking stop) and afterwards, in both taking the weapon from one of the soldiers and in exfiltrating the scene.

---

in the north and ends in Beer-Sheba in the south. The road passes through the mountain ridge (the watershed line). A main part of the road passes through the West Bank. The road is a main arterial road.

[20]    The Givat Asaf junction is located on Route 60, two kilometers south of the settlement of Ofra. The settlement of Givat Asaf is located near the junction. There is a hitchhiking stop there which is usually protected by soldiers.

[21]    *See* the description of the attack, including an eyewitness's description: https://www.ynet.co.il/articles/0,7340,L-5424946,00.html. *See also* a short version in English: https://www.ynetnews.com/articles/0,7340,L-5425209,00.html.

45. During his escape from the scene of the attack, Asem al-Barghuthi's getaway car became stuck, and he abandoned it and continued his escape by foot, leaving behind the M-16 rifle he stole during the attack.[22] This decision to leave the weapon behind was made to make his escape by foot easier and reflects his composure and skill. Asem al-Barghuthi was arrested by Israel security forces only on January 8, 2019 (almost a month after the execution of the attack, while he used the period he was hiding and escaping to recruit terrorists and collaborators to the Hamas cell he commanded, and to plan additional attacks).

## H.   The Connection to Hamas

46. Hereinafter, I examine Hamas's connection to the Givat Asaf Attack and to the cell that carried it out, including the organization's statements about the attack and the organizational identification of the cell that carried it out; the attitude of senior Hamas leaders and the organization's media organs to the attack and its perpetrators; the prior organizational affiliation of the cell members who carried out the attack; the upbringing of the perpetrators within Hamas familial networks; and the cell's modus operandi.

### 1.   Hamas's Claim of Responsibility for the Attack and Identification of the Cell that Carried it Out

47. The Hamas organization and its terrorist operational arm, the Qassam Brigades, quickly claimed responsibility for the Ofra Attack and announced that the

---

[22]    *See* Annex 2 at ¶20.

operative who was killed in the attack belonged to its organization.[23] The formal claim of responsibility for this attack was published on the Qassam Brigades website on December 13, 2018 – the day after Saleh al-Barghuthi's death. The Hamas organization in Gaza even hurried to open a mourning tent in the memory of Saleh al-Barghuthi (and in the memory of the Barkan attack terrorist, Ashraf Na'alawa – *see* n.23). By doing so, the organization expressed publicly, once again, its responsibility for the Ofra Attack and for the cell that carried it out and its organizational affiliation.[24]

48.　　Ismail Haniyeh, the Hamas leader, and the chairman of the organization's political bureau, honored, with his presence, the mourning tent that was put up by his organization in the memory of Saleh al-Barghuthi. In this occasion,

---

[23]　　The organization wrote in its announcement under the title: "A military announcement issued by the Izz al-Din al-Qassam Brigades" that: "The al-Qassam Brigades are escorting to their wedding **its Jihadi warriors**, Saleh al-Barghuthi and Ashraf Na'alawa, the heroes of the Barkan and Ofra attacks" (the attack at the Barkan industrial area was carried out by a Hamas terrorist, Ashraf Na'alawa, on October 7, 2018, in the Barkan industrial area in Samaria. The attack claimed the lives of two people. Na'alawa was killed during a clash with the IDF on December 13, a few hours after the killing of Saleh al-Barghuthi). Later in this announcement, the organization boasted about these two attacks and promised that they signaled the beginning of a wave of attacks: "our resistance will remain in all of the homeland and we possess many other things that can harm the enemy. The enemy must not dream of security, tranquility, and stability in the heroine West Bank. The ashes of the West Bank will burn the occupier and the heroes will hurt the occupier in a way he cannot predict. All the attempts to break the resistance and its weapons in the West Bank will end in failure. Bravo to the sons of our people who sacrifice their sons in the path of God and Bravo to the distinguished who protect the people of the resistance and provide them with shelter and everything they need." *See* https://www.alqassam.ps/arabic/صالح-المجاهدين-ف-تزّ-القسام-كتائب/5399/القسام-بلاغات-بيانات.

[24]　　*See*　　https://www.palinfo.com/news/2018/12/13/-تنفث-الهادئة-الضفة-اساف-جفعات-عملية حمها.

he stressed his organization's adherence to the continuation of the military struggle against Israel.[25] Hamas kept on boasting and praising the attack that the cell carried out in Ofra. On the first anniversary of the attack (December 13, 2019), the Qassam Brigades' website published a video clip that emphasized once again the responsibility of the Hamas cell for this attack. Although Hamas's depiction in the video of the alleged pivotal role of Saleh al-Barghuthi was inaccurate the important point is that it describes Asem al-Barghuthi (likely in error rather than by design) as a *Qassami*, which means: an operative of the Qassam Brigades.[26]

49.     Therefore, Hamas claimed responsibility for the Ofra Attack, officially and publicly, while both the organization and its leader, Haniyeh, stressed their satisfaction with the attack and its results; Haniyeh even promised to continue with the execution of other attacks.

50.     Hamas also publicly described Saleh al-Barghuthi, who was killed a few days after the attack, as a *Qassami* martyr (which means a Qassam Brigades operative who was killed while carrying out activities in the framework of the organization). In its announcements, Hamas emphasized Saleh al-Barghuthi's (allegedly) pivotal role in the Ofra Attack, while only insinuating that the Givat Asaf Attack was also committed by Hamas, consistent with the organization's policy of

---

[25]     *See*   https://www.palinfo.com/news/2018/12/13/-هنية-فتحنا-صفحة-جديدة-مع-الاحتلال-بالدم والنار.

[26]     *See* https://www.alqassam.ps/arabic/news/details/15671.

giving precedence to the security of its operatives over the public relations or propaganda value of taking credit for particular attacks.[27]

51.     Unlike his brother, Asem al-Barghuthi was apprehended by the Israeli security forces. Publicly acknowledging him as a Hamas operative could have jeopardized his efforts to escape the Israeli security forces' search for him (he remained in hiding until January 8, 2019 – a long time after Hamas's announced claims of responsibility for the Ofra Attack were published) and hindered his defense during his trial.

52.     By attributing the Ofra Attack to the deceased Saleh al-Barghuthi, the organization tried to achieve several advantages: (1) after a relatively long period of limited and failed terrorist activity outside of the Gaza Strip, the Ofra Attack served as a declaration that Hamas remained active in the West Bank; (2) emphasizing the allegedly critical role of an operative who was already deceased might divert attention from the real commander of the cell who remained at large and continued to carry out and plan additional attacks; and (3) it provided an opportunity to honor the "martyred" operative and his well-known family of high ranking Hamas operatives.

53.     Hamas' reference to the Givat Asaf Attack was initially characterized, as stated above, with certain vagueness. The organization avoided publishing an

---

[27]     For this issue, *see* a press conference held by the Qassam Brigades spokesman known as Abu Ubaida, where he claimed responsibility on behalf of the Qassam Brigades for several attacks that the organization carried out several years before. *See*    https://www.alqassam.ps/arabic/23-خلال-القسام-مسيرة-حول-صحفي-مؤتمر/417/الفيديو-عاما; *see also* https://www.alqassam.ps/arabic/المؤتمر-الصحفي-لكتائب-القسام/4336/القسام-بلاغات-بيانات حول-حصاد-23-عاما-من-مسيرتها-الجهادية.

official announcement about its responsibility for the attack (unlike the Ofra Attack).

54.     But at the same time, Hamas used language that pointed to its responsibility for this attack. Key Hamas websites described the Givat Asaf Attack as an attack that was carried out by the "Resistance" or expressed the "Resistance."[28] The use of the words "the Resistance" is an indirect way by which Hamas informs its target audience that the organization is the one responsible for the attack (Hamas is "The Islamic **Resistance** Movement.") Although the word "resistance" has other meanings, its use in the context of an attack by a Hamas operative is intended to have a very specific meaning.

55.     On the day that the perpetrator of the Givat Asaf Attack, Asem al-Barghuthi, was arrested, the official Hamas website published an announcement on behalf of the Hamas organization. The announcement described the arrest as a prosecution of "the resistance" and described the Givat Asaf Attack as a bold operation carried out by "the Resistance" that hurts "the occupation."[29]

---

[28]     *See* for example a report about the Givat Asaf Attack on the PALINFO website (the website is an official Hamas website and the report attributes the attack to "the Resistance"):   https://www.palinfo.com/news/2018/12/13/-عملية-جفعات-اساف-الضفة-الهادئة-تنفث-حممها. This is how the website opens its report: "All the bets about tranquility in the West Bank and its resistance (*Wa-Muqawamatiha*) were silenced and the fire of the resistance (*al-Muqawama*) is bursting from under the ashes and signaling a new and painful stage for the Zionist entity… and within less than two weeks, the resistance warriors succeeded in carrying out a series of special and painful attacks…" The same version also appears on the PLDF forum, which is identified with Hamas. *See* http://15years.paldf.net/news/2018/12/14/عملية-جفعات-اساف-الضفة-الهادئة-تنفث-حممها.

[29]     *See* https://hamas.ps/ar/post/10067 "as long as there is occupation on our lands, our resistance will continue with force, determination and with operations that shatter the arrogance (of the occupation), like the operation in Givat Asaf, that surprised him only recently, and with the bold operations of the resistors."

56.     This implied reference indicating Hamas responsibility for both attacks was also used in a speech given on December 16, 2018, by Hamas's leader, Ismail Haniyeh, which commemorated 31 years of the establishment of the organization.[30] In this speech he said: "from here, I wish [to notify] to the Zionists who say that what happens in the [West] Bank is being directed and organized in Gaza, that this is an allegation that we don't deny and that we shall not stop taking pride in – because this is a pride that rests upon all of us, in the [West] Bank and in Gaza."[31]

57.     Hamas's "strategic vagueness" largely ended on the day Asem al-Barghuthi was sentenced to life in prison when the organization published an official announcement on one of its official websites, where it openly described al-Barghuthi as a "Qassami prisoner" (i.e. a prisoner belonging to the Qassam Brigades).[32] The Qassam Brigades' website also published an announcement about Asem al-Barghuthi's verdict, referring to him as "the Qassami prisoner."[33] Hamas's recognition of Asem al-Barghuthi and the al-Barghuthi family as the organization's senior operatives was further manifested by an extremely remarkable gesture – a phone call from the organization's leader, Ismail Haniyeh, to Asem al-Barghuthi's

---

[30]     Hamas officially celebrates its founding as December 14, 1987. As mentioned above, around this date, Hamas cells make special efforts to carry out attacks.

[31]     *See* https://www.palinfo.com/news/2018/12/16/-نص-كلمة-رئيس-المكتب-السياسي-لحماس-اسماعيل-هنية-بمهرجان-الحركة-ال-31.

[32]     *See* https://hamas.ps/ar/post/12174/-تصريح-صحفي-تعقيبا-على-قرار-سجن-الأسير-عاصم-البرغوثي-4-مؤبدات.

[33]     *See* https://www.alqassam.ps/arabic/-تقارير-القسام/16141/والدة-الأسير-البرغوثي-يحكمهم-حبر-على-ورق-وتفتنا-بالمقاومة.

mother immediately after his verdict was published. In the course of the conversation, Haniyeh expressed his and Hamas's appreciation to Asem al-Barghuthi and to the "holy warrior (*al-Mujahida*) al-Barghuthi family that made sacrifices in the battle to defend the Palestinian land and the Palestinian homeland." During the phone call, Haniyeh also described the verdict as "a medal of honor that lies on the whole Palestinian people's chest…"[34]

2.  **The Hamas Cell – Modus Operandi**

58.  The Hamas cell whose founder and commander, Asem al-Barghuthi, carried out the Givat Asaf Attack, excelled since its inception, in a number of characteristics that were realized in the two attacks that the cell succeeded in carrying out: the Ofra Attack on December 9, 2018; and the Givat Asaf Attack on December 13, 2018. The cell's characteristics and modus operandi in both attacks testify to planned, determined, and organized behavior that is typical of the conduct of an established cell that belongs to a terrorist organization, not a rogue actor or lone wolf.

59.  These include the fact that Asem al-Barghuthi, the founder and commander of the Hamas cell, planned, over the course of several years, to carry out attacks. The determination and the long-term planning that characterize the Ofra Attack and the Givat Asaf Attack were realized also in his conduct.

60.  In 2007, Asem al-Barghuthi had buried the weapons he later used in both of the attacks that the cell carried out, the Ofra Attack and the Givat Asaf

---

[34]  *See* https://hamas.ps/ar/post/12179/هنية-يهاتف-والدة-الأسير-عاصم-البرغوثي.

Attack, in a hideout, before he was jailed by Israel for the second time.[35] Specifically, Asem al-Barghuthi buried in the ground a pistol and a Kalashnikov rifle and covered them with cement. Al-Barghuthi had these weapons with him since he established the cell and he used them (particularly the Kalashnikov rifle) to shoot the victims in the Ofra Attack and Givat Asaf Attack.[36]

61.     The long-term planning and the will to obtain weapons to carry out attacks for Hamas were manifested in quotations that were taken from Asem al-Barghuthi's interrogation following his arrest in January 2019. The quotations were published on the internet,[37] and al-Barghuthi is quoted as saying the following: "… I want to say everything. When I was in prison, I contacted a prisoner, by the name of

---

[35]     In 2005, Asem al-Barghuthi was arrested for the first time and convicted of being a member of Hamas's Islamic Bloc. *See* Annex 3. In that case, he was convicted in a plea bargain, based on his confession, of three charges. He was sentenced to 19 months in prison since the day of his arrest (June 21, 2005) and to an additional 20 months of suspended arrest. Asem al-Barghuthi was arrested for the second time in February 2007 (a short time after his release from prison), for being a member in a terrorist cell whose operatives planned and tried to kidnap Jews for the purpose of their exchange with Palestinian prisoners in Israeli jails. About this arrest, *see* an indictment against Asem al-Barghuthi from March 22, 2007, Court file number 2456/07; a verdict in Court case number 2456/07, and also the dismissal of al-Barghuthi's appeal against his conviction in appeal case number 2645/10. In that case, Asem al-Barghuthi was sentenced to 11 years and two months in prison.

[36]     *See* Annex 2 at ¶¶3-4.

[37]     The source is a report that was published on the internet about Asem al-Barghuthi's interrogations and was based upon a news report in Israeli TV, Channel 13, which publicized the methods and subjects of the interrogation. *See* https://paltimesps.ps/post/219596/تفاصيل-عملية-عاصم-البرغوثي-في-عوفرة-و-جفعات-أساف. I do not consider the source reliable and do not rely upon it in reaching my conclusions herein. However, because the statement is generally consistent with other evidence which I have cross-referenced, I have included it here.

Abdallah Arar,[38] who was released in the Shalit Prisoner Exchange[39] and deported to the Gaza Strip. He told me that if I am interested in carrying out attacks against Israel, he will direct me to a place in which I can obtain weapons…"

62.     As mentioned above, this kind of behavior testifies to a determination to carry out an attack and devotion to that cause, together with long-term planning which includes the accumulation of weapons – sometimes years before the actual attack.

63.     Because the Ofra Attack resulted in Israeli security forces actively investigating and searching for members of the cell that perpetrated it, and Saleh al-Barghuthi was traced and killed by the IDF, Asem al-Barghuthi had to accelerate the preparations for the execution of the Givat Asaf Attack. As a result, although his training for and execution of the Givat Asaf Attack was highly professional, it was also somewhat improvised.

64.     The differences in the preparation for the two attacks reflected this reality.

65.     The preparations before the Ofra Attack were conducted for a relatively

---

[38]     Abdallah Arar is a Hamas operative (Qassam Brigades) that was released in the "Shalit Prisoner Exchange" (*see* n.39) and deported to the Gaza Strip together with Asem al-Barghuthi's uncle – Jaser al-Barghuthi (*see* below about him). Arar was responsible for the murder of Sason Nuriel in September 2005. From his new residence in Gaza, Arar operated Hamas cells in the West Bank. *See* for example https://www.ynet.co.il/articles/0,7340,L-5064737,00.html.

[39]     A prisoner exchange involving a captured Israeli soldier (Gilad Shalit), who was released in return for over 1,000 Palestinian prisoners (the "Shalit Prisoner Exchange").

long time. Among other things, this included: the purchase of a vehicle for the attack by a collaborator that would "distance" Asem al-Barghuthi from the purchase; additional preliminary arrangements that would cover up the connection between him and the car used to carry out the attack while maintaining a cautious and sophisticated manner of conduct (typical of Hamas's established terrorist cells);[40] and an attempt to recruit another member to the cell who would drive the car during the attack (Asem al-Barghuthi tried to recruit at that time a Hamas operative, Musa al-Khatib – about him, *see* below – and when this attempt failed, he recruited his brother Saleh).

66.     On the other hand, in preparing for the Givat Asaf Attack, Asem al-Barghuthi decided to act on his own and to take care of purchasing a vehicle (it is not clear how he purchased the car) and to accelerate the tempo of his preparations. Despite the time constraints, both his determination (under significant pressure) and the benefits of his prior planning, training and professionalism are evident.

67.     Even the gathering of the preliminary intelligence for both attacks, attests to the cell's level of experience and professionalism. In the case of the Ofra Attack, Asem al-Barghuthi noticed on several occasions that the hitchhiking stop

---

[40]     *See* Annex 1. For the issue of the use in behavioral patterns that are typical of Hamas cells and the cover up of the connection between the operatives of the Hamas cell that carried out the Ofra Attack, *see* the behavior of Asem al-Barghuthi, years before that, in the court decisions in Court file number 2456/07 and in Court file number 2458/07, p.3 lines 2-8: "Anas and Asem drove together to Beitonia, where they purchased a 'SEAT' car according to the abovementioned planning. The car was parked in a public parking lot to avoid the expected special attention that would occur if they would bring the car to their homes… The next day, which was the day of the attributed event, Asem and Anas met and drove together to bring the 'SEAT.'"

which is located in the Ofra junction has a permanent presence of soldiers and Jewish settlers and he choose this place to hurt as many Israelis as possible.[41] In the case of the Givat Asaf Attack, Asem al-Barghuthi drove along the length of Route 60 and searched for a suitable target. When he noticed a concentration of soldiers and settlers in the hitchhiking stop at Givat Asaf, he made a U-turn and went back. He got out of the car and started shooting towards the people that were in the junction.[42]

68.     The choice to carry out the attacks on these specific dates was also made with care and probably had a direct link to the Hamas narrative. December 9, the day in which the First Intifada erupted, is considered to be the day in which the founder of Hamas and its first leader, Sheikh Ahmed Yasin, summoned six of the leaders of the Muslim Brotherhood movement in the Gaza Strip and decided to establish the organization. And December 14, the circulation day of Hamas's first announcement, is also the date Hamas marks as the official anniversary of its establishment. Throughout the years, this date and the calendar days surrounding it have been popular dates for Hamas terrorist operatives to carry out attacks.

69.     In my assessment, it is very likely that Asem al-Barghuthi also chose to execute both attacks around these dates for symbolic reasons.

---

[41]     *See* Annex 1, Asem al-Barghuthi's 2019 indictment, third count, article 5.

[42]     *See* Annex 1, Asem al-Barghuthi's 2019 indictment, fifteenth count, articles 4-6.

70.    The method of executing both attacks demonstrates a high level of skill and professionalism in the use of weapons,[43] that are also typical of Hamas's organized terrorist cells. In the Ofra Attack, Asem al-Barghuthi succeeded in hurting several people who stood at the hitchhiking stop while he was shooting through a driving vehicle and his brother was focusing on his driving. In the Givat Asaf Attack, Asem al-Barghuthi got out of the car, aimed his weapon from short range towards the people who were on the spot, killed two soldiers, injured others and even succeeded in stealing a weapon from one of the soldiers.

71.    During his escape from the scene of the Givat Asaf Attack, the car he used to carry out the attack got stuck. Asem al-Barghuthi abandoned the car and the weapon he stole so it would not hinder his movement and affect his ability to escape. In this behavior, he also demonstrated a high level of professionalism and restraint that are typical of skillful terrorist operatives who belong to established terrorist cells of organizations like Hamas.

72.    In the Givat Asaf Attack, Asem al-Barghuthi showed his devotion to carry out the attack even at the cost of his own life, or using his own words, to become a "martyr." The decision to carry out the attack despite the fact that he knew that he was wanted by the Israeli security forces and his choice to target armed soldiers, is consistent with al-Barghuthi's stated determination to be killed during the execution

---

[43]    As discussed below, Asem al-Barghuthi trained in shooting with firearms since he was relatively young. He trained under the guidance of his father, who was a senior operative in the Qassam Brigades.

of a terror attack – a desire borne by al-Barghuthi for a long time.[44] Even after the execution of the Givat Asaf Attack, Asem al-Barghuthi continued to plan other terror attacks while recruiting new members to the Hamas cell he established. He also showed determination to continue with terrorist activity on behalf of Hamas.

73.    Asem al-Barghuthi's activity (after the Givat Asaf Attack) to reactivate the terror cell he established and commanded included an attempt to accumulate weapons and ammunition. It also included an attempt to recruit to the cell new members and operatives who would help him to escape and to carry out shooting attacks.

74.    After the execution of the Givat Asaf Attack, on the very same day, al-Barghuthi contacted his uncle, Lutfi al-Barghuthi,[45] and asked him to send him a rifle and ammunition. The uncle did send him a Kalashnikov and magazines.[46] Asem

---

[44]    For this case *see* Annex 1, Asem al-Barghuthi's 2019 indictment, fifteenth count, article 4; *see* also a court ruling given by the Supreme Court in the case of al-Barghuthi against the Military Commander of the West Bank, April 8, 2019, Court file number 2356/19. The court ruling says: "In his police statements, Asem made it clear that he carried out the attacks 'to become a martyr'" (statement from January 10, 2019, p.3, line 86). Becoming a martyr occupied al-Barghuthi's mind since a relatively young age. For this issue, *see* the original indictment against Asem al-Barghuthi in Court file number 3549/05 from August 25, 2005, fourth count: "the abovementioned defendant, during the abovementioned period of time, in Kubar or nearby, approached his father and told him about his will to act in the path of Jihad and to carry out a suicide attack."

[45]    Lutfi al-Barghuthi was previously convicted of manufacturing weapons. *See* Court file number 1619/09, a verdict from May 4, 2009. He was also convicted of hiding a wanted terrorist. *See* Court file number 40176/90 (court decision from April 14, 1991).

[46]    *See* Annex 1, Asem al-Barghuthi's 2019 indictment. *See* also, Annex 2 at ¶21.

al-Barghuthi received night vision devices and additional ammunition from another collaborator, Ziyad Shalalda, who hid him in his home.

75.     A while after carrying out the Givat Asaf Attack and while hiding and escaping from the Israeli security forces, Asem al-Barghuthi began his attempts to recruit new members to the Hamas cell. He offered Mamduh Jaber Abdu (about him and about his connection to Hamas, *see* below) to enlist in the cell. Jaber recommended al-Barghuthi recruit his brother-in-law, Mahdi Abd al-Mu'min Ahmad Abu Rahma. Asem al-Barghuthi recruited them both to the cell. A short time after that, Asem al-Barghuthi met Musa al-Khatib (about al-Khatib's connection to the Hamas organization and about his activity in the framework of the organization, prior to his recruitment to the cell, *see* below) and he agreed to join the cell. Al-Khatib was supposed to purchase a Kalashnikov for the cell and to obtain 50,000 Israeli new shekel ("NIS") for funding the cell's activities from a person by the name of Abu Abdallah. But Abu Abdallah was arrested, and his mission to purchase weapons failed.[47] According to Musa al-Khatib's indictment, Asem al-Barghuthi told al-Khatib he intended to train Jaber Abdu and al-Khatib in the use of weapons.

76.     The Hamas cell that Asem al-Barghuthi recruited did not have the

---

[47]     The indictment against Musa al-Khatib from March 7, 2018, first count, article 7; *see also* Annex 4, Musa al-Khatib's verdict and sentencing from December 17, 2019, Court file number 3087/19, where he was convicted for being a member and operating on behalf of an unlawful association. It is possible that this "Abu Abdallah" is Abdallah Arar, one of the prisoners released in the "Shalit Prisoner Exchange" and that Asem al-Barghuthi contacted him while he was in prison. He was supposed to help Asem al-Barghuthi in acquiring weapons. *See* details from Asem al-Barghuthi's interrogation as reported on the internet: https://paltimesps.ps/post/219596/-تفاصيل-عملية-عاصم-البرغوثي-في-عوفر-ة-و-جفعات-أساف.

chance to carry out its plans (after the Givat Asaf Attack) because its members were arrested by the Israeli security forces. But the cell's patterns of behavior that included: the cell members' recruitment; its equipment with weapons and ammunition; and its intention to train its members with weapons, match the behavior of a Hamas established terror cell. And most of its members and collaborators were already Hamas operatives in the past and were even convicted for this activity.

## I.   A Hamas Cell and Several Accessories Affiliated with Hamas Were Responsible for the Givat Asaf Attack

### 1.   General Overview

77.    As noted above, Asem al-Barghuthi was the commander of the Hamas cell that carried out both the Ofra Attack and the Givat Asaf Attack. Asem's brother, Saleh al-Barghuthi, was also a member of the cell and participated in the Ofra Attack before being killed several days later by the IDF. The al-Barghuthi family is closely tied to Hamas's infrastructure in the West Bank and is publicly associated with Hamas.[48] Asem and Saleh's father, Ummar al-Barghuthi, is a prominent Hamas figure in the West Bank who previously spent many years in prison for his

---

[48]    Hamas leader Ismail Haniyeh referred to the al-Barghuthi family in a visit he made on December 13, 2018, at a mourning tent that the Hamas organization opened in Gaza in memory of Saleh al-Barghuthi. Among other things, Haniyeh said: "The martyr Saleh al-Barghuthi is the son of the released prisoner, Ummar al-Barghuthi, the brother's son of the prisoner and the commander, Na'il al-Barghuthi, and the sister's son of the prisoner Jasem [probably Jaser] al-Barghuthi. So, we [are facing] an important milestone and in front of one of the houses of glory, Jihad and resistance." http://alqudsnews.net/post/134179.

involvement in terror attacks.[49] Their uncle Na'il is also a Hamas terror operative and one of the most veteran Palestinian prisoners jailed by Israel. Another uncle is Jaser al-Barghuthi, a longtime Hamas operative, who was deported to Gaza after he was released as part of the Shalit Prisoner Exchange.[50]

78.    From the time they were young, Ummar al-Barghuthi indoctrinated his sons and trained them to use firearms with the intention of preparing them to join the Qassam Brigades.

79.    In 2005, Asem al-Barghuthi was convicted for the first time[51] — together with his brother Asef[52] — for undergoing illegal military training in 2002 (e.g.

---

[49]    The al-Qassam website, which belongs to the Hamas operational terrorist arm (Qassam Brigades), points out that the father, Ummar, is one of the Hamas commanders in the West Bank and that he spent close to 28 years in an Israeli prison. https://www.alqassam.ps/arabic/news/newsline_details/42751. In this context, *see* also the Supreme Court ruling in the al-Barghuthi case against the (Israeli) Military Commander of the West Bank, April 8, 2019, Court file number 2356/19. As was also mentioned in the Supreme Court procedure 19/974, the father of the two, petitioner 2 (meaning Ummar), is one of "**the senior military Hamas in Binyamin**" (emphasis added).

[50]    *See* https://www.kan.org.il/item/?itemid=48422. In this video clip, Jaser appears with the leaders of the organization: Ismail Haniyeh, the chairman of Hamas's political bureau (and supreme leader of Hamas) and Yahya Sinwar, who is the chairman of Hamas's political bureau in Gaza (de facto, the Prime Minister of Hamas in the Gaza Strip). https://www.facebook.com/QudsN/photos/a.119620728114837/2344748708935350/?type=3&theater.

[51]    The March 15, 2006 verdict against Asem al-Barghuthi (Annex 3) indicates that he was convicted of, among other things, using a Kalashnikov rifle and training under the guidance of his father, a Qassam Brigades operative.

[52]    The sentencing of Asef al-Barghuthi (Annex 5) indicates that he was convicted of military training with weapons under the guidance of his father, a Qassam Brigades operative.

practicing marksmanship with a Kalashnikov rifle) – under the guidance of their father, Ummar al-Barghuthi.

80.    Asem was only 16 years old at the time of the offense.

**2.    Asem al-Barghuthi**

81.    Asem Ummar Saleh al-Barghuthi was the founder and commander of the Hamas Qassam Brigades cell at issue.

82.    He was born in March 1986 to Ummar Saleh al-Barghuthi and his wife, Suheir Isma'il al-Barghuthi, from the village of Kubar in the Ramallah district,[53] and he later married Ayat 'Id Dahadha.[54]

83.    As noted above, Asem al-Barghuthi's father, Ummar, is a senior Hamas terrorist operative who served a long prison term in Israel.

84.    From his early childhood, Asem al-Barghuthi grew up under the influence of multiple family members who were Hamas operatives.

85.    As noted above, Asem al-Barghuthi was arrested as a teenager and later convicted in 2005 for being a member, and operating on behalf, of Hamas's Islamic Bloc – *Al-Kutla al-Islamiya*, since 2003. The Islamic Bloc is a student organization that is an integral part of Hamas and is used to recruit terror operatives for the organization's Qassam Brigades.

---

[53]    The personal details were taken from: Annex 1, Asem Ummar Saleh al-Barghuthi's 2019 indictment; Military Court file Number 3112/19; Prosecution File Number (Binyamin) 1425/19; Police file Numbers: 545750/18, 551767/18.

[54]    *See* the personal details about Ayat Dahadha, a Birzeit university graduate in 2019: https://www.paldf.net/forum/showthread.php?t=1216033&page=3.

86.     According to the indictment, Asem al-Barghuthi helped engineer *al-Kutla*'s victory in the elections for the university's student council.[55] As part of that effort, he contacted one of Hamas's founding members in the West Bank, Hassan Yusuf,[56] and asked him for help financing *al-Kutla*'s activities; Hassan Yusuf promised to assist.

87.     For his membership and activities in Hamas's *al-Kutla* and for his illegal weapons training (under his father's guidance), Asem al-Barghuthi was given a suspended sentence of 19 months in prison and a fine.[57]

88.     In January 2007, approximately three months after his release from prison, Asem al-Barghuthi joined a Qassam Brigades terrorist cell that was established by a convicted Hamas operative named Anas Mashal.[58]

89.     The cell's principal objective was to successfully kidnap Jews who could

---

[55]    An indictment from August 25, 2005, Court case number 3549/05. Neither the court records nor Hamas's biographic descriptions make clear what university Asem al-Barghuthi attended, but one can draw a reasonable inference that it was Abu Dis University.

[56]    Sheikh Hassan Yusuf Dawud al-Khalil is one of the senior figures in the Hamas organization. In 2004, he served as Hamas's official spokesman in the West Bank. In 2006, he was chosen to serve in the Palestinian Legislative Council as a part of Hamas's *Change and Reform* list. Al-Khalil was also a member in the Palestinian Scholars League and was among Hamas deportees to Lebanon in 1992. He also served as the secretary of the deportees' camp. Over the years, al-Khalil was arrested many times, both by the Palestinian Authority and by Israel for his activities in the ranks of the Hamas organization.

[57]    *See* Annex 3, the court's March 15, 2006 sentencing (Court file number 3549/05) of Asem Ummar Saleh al-Barghuthi.

[58]    Court file numbers 2456/07 and 2458/07 including the indictments against Asem al-Barghuthi and against Anas Mashal and the verdicts given in both cases.

be taken hostage and used as bargaining chips for the release of Palestinian prisoners from Israeli jails.[59] This was consistent with Hamas's own declared objectives and was among the organization's top priorities.[60] Kidnapping operations are complex attacks — both logistically (the purchase of vehicles and weapons and securing safehouses) and politically (because of the need to communicate clandestinely with Hamas negotiators involved in the talks with Israeli authorities about the release of prisoners). Accordingly, the planning and execution of these types of complex attacks were (and are) typically tasked to established terror cells.[61]

---

[59]    Anas Mashal's verdict in Court file number 2457/07. According to the indictment that was submitted against Mashal, "From 2004 and until his arrest, the defendant was a member of the Hamas organization. In the second half of January 2007, the defendant began to plan with his friends, Asem al-Barghuthi and Sharar Mansur, the kidnapping of a Jew for negotiating the release of Palestinian prisoners from Israeli jails."

[60]    *See* for example, Asem al-Barghuthi's specific statement during a reception in his honor upon his release from prison in April 2018. Ummar al-Barghuthi says on that occasion that the Qassam Brigades in Gaza know well the message (that according to it they must work) – the release of the prisoners until not even a single brother stays (in jail). https://www.facebook.com/WattanNews/videos/366346717256699/?v=366346717256699. Minute 01:14: Asem al-Barghuthi says: "I am the son of Hamas and the son of al-Qassam."

[61]    For his participation in this terror cell, Asem al-Barghuthi was sentenced to 11 years and two months in prison, because the suspended arrest from his early conviction was still pending and was activated by the court. Court file number against Asem al-Barghuthi 2456/07. In the verdict from February 22, 2010 it was written: "Nine and a half years in prison since the day of his arrest, activating a suspended arrest of 20 months that were sentenced upon him in file 3549/05, so that the entire imprisonment will accumulate to the punishment that was sentenced in the current file and an additional three years of suspended imprisonment in the case that he will not have an offence identical to the one he was convicted in this case. In total, the defendant will spend 11 years and two months in prison."

90.    Nonetheless, the cell was discovered and Asem al-Barghuthi was again arrested.

91.    In August 2009 he was convicted of six counts and sentenced to 9 ½ years in prison for, among other things, two counts of arms dealing, and three counts of attempted kidnappings dating back to 2005 and 2007.[62]

92.    After Asem al-Barghuthi's arrest, Hamas's official website identified him as a Hamas prisoner[63] and officially acknowledged his organizational affiliation.[64]

---

Although the terror cell he was a part of was a Hamas cell whose commander was convicted of being a Hamas member, Asem was not convicted for being a Hamas member in this case due to technical failures in his interrogation (he wasn't confronted with this specific accusation that was based upon the testimony of the cell's commander, Anas Mashal).

In his police statement on February 6, 2007, Anas Ahmad Yusuf Mashal (from the al-Barghuthi clan) elaborated about the development of events concerning the attempts to kidnap Jews for the release of Palestinian prisoners of Israel from Israeli jails and about the circumstances of the establishment of the Hamas cell: "Approximately a month ago (the beginning of 2007) a guy from our village named Asem Ummar Saleh al-Barghuthi was released from the Ashkelon prison. He was 21 years old and he spent 19 months in prison **for his activities in Hamas within *al-Kutla al-Islamiya*** (emphasis added). I decided to share with him my thoughts about kidnaping a Jew." In this testimony Anas Mashal practically exposed the fact that Asem al-Barghuthi was known in his surroundings as a Hamas operative.

[62]    *See* Annex 2 at ¶25.

[63]    *See* http://hamas.ps/ar/prisoner/225/.

[64]    The security prisoners who serve their punishments in Israeli jails are divided in prison by organizational sections based upon their affiliation to the different terrorist organizations. Publishing a prisoner's name in Hamas's official website as affiliated with the organization is practically an official confirmation given by the organization for the prisoner's affiliation.

93.     As a result of his criminal convictions in 2005 and 2007, Asem al-Barghuthi served over 11 years in prison.

94.     Within approximately 8 months of his release from prison in April 2018, after over 11 years imprisonment in Israeli jails, Asem al-Barghuthi began to establish yet another Qassam Brigades terrorist cell.

95.     By this point, Asem al-Barghuthi's organizational affiliation with Hamas was common knowledge.

96.     In a reception that was held in his honor upon his release from prison, in April 2018, that was recorded and broadcasted in many Palestinian media organs, Hamas flags were prominently displayed as were flags of Hamas's *al-Kutla al-Islamiya*.[65] During that same event, Asem al-Barghuthi was recorded giving a speech and confirming that he belonged to Hamas's Qassam Brigades.

97.     In fact, at the beginning of the reception ceremony, when he got up to make his speech, Asem al-Barghuthi pointed to a Hamas bandana that was wrapped around his neck and said: "This symbol of Hamas, someone wrapped it around my neck and indeed, I am a Hamas man, an al-Qassam (Izz al-Din al-Qassam Brigades) man."[66]

---

[65]     *See* http://omamh.net/search?q=عاصم+البرغوثي; *see also* https://www.facebook.com/watch/?v=1607548742665977 (at 00:18).

[66]     A video clip that documents the reception held in Asem al-Barghuthi's honor appeared in several internet websites. Among them: https://www.facebook.com/WattanNews/videos/366346717256699/?v=366346717256699; https://www.facebook.com/ShehabAgency.MainPage/videos/390100401565591/. The following video clip shows parts of the reception with Hebrew subtitles: https://www.kan.org.il/item/?itemid=48422 and https://www.youtube.com/watch?v=Yg2KhRiqMu4. In a

98.     After Asem's arrest by Israeli security services, Hamas issued an announcement identifying him as one of their operatives. The Hamas movement clarified in a press release: "…the Occupation's boasting in the arrest of the *Muqawim* ("The resistor") Asem al-Barghuthi, points out to the occupation's need for achievements."[67] (The use of the term *Muqawim* hints to his membership in the Islamic Resistance Movement – Hamas.) Palestinian media organs and websites subsequently mentioned Asem al-Barghuthi's conviction for membership in the Qassam Brigades.[68]

---

report that was published on the internet about Asem al-Barghuthi's interrogations following his arrest in January 2019 (based upon a news report from Israeli television Channel 13) al-Barghuthi is quoted as stating: "… I want to say everything. When I was in prison, I contacted a released prisoner from the "Shalit Prisoner Exchange" who was deported to the Gaza strip. His name is Abdallah Arar and he told me that if I am interested in carrying out attacks against Israel, he will direct me to a place in which I will be able to obtain weapons…" *See* https://paltimesps.ps/post/219596/تفاصيل-عملية-عاصم-البرغوثي-في-عوفرة-و-جفعات-أساف/. Abdallah Arar is a Qassam Brigades operative who was released in the "Shalit Prisoner Exchange" and deported to the Gaza Strip together with Asem al-Barghuthi's uncle – Jaser al-Barghuthi. *See, e.g.*, https://mfa.gov.il/MFA/ForeignPolicy/Terrorism/Pages/Hamas-terror-cell-arrested-1-January-2018.aspx.

[67]     *See* https://www.alqassam.ps/arabic/أخبار-القسام/42755/حماس-مسيرة-المقاومة-بالضفة-مستمرة-بعزيمة-أقوى.

[68]     *See* http://hadfnews.ps/post/62355; *see also* http://www.arn.ps/archives/233932; on one of the internet websites, Asem al-Barghuthi was described as a Hamas operative who received assistance from Hamas, in contrast to another terrorist who operated independently. *See* http://www.5otwaa.net/index.php?s=24&cat=11&id=1817.

99.    On the day that Asem al-Barghuthi's house was demolished by Israel, Hamas's green flag was raised above its ruins. This is another indicator of his role as a Hamas operative.[69]

100.    After an Israeli Military Court sentenced Asem al-Barghuthi on June 24, 2020, Hamas identified him as an operative of the organization.[70]

101.    In sum, Asem al-Barghuthi was a Hamas operative known to the Palestinian public as a Qassam Brigades operative who openly acknowledged the fact and publicly took pride in it.

### 3.    Saleh al-Barghuthi

102.    Asem al-Barghuthi's younger brother, Saleh Ummar Saleh al-Barghuthi, was born in August 1988.

103.    Like his brother, he was a resident of the Kubar village in the Ramallah district.

104.    Saleh al-Barghuthi graduated high school and then worked first as a truck driver and later as a taxi driver.

105.    In 2012, he married Shima' al-Rimawi and fathered a son by the name of Qays.

---

[69]    *See* https://www.youtube.com/watch?v=HLg3y1KyZEs (showing the wreckage of the house and the Palestinian national flag and Hamas flag raised above the ruins). *See also* https://nn.ps/news/rm-llh/2019/03/07/208248/ (also showing the raising of the Hamas flag above the ruins beginning at 06:18 of the video).

[70]    *See*    https://hamas.ps/ar/post/12174/-عاصم-الأسير-سجن-قرار-على-تعقيبا-صحفي-تصريح; https://www.palinfo.com/news/2020/6/24/-لعاصم-الاربعة-المؤبدات-حماس مؤبدات-4-البرغوثي; فخر-نياشين-البرغوثي.

106.   I found no indication that Saleh followed the same path as his older brother, Asem, in terms of a prior affiliation with the Qassam Brigades.

107.   Certainly, Saleh's brothers, father and uncles were all longstanding Hamas operatives, and he grew up in a family culture very much suffused with the ideology and political outlook of Hamas.

108.   However, it appears that Saleh was first recruited into the terror cell by his brother on the eve of the Ofra Attack and served as the driver of the car used in that attack.

109.   Saleh al-Barghuthi had no prior criminal convictions before that date.

110.   Saleh al-Barghuthi was killed while attempting to escape arrest on December 12, 2018.

111.   A day later, Hamas announced that Saleh al-Barghuthi was a Qassam Brigades operative and that he carried out the Ofra Attack.[71]

112.   Initially, Hamas remained vague about the organizational affiliation of his brother, Asem al-Barghuthi, presumably because he remained at large at the time and Hamas did not want to disclose information that could be used to charge him.

113.   On the Qassam Brigades website, Saleh al-Barghuthi is identified as a martyr of the Brigades (*al-Shahid al-Qassami*).[72] The website even dedicates more

---

[71]   *See* the official announcement issued by the Qassam Brigades: https://www.alqassam.ps/arabic/كتائب-القسام-تزف-المجاهدين-صالح/5399/القسام-بلاغات-بيانات-. On December 13, 2018, Hamas's website published a news article also identifying Saleh al-Barghuthi as a Qassam Brigades operative: https://hamas.ps/ar/post/9979.

[72]   On February 5, 2019, the Qassam Brigades website published a report about the arrest of Saleh al-Barghuthi's mother. In this report, Saleh al-Barghuthi was

than one memorial page that praises Saleh al-Barghuthi and elaborates on his biography, praises the Ofra Attack, claims that it was executed to avenge the killing of Qassam Brigades operatives by the Israeli security forces, and even confirms again that Saleh al-Barghuthi was a Qassam Brigades operative.[73]

114.   Websites identified with Hamas emphasized Saleh al-Barghuthi's influence on other terrorists, that brought them to imitate his actions and to act in the path of terrorism.[74]

115.   Hence, Saleh al-Barghuthi was officially recognized by Hamas as its operational terrorist arm operative who carried out the Ofra Attack on the organization's behalf.

---

called "The Qassami martyr," which means a Qassam Brigades martyr. *See* https://www.alqassam.ps/arabic/news/newsline_details/42965; *see also* Saleh al-Barghuthi martyr's page on the Qassam Brigades website: https://alqassam.ps/arabic/martyrs/details/2822. *See also* an announcement from the Qassam Brigades. The announcement stated that the Qassam Brigades ("escorted to the wedding") the warrior Saleh al-Barghuthi and the warrior Ashraf Na'alawa (the aforementioned terrorist who killed two people in the Barkan industrial area): "The Izz al-Din al-Qassam Brigades accompany the two warriors with dignity and pride all the way to heaven: Saleh Ummar al-Barghuthi from the fighting al-Barghuthi family and the hero of the Ofra attack that injured 11 of the occupiers, and Ashraf Walid Na'alawa, the hero of the Barkan attack…"

[73]   *See* https://www.alqassam.ps/arabic/news/details/14546; *see also* https://alqassam.ps/arabic/martyrs/details/2822. The official website of Hamas's political bureau also provides similar confirmation: https://www.palinfo.com/news/2018/12/13 /الشهيد-القسامي-صالح-البرغوثي-سليل-عائلة-الامجاد.

[74]   *See* https://qudsn.net/post/166745/الشهيد-عمر-يونس-برثي-الشهيدين-البرغوثي-ونعالوة; *see also* https://www.palinfo.com/news/2019/4/28/الشهيد-عمر-يونس-اسرائيل-تعدم-حلم-والدته.

### 4.    Jaber Abdu[75]

116.    Jaber Mamduh Jaber Abdu was born in November 1990. At the time of the Ofra Attack and Givat Asaf Attack, he was an unmarried resident of the Ni'ma village in the Ramallah district.

117.    When Jaber Abdu was approximately 14 years old he first came to the attention of Israeli security services. He was eventually arrested and convicted of terrorist activity and for his affiliation with Hamas. He served two years in prison between December 2009 and the end of November 2011.[76] He was then released and repeatedly detained under administrative detention for significant stretches of time between July 2012 and December 2016.

118.    In December 2014,[77] an Israeli military court concluded that: "based upon the confidential materials brought to me, I became convinced that in [Jaber Abdu] there is hidden a grave and actual danger for the region's safety… the materials show that [he] is a Hamas operative with connections to other Hamas operatives and that he returned to the forbidden activities a short time after his release from arrest. He was involved in planning a military activity with others."

119.    After the Ofra Attack and Givat Asaf Attack were perpetrated, Asem

---

[75]    For information pertaining to Jaber Abdu's family members, *see* https://maqam.najah.edu/judgments/6292/; *see also* https://www.paldf.net/forum/showthread.php?t=160204.

[76]    An indictment against him in prosecution file number 1018/10. The indictment charges him with membership in the Hamas organization between 2004-2006.

[77]    Court decision dated December 29, 2014 in Court file number 2160/14.

Barghuthi recruited Abdu to join his Qassam Brigades cell.

120.    At that time, he had already previously been convicted of being a Hamas operative and his name had appeared on Hamas's prisoners lists published on one of its websites.[78]

121.    Once recruited into Asem Barghuthi's cell, Abdu agreed to practice using weapons and tried to recruit another person to join the cell.

122.    At Asem al-Barghuthi's request, Abdu also tried, but failed, to acquire more weapons.

123.    Abdu planned to carry out additional shooting attacks but was arrested in January 2019.[79]

124.    According to his indictment, he was charged as a Hamas operative and for his connection to Hamas's *Al-Nur* Society[80] in Gaza – previously designated an

---

[78]    *See* https://www.omamh.net/post/ل-يعتقل-المحرر-جابر-عبده-بعد-رفضه-الذهاب-الاحتلال للاستدعاء.

[79]    An indictment from February 20, 2019 against Jaber Abdu, Court file number 1305/19.

[80]    The Gaza-based *Al-Nur* Prisoners and Families of Martyrs Care Society is a pivotal Hamas institution. Several senior Hamas leaders who were released in the "Shalit Prisoner Exchange" work for the Society, which transfers funds to Hamas prisoners in the Gaza Strip and the West Bank. The Society has also been involved in transferring funds to Hamas terror operatives to finance terrorist attacks. For example, the prominent kidnapping and murder of three Israeli teenagers in June 2014 was funded by the *Al-Nur* Society.

"Unlawful Organization" belonging to the Hamas movement from which he allegedly received money.[81]

125.  He was also charged with planning a shooting attack and requesting money and weapons from a Hamas operative in the Gaza Strip to carry out the attack.[82]

126.  Abdu was also charged with:

- recruiting others to the Qassam Brigades cell.
- contacting another Hamas operative who was responsible for providing supplies for the attack.
- creating secret communication channels with the handlers.
- making a failed attempt to purchase weapons.
- publishing pictures of the Hamas flag, the Qassam Brigades symbol and Hamas operatives on his Facebook page.
- meeting Asem al-Barghuthi while Asem was a fugitive following the Ofra Attack and Givat Asaf Attack. Abdu agreed to join the military cell that Asem established and to go through weapon trainings.[83]

127.  The evidence from several statements made to the Israeli police suggests that Jaber Abdu was known in his village and close surroundings as a Hamas operative who had connections with Hamas operatives in the Gaza Strip, and received funding for Hamas prisoners from sources in Gaza.[84]

---

[81]  An indictment from February 20, 2019, The Judea Military Court, prosecution file number (Binyamin) 1305/19.

[82]  That same operative allegedly recruited Abdu to Hamas and asked him to recruit others to the military cell.

[83]  An indictment from February 20, 2019, The Judea Military Court, prosecution file number (Binyamin) 1305/19.

[84]  *See* police statement of Muhammad Najah Muhammad Abdu from the village of Ni'ma (Ramallah district), given in August 19, 2013: "Jaber Mamduh Abdu, about 20 years old, single, imprisoned today in Israel and known in the village for being a

### 5.   Musa al-Khatib

128.   Musa Majdi Isa al-Khatib, born in February 1987, is a resident of the Hizma village – northeast of Jerusalem – married, and has several brothers and sisters.[85] Al-Khatib studied Quranic studies and Islamic studies in the Abu Dis University.[86] He agreed to be recruited to Asem al-Barghuthi's Hamas cell after the two attacks that the cell carried out (the Ofra Attack and the Givat Asaf Attack). At the time, al-Barghuthi was declared wanted by the authorities. (Asem al-Barghuthi had approached him already in December 2018, before the execution of the first attack, but at that time, al-Khatib refused to join the cell.)[87] Al-Khatib agreed to

---

Hamas operative…" Another statement that was read to Jaber Abdu in his police interrogation on June 18, 2013, belongs to a different person. According to Abdu's police statement, this was its exact text: "So and so, Jihad Dar Atiyya, says that you were a member in a Hamas cell together with him. That same person points to your connections with a Hamas operative in Gaza." Another statement that was taken by the police was Sayf Abdu's, who claimed in his interrogation that Jaber was a part of a Hamas cell. Another detainee, Ahmad Abdu, confirmed that fact and pointed to Jaber's activities within this cell between 2003-2006. Also, *see* a very elaborated protocol from the interrogation of the above-mentioned Sayf Muhammad Hussein Abdu from May 12, 2013, that exposes the infrastructure of Hamas activities in the Ni'ma village and his confession about his official recruitment to Hamas by Jaber Abdu.

[85]   Details concerning Musa al-Khatib's family members can be found at: https://shobiddak.com/tawjihi/78073; *see also* https://www.raya.ps/news/952246.html; https://zh-cn.facebook.com/almasdernews/posts/1054005244696430/.

[86]   *See* http://www.alhayat-j.com/pdf/2018/7/8/page13.pdf.

[87]   *See* Annex 1, Asem al-Barghuthi's 2019 indictment; and also an indictment against Musa al-Khatib from March 7, 2019, Prosecution file number 1424; *see also* Annex 4, Musa al-Khatib's verdict and sentencing from December 17, 2019, Court file number 3078/19, where he was sentenced to 28 months in prison based upon his confession in a plea bargain. According to his confession, he agreed to be recruited to Asem al-Barghuthi's cell and to acquire weapons and money for him.

practice using weapons and tried to help Asem al-Barghuthi to obtain money while he was wanted.

129.   When Musa al-Khatib agreed to be recruited to the Hamas terror cell that was established by Asem al-Barghuthi, he was already a convicted Hamas operative. Musa al-Khatib's name even appeared on the Hamas website in the list of the organization's prisoners who are jailed in Israel.[88] On the eve of his arrest by Israel for taking part in Asem al-Barghuthi's cell, Musa al-Khatib was arrested on January 3, 2019 by the Palestinian Preventive Security.[89] Al-Khatib's arrest was extended and he was released from the Palestinian prison after 41 days, on February 12, 2019.[90] It seems that al-Khatib's arrest by the Palestinian Authority was linked to his activities in the framework of Asem al-Barghuthi's Hamas cell. The verdict that was given in his case by the Israeli military court took under consideration the period

---

[88]   https://hamas.ps/ar/prisoner/890/موسى-مجدي-عيسى-خطيب. Musa al-Khatib's name appeared on the Hamas website in the list of the organization's administrative detainees:   https://hamas.ps/ar/prisoners/7/page-36/اداريون-وموقوفون. *See also*   https://www.alqassam.ps/arabic/news/newsline_details/33715.

[89]   For this matter, *see* the extended coverage that was given to al-Khatib's arrest on the Hamas and Qassam Brigades websites: https://www.alqassam.ps/arabic/news/newsline_details/42715.

*See also* the reference to his arrest on the Hamas website. On the website, al-Khatib was referred to as a "political prisoner" – a term used to describe Hamas operatives who are arrested by the Palestinian Authority. *See* https://hamas.ps/ar/post/10180/أجهزة-السلطة-بالضفة-تعتقل-مواطناً-وتواصل-اعتقال-آخرين.

[90]   *See*   http://hadfnews.ps/post/51606/رام-الله-الاحتلال-يعتقل-شاباً-بعد-لحظات-من-الإفراج-عنه-من-سجون-السلطة.

of his arrest in the Palestinian Authority's prison.[91]

130.    Musa al-Khatib's activity in Hamas began in 2006, when he was a youth. Then, he was a member of the organization's "Usra" (literally "family" – this is the nickname given to a group of supporters and operatives in the framework of the Hamas organization). He was convicted for acting in the framework of Hamas's Islamic Bloc in the Abu Dis University in 2010, where for a certain period of time, he was the chairman of the Islamic Bloc.[92] He was also convicted of transferring Hamas moneys to terror operatives.[93] Even after his release from prison, al-Khatib continued in his activities for Hamas and was put in administrative arrest during 2015 and 2016. Musa al-Khatib was arrested on February 12, 2019 after the Hamas cell that carried out the Ofra Attack and the Givat Asaf Attack was exposed. On December 17,

---

[91]    *See* Annex 4, Musa al-Khatib's verdict and sentencing from December 17, 2019.

[92]    *See* the verdict in the case against Musa al-Khatib from December 21, 2010, Court file number 2384/10; and another verdict from January 28, 2013 in Court file number 1942/13. About the essence of his activity in the framework of the Islamic Bloc, *see* Court file number 2384/10, an indictment against Musa al-Khatib, and a verdict and court's decision from December 21, 2010. About his activity in the framework of the Islamic Bloc the indictment says: "… the defendant used to attach all over the university leaflets on behalf of the *al-Kutla al-Islamiya* organization which is an unlawful association that belongs to Hamas, which is an unlawful association. In addition, the defendant approached other students in the university and convinced them to join to the *al-Kutla al-Islamiya*'s activities… also, at the beginning of 2010… the defendant received from another person 600 NIS for the *al-Kutla al-Islamiya*'s activities." The indictment also says that: "On April 17, 2010… in al-Quds university, the defendant wrote a pamphlet on behalf of the organization of *al-Kutla al-Islamiya*… in the pamphlet he wrote, among other things, that: Hamas is still alive and kicking; one must resist the occupation; Izz al-Din al-Qassam… will strike the occupation; and that Muhammad will guard them and bless them. The defendant distributed the above-mentioned pamphlet to the university's students."

[93]    *See* Court file number 2507/14.

2019, he was convicted, based upon his confession in a plea bargain, for being a member in an unlawful association and was sentenced to 28 months in prison.[94] Hence, Musa al-Khatib was a convicted and familiar Hamas operative who spent long periods of time, with short breaks between them, in Israeli prison. He accepted Asem al-Barghuthi's offer to enlist in the terror cell that al-Barghuthi established after he became wanted. Al-Khatib was supposed to obtain money and weapons for the cell, and to train with weapons under Asem al-Barghuthi's guidance. In parallel to his membership in the cell, he was in contact with a Hamas operative from Gaza, who was deported to Gaza in the "Shalit Exchange Deal." This prisoner gave him Hamas flags to be hung on Hamas's establishment date.[95]

### 6.   Khaled Nuibat

131.   Khaled Kamel Rashid Nuibat (also spelled Khalid Nawabit), born on March 8, 1978, is married, and a resident of the Burqa village in the Ramallah district. Khaled Nuibat operated in the framework of the terror cell established by Asem al-Barghuthi, from its early stages. Nuibat was arrested by the Israeli security forces on December 19, 2018.[96] For his activities in the framework of Asem al-

---

[94]   *See* Annex 4, Musa al-Khatib's verdict and sentencing from December 17, 2019. The verdict also included 15 months of suspended sentence, a 6,000 NIS fine and confiscation of the Hamas flags that al-Khatib received from a Hamas operative in Gaza.

[95]   *See* the March 7, 2019 indictment of Musa al-Khatib, Prosecution file number 1424. *See* Annex 4, Musa al-Khatib's verdict and sentencing from December 17, 2019, where the court orders confiscation of the Hamas flags that were found in Musa al-Khatib's possession.

[96]   *See* an indictment against Khaled Nuibat, Court file number 1785/19.

Barghuthi's cell, Nuibat was sentenced to 27 months in prison, 12 months of suspended sentence and a 5,000 NIS fine.[97]

132.   A month before the execution of the Ofra Attack, Khaled Nuibat was recruited to the cell by Asem al-Barghuthi for the purpose of providing logistical assistance (purchasing a car) to be used during the attack. He received from Asem al-Barghuthi 4,000 NIS to fund the purchase and he bought the car that was used for the Ofra Attack committed on December 9, 2018.

133.   Khaled Nuibat was officially recognized as a Hamas prisoner before he joined Asem al-Barghuthi's cell, and his name appeared in the Hamas prisoner's list that was published on one of Hamas's official websites.[98] In 2011, the activity for which Khaled Nuibat was convicted, including an attempt to manufacture rockets and testing them, is an unusual activity that is consistent with the Hamas organization's strategic goals to expand the threat of the use of high-trajectory weapons to the West Bank and threaten from there the population masses in Israel. Over the years, both the Israeli and the Palestinian Authority's Security Forces prevented several attempts of this kind.[99] If so, it is reasonable to presume that

---

[97]    *See* Annex 6, the verdict and sentencing of Khaled Nuibat from December 9, 2019, Court file number 1785/19.

[98]    *See*  https://hamas.ps/ar/prisoner/882/خالد-كامل-رشيد-نوايت.  This list contains Khaled Nuibat's personal details and it mentions that he was arrested on September 4, 2011. Nuibat was sentenced to four years in prison, and he was released on September 13, 2015.

[99]    For example, in February 2010 the Palestinian Authority Security Forces arrested the members of a Hamas cell that planned to attempt to launch rockets from the West Bank to Israel. *See* https://imemc.org/article/58030/.

Nuibat was a Hamas operative already in 2006[100] and that his attempts to manufacture rockets were carried out for the Hamas organization. Indeed, after he was captured and sentenced to four years in prison (a relatively severe punishment), the organization officially recognized him as a Hamas prisoner. Nuibat assisted the Hamas cell under the command of Asem al-Barghuthi, mostly logistically: in purchasing a car while the Ofra Attack was in its planning stages; and in bringing Asem al-Barghuthi to a hideout after Saleh al-Barghuthi was killed and Asem al-Barghuthi carried out the Givat Asaf Attack and became wanted.[101]

### 7. Mahdi Abu Rahma

134.   Mahdi Abd al-Mu'min Ahmad Abu Rahma, born on March 17, 1989, is a resident of the Bil'in village (Ramallah district). Mahdi Abu Rahma participated in the past in the "Fence Demonstrations" in his village of Bil'in[102] and was even injured three times during these demonstrations.[103]

---

[100]   *See* Khaled Kamel Rashid Nuibat's indictment, Court file number 4983/11. The charges show from the fifth count onward that since 2006, Nuibat was occupied with attempts to manufacture a high-trajectory weapon and with training and testing this weapon.

[101]   *See* Annex 2 at ¶¶6-15.

[102]   The village of Bil'in became famous for the demonstrations that were held every Friday near it since 2005. The demonstrations were against the security separation fence that Israel built on the village's lands. Residents from Bil'in and from the nearby villages together with radical left activists from Israel (like "Anarchists Against the Fence") and international human rights organizations usually participated in the demonstrations. Sometimes, the demonstrations escalated to violent clashes with the Israeli security forces.

[103]   *See* a report about his injury in 2006: http://www.miftah.org/Arabic //Display.cfm?DocId=6377&CategoryId=4. *See* a report about his injury in 2007:

135.   Mahdi Abu Rahma was already a convicted Hamas operative when he was recruited to Hamas's terror cell under the command of Asem al-Barghuthi. He also had a prior criminal record of security offenses in the framework of Hamas (he was imprisoned in Israeli jails from December 29, 2008 until August 29, 2010).[104]

136.   A short time after his release from prison, Abu Rahma made contact with Rateb Abdallah Zaydan Ajrab – a senior leader in the Qassam Brigades and among the released prisoners in the "Shalit Prisoner Exchange" who was deported to Gaza (Ajrab was sentenced in 1991 to life imprisonment for murder). Mahdi Abu Rahma asked to check the level of compensations that he was entitled to from the Hamas organization for being an organization's prisoner in the Israeli jail. These compensations are paid through the *Al-Nur* Society, which is a part of the Hamas organization. Indeed, Mahdi Abu Rahma received compensations at the total sum of 3,000 USD.[105]

---

http://www.pchrgaza.org/files/w_report/arabic/2007/pdf/weekly%20report%2050.pdf. About his injury in 2008, *see*: https://oldwebsite.palestine-studies.org/sites/default/files/uploads/files/pdf3_1.pdf. *See also*: http://www.wafa.ps/ar_page.aspx?id=Pzf4xLa161170804773aPzf4xL.

[104]   Court file number 1731/09 from 2009; an indictment against Mahdi Abu Rahma, arrested since February 2009. *See also* his prisoner's card on the Hamas website: https://hamas.ps/ar/prisoner/3510/مهدي-عبد-المؤمن-أحمد-أبو-رحمة.

[105]   *See* the indictment against Mahdi Abd al-Mu'min Ahmad Abu Rahma, Prosecution File (Binyamin) number: 1221/19, Police file number: 19694/19 first count (contact with the enemy Rateb Ajrab), second count (bringing enemy's money into the region). *See* Annex 7, Mahdi Abu Rahma's January 21, 2020 verdict and sentencing in Court file number 2127/19, where he was convicted for making forbidden contact with an enemy because of his ties with the Hamas operative Abdallah Ajrab; and also for being a member and operating on behalf of an unlawful

137.   Asem al-Barghuthi, the commander of the terror cell that carried out the Ofra Attack, recruited Mahdi Abu Rahma to the cell. Abu Rahma was recommended to the cell by his brother-in-law – Jaber Abdu. Abu Rahma was recruited after the execution of the Ofra Attack and Givat Asaf Attack. At that time, the cell's commander was declared wanted by the Israeli security forces.[106] Mahdi was supposed to assist Asem al-Barghuthi to acquire weapons and to take part in planned shooting attacks to be carried out by the terrorist cell.

138.   Mahdi Abu Rahma was arrested on January 11, 2019.[107] He was convicted by his confession (in a plea bargain) on January 21, 2020 and sentenced to 20 months in prison, 18 months of suspended sentence, and was also fined.[108]

---

association. Mahdi Abu Rahma was sentenced to 20 months in prison, 18 months of suspended sentence, and was also fined.

[106]   *See* indictment of Mahdi Abd al-Mu'min Ahmad Abu Rahma from February 6, 2018; Prosecution file number (Binyamin): 1221/19, Police file Number 19694/19; *see also* Annex 1, Asem al-Barghuthi's 2019 indictment. *See also* Mahdi Abu Rahma's verdict from January 21, 2020, in Court file number 2127/19, where he was convicted of making contact with an enemy and also for being a member and operating on behalf of an unlawful association because of his membership in the cell headed by Asem al-Barghuthi.

[107]   *See* https://www.sadanews.ps/news/33255.html.

[108]   *See* Annex 7, Mahdi Abu Rahma's January 21, 2020 verdict and sentencing.

## J.   <u>Summary and Conclusion</u>

139.   Based on the contents and analysis contained in this expert declaration that I have submitted concerning the serious injury Nathaniel Felber sustained in the Givat Asaf Attack committed on December 13, 2018, I determine the following:

- The Givat Asaf Attack was a terror attack that was planned and executed by a commander of a Hamas cell and an operational operative in the Qassam Brigades, Asem al-Barghuthi.
- This was the second of two attacks that the cell executed. The cell even planned to carry out more attacks.
- The goal of the cell was to murder and kill as many Israelis as possible or abduct Israelis to use as bargaining chips to gain the release of Palestinian terrorists imprisoned in Israel.
- The cell was established in 2018 and operated until the arrest of its members by the security authorities in Israel at the beginning of 2019.

140.   The terrorist operational arm of the Hamas organization, the Qassam Brigades, claimed responsibility for the first attack (Ofra Attack). The claim of responsibility was done in an official announcement that was already published on the Qassam Brigades' official website on December 13, 2018 – one day after the death of Saleh al-Barghuthi, and on the same day that the Givat Asaf Attack was executed. By doing that, Hamas acknowledged that the cell operated on its behalf.

141.   Asem al-Barghuthi, the commander of the cell, was a longtime and convicted Hamas operative when he decided to establish the cell. Already in 2005, he was convicted for being a member of Hamas's *al-Kutla al-Islamiya*. To the Palestinian public, he was a well-known Hamas operative. Asem al-Barghuthi declared openly and publicly in a video clip that was produced for his release from prison in April 2018 about his affiliation with the Hamas operational terror arm – the Qassam Brigades.

142.    Saleh al-Barghuthi, the cell commander's brother and the one who participated in the first attack (Ofra Attack) that was carried out by the cell on December 9, 2018, was killed on December 12, 2018. Immediately after his death, the Hamas organization announced that Saleh al-Barghuthi was one of its operatives and one of the Qassam Brigades' operatives.

143.    The other cell members, most of them recruited after the Givat Asaf Attack, were also convicted Hamas operatives. They included Jaber Abdu, Musa al-Khatib and Mahdi Abu Rahma. Another cell member, Khaled Nuibat, was recognized by the Hamas organization as one of its prisoners even before his recruitment to the cell. He was imprisoned previously for his terrorist activities.

144.    Based upon the forgoing, I conclude that Nathaniel Felber, a Plaintiff in this lawsuit, was shot by Asem al-Barghuthi, who murdered two other soldiers and severely injured Mr. Felber while acting in his capacity as a commander of a Qassam Brigades cell and a Hamas operative.

Sworn to this day:  <u>July 23, 2020</u>

Arieh Dan Spitzen

# Annex 1



**Global Arabic Translation Services**

الخدمات العالمية للترجمة العربية

26 Sheinfain St., Kfar-Saba, Israel
+972 54 8349.337
www.GatsTranslations.com

## <u>CERTIFICATION</u>

I, Yaniv Berman, do hereby certify that as a qualified translator I am fully conversant with the English and Hebrew languages, and that to the best of my knowledge, the attached document, Indictment of Asem Ummar Saleh al-Barghuthi dated March 11, 2019, is a true and accurate translation of the original text from the Hebrew language into English.

Date: July 21, 2020

Yaniv Berman

| Israel | Defense | Forces |
|---|---|---|

| At the military court of | Court case no.: | *3112*/19 |
| J u d e a | Prosecution file (Binyamin) no. | 1425/19 |
| b e f o r e   a   p a n e l | Criminal file no. | 545750/18 |
| | | 551767/18 |

<div align="center">

**In the case of**

</div>

**The Military Prosecutor**                                                    **Complainant**

<div align="center">

**versus**

</div>

*[stamp:]*
Received by: *Hodaya*
On date: *11 March 2019*

**Asem Ummar Saleh al-Barghuthi**
ID no. 950446633, born 27 March 1986, resident of Kubar
Detained since 8 January 2019                                              **Defendant**

<div align="center">

## *Indictment*

</div>

The above defendant is hereby indicted for commission of the following offenses:

**First count of indictment:**

**Nature of the offense:**   ***Trading in war materiel,*** an offense under clause 233 (a+b) of the Security Provisions [Consolidated Version] (Judea and Samaria) (No. 1651) 5770/2009

**Details of the offense:**   The above defendant, on occasions detailed below, traded or otherwise engaged with war materiel without a permit signed by the district commander or on that commander's behalf, specifically:

1. At the start of the year 2007, on an exact date unknown to the prosecution, the defendant purchased a Kalashnikov rifle, which fires and is capable of killing a human being, in return for the monetary sum of 2,000 dinars.

2. In April 2018, on an exact date unknown to the prosecution, the defendant met with Fuad Mahmud Saleh Dar Khalil (hereafter, "Fuad") and sold him the rifle, two magazines, and 60 bullets suitable for the rifle.

3. The defendant sold the rifle, magazines, and bullets to Fuad in return for the monetary sum of NIS 40,000.

By the above deeds, the defendant traded in war materiel without a permit from the district commander.

***Second count of indictment:***

***Nature of the offense:***   ***Carrying, possessing, and manufacturing weaponry,*** an offense under clause 230 (a+b) of the Security Provisions [Consolidated Version] (Judea and Samaria) (No. 1651) 5770/2009

***Details of the offense:***   The above defendant, during a period that began in 2007 and ended in April 2018, or thereabouts, carried, possessed, or manufactured a weapon with no permit from a military commander nor on a commander's behalf, or in contravention of the conditions of a permit, specifically:

During the period noted above, in committing the offense described in the previous count of indictment, the defendant was in possession of a weapon with no permit from a military commander.

Israel                                   Defense                                   Forces

_____

*Third count of indictment:*

*Nature of the offense:*  **Intentionally causing death,** an offense under clause 209 (a) of the Security
Provisions [Consolidated Version] (Judea and Samaria) (No. 1651) 5770/2009

*Details of the offense:*  The above defendant, in the month of December 2018 or thereabouts, caused
the death of another person, specifically:

1.  At the start of the year 2007, on an exact date unknown to the prosecution,
    the defendant purchased a Kalashnikov rifle in return for the monetary
    sum of 2,000 dinars (hereafter, **"the Kalashnikov Rifle"**). Shortly
    thereafter, the defendant dug a hole, buried there the Kalashnikov Rifle
    and, in addition, a pistol that was in his possession (hereafter, "**the Pistol**"),
    and poured concrete onto the ground.

2.  During the month of November 2018, at an exact date unknown to the
    prosecution, the defendant gave a monetary sum totaling NIS 4,000 to
    **Khaled Kamel Rashid Nawabit** (hereafter, "Khaled") and asked him to
    purchase a vehicle for him. Khaled assented, purchased for the defendant a
    white Peugeot vehicle, and passed it to the defendant (hereafter in this
    count of indictment: "**the Vehicle**").

3.  Later during the same day, the defendant drove to Ramallah and searched
    for a hiding place in which to park the Vehicle. Upon reaching the Ministry
    of Finance in Ramallah, the defendant parked the Vehicle and travelled to
    Bir Zeit by public transportation.

4.  At the start of December 2018, or thereabouts, the defendant met with
    Musa Majdi Issa Khatib (hereafter, "**Musa**"). During that meeting, the
    defendant proposed that Musa join him in carrying out military activities
    but the latter declined the defendant's proposal.

5.  During the same period, on an exact date unknown to the prosecution, the
    defendant determined to commit a shooting attack against Israeli targets.
    To that end, the defendant purchased gloves and began to consider where
    to commit the intended attack. At a certain moment, the defendant decided
    to commit the intended attack at the junction adjacent to the entrance into
    Ofra (hereafter, "**Ofra Junction**"), having noticed on a number of occasions
    that IDF soldiers are constantly present at that spot.

6.  On 8 December 2018 or thereabouts, the defendant met with his brother
    Saleh Ummar Saleh al-Barghuthi (hereafter, "Saleh"). The defendant
    expressed to Saleh his desire to commit an attack at Ofra Junction and
    proposed that Saleh join him and serve as driver for the attack.

7.  On the following day, 9 December 2018 or thereabouts, the defendant
    returned to his home and decided to perpetrate the intended attack on that
    very day. The defendant took the abovementioned gloves from his home

and went on foot to his parents' home. Upon arriving at his parents' home, the defendant met his brother Saleh and informed him that he desired to perpetrate the attack on that very day. In addition, the defendant asked Saleh to join him and serve as driver of the Vehicle. Saleh assented to the defendant's proposal, and the two drove in Saleh's vehicle to the defendant's home.

8.  When they reached the defendant's home, the defendant took up a bag and put into it the Kalashnikov rifle, the Pistol, and a number of magazines, while Saleh waited in the vehicle. Subsequently, the defendant returned to Saleh's vehicle and the two drove to the place where the defendant had parked the abovementioned Vehicle, the Peugeot.

9.  When they had reached the place, the defendant gave Saleh gloves and instructed him not to bring his mobile phone along. The two entered the Vehicle and began driving toward Ofra Junction, with the defendant at the wheel and Saleh sitting beside him. During the drive, the defendant told Saleh again that he intended to perpetrate a shooting attack at Ofra Junction.

10. On their way to Ofra Junction, the two stopped the Vehicle between the village of Surda and Jilazun, dismantled the license plates of the Vehicle, and discarded plastic parts and a wheel wrench that had been in the Vehicle. During the stop, the defendant took a scrap of cloth and wiped the Vehicle's doors with it in order to erase their fingerprints from the Vehicle.

11. Subsequently, the defendant told Saleh to shift into the driver's seat and the defendant sat in the back seat while carrying the Kalashnikov Rifle and the Pistol.

12. The two continued driving toward Ofra Junction, and on their way the defendant instructed Saleh to make his escape, once they had perpetrated the shooting attack at Ofra Junction, by driving toward the village of Ein Yabrud.

13. Subsequently, as they drove, the defendant covered his face with a hat and instructed Saleh to do the same.

14. Shortly before they reached Ofra Junction, the defendant cocked the Kalashnikov Rifle and the Pistol that were in his possession and opened the right rear window of the Vehicle, at his side.

15. When they reached Ofra Junction and the defendant perceived Israelis standing at the Junction, the defendant extended the Kalashnikov Rifle through the window and fired some 10 bullets toward them at close range, this being with the intent to cause their death (hereafter in this count of indictment, the "Shooting Attack").

16. As a result of the shooting perpetrated by the defendant, Shira Ish-Ran was injured during her seventh month of pregnancy, her husband Amichai Ish-Ran was injured, and so were a number of other citizens. Shira was evacuated to Shaare Zedek Medical Center in critical condition and rushed to an emergency operation during which the physicians were constrained to deliver her baby son and transfer him to the intensive-care unit. He was suffering from multi-system injury as a result of the above, and **after three days, on 12 December 2018, the baby Amiad Israel Ish-Ran died.**

17. Immediately after perpetrating the attack, the defendant and Saleh drove off to escape, and as they fled, the defendant extended the Pistol from the window of the Vehicle and fired into the air in order to deter others from firing toward them and thus make their escape from the place possible. The defendant returned the Pistol into the Vehicle, but it released a bullet which hit him.

18. Subsequently, the defendant instructed Saleh to drive to a building in Kharbata al-Misbah, where he had already planned to hide the Vehicle. After parking the Vehicle, the defendant took a bucket of paint that he found at the site and poured the paint into the Vehicle in order to hide the traces of blood that his injury had left. Then the defendant and Saleh drove away.

19. Later the same day, the defendant concealed the Kalashnikov Rifle and the Pistol in a hiding place and threw the clothes he had been wearing while he perpetrated the attack into the trash.

By committing the above deeds, the defendant intentionally caused the death of Amiad Israel Ish-Ran.

*Fourth count of indictment:*

*Nature of the offense:*   ***Attempting to intentionally cause death,*** an offense under clauses 209 (a) and 198 of the Security Provisions [Consolidated Version] (Judea and Samaria) (No. 1651) 5770/2009

*Details of the offense:*   The above defendant, on 9 December 2018 or thereabouts, attempted to intentionally cause the death of another person, specifically:

On the abovementioned occasion, at Ofra Junction or nearby, by committing the deeds stated in the third count of indictment, the defendant attempted to intentionally cause the death of Shira Ish-Ran, who was standing at the Junction. As a result of the shooting perpetrated by the defendant, Shira Ish-Ran was injured while in her seventh month of pregnancy and was evacuated to Shaare Zedek Medical Center in critical condition, suffering from multi-system injury. After resuscitation, she was rushed to emergency surgery in the course of which the physicians were constrained to deliver her baby.

**Fifth count of indictment:**

**Nature of the offense:**   ***Attempting to intentionally cause death,*** an offense under clauses 209 (a) and 198 of the Security Provisions [Consolidated Version] (Judea and Samaria) (No. 1651) 5770/2009

**Details of the offense:**   The above defendant, on 9 December 2018 or thereabouts, attempted to intentionally cause the death of another person, specifically:

On the abovementioned occasion, at Ofra Junction or nearby, by committing the deeds stated in the third count of indictment, the defendant attempted to intentionally cause the death of Amichai Ish-Ran, who was standing at the Junction. As a result of the shooting perpetrated by the defendant, Amichai Ish-Ran was injured at a number of places in his lower limbs.

**Sixth count of indictment:**

**Nature of the offense:**   ***Attempting to intentionally cause death,*** an offense under clauses 209 (a) and 198 of the Security Provisions [Consolidated Version] (Judea and Samaria) (No. 1651) 5770/2009

***Details of the offense:***   The above defendant, on 9 December 2018 or thereabouts, attempted to intentionally cause the death of another person, specifically:

On the abovementioned occasion, at Ofra Junction or nearby, by committing the deeds stated in the third count of indictment, the defendant attempted to intentionally cause the death of Sh. Sh., who was standing at the Junction. As a result of the shooting perpetrated by the defendant, Sh. Sh. was injured in the right shin and sustained a compound fracture to his left shin.

### Seventh count of indictment:

***Nature of the offense:***   ***Attempting to intentionally cause death,*** an offense under clauses 209 (a) and 198 of the Security Provisions [Consolidated Version] (Judea and Samaria) (No. 1651) 5770/2009

***Details of the offense:***   The above defendant, on 9 December 2018 or thereabouts, attempted to intentionally cause the death of another person, specifically:

On the abovementioned occasion, at Ofra Junction or nearby, by committing the deeds stated in the third count of indictment, the defendant attempted to intentionally cause the death of D. L., who was standing at the Junction. As a result of the shooting perpetrated by the defendant, D. L. was injured in the right thigh.

### Eighth count of indictment:

***Nature of the offense:***   ***Attempting to intentionally cause death,*** an offense under clauses 209 (a) and 198 of the Security Provisions [Consolidated Version] (Judea and Samaria) (No. 1651) 5770/2009

***Details of the offense:***   The above defendant, on 9 December 2018 or thereabouts, attempted to intentionally cause the death of another person, specifically:

On the abovementioned occasion, at Ofra Junction or nearby, by committing the deeds stated in the third count of indictment, the defendant attempted to intentionally cause the death of M. Sh., who was standing at the Junction. As a result of the shooting perpetrated by the defendant, M. Sh. was injured in the left ankle and left foot.

### Ninth count of indictment:

***Nature of the offense:***   ***Attempting to intentionally cause death,*** an offense under clauses 209 (a) and 198 of the Security Provisions [Consolidated Version] (Judea and Samaria) (No. 1651) 5770/2009

***Details of the offense:***   The above defendant, on 9 December 2018 or thereabouts, attempted to intentionally cause the death of another person, specifically:

On the abovementioned occasion, at Ofra Junction or nearby, by committing the deeds stated in the third count of indictment, the defendant attempted to intentionally cause the death of A. R., who was standing at the Junction. As a result of the shooting perpetrated by the defendant, A. R. was injured in his lower limbs.

**Tenth count of indictment:**

**Nature of the offense:**   ***Attempting to intentionally cause death,*** an offense under clauses 209 (a) and 198 of the Security Provisions [Consolidated Version] (Judea and Samaria) (No. 1651) 5770/2009

**Details of the offense:**   The above defendant, on 9 December 2018 or thereabouts, attempted to intentionally cause the death of another person, specifically:

On the abovementioned occasion, at Ofra Junction or nearby, by committing the deeds stated in the third count of indictment, the defendant attempted to intentionally cause the death of H. A., who was standing at the Junction. As a result of the shooting perpetrated by the defendant, H. A. was injured in her upper body and left leg.

**Eleventh count of indictment:**

**Nature of the offense:**   ***Attempting to intentionally cause death,*** an offense under clauses 209 (a) and 198 of the Security Provisions [Consolidated Version] (Judea and Samaria) (No. 1651) 5770/2009

**Details of the offense:** The above defendant, on 9 December 2018 or thereabouts, attempted to intentionally cause the death of another person, specifically:

On the abovementioned occasion, at Ofra Junction or nearby, by committing the deeds stated in the third count of indictment, the defendant attempted to intentionally cause the death of A. P., who was standing at the Junction.

### Twelfth count of indictment:

**Nature of the offense:** ***Attempting to intentionally cause death,*** an offense under clauses 209 (a) and 198 of the Security Provisions [Consolidated Version] (Judea and Samaria) (No. 1651) 5770/2009

**Details of the offense:** The above defendant, on 9 December 2018 or thereabouts, attempted to intentionally cause the death of another person, specifically:

On the abovementioned occasion, at Ofra Junction or nearby, by committing the deeds stated in the third count of indictment, the defendant attempted to intentionally cause the death of Sh. D., who was standing at the Junction.

### Thirteenth count of indictment:

**Nature of the offense:** ***Disruption of judicial procedures,*** an offense under clause 228 (a) of the Security Provisions [Consolidated Version] (Judea and Samaria) (No. 1651) 5770/2009

**Details of the offense:** The above defendant, on 9 December 2018 or thereabouts, committed an act intended to prevent or thwart a judicial procedure or to bring about a miscarriage of justice, whether by impeding the naming of a witness, or by concealing evidence, or by any other means, and specifically:

On the abovementioned occasion, at Kharbata al-Misbah or nearby, by committing the deeds stated in the third count of indictment, the defendant concealed evidence with the intent of preventing or impeding a judicial procedure.

### Fourteenth count of indictment:

**Nature of the offense:** ***Trading in war materiel,*** an offense under clause 233 (a+b) of the Security Provisions [Consolidated Version] (Judea and Samaria) (No. 1651) 5770/2009

**Details of the offense:** The above defendant, at the start of 2007 or at a time near that one, traded or otherwise dealt with war materiel without a permit signed by the district commander or on his behalf, specifically:

On the abovementioned occasion, by committing the deeds stated in item 1 of the third count of indictment, the defendant purchased a Kalashnikov rifle with no permit from the district commander.

*Fifteenth count of indictment:*

**Nature of the offense:**   ***Intentionally causing death,*** an offense under clause 209 (a) of the Security Provisions [Consolidated Version] (Judea and Samaria) (No. 1651) 5770/2009

**Details of the offense:**   The above defendant, on 13 December 2018 or thereabouts, intentionally caused the death of another person, specifically:

1.  On 12 December 2018, while the defendant was staying at the home of his parents in the village of Kubar, reports began arriving that his brother Saleh had been killed by the security services. Upon hearing of it, and in fear of being arrested by the security services, the defendant decided to flee the place.

2.  The defendant took up a bag, put into it the Kalashnikov Rifle and Pistol that he had hidden as described in the third count of indictment, left the house, and began to flee.

3.  In the vicinity of 11:00 p.m. the same day, the defendant reached the home of Khaled. He told him that Saleh had been killed and asked him to drive him to the village of Bil'in. Khaled assented to the defendant's request and drove him to Bil'in. There,

the defendant spent the night at the home of his relative, Hasan *[Translator's note: family name unclear]*, and watched the news, which reported on the death of Saleh.

4.   The next morning, on 13 December 2018, following on the death of his brother Saleh, the defendant decided to commit a further shooting attack against Israeli targets and to become a "shahid" *[Translator's note: Shahid is a person who is killed for the sake of Allah]*. In order to commit the intended shooting attack, the defendant purchased a blue Mitsubishi vehicle (hereafter, "**the Vehicle**") and drove the Vehicle toward Givat Assaf Junction in order to find Israeli targets, while equipped with the Kalashnikov Rifle and the Pistol.

5.   Upon arriving at Givat Assaf Junction the defendant *[unclear word]* a number of soldiers who were standing at the bus station and decided to perpetrate the shooting attack in that location.

6.   With that, the defendant drove back to the spot where the soldiers stood, stopped alongside them, and cocked the Kalashnikov Rifle. He descended from the Vehicle and began to shoot at them from close range in order to cause their death. **As a consequence of the shooting perpetrated by the defendant, death came to First Sergeant Yuval Mor Yosef and Sergeant Yosef Cohen, and two more people were injured.**

7.   Immediately after perpetrating the shooting, the defendant discerned an M16 rifle lying on the ground near one of the soldiers. The defendant took up the rifle, returned into the Vehicle, and began escaping by car toward Ramallah by way of a dirt road. Subsequently the defendant's Vehicle became stuck in the terrain and therefore he abandoned the weapons that had been in his possession and continued fleeing on foot.

By committing the above deeds, the defendant intentionally caused the death of First Sergeant Yuval Mor Yosef.

***Sixteenth count of indictment:***

***Nature of the offense:***   ***Intentionally causing death,*** an offense under clause 209 (a) of the Security Provisions [Consolidated Version] (Judea and Samaria) (No. 1651) 5770/2009

***Details of the offense:***   The above defendant, on 13 December 2018 or thereabouts, intentionally caused the death of another person, specifically:

On the abovementioned occasion, at Givat Assaf Junction or nearby, while committing the deeds stated in the fifteenth count of indictment, the defendant intentionally caused the death of Sergeant Yosef Cohen.

*Seventeenth count of indictment:*

*Nature of the offense:*     ***Attempting to intentionally cause death,*** an offense under clauses 209 (a) and 198 of the Security Provisions [Consolidated Version] (Judea and Samaria) (No. 1651) 5770/2009

*Details of the offense:*    The above defendant, on 13 December 2018 or thereabouts, attempted to intentionally cause the death of another person, specifically:

On the abovementioned occasion, at Givat Assaf Junction or nearby, while committing the deeds stated in the fifteenth count of indictment, the defendant attempted to intentionally cause the death of Sergeant N. F., who was standing at the junction. As a result of the shooting perpetrated by the defendant, Sergeant N. F. was shot and was evacuated to Hadassah University Hospital – Ein Kerem while sedated and intubated, with severe head wounds. Sergeant N. F. was hospitalized in the intensive-care unit in a subconscious neurological state.

*Eighteenth count of indictment:*

*Nature of the offense:*     ***Attempting to intentionally cause death,*** an offense under clauses 209 (a) and 198 of the Security Provisions [Consolidated Version] (Judea and Samaria) (No. 1651) 5770/2009

*Details of the offense:*    The above defendant, on 13 December 2018 or thereabouts, attempted to intentionally cause the death of another person, specifically:

On the abovementioned occasion, at Givat Assaf Junction or nearby, while committing the deeds stated in the fifteenth count of indictment, the defendant attempted to intentionally cause the death of Sh. S., who was standing at the Junction. As a result of the shooting perpetrated by the defendant, Sh. S. was wounded in the hip area and suffered a fracture in her left thigh.

**Nineteenth count of indictment:**

**Nature of the offense:**   ***Attempting to intentionally cause death,*** an offense under clauses 209 (a) and 198 of the Security Provisions [Consolidated Version] (Judea and Samaria) (No. 1651) 5770/2009

**Details of the offense:**   The above defendant, on 13 December 2018 or thereabouts, attempted to intentionally cause the death of another person, specifically:

On the abovementioned occasion, at Givat Assaf Junction or nearby, while committing the deeds stated in the fifteenth count of indictment, the defendant attempted to intentionally cause the death of Sh. A., who was standing at the junction.

**Twentieth count of indictment:**

**Nature of the offense:**   ***Carrying, possessing, and manufacturing weaponry,*** an offense under clause 230 (a+b) of the Security Provisions [Consolidated Version] (Judea and Samaria) (No. 1651) 5770/2009

**Details of the offense:**   The above defendant, during a period that began in 2007 and ended in December 2018, or thereabouts, carried, possessed, or manufactured a weapon with no permit from a military commander nor on a commander's behalf, or in contravention of the conditions of a permit, specifically:

During the period noted above, the defendant possessed, without a permit, the Kalashnikov Rifle and the Pistol as described in the third count of indictment and in the fifteenth count of indictment.

**Twenty-first count of indictment:**

**Nature of the offense:**   ***Carrying, possessing, and manufacturing weaponry,*** an offense under clause 230 (a+b) of the Security Provisions [Consolidated Version] (Judea and Samaria) (No. 1651) 5770/2009

**Details of the offense:**   The above defendant, during a period that began on 15 December 2018 and extended until the day of his arrest, or thereabouts, carried, possessed, or manufactured a weapon with no permit from a military commander nor on a commander's behalf, or in contravention of the conditions of a permit, specifically:

1. On 13 December 2018 or thereabouts, after perpetrating the shooting attacks described in the third and fifteenth counts of indictment, the defendant came to Ziyad Muhammad Abd a-Nabi Shalalda (hereafter, "Ziyad") and hid at his place for a number of days.

2. The defendant told Ziyad that he needed a weapon and asked him to approach his uncle, Lutfi Isma'il Musa al-Barghuthi (hereafter, "Lutfi").

Ziyad assented to the defendant's request, travelled to Lutfi's home, and told him that the defendant needed him.

3.  On 15 December 2018 or thereabouts, Lutfi came to Ziyad and met the defendant. The defendant received from Lutfi a Kalashnikov rifle, two magazines, and bullets.

4.  In addition, during the defendant's flight from the security services, at specific times unknown to the prosecution he received from Ziyad a night-vision telescope, three magazines, and bullets for a Kalashnikov-type weapon.

By committing the above deeds, the defendant was in possession of a weapon without a permit from the district commander.

***Twenty-second count of indictment:***

***Nature of the offense:***   ***Membership and activity in an unlawful association,*** an offense under clauses 84 and 85(a) of the Defense (Emergency) Regulations of 1945.

Israel                                              Defense                                              Forces

---

***Details of the offense:***   The above defendant, during a period that began on 15 December 2018 and extended until the day of his arrest, or thereabouts, was a member or acted as a member of an unlawful association, specifically:

1. On 15 December 2018 or thereabouts, Ziyad drove the defendant to the home of Mahmud Abu al-Mu'az Hussein Idris (hereafter, "Mahmud"), where the defendant hid for a number of days.

2. On 27 December 2018 or thereabouts, while hiding at the home of Mahmud, the defendant asked Mahmud and his son Diya Mahmud a-Din Maahmud Abd al-Mu'az Idris (hereafter "Diya") to travel to Jaber Mamduh Jaber Abdu (hereafter, "Jaber") and to bring him to him.

3. Mahmud and Diya assented to the defendant's request and, as requested by the defendant, travelled to the home of Jaber and brought him to their home.

4. Upon arriving at their home, Jaber met the defendant, and the two conversed alone. During their meeting, the defendant suggested that Jaber join him in a military cell with the objective of perpetrating shooting attacks against Israeli targets (hereafter, "**the Cell**"). Jaber assented and suggested recruiting his brother-in-law Mahdi Abd al-Mu'min Ahmad Abu Rahma (hereafter, "**Mahdi**") to the Cell as well. The defendant assented to Jaber's suggestion.

5. During the meeting, the defendant told Jaber that he had sold a Kalashnikov-type weapon to Fuad and that Fuad was imprisoned. The defendant asked Jaber to go bring that weapon from Fuad's home, and Jaber assented. In addition, the defendant asked Jaber to speak with Musa and tell him that he wants to meet him. The defendant told him that after he brought him the said weapon, he intended to train him and Musa on the weapon.

6. On 28 December 2018 or thereabouts, Jaber arrived at Mahdi's home and suggested that he join the military Cell whose objective was to perpetrate terror attacks against Israelis. Mahdi assented to Jaber's suggestion and even offered to recruit an additional person.

7. On 29 December 2018 or thereabouts, Jaber phoned Musa in the morning and asked to meet with him. Shortly afterward, Musa arrived at Jaber's workplace and the two met together. Jaber told Musa that he had met the defendant and that the defendant wished to meet him. Jaber told Musa that the defendant was at Diya's home.

8. On the same day, Musa arrived together with Ziyad at the home of Ahmad Muhammad Abd al-Hafez, where the defendant was hiding at the time. When they met, Musa and the defendant sat alone together and the

defendant suggested that Musa join him in military activity; and the two agreed that Musa would purchase a Kalashnikov-type weapon.

9.   Shortly afterward, on the same day, Jaber and Mahdi travelled to Fuad's home in order to take the abovementioned weapon as the defendant had requested of Jaber. When they reached Fuad's home Jaber alit from the vehicle, entered Fuad's home, and asked to speak with his wife. Jaber told her that he had come on behalf of the defendant, who had said that there was a Kalashnikov-type weapon in the house. Fuad's wife told Jaber that she had no weapon in her possession. Then Jaber and Mahdi drove away and returned to their home.

10.  On 31 December 2018, Jaber was arrested by the security services. At the time of his arrest, Jaber met Fuad, approached him, and gave him a note on which it was written that the defendant sent him regards and that he wanted the weapon that was in his possession. Fuad told Jaber that he had no weapon at his disposal.

11.  The plans of the defendant and of the other members of the Cell did not come to fruition, because they were arrested after a number of days.

By committing the above deeds, the defendant was a member, and active, in a military cell, which is an unlawful association.

***Twenty-third count of indictment:***

***Nature of the offense:***   ***Conspiracy to intentionally cause death,*** an offense under clauses 209 and 254 of the Security Provisions [Consolidated Version] (Judea and Samaria) (No. 1651) 5770/2009

***Details of the offense:***   The above defendant, during a period that began in December 2018 and extended until the day of his arrest, or thereabouts, conspired with another person to commit an offense punishable by more than three years' imprisonment, specifically:

During the period noted above, by committing the deeds described in the previous count of indictment, the defendant conspired with the members of the Cell to commit shooting attacks against Israelis.

Israel                                                    Defense                                                    Forces

---

*Twenty-fourth count of indictment:*

**Nature of the offense:**   ***Conspiracy to Trading in war materiel,*** an offense under clauses 233 (a+b) and 254 of the Security Provisions [Consolidated Version] (Judea and Samaria) (No. 1651) 5770/2009

**Details of the offense:**   The above defendant, during December 2018 or thereabouts, conspired with another person to commit an offense punishable by more than three years' imprisonment, specifically:

During the period noted above, by committing the deeds described in item 5 of the twenty-second count of indictment, the defendant conspired with Jaber to commit an offense of trading in war materiel.

*Twenty-fifth count of indictment:*

**Nature of the offense:**   ***Trading in war materiel,*** an offense under clauses 233 (c) of the Security Provisions [Consolidated Version] (Judea and Samaria) (No. 1651) 5770/2009

**Details of the offense:**   The above defendant, during December 2018 or thereabouts, knew that another person was about to commit, or had committed, the offense of trading in war materiel, and he did not, within any reasonable time, inform an officer or any of the area's police stations; specifically:

During the period noted above, by committing the deeds described in item 8 of the twenty-second count of indictment, the defendant was informed that Musa was about to commit an offense of trading in war materiel and he did not inform an officer or any of the area's police stations.

*Date:* 11 March 2019

        *[signature]*                                                    *[signature]*

Military Legal Officer Shoval Bergalas                                    Captain        Avivit Tsemach
Military                    Prosecutor                                    Military                Prosecutor


*Witnesses for the Prosecution:*

1.   Master Sgt. Zahran Halabi, military ID no. 1220078, Jerusalem
2.   Staff Sgt. Kan'an Izz a-Din, military ID no. 1902752, Jerusalem
3.   Sgt. 1st Class Alian Ghanem, military ID no. 8363062
4.   Ahmad Muhammad Abd al-Hafed Hussein, ID no. 980865588, Prosecution File 1367/19
5.   Mahmud Abd al-Mu'az Hussein Idris, ID no. 929180214, Prosecution File 1193/19
6.   Diya Mahmud Abd al-Mu'az Idris, ID no. 853608644, Prosecution File 1191/19
7.   Mahdi Abd al-Mu'min Ahmad Abu Rahma, ID no. 850495953
8.   Fuad Mahmud Saleh Dar Khalil, ID no. 906303581, Prosecution File 1209/19
9.   Ziyad Muhammad Abd a-Nabi Shalalda, ID no. 902604065, Prosecution File 1194/19

10. Jawdat Ahmad Yusuf Mash'al, ID no. 854100765, Prosecution File 1176/19
11. Muhammad Ummar Saleh Barghuthi, ID no. 406669697, Prosecution File 1175/19
12. Muhammad Ahmad Yusuf Mash'al, ID no. 859901464, Prosecution File 1174/19
13. Khaled Kamal Rashid Nawabit, ID no. 411013097, Prosecution File 1143/19
14. Musa Majdi Issa Khatib, ID no. *[unclear]*, Prosecution File 1424/19
15. Jaber Mamduh Jaber Abdu, ID no. 852246230, Prosecution File 1305/19

Israel                                    Defense                                    Forces

16. Lutfi Isma'il Musa Barghuthi, ID no. *[unclear]*, Prosecution File 1270.19
17. Miqdad Zahi Kaid Barghuthi, ID no. *[unclear]*, Prosecution File 1173/19
18. Mahmud Ziyad Muhammad Shelalda, ID no. 402653042, Prosecution File 1192/19
19. Mahmud Ali Abd al-Aziz al-Qadi, ID no. *[unclear]*, Prosecution File 1222/19
20. Suheir Isma'il Musa Barghuthi, ID no. *[unclear]*, Prosecution File 1251/19
21. Saher Isma'il Musa Barghuthi, ID no. 9335382566, Prosecution File 1269/19
22. Zahi Isma'il Musa Barghuthi, ID no. 933538282, Prosecution File 1268/19
23. Muhanad Shehada Shehada Rian, ID no. *[unclear]*
24. Ahlam Rasmi Sa'id Nawabit, ID no. *[unclear]*
25. Supt. Avi Kaufman, Weapons Laboratory, Jerusalem
26. Sgt. Maj. Moran Mas'ud, military ID no. 68833011, Binyamin
27. Sgt. Maj. Maxim Sorokin, military ID no. 1117480, Samaria
28. Sgt. Maj. Menashe Nahum, military ID no. *[unclear]*
29. Chief Warrant Officer Albert Shalev, military ID no. 581595, Binyamin
30. Master Sgt. Ehud Vaknin, military ID no. 1903930, Binyamin
31. Chief Inspector Osnat Israelson Azulai, Criminal Identification Division, Jerusalem
32. Staff Sgt. Reuven Hai, military ID no. 1903895, Binyamin
33. Master Sgt. Leon Avraham, military ID no. 75230102, Hebron
34. Supt.  Ezra Shoshani, Weapons Laboratory, Jerusalem
35. Supt. Yehonatan Roth, DNA and Biology Laboratory, Jerusalem
36. Sgt. Maj. Ro'i Ben Ami, military ID no. 1123819, Binyamin
37. Supt. Yair Devler, military ID no. 1159094, Binyamin
38. Supt. Inon Harush-Brosh, military ID no. 1176411
39. Sgt. Maj. Lior Meiri, military ID no. 1121268
40. Chief Warrant Officer Benny Gavrieli, military ID no. 572867
41. Master Sgt. Sima Avrahami, military ID no. 1219898
42. Supt. Alan Tchaikovsky, Criminal Identification Division, Jerusalem
43. Supt. Sigal Berlyne, DNA and Biology Laboratory, Jerusalem
44. Sgt. Maj. Tomer Maloul, military ID no. 1093186, Binyamin
45. Sgt. Maj. Ro'i Gavrieli, military ID no. 1909786
46. Staff Sgt. Adi Ben Ezra, military ID no. 1800390
47. Sgt. Maj. Ihab Halabi, military ID no. 1220060, Jerusalem
48. Chief Supt. Michal Levin Elad
49. Chief Inspector Nora Weiss
50. Supt. Tanya Ram
51. Master Sgt. Yitzhak Weitzmann, military ID no. 1007889, Binyamin
52. Staff Sgt. Erez Shmuel, military ID no. 1905584, Binyamin
53. Supt. Alfonso Ben Tulila, military ID no. 3151059, Binyamin
54. Supt. Yosef Amoyal, military ID no. 1103779, Binyamin
55. Senior Staff Sgt. Major Liron Mukdasi, military ID no 1019819
56. Yoram Hai Zecharia (details on file with the prosecution)
57. Ohevia Sharabi, IDF (details on file with the prosecution)
58. Shira Ish-Ran (details on file with the prosecution)
59. Amichai Ish-Ran (details on file with the prosecution)
60. Sh. Sh. (details on file with the prosecution)
61. D. L. (details on file with the prosecution)
62. M. Sh. (details on file with the prosecution)

63. A. R. (details on file with the prosecution)
64. H. A. (details on file with the prosecution)

65.   A. P. (details on file with the prosecution)
66.   Sh. D. (details on file with the prosecution)
67.   Sh. S. (details on file with the prosecution)
68.   Sh. A. (details on file with the prosecution)
69.   Medical documents for Shira Ish-Ran
70.   Medical documents for Amichai Ish-Ran
71.   Medical documents for Sh. Sh.
72.   Medical documents for D. L.
73.   Medical documents for M. Sh.
74.   Medical documents for A. R.
75.   Medical documents for Sh. S.
76.   Medical documents for Sergeant N. P.
77.   Certificate of death for Amiad Israel Ish-Ran
78.   Certificate of death for Yuval Mor Yosef
79.   Certificate of death for Yosef Cohen

' j:

צבא                                    הגנה                                    לישראל

| בבית | | | | | התבאי | | |
|---|---|---|---|---|---|---|---|
| ה | ו | ד | ה | | | |
| בפני | | | | | ורייבב | | |

תיק   בימ״ש:   19/ ‏3‏1₂
הזון תביעה (סניזמן): 1425/19
תיק פלי״א: 545730/18
551767/18

בפשבט שבין

התובע הצבאי                                                               נ א ש י ם

עאצם עומר צאלח בר׳גוה׳י
ח״ז: 950446633, יליד: 27/03/1986, תושב כובר
עצור מיום 08/01/2019

## כתב אישום

הנאשם הנ״ל מואשם בזאת בביצוע העבירות הבאות:

### פרטי אישום ראשון:

**מהות העבירה: סחי בציוד מלחמתי,** עבירה לפי סעיף 233(א+ב) לצו בדבר הוראות ביטחון [נוסח משולב] [יהודה והשומרון] (מס׳ 1651), תשע״ו - 2009.

**פרטי העבירה:** הנאשם הנ״ל, במועדים שיפורטו להלן, סחר או עסק בעורה אחרת בציוד מלחמתי ללא היתר חתוב ממפקד האיזור או מטעמו, דהיינו:

1. בתחילת שנת 2007, במועד מדויק שאינו בידיעת התביעה, רכש הנאשם נשק מסוג קלצ׳יניקוב, היורה ובכוחו להמית אדם, תמורת סכום כסף בסך 2,000 דינר.

2. בחודש אפריל 2018, במועד מדויק שאינו בידיעה התובעה נפגש הנאשם עם פואד מחמוד צאלח דאר חליל (להלן: פואד) ומסר לו את הנשק, שתי מחסניות ו-60 כדורים תמתאימם לנשק.

3. את הנשק, שתי תמחסניות והכדורים, מכר הנאשם לפואד תמורת סכום כסף בסך 40,000 ₪.

בעשותו את האמור לעיל, כיהר הנאשם בציוד מלחמתי ללא היתר ממפקד האיזור

### פרטי אישום שני:

**מהות העבירה: נשיאות, התחזקת ויצור נשק,** עבירה לפי סעיף 230(א+ב) לצו בדבר הוראות בטחון [נוסח משולב] [יהודה והשומרון] (מס׳ 1651), תשע״ו - 2009.

**פרטי העבירה:** הנאשם הנ״ל, בתקופה שנתחילתה בשנת 2007 וסיומה בחודש אפריל 2018, או בתקופה הסמוכה לכך, נשא, החזיק או יצר כלי נשק ללא ועדה ללא העדה היתר ממפקד צבאי או מטעמו או שלא בהתאם לתנאיה של תעודת היתר, דהיינ׳

בתקופה האמוהזלעיל, בעשותו את האמור בפרט האישום הקודם, החזיק הנאשם בכלי נשק ללא היתר ממפקד צבאי.

לישראל                                                               אבט

**פרק אישום שלישי:**

**מהות העבירה:** גרימת מוות במכוונה, עבירה לפי סעיף 05(א) לצו בדבר הוראות בטחון [נוסח משולב] (יהודה ושומרון) (מס' 1651), התשע"ע – 2007.

**פרטי העבירה:** הנאשם הנ"ל, בחודש דצמבר 2018 או במועד הסמוך לכך, גרם בכוונה למותו של אחד, דהיינו:

1. בתחילת שנת 2007, במועד מדויק שאינו בידיעת התביעה, רכש הנאשם נשק מסוג קלצ'ניקוב התמורה סכום כסף בסך 2,000 דינר ו[...] רובה הקלצ'ניקוב). סמוך לאחר מכן, חפר הנאשם בור, הטמין בתוכו את רובה הקלצ'ניקוב ואקדח נטף שחיה ברשותו (להלן: האקדח), ושפך מעל האדמה בטון.

2. במהלך חודש נובמבר 2018, במועד מדויק שאינו בידיעת התביעה, נתן הנאשם סכום כסף בסך כולל של 4,000 ₪ [...] (להלן: חאלד), וביקש ממנו לרכוש עבורו רכב. וחאלד הסכים ורכש עבור הנאשם רכב נוסע פרו בצבע לבן והעביר אותו לנאשם (להלן בפרק אישום זה: הרכב).

3. לאחר מכן, באותה חימוה, נסע הנאשם, לרמאללה וויתקין פקדום מסתור בו יחנה את הרכב. בהגיעו למשרד האזור ברמאללה, החנה הנאשם את הרכב ונסע לבני-ברית באמצעות תחבורה ציבורית.

4. בתחילת חודש דצמבר 2018, או במועד הסמוך לכך, נפגש הנאשם עם מוסא מג'דיר עיסא חטיב (להלן: מוסא), במהלך הפגישה, הציע הנאשם למוסא להצטרף אליו לביצוע פעילות צבאית. והאחרון סירב להצעתו של הנאשם.

5. באותה התקופה, במועד מדויק שאינו בידיעת התובעה, גמלה בליבו של הנאשם תחזילתכה לבצע פיגוע ירי נגד מתרווני ישראלים. כצורך כך, רכש הנאשם כפפות וחדל לחשוב על מקום בו יבצע את הפיגוע המתוכנן. בשלב נוסיף, החליט הנאשם לבצע את הפיגוע המתוכנן בצומת הכניסה לעפרה (להלן: צומת עפרה), וזאת מאחר שהבחין במספר הזדמנויות כי בנקודה זו קיימת נוכחות קבועה של חיילי צה"ל.

6. ביום 08/12/2018, או במועד הסמוך לכך, נפגש הנאשם עם אחיו, צאלח עומר צאלח ברגותי (להלן: צאלח). הנאשם הביא בפני צאלח את רצונו לבצע פיגוע בצומת עפרה והציע לו להצטרף אליו ולמשש בכחב בפיגוע.

7. למחרת, ביום 09/12/2018, או במועד הסמוך לכך, חזר הנאשם לביתו וחתלים לבצע את הפיגוע המתוכנן באותו יום. הנאשם הביא מביתו את חכפפות הניל וחלך ברגל לבית הוריו. בהגיעו לבית הוריו, נפגש הנאשם עם אחיו צאלח וחודיע לו כי בראצו לבצע את הפיגוע באותו היום. כן ביקש הנאשם מצאלח להצטרף אליו ולשעתם כהנא הרכב. צאלח הסכים להצעתו של הנאשם והשניים נסעו ברכבו של צאלח לבית הנאשם.

8. כאשר חגיעו לביתו של הנאשם, נטל הנאשם תיק וחכניס לתוכו את רובה הקלצ'ניקוב, האקדה ומספר מחסניות, בעוד שצאלח ממתין ברכבו. לאחר מכן, חזר הנאשם לרכבו של צאלח והשניים נסעו למקום בו וחנה הנאשם את הרכב האמור לעיל משוג פנוי.

9. בהגיעם למקום, נתן הנאשם לצאלח כפפות והנחה אותו שלא יבא איתו עד מכשיר הטלפון חייגל שלו. השניים עברו לרכב וחחלו בנסיעתם לכיוון צומת עפרה, כאשר הנאשם נהג ברכב וצאלח ישב לצדו. במהלך נסיעתם, חזר הנאשם ואמר לצאלח כי בכוונתו לבצע את פיגוע הירי בצומת עפרה.

10. בדרכם לצומת עפרה, עצרו השניים את הרכב בן כפר סורדא לגילוון, פירקו את לוחיות הזיהוי של הרכב והשליכו חלקי פלסטיק ומפתח גלגלים אשר חיד ברכב. במהלך הצעירה, לקח הנאשם פיסת בד ונגב באמצעותה את לוחית הרכב על מנת להעלים את טביעות אצבעותיהם מהרכב.

11. לאחר מכן, חורה הנאשם לצאלח לעבור למושב חנהג והתשמש התיישב במושב האחורי. כברשותו רובה הקלצ'ניקוב והאקדח.

12. השניים המשיכו בנסיעתם לכיוון צומת עפרה, ובדרכם הנחה הנאשם את צאלח כי לאחר שיבצע את הירי בצומת עפרה, עליו לברוח בכיוון כפר עין-יברוד.

13. בהמשך, במהלך הנסיעה, כיסה הנאשם את פניו באמצעות כובע והנחה את צאלח לעשות כמותו.

2

14. בסמוך לפני חגעתם לצומת עברתן, דרך הנאשם את רובה הקלצ'ניקוב והאקדח שהיו ברשגען ופתח את החלון האחורי הימני של הרכב, שם ישב.

15. בהגיעם לצומת עפרה, וכשהבחינו חנאשם בישראלים שעמדו בצומת, הוציא חנאשם מהחלון את רובה הקלצ'ניקוב ויירד לעברם ממרחק קצר כ-10 כדורים, וזאת בכוונה לגרם למותם (להלן בפרטי אישום זה: פיגוע היריו).

16. כתוצאה מהירי שביצע הנאשם, נפצעו שירה איש-רן שהייתה בחודש השביעי להריונה, נפצע בעלה עמיחי איש-רן ומספר אורחים נוספים. שירה פונתה לבית החולים שערי-צדק במצב אנוש והוהבהלה לנהנות חירום, ומהלכו נאלצו חרופאים ליילד אתחה ותעברין את חיילוד ליחידה לטיפול נמרץ, משהא יוכל בנמ'נתה רב-מערכתית. כתוצאת מהאמור, ובעבור שלושה ימים, ביום 12/12/2018, נפטר היילוד עמיעד ישראל איש-רן ז"ל.

17. מיד לאחר ביצוע הפיגוע, נמלטו הנאשם וצאלח מדמקום בנסיעה, ובמהלך מנוסתם הוציא חנאשם מהחלון הרכב אות דאקודח יורד באוחד על מנד לזרותע אוחדים עליירות לכיוונם, ובכך לאפשר את מנוסתם מהמקום חנאשם החזיר את האקדח לתוך הרכב ונפלט כדור מתוכו שפגע בו.

18. בהמשך, חנחת הנאשם אות צאלח לנסוע לביניין בחרבחא אל-מצבאחה תכנן מבעוד מועד להסתתיר את הרכב. לאחר שהחבא את הרכב, לקח הנאשם דלי צבע שמצא במקום ושפך את יהצבע בתוך הרכב, על מנת לירעלמם אית שאריית חדם מפ'עינתו. בחמשך, נטו הנאשם וצאלח מהמקום.

19. מאוחר יותר, 'באוותו היממנו, הוביא הנאשם את רובה הקלצ'ניקוב והאקדח במקום מסתור והשלך לאשפה את ההבדים אשר לבש בעת שביצע את פיגוע חירי.

בעשותי את האמור לעיל, גרם הנאשם בכוונה למותו של עמיעד ישראל איש-רן ז"ל.

<u>פרט אישום רביעי:</u>

<u>מהות העבירה:</u> ניסיון לגרימת מוות בכוונה, עבירה לפי סעיפים 209(א) ו-198 לצו בדבר הוראות בטחון [נוסח משולב] [יהודה ושומרון] (מס' 1651), התשע"ע - 2009.

<u>פרטי העבירה:</u> הנאשם הנ"ל, ביום 09/12/2018 או בסמוך לכך, ניסה לגרים בכוונה למותו של אחר, דהיינו:

במועד ובמקום האמור לעיל, בצומת עפרה, או במקום וכסמוך לשם, בעשותו את האמור בפרט האישום השלישי, ניסה חנאשם לגרום למותה של עמיחי איש-רן, אשר עמדה בצומת. כתוצאה מהירי שביצע הנאשם, נפצעה שירה איש-רן, שהייתה בחודש השביעי להריונה, ופונתה לבית החולים שערי-צדק במצב אנוש כשהיא טועבת כוביעוע רב-מערכהית. לאחר ביצוע פעולות החייאה, הובחלה לנהנות חירום, במהולכו נאלצו חרופאים ליילדת.

<u>פרט אישום חמישי:</u>

<u>מהות העבירה:</u> ניסיון לגרימת מוות בכוונה, עבירה לפי סעיפים 209(א) ו-198 לצו בדבר הוראות בטחון [נוסח משולב] (יהודה ושומרון) (מס' 1651), התשע"ע - 2009.

<u>פרטי העבירה:</u> הנאשם הנ"ל, ביום 09/12/2018, או בסמוך לכך, ניסה לגרים בכוונה למותו של אחר, דהיינו:

במועד ובמקום לעיל, בצומת עפרה, או במקום וכסמוך לשם, בעשותו את האמור בפרט האישום השלישי, ניסה הנאשם לגרום למותו של עמיחי איש-רן, אשר עמד בצומת. כתוצאה מהירי שביצע הנאשם, נפצע עמיחי איש-רן במספר מקומות בגפיים התחתונות.

<u>פרט אישום שישי:</u>

<u>מהות העבירה:</u> ניסיון לגרימת מוות בכוונה, עבירה לפן סעיפים 209(א) ו-198 לצו בדבר הוראות בטחון [נוסח משולב] (יהודה ושומרון) (מסי 1651), התשי"ע - 2009.

אבא                                          הגנה                                    לישראל

**פרטי העבירה:** הנאשם הנ"ל, ביום 09/12/2018, או במועד הסמוך לכך, ניסה לגרום בכוונה למותו של אחר, **דהיינו** ·

במועד האמור לעיל, בצומת עפרה, או במקום הסמוך לשם, בעשותו את האמור בפרט האישום השלישי, ניסה הנאשם לגרום בכוונה למותו של ש.ש., אשר עמד בצומת. כתוצאה מהירי שביצע הנאשם, נפצע ש.ש. בשרוך רגלו הימנית ונגרם לו שבר פתוח בשוק רגלו השמאלית.

**פרק אישום שמיני:**

**מהות העבירה:** ניסיון לגרימת מוות בכוונה, עבירה לפי סעיפים 209(א) ו-198 לצו בדבר הוראות בטחון [נוסה משולב] (יהודה ושומרון) (מס' 1651), התשי"ע – 2009.

**פרטי העבירה:** הנאשם הנ"ל, ביום 09/12/2018, או במועד הסמוך לכך, ניסה לגרום בכוונה למותו של אחר, **דהיינו** .

במועד האמור לעיל, בצומת עפרה, או במקום וסמוך לשם, בעשותו את האמור בפרט האישום השלישי, ניסה הנאשם לגרום בכוונה למותו של ד.ל., אשר עמד בצומה. כתוצאה מהירי שביצע הנאשם, נפצע ד.ל. בירך רגלו היימנית.

**פרק אישום שמיני:**

**מהות העבירה:** ניסיון לגרימת מוות בכוונה, עבירה לפי סעיפים 209(א) ו-198 לצו בדבר הוראות בטחון [נוסה משולב] (יהודה ושומרון) (מס' 1651), התשי"ע – 2009.

**פרטי העבירה:** הנאשם הנ"ל, ביום 09/12/2018, או במועד הסמוך לכך, ניסה לגרום בכוונה למותו של אחר, **דהיינו** :

במועד האמור לעיל, בצומת עפרה, או במקום חסמוך לשם, בעשותו את האמור בפרט האישום השלישי, ניסה הנאשם לגרום בכוונה למותו של מ.ש., אשר עמדה בצומג. כתוצאה מהירי שביצע הנאשם, נפצעה מ.ש. בקרסית רגלה השנואלית ובכף רגלה השמאלית.

**פרט אישום תשיעי:**

**מהות העבירה:** ניסיון לגרימת מוות בכוונה, עבירה לפי סעיפים 209(א) ו-198 לצו בדבר הוראות בטחון [נוסה משולב] (יהודה ושומרוה) (מס' 1651), התשי"ע – 2009.

**פרטי העבירה:** הנאשם הנ"ל, ביום 09/12/2018, או במועד הסמוך לכך, ניסה דגרום בכוונה למותו של אחר, **דהיינו** .

במועד האמור לעיל, בצומה עפרה, או במקום חסמוך לשם, בעשותו את האמור בפרט האישום השלישי, ניסה הנאשם לגרום בכוונה למותו של א.ר., אשר עמד בצומת. כתוצאה מהירי שביצע הנאשם, נפצע א.ר. בגפי התחתוניוי.

**פרט אישום עשירי:**

**מהות העבירה:** ניסיון לגרימת מוות בכוונה, עבירה לפי סעיפים 209(א) ו-198 לצו בדבר הוראות בטחון [נוסח משולב] (יהודה ושומרוו) (מס' 1651), התשי"ע – 2009.

**פרטי העבירה:** הנאשם הנ"ל, ביום 09/12/2018, או במועד הסמוך לכך, ניסה לגרום בכוונה למותו של אחר, **דהיינו** .

במועד האמור לעיל, בצומת עפרה, או במקום הסמך לשם, בעשותו את האמור בפרט האישום השלישי, ניסה הנאשם לגרום בכוונה למותה של ח.ע., אשר עמדה בצומה. כתוצאה מהירי שביצע הנאשם, נפצעה ת.ע. בפלג גופה העליון וברגלה השמאלית.

**פרט אישום אחד-עשר:**

**מהות העבירה:** ניסיון לגרימת מוות בכוונה, עבירה לפי סעיפיכ 209(א) ו-198 לצו בדבר הוראות בטחון [נוסה משולב] (יהודה ושומרוו) (מס' 1651), התשי"ע – 2009.

-4-

צבא _____ : 288 _____ לישראל

**פרטי העבירה**: הנאשם הנ"ל, ביום 09/12/2018, או בסמוך מ.מ. כך, נסה לגרום בכוונה למותו של אחר, דהיינו:

במועד האמור לעיל, בצומת עפרה, או גם שום הסמוך לשם, בעשותו את האמור בפרט האישום השלישי, ניסה הנאשם לגרום בכוונה למותו של א.פ., אשר עמדה בצומת.

## פרט אישום שנים-עשר:

**מהות העבירה**: ניסיון לגרימת מוות בכוונה, עבירה לפי סעיפים 20(א) ו-198 לצו בדבר הוראות בטחון [נוסח משולב] (יהודה ושומרון) (מס' 1651), התשע"ט – 2009.

**פרטי העבירה**: הנאשם הנ"ל, ביום 09/12/2018, או בסמוך לכך, ניסה לגרום בכוונה למותו של אחר, דהיינו:

במועד האמור לעיל, בצומת עפרה, או בסמוך הסמוך לשם, בעשותו את האמור בפרט האישום השלישי, ניסה הנאשם לגרום בכוונה למותה של ש.ה., אשר עמד בצומת.

## פרט אישום שלושה-עשר:

**מהות העבירה**: שיבוש הליכי משפט, עבירה לפי סעיף 228(א) לצו בדבר הוראות ביטחון [נוסח משולב] (יהודה ושומרון) (מס' 1651), התשע"ט – 2009.

**פרטי העבירה**: הנאשם הנ"ל, ביום 09/12/2018, או במועד הסמוך לכך, עשה דבר בכוונה למנוע או להכשיל הליך שיפוטי או להביא לידי עיוות דין, בין כשיכול היימתו של עד, בין בהעלמת ראיה ובין בדרך אחרת, דהיינו:

במועד האמור לעיל, בחרבתא אל-מנבאח, או במקום הסמוך לשם, בעשותו את האמור בפרט האישום השלישי, העליים הנאשם ראיות בכוונה למנוע או להכשיל הליך שיפוטי.

## פרט אישום ארבעה-עשר:

**מהות העבירה**: סחר בציוד מלחמתי, עבירה לפי סעיף 233(א–ב) לצו בדבר הוראות ביטחון [נוסח משולב] (יהודה ושומרון) (מס' 1651), התשע"ט – 2009.

**פרטי העבירה**: הנאשם הנ"ל, בתחילת שנת 2007, או במועד הסמוך לכך, סחר או עסק בצורה אחרת בציוד מלחמתי, ללא היתר חתום ומופק מאת ראש מטעמו, דהיינו:

במועד האמור לעיל, בעשותו את האמור בסעיף 1 בפרט האישום השלישי, רכש הנאשם רובה קלצ'ניקוב ללא היתר ממפקד האיזור.

## פרט אישום חמישה-עשר:

**מהות העבירה**: גרימת מוות בכוונה, עבירה לפי סעיף 20(א) לצו בדבר הוראות בטחון [נוסח משולב] (יהודה ושומרון) (מס' 1651), התשע"ע – 2005.

**פרטי העבירה**: הנאשם הנ"ל ביום 13/12/2018, או במועד הסמוך לכך, גרם בכוונה למותו של אחר, דהיינו:

1.  ביום 12/12/2018, בעת ששהה הנאשם בבית הורים בכפר כובר, החלו להונבל ידיעות על כך שאתיו צאלה נהרג על ידי כוחות הביטחון, משנשמע על כך, ומתוך חשש שייעצר על ידי כוחות הביטחון, החליט הנאשם לברוח מהבקום.

2.  הנאשם נטל נשק תיק, הכניס לחוכו את רובה הקלצ'ניקוב יהאקדח אשר הסתיר, כמתואר בפרט האישום השלישי, יצא מהבית והחל במנוסתו.

3.  בסביבות השעה 00:23 באו"ת חימה, הגיע הנאשם לבית של חיאלי, אמר לו כי צאלה נהרג וביקש ממנו שיסיע אותו אלים לא כך במקון, הלך הסכים לבקשות הנאשם והסיע אותו לבלעין, שם,

לו הנאשם בביתו של חסן נב__ __ __ ה שפחתו, וצפה בהדשות אשר דיווחו על מותו של
צאלח.

4. בבוקר שלמחרת, ביום 2018/__, __ב___, בנמבות מותו של אחיו צאלח, גמלה בלבו של הנאשם
וההחלטה לבצע פיגוע __ גידי __ __ __ __ __ ___ ת ישראליות, ולהפך לישהידי. לצורך ביצוע פיגוע
הירי המתוכנן, רכש הנא____ __ __ __ שין __ישי בצבע כתול (להלן: הרכב), ונסע עם הרכב
לכיוון צומת גבעת-אסף, בש____ __ __ להור אחר מטרות ישראליות, כאשר ברשותו רובה
הקלצ'ניקוב ותחמושת.

5. בהגיע לצומת גבעת-אסף, ה___ __ __ __ מספר ח____ים שעמדו בתחנת האוטובוס והחליט
כבעל בקומדה זו את פיגוע חירי.

6. או אז, חזר הנאשם בנסיעתו ל___ __ __דד תחיילים, עצר לידם, דרך את רובה הקלצ'ניקוב.
__יד מתוכב, וחל לירות לעברים מ___ם __ור__ ב__תרו לגרום למתם. כתוצאה מחירי שביצע
__נאשם, וגרם מותם של חיי____ __ __ כר__ __ __ כיד יוסף ו__ וסמל יוטורנכזן ז"ל, ו____ן שניים נוספים.

7. __יד לאחר ביצוע חירי, חמ___ הנאשם __נשק מסוג אם-16 אשר היה מונח על הרצפה סמוך
לאחד היוללים. הנאשם נטל את הנשק. עלה בחזרה לרכב וההל לברוח בנסיעתו לכיוון ר__אללה
דרך כביש עפר. בהמשך הנסיעה. __נ__ע חרכב של הנאשם בשטח, ולכן נטש את כלי הנשק שהיו
ברשותו וחמשיך במ__ותו ב__ __ גלי.

בעשרותו אוז האמור לעיל, גרם ח__ש___ __כ__וונה לממותו של חמ___ יוכל מורויוסף ז"ל.

### פרט אישום שישית-עשר:

**מהות העבירה:** גרימת מוות בכוונה, עבירה לפי סעיף 209(א) לצו בדבר הוראות בטחון [נוסח משולב] (יהודה
והשומרון) (מס' 1651), התשס"ע - 2009

**פרטי העבירה:** הנאשם הנ"ל, ביום 2018/12/13 __, או ב__עד __ס__ך לכך, גרם בכוונה למותו של אחר, **דהיינו:**

במועד האמור לעיל, בצומת גבעת-אסף, או במקום הסמוך לשם, בעשותו את האמור בפרטי
האישום החמישה-עשר, גרם חנאשם בכוונה לממותו של סמל יוסף כהן ז"ל.

### פרט אישום שבעה-עשר:

**מהות העבירה:** ניסיון לגריממות מוות בכוונה, עבירה לפי סעיפים 209(א) ו-198 לצו בדבר הוראות בטחון [נוסח
משולב] (יהודה ושומרון) (מס' 1651), התשס"ע - 2009.

**פרטי העבירה:** הנאשם הנ"ל, ביום 2018/12/13 __, או ב__עד ה___ך לכך, ניסה לגרום בכוונה למותו של אחר, **דהיינו:**

במועד האמור לעיל, בצומת גבעת-אסף, או במקום הסמוך לשם, בעשותו את האמור בפרטי
האישום החמישה-עשר, ניסה חנאשם לגרום בכוונה לממותו של סמל נ.פ., אשר עמד בצומת.
כתוצאה מחירי שביצע חנאשם, נורה סמל נ.פ. בראשו ופונה לבית החולים חדסה עין כרם כשהוא
מורדם ומונשם עם פגיעת ראש קשה. סמל נ.פ אושפז במחלקה לטיפול נמרץ כשהוא במצב
נוירולוגי תת-הכרתי.

### פרק אישום שמונה-עשר:

**מהות העבירה:** ניסיון לגרימת מוות בכוונה, עבירה לפי סעיפים 209(א) ו-198 לצו בדבר הוראות בטחון [נוסח
משולב] (יהודה ושומרון) (מס' 1651), התשס"ע - 2009.

**פרטי העבירה:** הנאשם הנ"ל, ביום 2018/12/13, או במועד חסמוך לכך, ניסה לגרום בכוונה למותו של אחר, **דהיינו:**

במועד האמור לעיל, בצומת גבעת-אסף, או במקום הסמוך לשם, בעשותו את האמור בפרט
האישום החמישה-עשר, ניסה חנאשם לג__ים בכוונה למותו של ש.ס., אשר עמדה בצומת. כתוצאה
מחירי שביצע חנאשם, נפצעה ש.ס. באגן וגנרם לח שבר בירך רגלה השמאלית.

צבא ‏ ‎ ‏ ‎ ‏ ‎ ‏ ‎ ‏ ‎ ‏ ‎ ‏ ‎ ‏ ‎ ‏ ‎ ‏ ‎ ‏ לישראל

### פרט אישום תשעה-עשר:

**מהות העבירה:** ניסיון לגרימת מוות במזיד, עבירה לפי תקנפינו 209(א) ו-196 לצו בדבר הוראות בטחון [נוסח משולב] [יהודה ושומרון] (מס' 1651), התשס"ע - 2009.

**פרטי העבירה:** הנאשם הנ"ל, ביום 2018/12/13, או בסמוך לכך, ניסה לגרום במזיד למותו של אחר, דהיינו:

במועד האמור לעיל, בצוותא נפ... .-אפף, או במקום הסמוך לשם, בעשותו את האמור בפרט האישום החמישה-עשר, ניסה הנאשם לגרום במזיד למותה של ש.א., אשר עמדה בצומה.

### פרט אישום עשרים:

**מהות העבירה:** נשיאת, החזקת וייצור נשק, עבירה לפי סעיף 230(א+ב) לצו בדבר הוראות בטחון [נוסח משולב] [יהודה והשומרון] (מס' 1651), התשס"ע - 2009.

**פרטי העבירה:** הנאשם הנ"ל, בתקופה שהתחילה בשנת ... וסמוכה בחודש דצמבר 2018, או בתקופה הסמוכה לכך, נשא, החזיק או ייצר בלי נשק כלא תעודת היתר מפקוד צבאי או מטעמו או שלא בהתאם לתנאיה של תעודת היתר, דהיינו:

בתקופה האמורה לעיל, החזיק הנאשם, ולא היתר, ברובה הקלצ'יניקוב ובאקדח ומזכה ומותארים בפרט האישום השלישי ובפרט האישום החמישה-עשר.

### פרט אישום עשרים ואח... : A  | :

**מהות העבירה:** נשיאת, החזקת וייצור נשק, עבירה לפי סעיף 230(א+ב) לצו בדבר הוראות בטחון [נוסח משולב] [יהודה והשומרון] (מס' 1651), התשס"ע - 2009.

**פרטי העבירה:** הנאשם הנ"ל, בתקופה שהתחילתי ביום 2018/12/15 ועד ליום מעצרו, או בתקופה הסמוכה לכך, נשא, ד"חזיק אי ייצר כלי נשק בלי ... בזידרת היתר מפקד צבאי או מטעמו או שלא בהתאם לתנאיה של תעודת היתר, בצוותא, דהיינו:

1. ביום 2018/12/13, אן בסמוך לכך, לאחר שביצע את פינומי הירי המפורטים בפרט האישום השלישי ובפרט האישום חמישה-עשר, הגיע הנאשם לזיאד מוחמד עבדאלכבי שלאלדה (להלן: זיאד) וחסתתר אצלו מספר ימים.

2. הנאשם סיפר לזיאד כי והא זקוק לנשק ובקקש ממנו שיפנה לזודזי, לוטפי אסמאעיל מוסא ברנותי (להלן: לוטפי). זיאד הסכים לבקשתו של הנאשם, נסע אל ביתו של לוטפי ומסר לו כי הנאשם זקוק לו.

3. ביום 2018/12/15, או במועד הסמוך לכך, הגיע לוטפי אל זיאד ופגש בנאשם. הנאשם קיבל מלוטפי נשק קלצ'יניקוב, שו... פחסניות וכדורי תחמושת.

4. בנוסף, בהמוך מנוסתו סכתה התבוחון, במועדים מדווקים שאינם בידיעת התביעה, קיבל הנאשם מזיאד משקפת לראית-לילה, שלוש מחסניות וכדורי תחמושת לנשק מסוג קלצ'יניקוב.

בעשותו את האמור לעיל, החזיק הנאשם כלי נשק ללא היתר מפקוד צבאי.

### פרט אישום עשרים ושניים:

**מהות העבירה:** חברות ופעילות בהתאחדות בלתי-מותרת, עבירה לפי תקנות 84 ו-85(א) לתקנות ההגנה (שעת חירום), 1945.

לישראל

**פרטי העבירה:** הנאשם חניאל, בתקופה שנזכרת רו דרש ... ב... 2018, ועד ליום מעצרו, או בתקופה הסמוכה לכך, היה חבר או פעל כחבר כ... ... בידי-מותרת, דהיינו:

1. ביום 15/12/2018, או סמוך ל... לשוך ליד ... ואת חסין את הנאשם אל ביתו של מחמוד עבד אלמנאע חסין אהריט (ט... ... ... עם ... הנאשמו במשך מספר ימים.

2. ביום 27/12/2018, או ... ... כך, בעדו מסתתר בביתו של מחמוד, ביקש הנאשם ממחמוד ומבנו, ודאא אלור ... ... עבד אלמנאע ארריט (לחלן: דיאא), לנסוע אל גיאבר ממדרום גיאבר עבודה (לחבר ... ... ... ... אלור.

3. מחמוד הדיאא נעשו לבק... ... בנאשם נטעו אל ביתו של גיאבר והבדאו אותו אל ביתם, כפי שהתבקשו על ידי הנאשם.

4. בתביעי אל ביתם, פגש כ... ... הנאשם והשניים שוחחו לנדים, במחליל הפגישות, חציע הנאשם לגיאבר להצטרף אליו להרלה בצאית שמונתרה בידוע פיגוני ירי כנגד מטורות ישראליות (לחי: רחתולות). היאבר ה... ... לצרף לחוליה את גיסר, מחדי עבד אלמואמן אחמד אבו וחמה (לחלן: מוחדי). הנא... ... ... ... לגציע גיאבר.

5. במסגרת הפגישה, הנאשם כיער ... ... כי מבר-לפואיר נשק בסוג קלפצינקוב, וכי פואד שוהה בכלא. הנאשם ביקש מראא... ... ... לנגד לוגיא מביתו של פואד את אותו נשק וגיאבר הסכים לכך. כמו כן, ביקש הנאשם ... ... ... עם ... ... וינוטור לו כי כרצונו לפמ... אותו. הנאשם אמר לו כי לאחר שיבוש אלה ... ... ... ... בכרינתו לאמון אותו ואת מוכא בנשק.

6. ביום 28/12/2018, או במ... הגמבך ... ... חגע גיאבר אל ביתו של מוחדי וחציאו לו להצטרף לחוליה הצבאית שמ... ... כ... פיגנמים נגד ישראלים. מהדי הסכים להצעתו של גיאבר ואף וצוע לצרף אדם נטף.

7. ביום 29/12/2018, או במ... הסמוך לכך, בסעית החבורר, התקושר גיאבר למוסא ובקש ממני להיפגש. ... קצר לאחר מכן, הגעו מ... אל מקום עבודתו של גיאבר והשניים נפגשו. גיאבר ספר למוסא כי נפגש עם הנ... וכי הנאשם מבקש לפגוש אותו. גיאבר ספר למוסא שהנאשם נמצא בבית ... של דיאא.

8. באותה חיממום, הגע מוסא יחד עם ודאד לביתו של אחמד מחמד עבד אלחאפז, שם הסתתר באותה עת הנאשם. כשנפגשו, ישבו ... ... ודהנאשם לברים, והנאשם וצוע למוסא להצטרף אליו לפעילות צבאית וחשיגים חימ... כ... ... ... נשק מסוג קלצינקוב.

9. סמוך לאחר מכן, באותה היממה, נסעו גיאבר ומחדי אל ביתו של פואד על מנת לקחת את וחנק האמור, כיד שב קף ... ... ... ... בהגיעם אל ... בנד... של פואד, יד ... גיאבר מהרכב ומבקש לביתו של פואד וב... לשוחח עם אשתו. גיאבר אמר לה כי הגיע מטעמו של חנאשם שמבד כי בבית יש נשק מסוג קלצינקוב. אשתו של פואד אמרה למיאבר כי אין ברשותה נשק. אז, גיאבר ומחדי נטעו מחמוקום וחזרו אל ביתם.

10. ביום 31/12/2018, מעבר גיאבר על חי רוחות הבישהור. בעת מעצרו, פגש/גיאבר בפואד, ניגש אליו ... ... פתק אשר בר ... כי הנא... מוסר לו דוישת שלום וכי הוא רוצה את כלי חנשק שנמצא אצלו. פואד אמר לגיאבר כי אין ברשותו נשק.

11. תכנגיתו של הנאשם והבר וח... ... ... לא יצאו אל הפועל בשל מעצרם לאחר מספר ימים.

בעשותו את האמור לעיל, היד... ... ... ובר ופעיל בחוליה צבאית שהיינה התאחדות בלתי מותרת.

## פרט אישום עשרים ושלושה:

**מהות העבירה:** קשירות קשר לגרימת מות במ... ... עבירה לפי סעיפים 209 ו-254 לצו בדבר הורואות ביטחון [נוסח משולב] (יחדיהו והשומרון) (מס' 1631, ותשיע - 2009.

**פרטי העבירה:** הנאשם חניאל, בתקופה שנהחלתה בחודש דצמבר 2018 ועד ליום מעצרו, או בתקופה הסמוכה לכך, קשר קשר עם אחר לעבור עבירה עבירה שועש... מאסר לתקופה העולה על שלוש שנים, דהיינו:

בתקופה האמורה לעיל, בעשותו את האמור כפרט האישום הקדום, קשר הנאשם קשר עם חברי חוליה לבצע פיגוני ירי נגד ישראלים,

צבא ‏                                                                                    לישראל

**פרט אישום עשרים וארבעה:**

**מהות העבירה:** קשירות קשר לסחר בציוד מלחמתי, עבירה לפי סעיפים 233(א+ב) ו-254 לצו בדבר הוראות ביטחון [נוסח משולב] (יהודה והשומרון) (מס' 1651), ותשע"ע – 2009.

**פרטי העבירה:** הנאשם הנ"ל, במהלך חודש דצמבר 8.2018, או בסמוך למועד הסמוך לכך, קשר קשר עם אחר לעבור עבירה שעונשה מאסר לתקופה העולה על שלוש שנים, דהיינו:

במועד האמור לעיל, בעשותו את האמור בסעיף 5 בפרט האישום העשרים ושנים, קשר הנאשם קשר עם מאבר לעבור עבירת שערמות בדבר בציוד מלחמתי.

**פרט אישום עשרים וחמישה:**

**מהות העבירה:** סחר בציוד מלחומתי, עבירה לפי סעיף 233(א) לצו בדבר הוראות ביטחון [נוסח משולב] (יהודה והשומרון) (מס' 1651), תשע"ע – 2009.

**פרטי העבירה:** הנאשם הנ"ל, במהלך חודש דצמבר 2018, או במועד הסמוך לכך, ידע כי אדט אחר עומד לעבור או עבר עבירה של סחר בציוד מלחמתי, ואינו חדיע על כך בתוך זמן סביר לקצין או לאחת מתחנות המשטרה באזור, דהיינו:

במועד האמור לעיל, בעשותו את האמור בסעיף 8 בפרט האישום העשרים ושנים, ידע הנאשם כי מוסא עומד לעבור בעבירה שעניינה סחר בציוד מלחמתי, ואינו חודיע על כך לקצין או לאחת מתחנות המשטרה באזור.

**תאריך:** 11/03/2019

קמ"ש   שובל   ברגלס                                          סרן   אביבית   צמח
תובעת   צבאית                                               תובעת   צבאית

**עדי התביעה:**

1. רס"ר זוהראן חלבי, מ"א 1220078, רחובות.
2. רס"ל כגאן עוז ולד"ת מ"א 1902752, רחובות.
3. סמ"ש אליאן ג'אוב, מ"א 8363062, ירושלים.
4. אחמד מוחמד עבד אלהאפד חוסין, ת"ז 980841538. תיק תביעה 1367/19;
5. מחמוד עבד אלמונאם חסין אדרים, ת"ז 929180214. תיק תביעה 1195/19;
6. דיאא מחמוד ע"א מטי אדריס, ת"ז 852608644 ותיק תביעה 1191/19;
7. מהדי עבד אלמנאמן אחמד אבו רחמה, ת"ז 830495953 תיק תביעה 1221/19;
8. פואד מחמוד צאלח דאר חליל, ת"ז 906303581, ותיק תביעה 1209/19;
9. זיאד מוחמד עבדאלנבי שלאלדה, ת"ז 902604265, תיק תביעה 1194/19;
10. ג'ודת אחמד יוסף משלל, ת"ז 854100765 תיק רביעה 1176/19;
11. מוחמד עומר צאלח ברגותי, ת"ז 906669697. תיק הביעה 1175/19;
12. מוחמד אחמד יוסף משעל, ת"ז 859201464 ותיק תביעה 1174/19;
13. ח'אלד כאמל רשיד נואבנה, ת"ז 1013097 תיק הביעה 1143/19;
14. מוסא מג'די עישא חטיב, ת"ז 850389119 תיק תביעה 1424/19;
15. ג'אבר ממדוח ג'אבר עבדה, ת"ז 852246230 היק תביעה 1305/19;

לישראל

16. לוטפי איסמעיל מוסא ברנותי, הש" 3013508623, חיק תביעה 1270/19;
17. מקדאד זאהי כאיד ברגותי, ת"ז 3195058343, תיק תביעה 1173/19;
18. מחמוד זיאד מוחמד שלאלדיה, ת"ז 02653842, ותיק תביעה 1192/19;
19. מוחמיר עלי עבד אלעזיז אלקאדר, ת"ז 950127288, ותיק תביעה 1222/19;
20. סוהיר אסמעיל מוסא ברגותי, ת"ז 935358233, תיק תביעה 1251/19;
21. סאחר אסמעיל מוסא ברנותי, ת"ז 0335382566, ותיק תביעה 1269/19;
22. ואהב אסמעיל מיסא ברגותי, ה"ז 935338282, תיק תביעה 1268/19;
23. מחמד שחאדה שחאדה ריאן, ת"ז 858585324;
24. אחלאם רסנו סעיד נואבית, ת"ז 91052890;
25. רפי"מ אבי קופמן, מעבדת נשק, ירושלים;
26. רס"מ מורן מסעוד, מ"א 68833011, בומין;
27. רס"מ מקסים סורוקין, מ"א 1117880, שומרון;
28. רס"מ מנשה נחום, מ"א 3089911, מחוז שי"ך;
29. רנ"ג אלברטו שלו, מ"א 581595, בניגיר;
30. רס"ר אהוד (אקנין), מ"א 1903930, בנימין;
31. פקד אסנת ישראלזון אזולאי, החטיבה ליחהוי פלילי, ירושלים;
32. רס"ל ראובן חי, מ"א 1903895, בניגיר;
33. רס"ר לויאן אברהם, מ"א 75230102, חבוקן;
34. רפי"מ עזרא שושני, מעבדת נשק, ירושלים;
35. רפי"ק יהונתן רוט, מעבדת דני"א ובוולורי, ירושלים;
36. רס"מ רועי בן עמר, מ"א 1123819, בניגמי;
37. רפי"ק אאיד דבלה, מ"א 1159094, בנימין;
38. רפי"ק נונו הורש-ברוש, מ"א 1276411;
39. רס"מ ליאור מאירי, מ"א 1121268, בנימין;
40. רנ"ג בני גבראלל, מ"א 572867;
41. רס"ר סימון אברהמי, מ"א 1219898;
42. רפי"ק אלן צייסובסקי, החטיבה ליחהוי פלילי, ירושלים;
43. רפי"ק סיגל ברליין, מעבדת דני"א ובוולוגיה ירושלים;
44. רס"מ תומר מלול, מ"א 1093186, בנימין;
45. רס"מ רועי גבריאלל, מ"א 1907786;
46. סמי"ר עדי בן עזרא, מ"א 1800390;
47. רס"מ איתאב חלבי, מ"א 1220060, ירושים;
48. סנ"צ מיכל כויר אלעד;
49. פקד נורה רייס;
50. רפי"ק תגיה רם;
51. רס"ר יצחק ויצמן, מ"א 1007889, בנימין;
52. סמי"ר ארז שמואל, מ"א 1905584, בנימין;
53. רפי"ק אלפונסו בן טולילה, מ"א 1151059, בנימין;
54. רפי"ק יוסף אשמואל, מ"א 1103779, מוזיוי;
55. רס"ב לירוו מוקדיסי, מ"א 1019819;
56. יורם חי זבריגת (פרטים בידי התביעה);
57. אוהביה שרעבי, צה"ל (פרטים בידי התביעה);
58. שירה איש-רן (פרטים בידי התביעה);
59. עמיחי איש-רן (פרטים בידי התביעה);
60. ש.ש. (פרטים בידי התביעה);
61. ד.ל. (פרטים בידי התביעה);
62. מ.ש. (פרטים בידי התביעה);
63. א.ר. (פרטים בידי התביעה);
64. ח.ע. (פרטים בידי התביעה);

65. א.פ. (פרטים בידי התביעה);
66. ש.ד. (פרטים בידי התביעה);
67. ש.ס. (פרטים בידי התביעה);
68. ש.א. (פרטים בידי התביעה);
69. מסמכים רפואיים על שם שירה איש-רן;
70. מסמכים רפואיים על שם עמיחי איש-רן;
71. מסמכים רפואיים על שם ש.ע.;
72. מסמכים רפואיים על שם ד.ל.;
73. מסמכים רפואיים על שם מ.ש.;
74. מסמכים רפואיים על שם א.ר.;
75. מסמכים רפואיים על שם ש.ס.;
76. מסמכים רפואיים על שם סמל נ.פ.;
77. תעודת פטירה על שם עמיעד ישראל איש-רן;
78. תעודת פטירה על שם יובל מוריוסף;
79. תעודת פטירה על שם יוסף כהן.

# Annex 2



# Global Arabic Translation Services

الخدمات العالمية للترجمة العربية

26 Sheinfain St., Kfar-Saba, Israel
+972 54 8349.337
www.GatsTranslations.com

## <u>CERTIFICATION</u>

I, Yaniv Berman, do hereby certify that as a qualified translator I am fully conversant with the English and Hebrew languages, and that to the best of my knowledge, the attached document, Sentencing of Asem Ummar Saleh al-Barghuthi in Case no. 3112/19, is a true and accurate translation of the original text from the Hebrew language into English.

Date: July 21, 2020

Yaniv Berman

**Israel Defense Forces**

**The Military Court of Judea**                    *[logo]*                    **Case no. 3112/19**

**Military Court of Judea**

Before the Hon. President:          **Lieut. Col. Zvi Heilbrun**

Before the Hon. Judge:              **Lieut. Col. Eti Adar**

Before the Hon. Judge:              **Maj. Sebastian Osovski**

**The Military Prosecutor's Office**
(represented by attorneys: Military Legal Officer Shoval Bergalas-Shemesh, Capt. Avivit Tsemach, and Capt. Ben Bar)

      **versus**

**The Defendant: Asem Ummar Saleh al-Barghuthi, ID no. 950446633**
(represented by attorneys: Adv. Khalid A'raj and Adv. Fadi Qawasmeh)

---

<u>Sentence</u>

<u>The Hon. Judge Maj. Sebastian Osovsky:</u>

**<u>General</u>**

1.     The defendant's sentencing proceeds from his conviction for a series of crimes that are among the most severe in the statute books — intentionally causing the death, in two different terror attacks, of the infant Amiad Israel Ish-Ran of blessed memory, Staff Sgt. Yuval Mor-Yosef of blessed memory, and Sgt. Yosef Cohen of blessed memory, as well as attempting to cause the death of further soldiers and civilians and committing further severe crimes.

2.     The indictment centers around two severe terror attacks, which may be described as killing sprees, planned and perpetrated by the defendant in December 2018.

3.     According to the facts in the indictment, to which the defendant has confessed, as early as the start of 2007 the defendant procured a Kalashnikov rifle, and he kept it buried in the earth, together with a pistol that was in his possession, for more than ten years.

4.     At the end of that period, the defendant decided to commit a terror attack against Israeli targets in general and IDF soldiers in particular. The defendant asked Musa Khatib (hereafter, **"Musa")** to be his partner in that military act but was refused.

5.     After long thought and examination, the defendant decided to pursue his plan and to perpetrate the attack at the entrance junction of the community of Ofra, having noticed a steady presence of many soldiers there.

Scanned with CamScanner

6.   On 12 August 2018, the defendant met with his brother Saleh Barghuthi and asked him to join in the plan. And indeed one day later the defendant came to his parents' house, there he asked his brother to serve as driver during and after the attack, and after they had agreed, the two went to the defendant's home.

7.   Only then did the defendant take up a bag and put into it the Kalashnikov rifle and the pistol that had been buried in the earth years earlier, and he added a number of magazines. Afterward, the two drove to the place where the defendant had parked a Peugeot vehicle, bought by him already in November 2018 and kept since then in a hiding place to await the moment of opportunity.

8.   The defendant gave his brother gloves and instructed him not to bring his telephone with him. The two entered the Peugeot and began driving toward Ofra Junction, with the defendant at the wheel. Along the way, the two removed the license plates from the vehicle, and they used a piece of cloth to wipe the doors in order to erase their fingerprints.

9.   Afterward, the defendant instructed his brother to move into the driver's seat, and the defendant moved into the back seat with the Kalashnikov rifle and the pistol at hand. The defendant covered his face and asked his brother to do the same. In addition, the defendant instructed his brother where to flee to after the terror attack.

10.  Shortly before arriving at the place, the defendant cocked the guns that he was carrying. Finally, when he noticed Israelis standing at the junction, he extended the Kalashnikov rifle from the window of the vehicle and shot some ten bullets at them from close range with the intent of causing their death.

11.  As a result of the shooting, **Shira Ish-Ran** was injured. She was in her seventh month of pregnancy. Shira was evacuated to Shaare Zedek Medical Center in critical condition and rushed to an emergency operation during which the physicians were constrained to deliver her baby son and transfer him to the intensive-care unit. He was suffering from multi-system injury. **A few days later, on 12 December 2018, the infant Amiad Israel Ish-Ran, of blessed memory, died.**

12.  In addition, the shooting perpetrated by the defendant caused injury to **Amichai Ish-Ran**, Shira's husband, in a number of places in his lower limbs; **Sh. Sh. D.** was injured in his right shin and sustained a compound fracture to his left shin; **D. L.** was injured in his right thigh; **M. Sh.** was injured in her ankle and left foot; **A. R.** was injured in his lower limbs; and **Ch. A.** was injured in her upper body and left leg. Two further civilians who were standing at the junction, **A. P.** and **Sh. D.,** only miraculously escaped being injured in the shooting perpetrated by the defendant.

13.  After the shooting, the defendant and his brother fled the site, with the defendant firing into the air in order to deter others from firing in his direction. As he was returning the pistol into the vehicle, a bullet was accidentally released and hit him. Later, the defendant instructed his brother to drive to a building in Kharbatha al-Misbah, where he had already planned to hide the vehicle. When they reached the place, the defendant took a bucket of paint and poured it inside the car in order to hide the blood that his injury had left.

14.  That same day, the defendant concealed the rifle and pistol that were in his possession in a hiding place and he threw the clothes he had been wearing at the time of the terror attack into the trash.

Scanned with CamScanner

Date: 24 June 2020                Military Court of Judea                Case no. 3112/19

15.     Some days later, on 12 December 2018, the defendant heard that his brother Saleh had been killed by the security services. Upon hearing that, the defendant decided to flee from his parents' home, where he had been staying, for fear of arrest. And indeed, the defendant put the Kalashnikov rifle and pistol which he had hidden into his bag and took flight.

16.     At a later stage, the defendant went to the home of Khaled Nawabit, who agreed to drive him to the village of Bil'in, and there the defendant stayed at the home of a relative and watched the news, which reported on the death of his brother.

17.     The next day, 13 December 2018, the defendant decided to commit a further shooting attack and to become a "shahid." *[Translator's note: a Shahid is a person who is killed for the sake of Allah]*. To that purpose, the defendant purchased a Mitsubishi vehicle and drove toward **Givat Asaf Junction** with the Kalashnikov rifle and the pistol in his hands.

18.     Upon arriving at the junction, the defendant noticed a number of soldiers standing at a bus stop and he decided to carry his plan out then and there. The defendant stopped the vehicle alongside the spot where the soldiers were standing and began shooting at them from close range in order to cause their death.

19.      The shooting resulted in the death of two of the soldiers, **Staff Sgt. Yuval Mor-Yosef of blessed memory and Sgt. Yosef Cohen of blessed memory**. In addition, **Sgt. Netanel Felber** was shot in the head, seriously wounded, and evacuated to Hadassah University Hospital – Ein Kerem while sedated and intubated, suffering from a severe head injury. **Sh. S.** was also injured, in the hip, and she suffered a fracture in her left thigh. Another civilian standing at the place, **Sh. A.,** was miraculously unhurt by the shooting, which was aimed at her as well.

20.     After that attack, the defendant took an M16 rifle that was lying on the ground near one of the soldiers, he returned into his vehicle, and he began a getaway drive toward Ramallah. During that drive, his vehicle became stuck in the terrain, and therefore the defendant abandoned the weapons that had been in his possession and continued his way on foot.

21.     The defendant reached the home of **Ziyad Shalalda** and hid there for some days. In addition, **Ziyad Shalalda** helped the defendant to obtain a Kalashnikov rifle, two magazines, and bullets, which were passed to the defendant by *his uncle,* **Lutfi Barghuthi**, and provided him with night-vision binoculars, magazines of ammunition, and extra ammunition.

22.     A few days later, the defendant organized a military cell with the aim of committing further terror attacks. The cell's members attempted, among other things, to gain possession of a Kalashnikov rifle that had been at the defendant's disposal starting in 2007 but had been sold by him in April 2018 to a man named Fuad Khalil. The cell ceased operations, leaving its plan unimplemented, after the defendant and other cell members were arrested.

23.     Because of his deeds, the defendant was convicted on twenty-five counts as detailed in the verdict.

**The evidence for the purpose of sentencing, and the contentions of the parties**

24.     As part of the evidence for sentencing, the military prosecution submitted the defendant's criminal record. Also submitted were affidavits from those injured by the crime and affidavits from the Mor-Yosef and Cohen

Scanned with CamScanner

families. In addition, calculations of damage and further documents were submitted on behalf of those injured by the crime.

25.   Also submitted for our study was a previous sentencing handed down by this court against the defendant in Judea case 2456/07, **Military Prosecutor vs. Barghuthi**, of 18 October 2010. From examination of that sentencing and of the criminal record, it emerges that the defendant was convicted of three counts of attempted kidnapping under aggravating circumstances, two counts of trading in war materiel, and another count of possessing weaponry. Being convicted in that case, the defendant was sentenced to 9 and a half years' imprisonment counted from the date of his arrest, and to 20 months' imprisonment suspended, consecutive with the actual imprisonment. In addition, the defendant was sentenced to 3 years' imprisonment suspended which is now subject to activation.

26.   Besides the many documents mentioned above, there is testimony that we heard directly from witnesses who told of how the defendant's deeds affected them and their families.

27.   First to testify was Ms. **Judy Felber**, the mother of Netanel Felber. He was critically wounded in the attack at Givat Asaf. Ms. Felber testified to the change that had beset her life and Netanel's since the terror attack. She described Netanel as a young person with many friends, pleasant of mien and liked by all. She explained how the family's life suffered after the terror attack and told of a ceaseless series of operations that her son had undergone during the most recent years.

28.   In her testimony before us, Ms. Felber described the routine of her life, and of her son Netanel's, since the terror attack. That description can afford us a glimpse, albeit partial, into the pain that the defendant caused to Netanel and to the entire family. From a soldier brimming with life, who was planning — at the end of his service — to resume his curriculum at the yeshiva where he had been studying, to begin a career, and to start a family, Netanel turned into a young man who needs constant nursing attention every hour of the day. We also heard about the hopes and about the improvement following on the many treatments Netanel has been undergoing, as detailed to us, and we join in wishing him an improvement in his condition.

29.   Next to testify was Mr. **Chaim Silberstein**, the father of Shira Ish-Ran. She was injured in the terror attack and her baby Amiad of blessed memory was murdered by the defendant.

30.   In his testimony, we heard of the tragic reversal that beset the family — from joy in anticipating the arrival of a first grandchild to the mourning and sorrow brought about by the defendant's deeds. And in Mr. Silberstein's words:

> "It was the night of the eighth Chanukah candle, and they (Shira and Amichai — S.A.) were on their way home … What joy to be with the family, to celebrate the holiday, and to feel the baby kicking in Shira's womb. Seven months of pregnancy. Two more months and, G-d willing, their first child would be born. Our first grandchild. Then in an instant, the accursed terrorists … cut short our joy and our expectations …. They will never be able to lead the normal, happy life that innocent newlyweds deserve …"

4

Scanned with CamScanner

31.  In his words, the witness noted the condition besetting the couple. They are undergoing rehabilitation treatments to this day. Moreover, Mr. Silberstein told of the distress that was created in the family because of the incident and he asked that the court be strict with the defendant and exact justice.

32.  Testifying next was **Mr. Refael Ish-Ran**, the father of Amichai Ish-Ran and grandfather of Amiad of blessed memory. This witness stressed the severe ramifications of his grandson's death both for the family in general and for the young couple in specific. The witness described the moment of telling his son that Amiad of blessed memory was dead, and Amichai's heartrending reaction:

> *"To this day I remember the cries from Amichai when I told him that Amiad*
> *Israel had died. The entire hospital heard them."*

33.  Like Mr. Silberstein, Mr. Ish-Ran too asked that the court be strict in its sentencing of the defendant and impose the maximum punishment stipulated by law.

34.  As to the murdered soldiers, we learned of the void that their deaths left from affidavits that those harmed by the crime provided and that were submitted by family members.

35.  The parents of **Staff Sgt. Yuval Mor-Yosef of blessed memory** spoke of their son Yuval's special personality and of the special relationship between him and his little sisters, who are affected until today by the absence of their beloved brother. We also learned of this special link from a picture that was attached to the assessment of damage submitted and from the words of the affidavit.

> *"To our great sorrow, he hurt us and took from us the most precious thing of*
> *all, our beloved son Yuval, may God avenge his blood, who for us was the*
> *world and everything in it, the central pillar of the family..."*

36.  Also brought before the report was a crime victim affidavit from the mother of the late **Yosef Cohen of blessed memory**. The mother pointed out that the family had undergone a tragic event a few years before, with the father's death from a severe illness. Now, Mrs. Cohen related, she and her family have undergone an additional tragedy — the death of their beloved son Yosef.

37.  In her affidavit, the mother told of Yosef's qualities, of his special place, and of his desire to develop himself in the future, all cut off in the blinking of an eye because of the terror attack:

> *"Yosi filled every place in my heart that had life. And he has filled every place*
> *with his personality, and every corner that my eyes rest on, since he was*
> *plucked away and uprooted from the world. I find myself reaching for his*
> *image as it arises time after time before the eyes of my spirit, and I cannot*
> *answer my heart — a mother's heart — when it asks the single question*
> *'Why so brief?'*

Scanned with CamScanner

> *"He was a gifted and a blessed child ... his sense* of healing and the talent for
> bestowing relief were ingrained in his soul. They had ripened before Yosi
> could turn his dream to reality."

38.   **In its arguments for punishment** the prosecution stressed the exceptional severity of the deeds of which
the defendant has been convicted. In this connection, it is contended that the defendant committed **two
terror attacks** one after the other, and this was a short time **after his release from a previous
imprisonment** that was imposed on him for various security offenses.

39.   In the prosecution's opinion, the defendant's deeds most severely struck at the principle of life's sanctity,
which stands at the moral foundation of every civilized society, a principle that spans eras and religions. In
addition, both in mind and in body, the defendant damaged the intactness of all the crime victims who were
harmed in the attacks. The defendant's deeds, which targeted innocent people for ideological reasons, also
harmed the safety of the region and the public welfare.

40.   The prosecution has asked that in accordance with the customary rulings, the defendant be sentenced to
successive life terms for causing the death of the late **Amiad Ish-Ran, Staff Sgt. Yuval Mor-Yosef, and Sgt.
Yosef Cohen of blessed memory**.

41.   Furthermore, the prosecution called upon us to impose two further successive life sentences as fitting
punishment for the attempt to cause the deaths of victims who survived the slaughter perpetrated by the
defendant but some of whom were severely injured. In the prosecution's opinion, each of the terror attacks
alone meets the standards set down in the ruling as justifying a life sentence even on the crime of
intentionally attempting to cause death.

42.   In light of the above, the prosecution has asked us to impose on the defendant a punishment of **five
successive life sentences** — three life sentences for the murders of the infant Amiad Israel Ish-Ran of
blessed memory, Staff Sgt. Yuval Mor-Yosef of blessed memory, and Sgt. Yosef Cohen of blessed memory, plus
a further life sentence for the attempt to cause the death of further victims in the terror attack at Ofra
Junction, plus a further life sentence for the attempt to intentionally cause the death of the victims at the
Givat Asaf terror attack.

43.   In addition, the prosecution has asked that payment of heavy damages be imposed upon the defendant
because of the harm caused to each of the crime victims, in accordance with practices recently stipulated for
such matters. And finally, as mentioned above, the prosecution asked for the defendant's suspended
sentence, imposed on him in Judea case 2456/07,  be activated.

44.   **The defense**, for its part, waived defense arguments with respect to punishment.

45.   **The defendant** offered grounds for his actions, contending that they derive from the battle against the
"occupation," as he called it. Thus he expressed no remorse for the deeds of his that led to the death by
murder of two soldiers who were standing at a bus stop. However, according to his contention, he did not
intend to harm civilians and specifically not the infant who died as a consequence of the shooting that the
defendant perpetrated. The defendant believes that the harm caused to him over the years, and as a result of
the processes undertaken in his case, is greater than the harm that he caused to the crime victims.

Scanned with CamScanner

**Discussion and ruling**

> *"A person who existed —any person — is a world unto itself. A person — any person — is individual, unique, and special. And no person is like another. Who may not come to be? And those who have gone will never return... Such are people, and that is their uniqueness."*

46.  Those words, written many years ago by Supreme Court Justice Michael Heshin of blessed memory for criminal appeal 1742/91, **Popper vs. State of Israel**, verdict 51(5) 289 (hereafter, "the Popper case"), indicate the weightiness of the principle of life's sanctity, which stands above all religious viewpoints, all disputes, and all differences of worldview and which stands at the foundation of every civilized society that respects human life as such.

47.  The defendant struck at this sacred principle when he committed the abominable deeds for which he has been convicted, which caused the severing of life for three victims — Amiad Israel Ish-Ran of blessed memory, Staff Sgt. Yuval Mor-Yosef of blessed memory, and Sgt. Yosef Cohen of blessed memory. Despite his attempts to raise a screen of political excuses to justify what he did, his shooting sprees against civilians and soldiers are nothing but evil and abominable deeds that proclaim his "ideological" motivation — indiscriminate hatred of Jews and Israelis.

48.  In addition, the defendant has struck at central social values — the integrity of the human body and public safety. The defendant's deeds brought enormous pain and changed the course of life for entire families. It is sufficient to look at the crime victims' affidavits and to hear the accounts of the families who testified before us in order to reveal, albeit only slightly, the terrible tragedy that beset them as a result of the terror attacks perpetrated by the defendant.

49.  The military courts in the region, foremost among them the Military Court of Appeals, have consistently held that a life sentence is the punishment prescribed for defendants who have intentionally taken human life. That is also the view of Israeli law, even after amendment 137 to the Penal Law, 5737/1977, which deals with ideologically motivated murder.

50.  In this connection, it is well to cite the words set down for appeal 4123/17, **Military Prosecutor vs. Abu Hammad** (published in Nevo, 2 October 2019 [hereafter, "the Abu Hammad case"]):

> *"The imposition of a life sentence implies a moral statement that gives palpable form to society's revulsion at an offense to its most sacred values. That revulsion, and indeed society's desire to defend itself against similar deeds, justifies the imprisonment of the defendant for the rest of his life, in certain instances. Accordingly, in imposing this punishment, the court is stating that by his deeds, the defendant lost the character of humanity, he is undeserving of ever rejoining human society, and he is incapable of rehabilitation."*

Scanned with CamScanner

51.   The instance before us, in which the defendant acted coldly according to plan, with no mercy, with no real remorse, and with no awareness that his deeds were inadmissible, is a classic case for ruling out any deviation by the court from the generally prescribed life sentence.

52.   Note too — in addition to the considerations of justice and retribution that underlie our ethical judgment — the obligation to protect society from the defendant, who committed his deeds under terrorist motivation in an attempt to harm the entire public. We again point out, in this connection, that the defendant was convicted in the past and served a very long prison sentence but remained undeterred from carrying out what he had plotted, possibly for many years, and he perpetrated it only a short while after his release, in mounting the terror attacks for which he is now answering.

53.   In light of the above, we believe that the proper penal consequence in this case is **permanent annulment of the defendant's liberty** so that he will never again be afforded human society and his independence will be substantially limited.

54.   Along with that expression of principle, we have found that the elements of punishment must reflect the harm inflicted on each and every one of the crime victims who were murdered by the defendant; and in the words of Justice Dorner regarding the **Popper** case:

> "The value of human life, and the deep revulsion at acts that harm it, must be explicitly and individually expressed in the context of sentencing as well, both with respect to the number of punishments imposed on the defendant and with respect to their consecutiveness. Although the murder of a single individual is in itself an act of ultimate and vile severity, the imposition of identical punishment on the murderer of one person and on the murderer of many could be understood as undermining the meaning of the value of human life and it could even reduce the element of deterrence. After all, what would deter a murderer from adding more victims if additional murders could not be expected to incur additional punishment?"

55.   Accordingly, and in light of the above words and judicial precedent, we believe that for all the defendant's deeds of intentionally causing death, he must serve the terms of punishment **consecutively**.

56.   As to the further crimes of which the defendant has been convicted, foremost among them the attempts at bringing death to those who were at the scenes of the terror attacks, we have found it appropriate to impose a life sentence upon the defendant for them too, **additionally and consecutively**.

57.   Unlike the crime of intentionally causing death, which we treated above and in which a life sentence is justified first and foremost because it is "a simple example meeting the test of 'measure for measure' as the person who has taken the life of another has his own autonomy and freedom — two of the primary components of the human experience — taken away" (the **Abu Hammad** case), the other instances incurring this extraordinary punishment present a more complex issue.

58.   As noted, in the case under consideration the accumulation of severe circumstances justifies the imposition of this punishment even in response to those crimes that did not lead to fatalities.

Scanned with CamScanner

59.     In the case of **Abu Hammad**, mentioned above, the Hon. President of the Military Court of Appeals, Col. Netanel Benishu, analyzed the rationale and the main precedents that resolve the issue under consideration.

60.     At the end of his explanation, and after a wide-ranging review of relevant precedents in Israel, the region, and the world, the President ruled that in the case of an attempt to intentionally cause death, the extraordinary punishment of life imprisonment is to be imposed in unusual cases where unique aggravating circumstances as to the act combine with aggravating circumstances as to the perpetrator, and where the defendant has done everything in his power to achieve fatal results.

61.     The case before us meets the stringent criteria set in that ruling. As to the act, two terror attacks were perpetrated in close succession, as noted, for ideological reasons of hatred against Jews and Israelis, were planned carefully, and were carried out by means of deadly weapons acquired especially for the purpose. The attack sites were chosen especially for the high number of potential victims there, and indeed the defendant caused injury to many victims, including severe injury to Sergeant Netanel Felber as well as to Shira Ish-Ran, a woman in advanced pregnancy.

62.     As to the perpetrator, the defendant has been shown to have a weighty criminal record of terrorist deeds, and the actions for which he is answering now followed quickly upon his release after a very long term of imprisonment. In addition, the defendant founded a terror cell, together with his brother and attempted to found another cell in order to continue perpetrating lethal acts. As noted above, the defendant expressed no true remorse but rather asserted political motivations as grounds for his actions, while hatred of the region's Jews and Israelis underlay them.

63.     The defendant did everything in his power to achieve completion of the lethal results which, in the event, he achieved against the three crime victims cited above. In the two incidents, the defendant shot at the victims from very close range, using especially lethal weaponry, his purpose being to maximize fatalities. Moreover, even after the second terror attack the defendant wished to continue taking human life and had he not been arrested by the security services, it is not impossible that he would have succeeded.

64.     In light of the above, the episode before us evinces exceptional and unique forms of severity that require the imposition of an additional, consecutive life sentence because of those further crimes which did not achieve lethal results but which are extraordinarily severe in their aggravating circumstances.

65.     Regarding the element of damages, which the prosecution raised in its conclusion and in support of which estimates and documents were also submitted on behalf of some of the crime victims, I will point out that in a sentencing, military courts are entitled by regional precedent to impose punitive damages in an amount exceeding the maximum set by Israeli law (see appeal 1009/19, **Military Prosecutor vs. A. Tz.** [unpublished]).

66.     However, considering that in a criminal process damages are considered by nature to be a limited preliminary recompense subject to a narrow process of substantiation in the context of the procedure's deliberations, the damages will reflect only such harm as has been proven clearly before us, including the direct harm caused to the crime victims, such as medical expenses, loss of wages, etc. Without requiring the hearing of supplementary evidence in order to fully and accurately evaluate every entitlement, these damages will be awarded; and the victims retain the option of opening civil proceedings against the defendant in a court that has appropriate jurisdiction.

Scanned with CamScanner

67.  Having read the estimates of damages presented in the light of the context set by regional precedent for the awarding of damages, and with the defense not having requested to relate to the calculations that were presented, I suggest to my colleagues to impose upon the defendant the payment of damages to the crime victims as follows:

Damages to the estate of the late **Amiad Ish-Ran of blessed memory, to the amount of NIS 3,850,000.**

Damages to the estate of the late **Yuval Mor-Yosef of blessed memory, to the amount of NIS 3,850,000.**

Damages to the estate of the late **Yosef Cohen of blessed memory, to the amount of NIS 3,850,000.**

Damages to the crime victim **Shira Ish-Ran, to the amount of NIS 180,000.**

Damages to the crime victim **Amichai Ish-Ran, to the amount of NIS 130,000.**

Damages to the crime victim **Sgt. Netanel Felber, to the amount of NIS 4,200,000.**

Damages to the crime victim **Sh. Sh. D., to the amount of NIS 160,000.**

Damages to the crime victims **D. L., M. Sh., A. R., T. A., and Sh. S., to the amount of NIS 20,000 each.**

Damages to the crime victims **A. P., Sh. D., and Sh. A., to the amount of NIS 5,000 each.**

68.  This case thus comes to an end but is not the end. Even after the sentencing and the conclusion of the judicial process, the families of the victims will remain with the pain and grief that are their eternal lot and they will be compelled to live with the thought of the irreparable fissure between what should have been and what now will never be. The terror attack perpetrated by the defendant changed the lives of the victims and of their families beyond recognition in every case, and particularly in the case of the soldier Netanel Felber. The deeds of the defendant also cut short the lives of two young soldiers whose entire future was before them, and the life of the youngest terror victim in our region, the infant whose first hours outside his mother's womb were also his last.

The Hon. President, Lieut. Col. Zvi Heilbrun:

I agree.

The Hon. Judge Lieut. Col. Eti Adar:

I agree.

Scanned with CamScanner

Date: 24 June 2020                Military Court of Judea                Case no. 3112/19

**Conclusion**

In light of all the above, we sentence the defendant to the following punishments:

1.  3 consecutive sentences of life imprisonment for the murders of the infant Amiad Israel Ish-Ran of blessed memory, of Staff Sgt. Yuval Mor-Yosef of blessed memory, and of Sgt. Yosef Cohen of blessed memory.

2.  A further consecutive life sentence for the additional crimes of which he has been convicted: **In all, the defendant shall serve 4 consecutive life sentences in consequence of this case.**

3.  We activate the suspended sentence of **3 years'** imprisonment that was imposed on the defendant in Judea case 2456/07, to be served **consecutively** with the punishment of actual imprisonment in consequence of this case.

4.  Damages to the crime victims as detailed in clause 68 of the sentencing: The damages to the crime victims shall be paid by 1 January 2022.

5.  We order confiscation of all the exhibits that have been seized for the case.

In light of the special aggravated circumstances that surround the commission of the crimes of which the defendant has been convicted — including his cruelty, the ideology of hatred that hung over his deeds, and his determination to cause all the deaths possible — we have found it appropriate to recommend that if any office considers reducing the defendant's term of punishment or releasing him from imprisonment despite his sentencing, it should be avoided for the sake of protecting the public welfare and safety.

**30 days' right to appeal.**

Delivered and proclaimed today, 24 June 2020, in public and in the presence of the parties.

|                    |                    |                    |
| :----------------: | :----------------: | :----------------: |
| *[signature]*      | *[signature]*      | *[signature]*      |
| _____ | _____ | _____ |
| Judge              | President          | Judge              |

Scanned with CamScanner

צבא ההגנה לישראל



בית המשפט הצבאי ביהודה                                    תיק מס': 3112/19

בפני כב' הנשיא:   סא"ל צבי היילברון

בפני כב' השופטת:  סא"ל אתי אדר

בפני כב' השופט:   רס"ן סבסטיאן אוסובסקי

**התביעה הצבאית**

(באמצעות ב"כ קמ"ש שובל ברגלס – שמש, סרן אביבית צמח וסרן בן בר)

**נגד**

**הנאשם:** עאצם עומר צאלח ברגותי ת.ז 950446633

(באמצעות ב"כ עו"ד חאלד ארערני ועו"ד פאדי קוואסמה)

## ג ז ר   ד י ן

כב' השופט, רס"ן סבסטיאן אוסובסקי:

**כללי**

1. הנאשם נותן את הדין בגין הרשעתו בשורה של עבירות מהחמורות שבספר החוקים – גרימת מותם בכוונה, בשני פיגועים שונים, של היילוד עמיעד ישראל איש-רן ז"ל, החייל סמ"ר יובל מור יוסף ז"ל, והחייל סמל יוסף כהן ז"ל; וכן בניסיון לגרום למותם של חיילים ואזרחים נוספים לצד עבירות חמורות נוספות.

2. במרכז כתב האישום עומדים שני פיגועים קשים – אשר ניתן לתארם כמסעי הרג, אותם תכנן וביצע הנאשם בחודש דצמבר 2018.

3. על פי עובדות כתב האישום, בהן הודה הנאשם, עוד בתחילת שנת 2007 רכש הנאשם נשק מסוג 'קלצ'ניקוב' והטמין אותו באדמה יחד עם אקדח שהיה ברשותו, למשך תקופה העולה על עשר שנים.

4. בחלוף אותה תקופה, גמלה בליבו של הנאשם ההחלטה לבצע פיגוע נגד מטרות ישראליות בכלל וחיילי צה"ל בפרט. הנאשם הציע למוסא חטיב (להלן: **מוסא**) להיות שותף לאותה פעילות צבאית, אך נענה בסירוב.

5. לאחר מחשבה ובדיקה ממושכת, הנאשם החליט לקדם את תכניתו ולבצע את הפיגוע בצומת הכניסה ליישוב עופרה, וזאת לאחר שהבחין שבמקום ישנה נוכחות קבועה של חיילים רבים.

Scanned with CamScanner

6. ביום ה-8/12/2018, הנאשם נפגש עם אחיו, צאלח ברגותי, והציע לו להצטרף לתוכנית. ואכן, יום לאחר מכן הגיע הנאשם לבית הורוי, שם ביקש מאחיו לשמש כנהג במהלך הפיגוע ולאחר שקיבל את הסכמתו, יצאו השניים לביתו של הנאשם.

7. או אז, לקח הנאשם תיק והכניס לתוכו את רובה הקלצ'ניקוב והאקדח שהוטמנו באדמה שנים לפני כן, ומספר מחסניות. לאחר מכן, נסעו השניים למקום בו החנה הנאשם רכב מסוג פג'ו, אשר נקנה על ידו כבר בחודש נובמבר 2018, והמתין מאז לשעת כושר במקום מסתור.

8. הנאשם העביר לאחיו כפפות והנחה אותו שלא להביא עימו את מכשיר הטלפון שלו. השניים עלו על רכב הפג'ו והחלו את נסיעתם לצומת עפרה, כאשר הנאשם משמש כנהג. בדרך הורידו השניים את לוחית הזיהוי של הרכב וניגבו באמצעות פיסת בד את דלתותיו על מנת להעלים את טביעות אצבעותיהם.

9. לאחר מכן, הורה הנאשם לאחיו לעבור למושב הנהג ועבר למושב האחורי כשברשותו רובה הקלצ'ניקוב והאקדח. הנאשם כיסה את פניו שלו, וביקש מאחיו לעשות כמוהו. בנוסף, הנחה הנאשם את אחיו לאן לברוח לאחר הפיגוע.

10. הנאשם, בסמוך לפני הגעתו למקום, דרך את הנשקים שהחזיק. לבסוף, כאשר הבחין בישראלים שעמדו בצומת, הוציא מחלון הרכב את רובה הקלצ'ניקוב וירה לעברם ממרחק קצר כ-10 כדורים וזאת בכוונה לגרום למוותם.

11. כתוצאה מהירי נפצעה **שירה איש-רן** שהייתה בחודש השביעי להריונה. שירה פונתה לבית החולים שערי-צדק במצב אנוש והובהלה לניתוח חירום. במהלך הניתוח נאלצו הרופאים ליילד אותה והעבירו את היילוד ליחידת לטיפול נמרץ, כשהוא סובל מפגיעה רב מערכתית. **כעבור ימים בודדים, ביום 12/12/2018, נפטר היילוד עמיעד ישראל איש-רן, ז״ל.**

12. בנוסף נפצעו כתוצאה מהירי אשר ביצע הנאשם **עמיחי איש רן**, בעלה של שירה, במספר מקומות בגפיים התחתונות ; **ש.ש.ד**, נפצע בשוק רגל הימנית ונגרם לו שבר פתוח בשוק רגלו השמאלית, **ד.ל**, נפצע בירך רגל הימנית ; **מ.ש**, נפצעה בקרסול ובכף הרגל השמאלית ; **א.ר**, נפצע בגפיו התחתונות ; ו-**ח.ע**, נפצעה בפלג גופה העליון וברגלה השמאלית. שני אזרחים נוספים אשר עמדו בצומת, **א.פ ו-ש.ד** בנס לא נפצעו כתוצאה מהירי אשר ביצע הנאשם.

13. לאחר הפיגוע הנאשם ואחיו נמלטו מהמקום, תוך שהנאשם יורה באוויר בכדי להרתיע אחרים מלירות לכיוונו. בעת שהחזיר את אקדחו לתוך הרכב, נפלט כדור אשר פגע בו. בהמשך, הנאשם הנחה את אחיו לנסוע לבניין בחרבתא אל מצבאח, בו תכנן מבעוד מועד להחביא את הרכב. בהגיעם למקום, הנאשם לקח דלי צבע ושפך אותו ברכב, במטרה לטשטש את הדם מפציעתו.

14. עוד באותו היום, הנאשם החביא את הרובה והאקדח שהיו ברשותו במקום מסתור וזרק לפח את הבגדים שלבש בעת הפיגוע.

Scanned with CamScanner

15. מספר ימים לאחר מכן, בתאריך ה – 12/12/2018, שמע הנאשם כי אחיו צאלח, נהרג על ידי כוחות הביטחון. משמשמע על כך, החליט הנאשם לברוח מבית הוריו בו שהה, מחשש שייעצר. ואכן, הנאשם הכניס לתיקו את רובה הקלצ'ניקוב והאקדח שהחביא, והחל במנוסה.

16. בשלב מאוחר יותר, הנאשם הלך לביתו של ח'אלד נואבית, אשר הסכים להסייע לכפר בלעין, שם לן הנאשם בביתו של קרוב משפחה וצפה בחדשות בדיווח על מות אחיו.

17. יום למחרת, ב-13/12/2018, גמלה בליבו של הנאשם ההחלטה לבצע פיגוע ירי נוסף ולהפוך ל"שהיד". לשם כך, רכש הנאשם רכב מסוג מיצובישי, ונסע לכיוון **צומת גבעת אסף**, כאשר בידיו רובה הקלצ'ניקוב והאקדח.

18. בהגיעו לצומת, הבחין הנאשם במספר חיילים שעומדים בתחנת אוטובוס, והחליט לבצע בנקודה זו את זממו. הנאשם עצר את רכבו ליד הנקודה בה עמדו החיילים והחל לירות לעברם מטווח קצר במטרה לגרום למותם.

19. כתוצאה מהירי, נגרם מותם של שניים מהחיילים, **סמ"ר יובל מוריוסף ז"ל וסמל יוסף כהן ז"ל**. בנוסף, נפצע קשה **סמל נתנאל פלבר**, אשר נורה בראשו ופונה לבית החולים הדסה עין כרם כשהוא מורדם ומונשם עם פגיעת ראש קשה. כן, נפצעה **ש.ס.** באגן ונגרם לה שבר בירך רגלה השמאלית. אזרחית נוספת שעמדה במקום, **ש.א.**, בנס לא נפגעה מהירי שכוון אף לעברה.

20. לאחר הפיגוע, הנאשם נטל רובה מסוג M-16 אשר היה מונח על הרצפה סמוך לאחד החיילים, עלה בחזרה לרכבו והחל במנוסה בנסיעה לכיוון רמאללה. בהמשך המנוסה רכבו נתקע בשטח, וכתוצאה מכך הנאשם נטש את כלי הנשק שהיו ברשותו והמשיך את דרכו רגלית.

21. הנאשם הגיע לביתו של **זיאד שלאלדה** והסתתר שם מספר ימים. בנוסף, סייע **זיאד שלאלדה** לנאשם להשיג רובה קלצ'ניקוב, שתי מחסניות וכדורי תחמושת אשר הועברו לנאשם על ידי דודו, **לוטפי ברגותי**, וכן העביר לו משקפת לראיית לילה, מחסניות וכדורי תחמושת נוספים.

22. ימים בודדים לאחר מכן, הנאשם הקים חוליה צבאית במטרה לבצע פיגועים נוספים. בין היתר, ניסו חברי החוליה להביא לחזקתם רובה קלצ'ניקוב שהחזיק הנאשם החל משנת 2007, אך נמכר על ידו זה באפריל 2018 לאדם בשם פואד חליל. החוליה חדלה מפעילותה ולא ביצעה את זממה בעקבות מעצרו של הנאשם וחברי חוליה נוספים.

23. בשל מעשיו, הורשע הנאשם בעשרים וחמישה פרטי אישום כפי שפורטו בהכרעת הדין.

### הראיות לעונש וטיעוני הצדדים

24. במסגרת ראיותיו לעונש, הגישה התביעה הצבאית את גיליון הרישום הפלילי של הנאשם, הוגשו תצהירי נפגעי העבירה, וכן תצהירים של משפחת מור יוסף ומשפחת כהן. בנוסף, הוגשו תחשיבי נזק ומסמכים נוספים מטעם נפגעי העבירה.

3

Scanned with CamScanner

25. עוד הוגש לעיוננו גזר דין קודם שניתן על ידי בית משפט זה כנגד הנאשם בתיק יהודה
2456/07 **התובע הצבאי נ' ברגותי**, מיום 18/10/2010. מעיון בגזר הדין ובריישום הפלילי
עולה, כי הנאשם הורשע בשלושה פרטי אישום של ניסיון חטיפה בנסיבות מחמירות, שני
פרטי אישום של סחר בציוד מלחמתי ופרט אישום נוסף של החזקת אמצעי לחימה. בגין
הרשעתו הושת על הנאשם בתיק זה עונש של 9 שנות מאסר וחצי מיום מעצרו וכן הופעל
עונש מאסר מותנה בן 20 חודשים במצטבר לעונש המאסר בפועל. בנוסף, הוטל על הנאשם
עונש מאסר מותנה בן 3 שנים שהוא בר הפעלה כעת.

26. לצד המסמכים הרבים שצוינו לעיל, שמענו באופן בלתי אמצעי את עדויותיהם של עדים אשר
סיפרו על השפעת מעשי הנאשם עליהם ועל משפחותיהם.

27. ראשונה העידה הגברת **ג'ודי פלבר**, אמו של נתנאל פלבר, שנפצע באופן אנוש בפיגוע בגבעת
אסף. גב' פלבר העידה על השינוי שהתחולל בחייה ובחיי נתנאל מאז הפיגוע. היא תיארה את
נתנאל, כצעיר עם חברים רבים, נעים הליכות ואהוב על כל. היא הסבירה כיצד חיי משפחתה
נפגעו בעקבות הפיגוע וסיפרה על סדרת ניתוחים בלתי פוסקת אותה עובר בנה בשנים
האחרונות.

28. בעדותה לפנינו סיפרה גב' פלבר על שגרת חייה וחייו של נתנאל מאז הפיגוע. יש בתיאור
האמור כדי לאפשר לנו הצצה, ולו חלקית, לכאב שגרם הנאשם לנתנאל ולמשפחתו כולה.
מחייל מלא חיים אשר תכנן לסיים את שירותו, לחזור ללימודיו בישיבה בה למד, להתחיל
קריירה ולהקים משפחה, הפך נתנאל לצעיר הזקוק להשגחה סיעודית בכל שעות היום. לצד
זאת, שמענו על אודות התקווה ועל השיפור בעקבות הטיפולים הרבים שנתנאל עובר כפי
שפורט לפנינו בהרחבה, ומייחלים גם אנו שמצבו של נתנאל ישתפר.

29. לאחר מכן העיד מר **חיים סילברסטייין**, אביה של שירה איש-רן אשר נפצעה בפיגוע, וסבו של
עמיעד, ז"ל, אשר נרצח על ידי הנאשם.

30. בעדותנו שמענו על המהפך הטרגי שפקד את משפחתו – בין האושר לקראת בואו לעולם של
נכד ראשון, לאבל והעצב שנגרמו בעקבות מעשיו של הנאשם. ובמילותיו של מר סילברסטיין:

> " זה היה נר שמיני של חנוכה, והם (שירה ועמיחי –
> ס.א.) היו בדרכם הביתה ... איזה אושר להיות עם
> המשפחה, לחגוג את החג ולהרגיש את בעיטות
> העובר ברחמה של שירה. שבעה חודשי הריון, עוד
> חודשיים בעזרת ה' יוולד, הילד הראשון שלהם. נכד
> ראשון שלנו. אז בן רגע, המחבלים הארורים ...
> קטעו את האושר ואת הציפיות ... הם לעולם לא
> יוכלו לנהל חיים תקינים ומאושרים המגיע לזוג טרי
> ותמים...".

4

Scanned with CamScanner

31. העד ציין בדבריו את המצב שבו שרויים בני הזוג, העוברים עד היום טיפולי שיקום. מעבר לכך, ציין מר סילברסטיין את המצוקה שנוצרה בקרב המשפחה בעקבות האירוע, וביקש שבית המשפט יחמיר עם הנאשם וימצה עמו את הדין.

32. אחריו, עלה להעיד **מר רפאל איש-רן**, אביו של עמיחי איש-רן וסבו של עמיעד ז״ל. העד הדגיש את ההשלכות כבדות המשקל של מות נכדו, הן על המשפחה, והן על הזוג הצעיר. העד תיאר את הרגע בו סיפר לבנו על מותו של עמיעד ז״ל ואת תגובתו קורעת הלב של עמיחי:

> "עד היום אני זוכר את הזעקות של עמיחי
> כשסיפרתי לו שעמיעד ישראל נפטר. כל בית החולים
> שמע אותו".

33. בדומה למר סילברסטיין, גם מר איש-רן ביקש כי בית המשפט יחמיר בעונשו של הנאשם ויטיל את העונש המרבי הקבוע בחוק.

34. אשר לחיילים שנרצחו, למדנו על החלל שהם הותירו במותם באמצעות הצהרות נפגעי עבירה שהוגשו על ידי בני המשפחה.

35. הורי החייל **סמ״ר יובל מורייוסף ז״ל**, ציינו את אישיותו המיוחדת של בנם יובל, ועל הקשר המיוחד בינו לבין אחיותיו הקטנות, אשר עד היום חוות את חסרונו של אחיהן האהוב. על הקשר המיוחד הזה למדנו גם מתמונה שצורפה לתחשיב הנזק שהוגש ומהדברים שנכתבו בהצהרה:

> " לצערנו הרב הוא פגע בנו ולקח לנו את היקר מכל.
> את בננו אהובנו יובל היי״ד, שהיה לנו עולם ומלואו,
> עמוד התווך של המשפחה..."

36. בנוסף, הובאה בפני בית המשפט הצהרת נפגע עבירה של אמו של המנוח **יוסף כהן ז״ל**. האם ציינה כי המשפחה חוותה לפני מספר שנים אירוע טרגי בדמות מותו של האב, אשר נפטר ממחלה קשה. כעת, מספרת גב׳ כהן, היא ומשפחתה חוו טרגדיה נוספת - מותו של בנה האהוב, יוסף.

37. האם סיפרה בהצהרתה על מעלותיו של יוסף, על מקומו המיוחד ועל רצונו להתפתח בעתיד, שנגדעו כהרף עין בעקבות הפיגוע:

> "יוסי מילא כל מקום בליבי, שהיה חי, והוא ממלא
> כל מקום באישיותו וכל פינה עליה נחות עיניי – מאז
> נקטף ונעקר מן העולם. אני מוצאת את עצמי
> ממשעשת את דמותו שעולה פעם אחר פעם לנגד עיני
> רוחי, ולא מצליחה להשיב לליבי – לב של אמא – על
> שאלה אחת: למה כל כך קצת..."

5

*הוא היה ילד מחונן ומבורך... חושי הרופא שלו*
וכישרונו הענקת המזור שהיו מוטבעים בנפשו,
הבשילו עוד לפני שיוסי יכול היה להגשים את
חלומו.״

38. **בטיעוניה לעונש** הדגישה התביעה את החומרה היתרה הטמונה במעשים בהם הורשע
הנאשם. בהקשר זה נטען כי הנאשם ביצע **שני פיגועים** בסמיכות זמנים וזאת קצר זמן **לאחר
שחרורו ממאסר קודם** שהוטל עליו בגין עבירות ביטחון שונות.

39. לדידה של התביעה, מעשיו של הנאשם פגעו באופן קשה ביותר בערך קדושת החיים, העומד
בבסיסה המוסרי של כל חברה מתוקנת – ערך חוצה דתות ותקופות. בנוסף, פגע הנאשם
בשלמות הגוף והנפש של כלל קורבנות העבירה אשר נפגעו בפיגועים. מעשיו של הנאשם,
אשר כוונו לעבר חפים מפשע מתוך מניעים אידיאולוגים, פגעו גם בביטחון האזור ובשלום
הציבור.

40. התביעה ביקשה, כי בהתאם לפסיקה הנוהגת, יוטל על הנאשם מאסרי עולם מצטברים בגין
גרימת מות של המונחים **עמיעד איש רן, סמל יובל מוריוסף וסמל יוסף כהן, ז״ל**.

41. מעבר לכך, עתרה התביעה שנטיל על הנאשם שני מאסרי עולם נוספים באופן מצטבר, אשר יתנו ביטוי
עונשי הולם לניסיון לגרום למותם של הקורבנות שניצלו ממעשי הטבח שביצע הנאשם, ואשר
נפצעו באורח קשה. לדידה של התביעה, כל אחד מהפיגועים כשלעצמו עומד במבחנים
שנקבעו בפסיקה, המצדיקים הטלת מאסר עולם גם על עבירת הניסיון לגרימת מוות בכוונה.

42. לאור האמור, עתרה התביעה כי נשית על הנאשם עונש של **חמישה מאסרי עולם מצטברים** –
שלושה מאסרי עולם בגין רציחתם של הילוד עמיעד ישראל איש-רן ז״ל, החייל סמ״ר יובל
מוריוסף ז״ל והחייל סמל יוסף כהן ז״ל, וכן מאסר עולם בגין ניסיון לגרום למותם של
קורבנות נוספים בפיגוע בצומת עפרה, וכן מאסר עולם נוסף, בגין ניסיון לגרימת מותם
בכוונה של הקורבנות בפיגוע בגבעת אסף.

43. בנוסף, עתרה התביעה להשית על הנאשם פיצויים מכבידים, בגין הנזקים שנגרמו לכל אחד
מקורבנות העבירה, בהתאם להלכות שנקבעו בסוגיה בתקופה האחרונה. לבסוף, התביעה
ביקשה להפעיל את המאסר המותנה התלוי ועומד בעניינו של הנאשם שהוטל עליו בתיק
יהודה 2456/07, כפי שצוין לעיל.

44. **הסנגור** מצידו, ויתר על טיעוני ההגנה לעונש.

45. **הנאשם** הצדיק את מעשיו בטענות שקשורות למלחמה ב״כיבוש״, כך לדבריו. על כן, לא
הביע כל חרטה על מעשיו אשר הובילו לרציחתם של שני חיילים שעמדו בתחנת אוטובוס. עם
זאת, כך לטענתו, לא התכוון לפגוע באזרחים ובפרט לא ביילוד שנהרג כתוצאה מהירי
שביצע. הנאשם סבור כי הנזקים שנגרמו לו במרוצת השנים וכתוצאה מההליכים שננקטו
בעניינו, עולים על הנזקים שהוא גרם לקורבנות העבירה.

Scanned with CamScanner

בית המשפט הצבאי ביהודה                    תיק מס': 3112/19

## דיון והכרעה

> "אדם שהיה – כל אדם – הוא עולם לעצמו. אדם –
> כל אדם – הוא אחד, יחיד ומיוחד. ואין אדם כאדם.
> מי לא עוד יהיה ומי שהלך לא ישוב...כך הוא האדם,
> וזה ייחודו".

46. דברים אלה, אשר נכתבו לפני שנים רבות על ידי שופט בית משפט העליון, מיכאל חשין ז"ל, בע"פ 1742/91 **פופר נ' מדינת ישראל** פ"ד נא(5) 289 (להלן : עניין פופר), מבטאים את משקלו הסגולי של ערך קדושת החיים, המתעלה על פני כל השקפה דתית, סכסוך או שונות בתפיסות עולם, ועומד בבסיס כל חברה מתוקנת, המכבדת חיי אדם באשר הוא.

47. בערך מקודש זה פגע הנאשם בעת ביצוע המעשים המתועבים שבגינם הורשע, אשר הובילו לגדיעת חייהם של שלושה קורבנות – עמיעד ישראל איש-רן ז"ל, סמ"ר יובל מוריוסף ז"ל, וסמל יוסף כהן ז"ל. על אף ניסיונותיו להצדיק את שעשה מאחורי נימוקים פוליטיים, מסעי הירי לעבר אזרחים וחיילים, אינם אלא מעשים מרושעים ומתועבים, המבטאים את מניעו ה"אידאולוגיי" – שנאה כלפי יהודים וישראלים באשר הם.

48. בנוסף, פגע הנאשם בערכים חברתיים מרכזיים – שלמות הגוף וביטחון הציבור. מעשיו של הנאשם הסבו כאב עצום ושינו את מסלול חייהם של משפחות שלמות. די לנו לעיין בתצהירי קורבנות העבירה ולשמוע את עדותם של בני המשפחה אשר העידו בפניינו כדי להיחשף – ולו במעט, לטרגדיה הנוראה, אשר פקדה אותם כתוצאה מהפיגועים שביצע הנאשם.

49. בתי המשפט הצבאיים באזור, ובראשם בית המשפט הצבאי לערעורים, קבעו באופן עקבי כי עונש מאסר עולם הוא עונש המוצא לנאשמים אשר נטלו חיי אדם בכוונה. זאת גם השקפתו של המשפט הישראלי, גם לאחר תיקון 137 לחוק העונשין, תשל"ז-1977, כאשר עסקינן ברצח מתוך מניע אידיאולוגי.

50. בהקשר זה יפים הדברים שנקבעו ב ע"י 4123/17 **התוב"ץ נ' אבו חמאד** (פורסם בנבו, 2/10/19 ; [להלן: עניין אבו חמאד]) :

> "הטלת עונש מאסר עולם משמעותה קביעה ערכית
> הממחישה את סלידת החברה מהפגיעה בערכיה
> המקודשים ביותר. סלידה זו ואף רצונה של החברה
> להתגונן מפני מעשים דומים, מצדיקה את כליאתו
> של הנאשם לשארית חייו, במקרים מסוימים. על כן,
> בהטילו עונש זה, קובע בית המשפט כי, במעשיו,
> הנאשם איבד כל צלם אנוש, אינו ראוי לבוא עוד
> בחברת בני אדם, ואינו בר שיקום"

7

51. המקרה שלפנינו – בו הנאשם פעל באופן מתוכנן וקר, ללא כל חמלה, ללא חרטה אמיתית ומבלי שמצא פסול במעשיו, הוא מקרה מובהק בו אל לבית המשפט לסטות מן הכלל ולהטיל עונש אחר שאינו מאסר עולם.

52. ודוק, בנוסף לשיקולי הצדק והגמול העומדים מאחורי קביעתנו הערכית, עומדת גם החובה להגן על החברה מפני הנאשם, אשר ביצע את מעשיו על רקע טרוריסטי בניסיון לפגוע בציבור כולו. נזכיר בהקשר זה שהנאשם הורשע בעבר וריצה עונש ממושך ביותר, דבר אשר לא הרתיעו מלבצע את מה שזמם, אולי במשך שנים רבות, ומימש זמן קצר לאחר שחרורו – בעת ביצוע הפיגועים בגינם נותן הוא עתה את הדין.

53. **לאור האמור, סבורים אנו כי התוצאה העונשית הראויה במקרה דנן היא שלילת חירותו של הנאשם לצמיתות** כך שלא יזכה לשוב לחברת אדם וחירותו ועצמאותו תוגבלנה באופן ממשי.

54. לצד אמירה עקרונית זו, מצאנו כי על רכיבי העונשה לתת ביטוי לפגיעה בכל אחד ואחד מקורבנות העבירה אשר נרצחו על ידי הנאשם. ובמילותיה של השופטת דורנר בעניינו **פופר** :

> "ערך חיי האדם וסלידתו העמוקה ממעשים
> הפוגעים בו חייבים למצוא ביטוי מפורש ונפרד גם
> במסגרת גזירת העונש, הן לעניין מספר העונשים
> שיש לגזור על הנאשם והן לעניין הצטברותם. אף כי
> מעשה רצח של אדם בודד הוא כשלעצמו מעשה
> נפשע וחמור מאין כמותו, גזירה של אותו עונש על
> מי שרצח אדם אחד ועל מי שרצח רבים עלולה
> להתפרש כהחלשה של משמעות ערך חיי האדם, ואף
> עלולה לפגוע במידת ההרתעה. שכן, מה יעצור רוצח
> מלהרבות את קורבנותיו אם בגין הקורבנות
> הנוספים הוא לא יהיה צפוי לכל תוספת עונש?"

55. לפיכך, ולאור הדברים האמורים וההלכה הפסוקה, סבורים אנו כי על הנאשם לרצות את העונש בגין כל מעשה של גרימת מוות בכוונה באופן **מצטבר**.

56. אשר לעבירות הנוספות בהן הורשע הנאשם ובראשן ניסיונות לגרום למותם של אלה אשר שהו בזירות הפיגועים מצאנו שאף בגינן ראוי להטיל על הנאשם עונש מאסר עולם **נוסף ומצטבר**.

57. בשונה מעבירת גרימת המוות בכוונה, עליה עמדנו לעיל, בה ההצדקה להטלת עונש מאסר עולם נעוצה בראש ובראשונה "בבחינת 'מידה כנגד מידה' בזערי אנפין : הנוטל חיי זולתו, ניטלים ממנו אוטונומיה וחירות, שניים ממרכיביה העיקריים של ההוויה האנושית" (עניין **"אבו חמאד"**) – הטלת עונש חריג זה במקרים אחרים מורכבת יותר.

58. כפי שצוין, נסיבות החומרה המצטברות במקרה דנן מצדיקות הטלת עונש זה, גם בגין אותן עבירות שלא הובילו לתוצאה הקטלנית.

Scanned with CamScanner

59. בעניין **אבו חמאד**, המוזכר לעיל, ניתח כב' נשיא בית המשפט הצבאי לערעורים, אל"ם נתנאל בנישו, את הרציונאליים ואת ההלכות המרכזיות המסדירות את הסוגיה דנן.

60. בסוף מסעו ולאחר הסקירה הענפה בפסיקה הרלוונטית בעולם, בישראל ובאזור, קבע הנשיא כי עונש חריג של מאסר עולם במקרה של ניסיון לגרימת מוות בכוונה יוטל במקרים חריגים בהם חוברות יחדיו נסיבות חומרה מרובה בהיבט המעשה, נסיבות חומרה בהיבט העושה וכאשר הנאשם עשה כל שלאל ידו על מנת שתושלם התוצאה הקטלנית.

61. המקרה שלפנינו עונה על אותם תנאים מחמירים שנקבעו בפסיקה. בהיבט המעשה, עניינו בשני פיגועים סמוכים זה לאחר זה, אשר כאמור בוצעו על רקע אידאולוגי של שנאת יהודים וישראלים, תוכננו בקפידה, והוצאו אל הפועל באמצעות כלי נשק קטלניים שגויסו במיוחד למטרה זו. זירות הפיגועים נבחרו במיוחד לאור פוטנציאל הקורבנות הרב הנמצאים בהן, ובפועל הנאשם גרם לפציעתם של נפגעים רבים, ובתוכם פציעתו החמורה של סמל נתנאל פלבר וכן של שירה איש רן, אישה בהריון מתקדם.

62. אשר להיבט העושה, הרי שלנאשם עבר פלילי מכביד בגין מעשי טרור והמעשים בגינם הוא נותן את הדין בוצעו זמן קצר לאחר ששוחרר מעונש מאסר ממושך מאוד. בנוסף, הנאשם הקים חולייה עם אחיו וניסה להקים חוליה נוספת על מנת להמשיך בביצוע מסעי הרג. כפי שצוין לעיל, הנאשם לא הביע חרטה אמיתית, והצדיק את מעשיו במניעים פוליטיים אשר מאחוריהם עומדת שנאה ליהודים ולישראלים תושבי האזור.

63. הנאשם עשה כל שלאל ידו על מנת שתושלם התוצאה הקטלנית – אשר בפועל הושגה בקשר לשלושה קורבנות העבירה אשר הוזכרו לעיל. בשני האירועים הנאשם ירה לעבר הקורבנות מטווח קצר מאוד באמצעות נשק קטלני במיוחד, וזאת על מנת למקסם את התוצאה הקטלנית. בנוסף, גם לאחר הפיגוע השני חפץ הנאשם להמשיך וליטול חיי אדם נוספים, ואלמלא מעצרו על ידי כוחות הביטחון, לא מן הנמנע שהיה משיג את מטרתו.

64. לאור האמור לעיל, המקרה שלפנינו מבטא היבטי חומרה חריגים ומיוחדים המחייבים הטלת עונש מאסר עולם נוסף ומצטבר, גם בגין אותן עבירות שלא הובילו לתוצאה קטלנית, אולם חומרתן מופּלֶלת בנסיבות העניין.

65. אשר לרכיב הפיצויים, אליו עתרה התביעה בסיכומיה ואשר להוכחתו הוגשו גם אומדנים ומסמכים מטעם חלק מקורבנות העבירה, אזכיר שההלכה באזור קובעת כי בתי משפט צבאיים רשאים להטיל פיצוי עונשי במסגרת גזר הדין בסכום שעולה על התקרה הקבועה בחוק הישראלי (ראו: ע' 1009/19 **התוב"ץ נ' א.ג** [לא פורסם]).

66. עם זאת, לאור אופיו של הפיצויי במסגרת ההליך הפלילי, המוכר כפיצויי ראשוני ומוגבל אשר דרכי הוכחתו מצומצמות במסגרת הדיונית של ההליך, הפיצויי ייתן ביטוי לאותם נזקים אשר הוכחו בפנינו באופן ברור, ובתוך כך הנזקים הישירים שנגרמו לנפגעי העבירה כגון הוצאות רפואיות, אבדן השתכרות וכו'. הפיצויי יינתן מבלי שנזדקק לשמיעת ראיות משלימות לצורך קביעת שיעורן המלא והמדויק של כל ראשי הנזק, ובהקשר זה פתוחה בפני הנפגעים האפשרות לנקוט נגד הנאשם בהליכים אזרחיים בפני משפט מוסמך.

9

Scanned with CamScanner

בית המשפט הצבאי ביהודה                תאריך: 24/6/2020

67. לאחר שעיינתי בתחשיבי הנזק שהוגשו לאור המסגרת שנקבעה בהלכה לפסיקת פיצויים באזור, ולאחר שהסנגור לא ביקש להתייחס לתחשיבים שהוגשו, אציע לחבריי להטיל על הנאשם תשלום פיצויים לקורבנות העבירה כדלקמן:

פיצויים לטובת עיזבון המנוח **עמיעד איש-רן ז״ל בסך 3,850,000** ₪.

פיצויים לטובת עיזבון המנוח **יובל מוריוסף ז״ל בסך 3,850,000** ₪.

פיצויים לטובת עיזבון המנוח **יוסף כהן ז״ל בסך 3,850,000** ₪.

פיצויים לטובת נפגעת העבירה, **שירה איש-רן בסך 180,000** ₪.

פיצויים לטובת נפגע העבירה **עמיחי איש-רן בסך 130,000** ₪.

פיצויים לטובת נפגע העבירה, **סמל נתנאל פלבר, בסך 4,200,000** ₪.

פיצויים לטובת נפגע העבירה **ש.ש.ד בסך 160,000** ₪.

פיצויים לטובת נפגעי העבירה **ד.ל, מ.ש, א.ר, ח.ע וש.ס בסך 20,000** ₪ לכל אחד.

פיצויים לטובת נפגעי העבירה **א.פ, ש.ד ו-ש.א בסך 5,000** ₪ לכל אחד מהם.

68. תם ולא נשלם. גם לאחר מתן גזר הדין וסיום מלאכתנו השיפוטית, משפחות הקורבנות תישארנה עם הכאב והשכול אשר ילוו אותן לנצח ויאלצו לחיות במחשבה על ההפר הבלתי ניתן לגישור בין מה שהיה צריך להיות, לבין מה שכבר לא יהיה. הפיגוע אשר ביצע הנאשם שינה עד לבלי הכר את חייהם של הפצועים ומשפחותיהם, כך ככלל, ובפרט את מסע חייו של החייל נתנאל פלבר. מעשיו של הנאשם אף גדעו את חייהם של שני חיילים צעירים, אשר כל עתידם היה לפניהם, וגם את חייו של הקורבן הצעיר ביותר שגובה הטרור באזורנו – יילוד אשר שעותיו הראשונות מחוץ לרחם אימו, היו גם האחרונות.

<u>כב׳ הנשיא, סא״ל צבי היילברון:</u>

אני מסכים.

<u>כב׳ השופטת, סא״ל אתי אדר:</u>

אני מסכימה.

Scanned with CamScanner

בית המשפט הצבאי ביהודה

תיק מס׳: 3112/19

## סוף דבר

לאור כל האמור, אנו גוזרים על הנאשם את העונשים הבאים:

1. 3 מאסרי עולם מצטברים בגין רציחתם של היילוד עמיעד ישראל איש-רן ז״ל, של החייל סמ״ר יובל מוריוסף ז״ל ושל החייל סמל יוסף כהן ז״ל.

2. עונש מאסר עולם מצטבר נוסף בגין העבירות הנוספות בהן הורשע. **סך הכל ירצה הנאשם 4 מאסרי עולם בגין תיק זה.**

3. אנו מפעילים את עונש המאסר המותנה בן **3 שנים** שהוטל על הנאשם בתיק יהודה 2456/07 והוא ירוצה **במצטבר** לעונש המאסר בפועל בגין תיק זה.

4. פיצויים לקורבנות העבירה כמפורט בסעיף 68 לגזר הדין. הפיצויים לנפגעי העבירה ישולמו עד ליום 1/1/2022.

5. אנו מורים על חילוט כלל המוצגים שנתפסו בתיק.

לאור הנסיבות החמורות המיוחדות שעטפו את ביצוע העבירות בהן הורשע הנאשם, ובתוך כך אכזריותו, אידיאולוגיית השנאה שליוותה את מעשיו, ונחישותו לגרום לכמה שיותר פגיעות בנפש, מצאנו לנכון להמליץ בפני כל גורם שיבחן את קציבת עונשו או את שחרורו ממאסר של הנאשם חרף גזר דיננו, כי ימנע מלעשות כן, מתוך מטרה להגן על שלום הציבור ובטחונו.

**זכות ערעור תוך 30 יום.**

ניתן והודע היום, 24/6/2020, בפומבי ובמעמד הצדדים.

שופטת          נשיא          שופט

11

# Annex 3



# Global Arabic Translation Services

الخدمات العالمية للترجمة العربية

26 Sheinfain St., Kfar-Saba, Israel
+972 54 8349.337
www.GatsTranslations.com

## <u>CERTIFICATION</u>

I, Yaniv Berman, do hereby certify that as a qualified translator I am fully conversant with the English and Hebrew languages, and that to the best of my knowledge, the attached document, Sentencing of Asem Ummar Saleh al-Barghuthi in Case no. 3549/05, is a true and accurate translation of the original text from the Hebrew language into English.

Date: July 21, 2020

Yaniv Berman

Date: 14 Adar 5766                                                                    Case no. 3549/05
15 March 2006

**Military Court of Judea**

**Before the Hon. Judge: Maj. Dalia Kaufmann**

**The Military Prosecutor's Office**
(represented by Capt. Shelly Ben Shachar)

**versus**

**The Defendant: Asem Ummar Saleh al-Barghuthi, ID no. 9504466933 / Israel Prison Service – Present**
(represented by attorney: Adv. Jamil Khatib – Present)

**Stenographer: Pvt. Gal Gafni**
**Translator: Sgt. Rami Azi**

---

*Sentence*

The defendant was found guilty on the basis of his confession and under a plea agreement, of three crimes. The first is connected with military training, specifically his and his brother's training by his father in the use of a Kalashnikov rifle. In addition, the defendant was found guilty of throwing stones at IDF forces in 2002 and of membership in Al-Kutla al-Islamiya from the year 2003 until his arrest.

The crimes of which the defendant has been convicted are severe. Without forgetting that, considerations on the side of leniency, including above all the fact that most of the crimes were committed roughly three years before the defendant's arrest, must also find expression. Moreover, I have given weight, in favor of leniency, to the fact that the defendant confessed while his case was at an early stage, with witnesses not heard.

The parties have presented a plea agreement to me that somewhat lightens the defendant's punishment, and they explained that among their considerations was the understanding that regarding one of the counts of indictment, certain difficulties with the evidence occasioned a certain leniency toward the defendant. In addition, the parties presented the sentences of the defendant's father and brother in connection with the first count of indictment and there too those considerations were given expression in the punishment.

Given the said circumstances, the punishment that the parties have suggested is reasonable and there are no grounds for intervening in it.

Accordingly, having weighed all the considerations for leniency and for severity, I sentence the defendant to the following punishments:

a.   19 months' imprisonment, to be served as counted from the day of his arrest (June 21, 2005).

b.   20 months' imprisonment, suspended on condition that during 5 years from the day of his release, the defendant commits no crime of which he was convicted in this case, nor any crime under regulation 58 or 85 of the Defense (Emergency) Regulations of 1945, nor any crime involving manufacture of, possession of, or trading in weapons or military materiel of any kind.

c.   A monetary fine of NIS 4,000 or, alternatively, 4 months' imprisonment. The fine is to be paid before the defendant's release from prison. Payment of the fine shall constitute a condition for the defendant's release from his imprisonment.

**30 days' right to appeal.**
**Delivered and proclaimed today, March 15, 2006, in public and in the presence of the parties.**

_____
*[signature]*
Judge

-3-

<div dir="rtl">

תאריך: י"ד אדר, תשס"ו              תיק מס': 3549/05
15 מרץ, 2006

**ב י ת   ה מ ש פ ט   ה צ ב א י   י ה ו ד ה**

בפני כב' השופטת: רס"ן דליה קאופמן

התביעה הצבאית
(באמצעות סרן שלי בן שחר)

נגד

הנאשם: עצאם עומר צאלח ברגותי, ת.ז 950446633 / שב"ס- נוכח
(באמצעות ב"כ עו"ד ג'מיל חטיב - נוכח)

רשמת: טור' גל גפני
מתורגמן: סמל רמי עזי

---

## ג ז ר - ד י ן

הנאשם הורשע, על פי הודאתו, במסגרת הסדר טיעון בשלוש עבירות. הראשונה עניינה אימונים צבאיים בכך שאביו אימן אותו ואת האם בשימוש ברובה קלצ'ניקוב. בנוסף, הורשע הנאשם בזריקת אבנים לעבר כוחות צה"ל בשנת 2002 וכן בחברות בכותלא איסלמיה משנת 2003 ועד למעצרו.

העבירות בהן הורשע הנאשם הינן חמורות. יחד עם זאת, יש ליתן ביטוי גם לשיקולים לקולא ובעיקר לכך שמרבית העבירות בוצעו כשלוש שנים קודם למעצרו של הנאשם. כמו כן, נתתי משקל לקולא להודאתו של הנאשם בשלב מוקדם במשפטו ומבלי שנשמעו עדים.

הצדדים הציגו בפניי הסדר טיעון אשר מקל עם הנאשם במידה מסוימת, והסבירו כי בין שיקוליהם נתנו ביטוי לקשיים ראייתיים מסוימים בנוגע לאחד מפרטי האישום אשר הובילו להקלה מסוימת עם הנאשם. כמו כן, הציגו הצדדים את גזרי הדין של אבי הנאשם ואחיו הקשורים לפרט האישום הראשון ואף להם נתנו ביטוי בשיקוליהם לעונש.

בנסיבות האמורות, העונש שביקשו הצדדים הוא סביר ואין מקום להתערב בו.

אשר על כן, לאחר ששקלתי את מכלול השיקולים לקולא ולחומרה, אני גוזרת על הנאשם את העונשים הבאים:

א.  19 חודשי מאסר בפועל אשר יימנו החל מיום מעצרו, 21/06/05.

ב.  20 חודשי מאסר על תנאי, והתנאי הוא שבמשך 5 שנים מיום שחרורו ממאסרו לא יעבור עבירה בה הורשע בתיק זה, או כל עבירה לפי תקנות 58 או 85 לתקנות ההגנה (שעת חירום), 1945, או כל עבירה שעניינה נשק או אמל"ח מסוג כלשהו: ייצורם, החזקתם או סחר בהם.

ג.  קנס בסך 4,000 ש"ח או 4 חודשי מאסר תמורתו. הקנס ישולם עד למועד שחרורו של הנאשם ממאסר. תשלום הקנס יהווה תנאי לשחרורו של הנאשם ממאסרו.

**זכות ערעור תוך 30 יום מהיום.**

**ניתן והודע היום, 15/03/06, בפומבי ובמעמד הצדדים.**

שופטת

</div>

# Annex 4



**Global Arabic Translation Services**

الخدمات العالمية للترجمة العربية

26 Sheinfain St., Kfar-Saba, Israel
+972 54 8349.337
www.GatsTranslations.com

## <u>CERTIFICATION</u>

I, Yaniv Berman, do hereby certify that as a qualified translator I am fully conversant with the English and Hebrew languages, and that to the best of my knowledge, the attached document, Verdict and Sentencing of Musa Majdi Issa Khatib in Case no. 3087/19, is a true and accurate translation of the original text from the Hebrew language into English.

Date: July 21, 2020

Yaniv Berman

**Israel Defense Forces**
*[symbol]*

**Military Court of Judea**                                                    **Case no. 3087/19**
**Before the Hon. Judge: Maj. Sebastian Osovsky**

**The Military Prosecutor's Office**
(represented by attorney: Capt. Maayan Gross Antebi)

**versus**

**The Defendant: Musa Majdi Issa Khatib, ID no. 850839119 / Israel Prison Service – Present**
(represented by attorney: Adv. Qawasmeh – Present)

**Court Stenographer: Sgt. Mai Michalovski**
**Translator: Pvt. Iyal Sa'id**

Date of hearing: 17 December 2019 / Tuesday 19 Kislev 5780

## *Protocol of the Hearing*

**The court identifies the defendant.**

**The defendant states that Adv. Qawasmeh represents him.**

The Military Prosecutor: We have reached a plea agreement under which the indictment will be amended to omit items 2-5 of the indictment, the defendant will confess in writing to the amended indictment, and the parties will request an agreed upon punishment.

The Defense Attorney: I confirm my colleague's words.

**The court makes clear to the parties that it is not constrained by the plea agreement that they have concluded.**

The Defense Attorney: I have explained the revised indictment to my client. He understands it and he confesses to it.

**The court reads the revised indictment to the defendant.**

The Defendant: The court has read to me the amended indictment's charge against me, I have understood it, and I confess to it.

## *Verdict*

On the basis of the defendant's confession, I convict the defendant of the charge on which he was indicted, specifically:

**Membership and activity in an unlawful association** — An offense under clause 85(1)(a) of the Defense (Emergency) Regulations of 1945.

**Delivered and proclaimed today, 17 December 2019, in public and in the presence of the parties.**

_____
                                                                      Judge

1

Date: 17 December 2019                Military Court of Judea                Case no.: 3087/19

The Military Prosecutor: No evidence for the purpose of sentencing.

The Defense Attorney: No evidence for the purpose of sentencing.

The Military Prosecutor concludes: In keeping with the plea agreement, I ask that the court impose upon the defendant the agreed punishment of 28 months' actual imprisonment, and a suspended sentence of imprisonment subject to the court's discretion for each offense of which he has been convicted as well as for each offense that is founded on support for an unlawful association, or on intentional endangerment of human life, or on abetting any such offense, and a fine of NIS 6,000 or an alternative of imprisonment at the court's discretion. The plea agreement is predicated on the defendant's unblemished past, his confession of guilt, and the time saved for the court. We also took into consideration that the defendant's membership had not ripened into operational activity, and that the defendant's father is in poor condition and suffering from a terminal illness. The defendant was detained by the Palestinian Authority for two months, and Hamas flags had been confiscated.

The Defense Attorney concludes: I concur with the words of my colleague the prosecutor, and I ask that the agreement be honored.

The Defendant, in his final statement: I have nothing to add.

2

Date: 17 December 2019                    Military Court of Judea                    Case no.: 3087/19

**Before the Hon. Judge: Maj. Sebastian Osovsky**
**The Military Prosecutor's Office**
(represented by attorney: Capt. Maayan Gross Antebi)

**versus**

**The Defendant: Musa Majdi Issa Khatib, ID no. 850839119 / Israel Prison Service – Present**
(represented by attorney: Adv. Qawasmeh – Present)

## *Sentence*

The defendant was found guilty on the basis of his confession, under a plea agreement, as follows: In December 2018, he met Asem al-Barghuthi and was asked by him to join him in perpetrating terror attacks. At that point, the defendant refused Asem al-Barghuthi 's suggestion. Later, Asem al-Barghuthi perpetrated two deadly terror attacks. In the first, on 9 December 2018, the baby Amiad Israel was killed. In the second, on 13 December 2018, two soldiers were killed — Staff Sgt. Yuval Mor Yosef and Sergeant Yosi Cohen — and there were further people injured.

After perpetrating the terror attack, Asem al-Barghuthi requested a meeting with the defendant, who assented to al-Barghuthi's request. At the meeting, it was agreed between the two that the defendant would take part in joint military activity. It was also agreed at that meeting that the defendant would purchase a Kalshnikov rifle and would bring NIS 50,000 from al-Barghuthi's employer.

The parties have presented a plea agreement to me in which they request that I impose on the defendant an agreed punishment of 28 months' actual imprisonment, and a suspended sentence of imprisonment subject to the court's discretion for each offense of which he has been convicted as well as for each offense that is founded on support for an unlawful association, or on intentional endangerment of human life, or on abetting any such offense, and a fine of NIS 6000 or an alternative of imprisonment at the court's discretion. The prosecution also called for confiscation of the Hamas flags that were found in this case.

The parties predicated the plea agreement on the defendant's unblemished past, and on the other hand his confession and the time saved for the court. It was also put before me that the parties took into consideration that the agreement between al-Barghuthi and the defendant did not evolve into operational activity, and that the defendant's father is in poor medical condition. Finally, the parties also took into consideration the period of the defendant's detention by the Palestinian Authority.

Having weighed the arguments of the parties, I have found the arrangement to be reasonable and to merit being honored.

Therefore, I sentence the defendant to the following punishments:

a.   28 months' imprisonment, to be served as counted from the day of his arrest.

b.   15 months' imprisonment, suspended on condition that during 5 years from the day of his release, the defendant commits no offense against regulation 84 or 85 of the Defense Regulations, apart from the offense of presence at an assembly, no offense that is founded on intentional endangerment of human life, and no abetment of any such offense.

c.   A monetary fine of NIS 6,000 or, alternatively, 6 months' imprisonment. The fine is to be paid before, and as a condition for, the defendant's release from prison. Payment slip no.: 0019104439.

d.   I order the confiscation of the Hamas flags that were seized in this case.

   **This protocol constitutes documentation for imprisonment (a warrant to imprison) for: Musa Majdi Issa Khatib, ID no. 850839119.**

   **30 days' right to appeal.**
   **Delivered and proclaimed today, 17 December 2019, in public and in the presence of the parties.**

_____

Judge

צבא ההגנה לישראל



תיק מס׳: 3087/19

בית המשפט הצבאי ביחידה

בפני כב׳ השופט: רס״ן סבסטיאן אוסובסקי                                    1

2

התביעה הצבאית                                                          3

(באמצעות ב״כ סרן מעיין גרוס ענתבי)                                      4

5

נגד                                                                   6

הנאשם: מוסא מגדי עיסא חטיב , 850839119  / שב״ס - נוכח                    7

(באמצעות ב״כ עו״ד קווסאמה – נוכח)                                       8

9

רמ״שית: סמל מאי מיכלובסקי                                               10

מתורגמן: טור׳ אייל סעיד                                                 11

תאריך הדיון: 17/12/19, יום שלישי י״ט כסלו תש״פ                           12

## מהלך דיון                                                           13

14

בית המשפט מזהה את הנאשם.                                                14

הנאשם מצהיר כי מייצג אותו עו״ד קווסאמה.                                  15

16

תובע״צ: הגענו להסדר טיעון, במסגרתו יתוקן כתב האישום כך שימחקו פרטי אישום 2-5, הנאשם    17
ידה בכתב האישום המתוקן בנופו והצדדים יטעגו לעונש מוסכם.                  18

19

סנגור: אני מאשר את דברי חברי.                                           20

21

ביהמ״ש מבהיר לצדדים כי אינו כבול להסדר טיעון שנקשר ביניהם.               22

23

סנגור: הסברתי למרשי את כתב האישום המתוקן, הוא הבין אותו ומודה בו.        24

25

ביהמ״ש מקריא לנאשם את כתב האישום המתוקן.                                 26

27

נאשם: ביהמ״ש הקריא לי את המיוחס לי בכתב האישום המתוקן, הבנתי אותו ואני מודה בו.    28

## הכרעת - די ן                                                        29

30

על יסוד ההודאה באשמה, אני מרשיע את הנאשם במיוחס לו בכתב האישום, דהיינו:   31

32

חברות ופעילות בהתאחדות בלתי מותרת – עבירה לפי סעיף 185(1) (א) לתקנות ההגנה (שעת    33

חירום), 1945.                                                         34

35

ניתן והודע היום, 17/12/19, בפומבי ובמעמד הצדדים.                        36

37

_____                                                       38
שופט                                                                  39

40

41

42

43

תיק מס' : 3087/19    בית המשפט הצבאי ביהודה    תאריך : 17/12/19

1
2
תוב"צ : אין ראיות לעונש.    3
4
סנגור : אין ראיות לעונש.    5
6
תוב"צ מסכם : במסגרת הסדר הטיעון, אבקש להשית על הנאשם עונש מוסכם של 28 חודשי    7
מאסר לריצוי בפועל, מאסר מותנה לשיקול דעת ביהמ"ש על כל עבירה בה הורשע  וכן על כל    8
עבירה שיש עמה יסוד של תמיכה בהתאחדות בלתי מותרת או יצירת סיכון לחיי אדם בכוונה או    9
סיוע לעבירה כאמור וכן קנס בסך 6,000 ₪ או מאסר תמורתו לשיקול דעת ביהמ"ש . הנימוקים    10
להסדר הם עברו הנקי של הנאשם, הודאתו באשמה והחיסכון בזמן שיפוטי. עוד שקלנו כי מדובר    11
בחברות שלו בשלילה עד לפעילות אופרטיבית העובדה כי אביו של הנאשם חולה במחלה סופנית    12
ומצבו הבריאותי ירוד. הנאשם ישב במעצר ברשות במשך חודשיים וחילוט דגלי החמאס.    13
14
סנגור מסכם : אני מצטרף לדברי חברי התובע ומבקש לכבד את ההסדר.    15
16
הנאשם בדברו האחרון : אין לי מה להוסיף.    17
18
19

| תיק מס׳: 3087/19 | בית המשפט הצבאי ביהודה | תאריך: 17/12/19 |
|---|---|---|

בפני כב׳ השופט: רס״ן סבסטיאן אוסובסקי    1

2

התביעה הצבאית    3

(באמצעות ב״כ סרן מעיין גרוס ענתבי)    4

5

נגד    6

הנאשם: מוסא מגדי עיסא חטיב , 850839119 / שב״ס - נוכח    7

(באמצעות ב״כ עו״ד קוואסמה – נוכח)    8

9

10

11

12

### ג ז ר - ד י ן

הנאשם הורשע על פי הודאתו במסגרת הסדר טיעון, בכך שבחודש דצמבר 2018 פגש את עאצם 14
ברגותי אשר הציע לו להצטרף אליו לביצוע פיגועים. בשלב זה, הנאשם סירב להצעתו של עאצם 15
ברגותי. בהמשך , ביצע עאצם ברגותי שתי פיגועים רצחניים, הראשון ביום 09/12/18 במסגרתו 16
נרצח חתינוק עמיעד ישראל ז״ל, חשני ביום 13/12/18 במסגרתו נרצחו ונפצעו טמי״ר יובל מור 17
יוסף ז״ל וסמל יוסי כהן ז״ל. כתוצרה מחחפיגועים נפצעו גם אנשים נוספים. 18
לאחר ביצוע הפיגוע ביקש עאצם ברגותי לפגוש את הנאשם, אשר הסכים להצעתו של ברגותי. 19
במפגש סוכם בין השניים שהנאשם יצטרף לפעילות צבאית משותפת. עוד סוכם באותה הפגישה 20
שהנאשם ירכוש נשק מסוג קלצניקוב וכן יביא 50,000 ₪ ממעסיקו של ברגותי. 21

22

23

הצדדים הציגו לפני הסדר טיעון אשר במסגרתו מבקשים שאשית על הנאשם עונש מוסכם של 28 24
חודשי מאסר לריצוי בפועל, מאסר מותנה לשיקול דעת ביהמ״ש על העבירה בה הורשע וכן על כל 25
עבירה שיש עמה יסוד של תמיכה בהתאחדות בלתי מותרת או יצירת סיכון לחיי אדם בכוונה או 26
סיוע לעבירה כאמור וכן קנס בסך 6,000₪ או מאסר תמורתו לשיקול דעת ביהמ״ש. עוד עתרה 27
התביעה לחילוט דגלי החמאס שנתפסו בתיק. 28

29

הצדדים נימקו את ההסדר בעברו הנקי של הנאשם ומצד שני הודאתו של הנאשם באשמה 30
והתסכון בזמן שיפוטו. עוד צוין לפני כי הצדדים שקלו שהסיכום בין ברגותי לבין הנאשם לא 31
הגיע לכדי פעילות אופרטיבית וכן שקלו את מצבו הבריאותי חירוד של אביו הנאשם. לבסוף שקלו 32
הצדדים גם את תקופת מעצרו של הנאשם ברשות הפלסטינית. 33

34

לאחר ששקלתי את טענות הצדדים מצאתי כי ההסדר סביר וראוי לכבדו. 35

36

על כן, אני גוזר על הנאשם את העונשים הבאים : 37

38

א.   28 חודשי מאסר לריצוי בפועל מיום מעצרו. 39
ב.   15 חודשי מאסר על תנאי והתנאי הוא שבמשך 5 שנים מיום שחרורו לא יעבור הנאשם 40
    עבירה על תקנות 84, 85 לתקנות ההגנה הגמה מעבירה של נוכחות באסיפה, עבירה שיש 41
    עמה יסוד של יצירת סיכון לחיי אדם בכוונה או סיוע לעבירה כאמור. 42
ג.   קנס כספי בסך 6,000₪ או 6 חודשי מאסר תמורתו. הקנס ישולם עד למועד שחרורו של 43
    הנאשם מן המאסר וכתנאי לו. מס׳ שובר: 0019104439. 44
ד.   אני מורה על חילוט דגלי החמאס שנתפסו בתיק זה. 45

46

פרוטוקול זה מהווה אסמכתא לכליאה (פקודת מאסר) עבור: מוסא מגדי עיסא חטיב , 47
850839119. 48
זכות ערעור תוך 30 יום. 49
ניתן והודע היום, 17/12/19, בפומבי ובמעמד הצדדים. 50

51

52

שופט

3

# Annex 5



**Global Arabic Translation Services**

الخدمات العالمية للترجمة العربية

26 Sheinfain St., Kfar-Saba, Israel
+972 54 8349.337
www.GatsTranslations.com

## <u>CERTIFICATION</u>

I, Yaniv Berman, do hereby certify that as a qualified translator I am fully conversant with the English and Hebrew languages, and that to the best of my knowledge, the attached document, Sentencing of Asef Ummar Saleh al-Barghuthi in Case no. 1233/04, is a true and accurate translation of the original text from the Hebrew language into English.

Date: July 21, 2020

_____
Yaniv Berman

Date: 11 Tammuz 5764                                                                    Case no. 1233/04
30 June 2004

## Military Court of Judea

**Before the Hon. Judge: Maj. Ronen Atzmon**

**The Military Prosecutor's Office**
(represented by Lieut. Sagiv Lichtmann)

**versus**

**The Defendant: Asef Ummar Saleh al-Barghuthi, ID no. 901411660 / Ofer – Present**
(represented by attorney: Adv. Ilya Theodori – Present)

**Stenographer: Pvt. Ronnie Weissmann**
**Translator: Staff Sgt. Hammad Hamdan**

## *Sentence*

The defendant was found guilty on the basis of his confession to two counts of indictment for military training, illegal according to regulation 62 of the Defense (Emergency) Regulations of 1945. According to the indictment, the defendant's father Ummar al-Barghuthi, who is active in "Izz a-Din al-Qassam," trained the defendant in disassembling and reassembling a Kalashnikov rifle and in using a pistol, including firing of the pistol.

The parties have presented a plea agreement to me and requested that I honor it in light of the defendant's unblemished past, the fact that he did not seek out military training but rather was trained by his father, and in light of the fact that he confessed at an early stage of the proceedings and saved time for all involved.

Given the circumstances, I have decided to honor the plea agreement and I sentence the defendant to the following punishments:

I.     12 months' imprisonment, to be served as counted from the day of his arrest.

II.    8 months' imprisonment, suspended on condition that during 3 years from the day of his release, the defendant commits no crime of which he was convicted in this case.

III.   A monetary fine of NIS 2,000 or, alternatively, two months' imprisonment. The fine is to be paid as a condition for his release from prison.

**30 days' right to appeal,**

**Delivered and proclaimed today, June 30, 2004, in public and in the presence of the parties.**

_____
Judge

-3-

Scanned by Cam Scanner

תיק מסי : 1233/04

תאריך : י"א תמוז, תשס"ד
30 יוני, 2004

בית המשפט הצבאי יהודה

בפני כב' השופט : רס"ן רונן עצמון

התביעה הצבאית
(באמצעות סגן שגיב ליכטמן )

נגד

הנאשם : עאצף עומר צאלח ברגותי    ת.ז. 901411660/ עופר - נוכח
(באמצעות ב"כ עו"ד איליה תאודורי - נוכח)

רשמת : טור' רוני ויסמן
מתורגמן : סמ"ר חמאד חמדאן

## ג ז ר - ד י ן

הנאשם הורשע על פי הודאתו בשני פרטי אישום של אימונים צבאים, עבירות לפי
תקנה 62 תקנות להגנה (שעת חרום) , 1945. על פי כתב האישום אביו של הנאשם,
עומר ברגותי, שהוא פעיל ב" א זדין אל קסאם", אימן את הנאשם בפירוק ובהרכבה
של רובה קלצ'יניקוב ובהפעלת אקדח, לרבות ירי מן האקדח.

הצדדים הציגו בפני הסדר טיעון וביקשו שאכבדו, לאור עברו הנקי של הנאשם,
העובדה שלא חיפש אחר אימונים צבאיים, אלא אומן על ידי אביו, לאור העובדה
שהודה בשלב מוקדם של המשפט וחסך מזמנם של כל הגורמים.

בנסיבות העניין, החלטתי לכבד את ההסדר ואני גוזר על הנאשם את העונשים
הבאים :

I.   12 חודשי מאסר לריצוי בפועל מיום מעצרו.

II.  8 חודשי מאסר על תנאי והתנאי הוא שבמשך 3 שנים מיום שחרורו לא
     יעבור הנאשם עבירה בה הורשע בתיק זה.

III. קנס כספי בסך 2,000 ש"ח או חודשיים מאסר תמורתו. תשלום הקנס יהווה
     תנאי לשחרורו מן הכלא.

זכות ערעור תוך 30 יום.

ניתן והודע היום, 30/06/04, בפומבי ובמעמד הצדדים.

_____
שופט

-3-

# Annex 6



# Global Arabic Translation Services

الخدمات العالمية للترجمة العربية

26 Sheinfain St., Kfar-Saba, Israel
+972 54 8349.337
www.GatsTranslations.com

## <u>CERTIFICATION</u>

    I, Yaniv Berman, do hereby certify that as a qualified translator I am fully conversant with the English and Hebrew languages, and that to the best of my knowledge, the attached document, Verdict and Sentencing of Khaled Kamel Rashid Nuibat in Case no. 1785/19, is a true and accurate translation of the original text from the Hebrew language into English.

Date: July 21, 2020

_____
Yaniv Berman

**Israel Defense Forces**
*[symbol]*

**Military Court of Judea**                                      **Case no. 1785/19**
**Before the Hon. Deputy President: Lieut. Col. Rani Amer**

**The Military Prosecutor's Office**
(represented by attorney: Military Legal Officer Shoval Bergalas)

### versus

**The Defendant: Khaled Kamel Rashid Nawabit, ID no. 411013097 / Israel Prison Service – Present**
(represented by attorney: Adv. Sallah Mahamid – Present)

**Court Stenographer: Sgt. Eden Hayoun**
**Translator: Staff Sgt. Fa'iz Abu Haya**

Date of hearing: 9 December 2019 / Monday 11 Kislev 5780

### *Protocol of the Hearing*

**The court identifies the defendant.**

**The defendant states that Adv. Sallah Mahamid represents him.**


The Military Prosecutor: We have reached a plea agreement under which the indictment will be amended, the defendant will confess to the amended indictment, and the parties will request an agreed punishment.

The Defense Attorney: I confirm my colleague's words.

**The court makes clear to the parties that it is not constrained by the plea agreement that they have concluded.**

The Defense Attorney: I have explained the revised indictment to my client. He understands it and he confesses to it.

**The court reads the revised indictment to the defendant.**

The Defendant: The court has read to me the amended indictment's charge against me, I have understood it, and I confess to it.

### *Verdict*

On the basis of the defendant's confession, I convict the defendant of the charge on which he was indicted, specifically:

**Granting refuge** — An offense under clauses 245 and 333 of the Order Regarding Security Provisions [Consolidated Version] 5770/2009

**Delivered and proclaimed today, 9 December 2019, in public and in the presence of the parties.**


_____

Deputy President

The Military Prosecutor: No evidence for the purpose of sentencing.

The Defense Attorney: No evidence for the purpose of sentencing.

The Military Prosecutor concludes: In keeping with the plea agreement, I ask that the court impose upon the defendant the agreed punishment of 27 months' actual imprisonment, and a suspended sentence of imprisonment subject to the court's discretion, and a fine of NIS 5,000 or an alternative of 5 months' imprisonment. The arrangement is predicated on the unblemished past, on his confession of guilt, and on saving court time. We add that we gave consideration to the fact that this was a single instance of granting specific, limited assistance in the form of transportation from place to place, and consideration to difficulties in the evidence regarding the character of the defendant's suspicions regarding the future deeds of Asem al-Barghuthi.

The Defense Attorney concludes: I concur with the words of my colleague the prosecutor, and I ask that the agreement be honored. I repeat that the defendant and Asem had previously engaged in business with one another. The defendant did not know that Asem was using the car that was purchased, he entered his home without a key at a very late hour, and as soon as he knew that he had committed a terror attack, he went in and told his wife that he must help him out of sight. The account was examined, the wife was interrogated, and the defendant's version and the wife's version were consistent. All in all, he drove him for roughly 20 minutes, and only inside the car did he see the weapon. Thus, in our opinion the plea agreement is a reasonable on in the circumstances. We ask that it be honored. I ask that the court deviate from the agreement only if it is convinced that the agreement impinges on the public interest. The punishment is reasonable.

The Defendant, in his final statement: I corroborate the statement of the defense attorney.

**Before the Hon. Deputy President: Lieut. Col. Rani Amer**

**The Military Prosecutor's Office**
(represented by attorney: Military Legal Officer Shoval Bergalas)

**versus**

**The Defendant: Khaled Kamel Rashid Nawabit, ID no. 411013097 / Israel Prison Service – Present**
(represented by attorney: Adv. Sallah Mahamid – Present)

---

## Sentence

The defendant was found guilty, on the basis of his confession under a plea agreement, of the offense of granting refuge. Asem al-Barghuthi had planned, together with others, to perpetrate a shooting attack. Asem had prior acquaintanceship with the defendant on the basis of commercial ties. Among other things, the defendant purchased a vehicle at Asem's request. At the end of 2018, Asem perpetrated a fatal shooting attack that caused injury to Shira Ish-Ran, who was pregnant at the time, as well as to her husband Amichai Ish-Ran. The two were evacuated to hospital. During treatment of Shira's injuries, the baby was delivered and died.

After perpetrating the terror attack, Asem commenced his getaway. He met a number of people who assisted him. Among other meetings, Asem came to the home of the defendant. In Asem's coat at the time, a Kalashnikov rifle was concealed. Asem told the defendant that he had committed a terror attack and requested his help. The defendant consented. Then the defendant drove Asem in his vehicle to the Bil'in area, whereupon the connection between the two was severed. Later, Asem perpetrated a further shooting attack which, regrettably, brought further tragic consequences as two soldiers died.

The defendant is now answering to justice for providing refuge to Asem insofar as he drove him on one occasion from place to place.

The parties have presented a plea agreement to me in which they request that I impose on the defendant an agreed punishment of 27 months' actual imprisonment, a suspended sentence of imprisonment at the discretion of the court, and a fine of NIS 5,000 or an alternative of 5 months' imprisonment.

The granting of refuge bestows on the fugitive from the long arm of the security services ideological support and a supportive social infrastructure that enfolds him in protection and removes his fear of being apprehended by the security services. Thus, the offender in a case of granting refuge, including this specific defendant, brings a varying degree of damage to the preservation of security in the area (see Appeal 469/95, Basel Fayumi). In the current case, the harm to security in the area is significant and severe. As stated, the defendant was initially unaware of the Asem's activity, and indeed the indictment does not claim that he anticipated the continuation of Asem's activity, but there is no doubt that his assistance enabled Asem to continue his activity. That activity, regrettably, engendered further consequences of extreme severity.

Examination of the decision of the military court of appeals shows a broad range of punishments for the offense before us, from months of actual imprisonment to years of actual imprisonment. For example, in appeal 33/03 (Sarsur) the sentence was five months of imprisonment for granting refuge to a brother-in-law who was an operative of the military arm of Hamas. Other examples can be seen in appeal 61/00 (Daka) and appeal 101/02 (Zakzuk).

In more severe instances, years of imprisonment were imposed. For example, in Appeal 16/01 (Al-Bana) the punishment was two years' actual imprisonment for granting refuge to wanted senior figures such as Muhammad Deif for a period of months.

The defendant's deeds, as stated, are grave ones, worthy of condemnation and of deterrent punishment. That said, it is impossible to ignore the circumstances, connected and unconnected to the commission of the offense, that weigh in his favor. As noted, the defendant and Asem were already acquainted, Asem's request to the defendant came as a surprise, and the assistance was a single, limited instance. The parties added that the defendant has an unblemished past and that he chose to confess and save time for the court; in fact, the prosecution had noticed difficulties with the evidence.

In conclusion, having considered all the circumstances weighing in favor of and against the defendant, I have found that there should be no deviation from traditional practice as regards honoring the plea agreement.

I am honoring the plea agreement, and I sentence the defendant to the following punishments:

a.      27 months' imprisonment, to be served as counted from the day of his arrest.

b.      12 months' imprisonment, suspended on condition that during 5 years from the day of his release, the defendant commits no crime of which he was convicted in this case.

c.      A monetary fine of NIS 5,000 or, alternatively, 5 months' imprisonment. The fine is to be paid before, and as a condition for, the defendant's release from prison. Payment slip no.: 0018111536

**This protocol constitutes documentation for imprisonment (a warrant to imprison) for the defendant: Khaled Kamel Rashid Nawabit, ID no. 411013097**

**30 days' right to appeal.**
**Delivered and proclaimed today, 9 December 2019, in public and in the presence of the parties.**

_____

Deputy President

צבא ההגנה לישראל



תיק מס': 1785/19

בית המשפט הצבאי ביהודה

בפני כב' סגן הנשיא: סא"ל ראני עאמר        1

2

התביעה הצבאית        3

(באמצעות ב"כ קמ"ש שובל ברגלס)        4

נגד        5

6

הנאשם: חאלד כאמל רשיד נואבית, 411013097 / שב"ס – נוכח        7

(באמצעות ב"כ עו"ד סלאח מחמיד - נוכח)        8

9

רמ"שית: סמל עדן חיון        10

מתורגמן: רס"ל פאיז אבו חיה        11

12

תאריך הדיון: 09/12/19, יום שני י"א כסלו תש"פ        13

מהלך הדיון        14

15

ביהמ"ש מזהה את הנאשם.        16

הנאשם מצהיר כי מיוצג אותו עו"ד סלאח מחמיד.        17

18

תובע"צ: הגענו להסדר טיעון, במסגרתו יתוקן כתב האישום, הנאשם יודה בכתב האישום המתוקן        19

בגופו והצדדים יטענו לעונש מוסכם.        20

21

סנגור: אני מאשר את דברי חברי.        22

23

ביהמ"ש מבהיר לצדדים כי אינו כבול להסדר הטיעון שנקשר ביניהם.        24

25

סנגור: הסברתי למרשי את כתב האישום המתוקן, הוא הבין אותו ומודה בו.        26

27

ביהמ"ש מקריא לנאשם את כתב האישום המתוקן.        28

29

נאשם: ביהמ"ש הקריא לי את המיוחס לי בכתב האישום המתוקן, הבנתי אותו ואני מודה בו.        30

31

ה כ ר ע ת - ד י ן        32

33

על יסוד ההודאה באשמה, אני מרשיע את הנאשם במיוחס לו בכתב האישום המתוקן, דהיינו:        34

35

36

מתן מקלט- עבירה לפי סעיף 245 ו – 333 לצו בדבר הוראות ביטחון [נוסח משולב] התשי"ע- 2009.        37

38

39

ניתנה והודעה היום, 09/12/19, בפומבי ובמעמד הצדדים.        40

41

ס. נשיא        42

43

1

תוביי״צ : אין ראיות לעונש.   1
                              2
סנגור : אין ראיות לעונש.      3
                              4
תוב״יצ מסכם : במסגרת הסדר הטיעון, אבקש להשית על הנאשם עונש מוסכם של 27 חודשי   5
מאסר לריצוי בפועל, מאסר מותנה לשיקול דעת ביהמ״ש וכן קנס בסך 5,000 ₪ או 5 חודשי   6
מאסר תמורתו. הנימוקים להסדר הם עברו תוקי של הנאשם, הודאתו באשמה וחזוסכון בזמן   7
שיפוטי. נוסיף כי שקלנו את העובדה כי מדובר נקודתי וממוקד שהתבצע בהסעה           8
ממקום למקום. כמו כן, שקלנו קשיים ראייתיים הנוגעים לטיב החשד של הנאשם ביחס למעשיו   9
העתידיים של עאצם ברגותי.     10
                             11
סנגור מסכם : אני מצטרף לדברי חברי התובע ומבקש לכבד את ההסדר. אני חוזר ואומר, בין   12
הנאשם לבין עאצם היו עסקי סחר מלפני כן. הנאשם לא ידע שעאצם משתמש במכונית שנקנתה,   13
הוא נכנס אליו בלי מפתח בשעה מאוד מאוחרת וברגע שהוא ידע שביצע פיגוע הוא נכנס ואמר   14
לאשתו שהוא חייב לסלק אותו. חדברים נבדקו, תאישה נחקרה וחייתה התאמה בין גרסת הנאשם   15
לאישה. סך הכל הסיע אותו בערך 20 דקות ורק באוטו הוא ראה את הנשק. אשר על כן, לדעתנו   16
ההסדר הינו הסדר סביר בנסיבות העניין. נבקש לכבדו. אבקש כי ביהמ״ש יסטה מהההסדר רק אם   17
הוא משתכנע כי ההסדר נוגע את האינטרס הציבורי. העונש הוא סביר.   18
                                                              19
הנאשם בדברו האחרון : אני מחזק את דברי הסנגור.   20
                                               21
                                               22
                                               23

תאריך: 09/12/19     בית המשפט הצבאי ביהודה     תיק מס׳: 1785/19

1    בפני כב׳ סגן הנשיא: סא״ל ראני עאמר

2

3    התביעה הצבאית

4    (באמצעות ב״כ סמי״ש שובל ברגלס)

5    נגד

6    הנאשם: חאלד כאמל רשיד נואבית, 411013097 / שב״ס – נוכח

7    (באמצעות ב״כ עו״ד סלאח מחמיד - נוכח)

8

9

10

**ג ז ר - ד י ן**

11 הנאשם הורשע על פי הודאתו במסגרת הסדר טיעון בעבירה של מתן מקלט. עצם ברגותו תכנן

12 ביחד עם אחרים לבצע פיגוע ירי, לעאצם היתה היכרות מוקדמת עם הנאשם בשל קשרי סחר. בין

13 היתר נרכב על ידי הנאשם לבקשתו של עאצם כלי רכב. בסוף 2018 ביצע עאצם פיגוע ירי קטלני

14 שהוביל לפציעתם של שירה שהייתה באותו העת בחריון, כך גם לפציעת בעלה עמיחי אשרן.

15 השניים פונו לבית החולים. במהלך הטיפול בפציעתם של שירה נפטר הילד.

16

17 לאחר ביצוע הפיגוע, החל עאצם בתבוסה, פגש במספר אנשים אשר סייעו לו. בין היתר הגיע עאצם

18 לביתו של הנאשם כשבמעותו מוסתר כלי נשק מסוג ״קלצ'ינקוב״. עאצם מסר לנאשם כי ביצע

19 פיגוע וביקש את עזרתו, הנאשם הסכים. לאחר מכן הסיע הנאשם את עאצם ברכבו לאזור ביל עין,

20 או אז ניתק הקשר בין השניים. בהמשך ביצע עאצם פיגוע ירי נוסף אשר הוליד למרבה הצער

21 תוצאה טרגית נוספת של מות שני חיילים.

22

23 הנאשם נותן את הדין כעת בשל מתן מקלט עבור עאצם בכך שהסיעו בהזדמנות אחת ממקום

24 למקום.

25

26 הצדדים הציגו לפני הסדר טיעון אשר במסגרתו מבקשים שאשית על הנאשם עונש מוסכם של 27

27 חודשי מאסר לריצוי בפועל, מאסר מותנה לשיקול דעת ביהמ״ש וכן קנס בסך 5,000 ₪ או 5

28 חודשי מאסר תמורתו.

29

30 מתן מקלט מעניק לבורח מידם של כוחות הביטחון תמיכה אידיאולוגית ותשתית

31 חברתית ותומכת העוטפת אותו בגנוה לא חשש כי ייתפס על ידי גורמי הביטחון. מכאן שלמבצע

32 עבירות מתן המקלט לפרט בעניינו של הנאשם, קמה פגיעה בעוצמה משונה של שמירה על ביטחון

33 האזור (ראו עד״י 469/95 באסל פימול). במקרה דנן, קיימת פגיעה מהותית וקשה בביטחון האזור

34 כאמור הנאשם לא ידע בתחילה על פעילותו של עאצם ואף כתב האישום לא מייחס לו כי צפה את

35 המשך פעילותו של עאצם, אולם אין ספק כי סיוע אפשר לעאצם את המשך פעילותו. פעילות

36 שלמרבה הצער חולידה תוצאה קשה מאוד ונוספת.

37

38 עיון בפסיקת בית המשפט הצבאי לערעורים מגלה כי בעבירה דנן קיים מנעד ענישה רחב הנע בין

39 חודשי מאסר לריצוי בפועל ועד שנות מאסר לריצוי בפועל. למשל בעד״יי 33/03 (צרצור) נגזר עונש

40 של חמישה חודשי מאסר לריצוי בפועל על מי שנתן מקלט לניסו – פעיל בזרוע הצבאית של החמאס. דוגמאות

41 נוספות ניתן לראות בעד״יי 61/00 (דקה), עד״יי 101/02 (זקווק).

42

43 במקרים חמורים יותר נגזרו מספר שנות מאסר, למשל בעד״יי 16/01 (אלבנא) נגזר עונש של

44 שנתיים מאסר לריצוי בפועל למי שנתן מקלט למבוקשים בכירים כגון מוחמד דף לתקופה של

45 חודשיים.

46

47 מעשיו של הנאשם כאמור חמורים, ראויים לגינוי ולעונש מרתיעו. עם האמור, לא ניתן להתעלם

48 מהנסיבות הקשורות וחלא קשורות לביצוע העבירה שיש לזקוף לטובתו. כאמור, לנאשם ולעאצם

49 היתה היכרות מוקדמת, עאצם פנה בחיר לנאשם באופן מפתיע ומדובר בסיוע בודד ונקודתי. הצדדים

50 הוסיפו כי לנאשם עבר נקי והוא בחר להודות ולחסוך מזמנו של ביהמ״ש כך גם קיימים קשיים

51 ראייתיים בהם נתקלה התביעה.

52

53

תיק מס': 1785/19      בית המשפט הצבאי ביהודה      תאריך : 09/12/19

סוף דבר, לאחר שקילת מכלול הנסיבות לחובתו ולזכותו של הנאשם, מצאתי כי אין לחרוג     1
מההלכה בדבר כיבוד הסדרי טיעון.     2

    3
אני מכבד את הסדר הטיעון וגוזר על הנאשם את העונשים הבאים :     4

    5
א.    27 חודשי מאסר לריצוי בפועל מיום מעצרו.     6
ב.    12 חודשי מאסר על תנאי והתנאי הוא שבמשך 5 שנים מיום שחרורו לא יעבור הנאשם     7
עבירה בה הורשע בתיק זה.     8
ג.    קנס כספי בסך 5,000ש"ח או 5 חודשי מאסר תמורתו. הקנס ישולם עד למועד שחרורו של     9
הנאשם מן המאסר וכתנאי לו. מס' שובר:0018111536.     10

    11
פרוטוקול זה מהווה אסמכתא לכליאה (פקודת מאסר) לנאשם: חאלד כאמל רשיד נואבית,     12
411013097.     13

    14
זכות ערעור תוך 30 יום.     15
ניתן והודע היום, 09/12/19, בפומבי ובמעמד הצדדים.     16

    17
ס. נשיא     18

    19

    20

4

# Annex 7



# Global Arabic Translation Services

الخدمات العالمية للترجمة العربية

26 Sheinfain St., Kfar-Saba, Israel
+972 54 8349.337
www.GatsTranslations.com

## **CERTIFICATION**

I, Yaniv Berman, do hereby certify that as a qualified translator I am fully conversant with the English and Hebrew languages, and that to the best of my knowledge, the attached document, Verdict and Sentencing of Mahdi Abd al-Mu'min Ahmad Abu Rahma in Case no. 2127/19, is a true and accurate translation of the original text from the Hebrew language into English.

Date: July 21, 2020

Yaniv Berman

**Israel Defense Forces**

*[symbol]*

**Military Court of Judea**                                                                    **Case no. 2127/19**
**Before the Hon. Judge: Maj. Sebastian Osovsky**

**The Military Prosecutor's Office**
(represented by attorney: Military Legal Officer Haim Mishali)

**versus**

**The Defendant: Mahdi Abd al-Mu'min Ahmad Abu Rahma, ID no. 850495953 / Israel Prison Service – Present**
(represented by attorney: Adv. Samara – Present)

**Court Stenographer: Sgt. Mai Michalovski**
**Translator: Pvt. Iyal Sa'id**

Date of hearing: 21 January 2020 / Tuesday 24 Tevet 5780

*Protocol of the Hearing*

**The court identifies the defendant.**

**The defendant states that Adv. Samara represents him.**

The Military Prosecutor: We have reached a plea agreement under which the indictment will be amended, the defendant will confess in writing to the amended charges, and the parties will request an agreed punishment.

The Defense Attorney: I confirm my colleague's words.

**The court makes clear to the parties that it is not constrained by the plea agreement that they have concluded.**

The Defense Attorney: I have explained the revised indictment to my client. He understands it and he confesses to it.

**The court reads the revised indictment to the defendant.**

The Defendant: The court has read to me the amended indictment's charges against me, I have understood them, and I confess to them.

*Verdict*

On the basis of the defendant's confession, I convict the defendant of the charges on which he was indicted, specifically:

**Forbidden contact with an enemy** — An offense under clauses 237, 199c, and 333 of the Order Regarding Security Provisions [Consolidated Version] (Judea and Samaria) (No. 1651) 5770/2009

**Membership and activity in an unlawful association** — An offense under clause 85(1)(a) of the Defense (Emergency) Regulations of 1945.

**Delivered and proclaimed today, 21 January 2020, in public and in the presence of the parties.**

_____

Judge

1

Military Court of Judea

The Military Prosecutor: Presents the verdict in case 1731/09 of the Military Court of Judea.

The Defense Attorney: No evidence for the purpose of sentencing.

The Military Prosecutor concludes: In keeping with the plea agreement, I ask that the court impose upon the defendant the agreed punishment of 20 months' imprisonment to be served as counted from the day of his arrest, and a suspended sentence of 18 months during 5 years for each offense of which he has been convicted and each offense that is founded on support for an unlawful association, other than presence at a march, or founded on the handling of money, and imprisonment subject to the court's discretion for the offense of attendance at a march, and a fine of NIS 3000 or an alternative of imprisonment that is subject to the court's discretion. The arrangement is predicated on the relevant albeit distant past of the defendant, on his confession of guilt, and on saving court time. The fact is that this was a local cell that did not commit any activity at all and had not even managed to obtain a weapon. In addition, the prosecution has taken into account that the offense involving contact with the enemy occurred long ago.

The Defense Attorney concludes: I concur with the words of my colleague the prosecutor, and I ask that the agreement be honored. The defendant was not aware that Asem al-Barghuthi was connected with that cell.

The Defendant, in his final statement: I have nothing to add.

2

Date: 21 January 2020 | Military Court of Judea | Case no. : 2127/19

**Before the Hon. Judge: Maj. Sebastian Osovsky**
**The Military Prosecutor's Office**
(represented by attorney: Military Legal Officer Haim Mishali)

**Versus**

**The Defendant: Mahdi Abd al-Mu'min Ahmad Abu Rahma, ID no. 850495953 / Israel Prison Service – Present**
(represented by attorney: Adv. Samara – Present)

*Sentence*

The defendant was found guilty, on the basis of his confession under a plea agreement, of having made contact in the year 2011 with a prisoner who had been removed to Gaza with regard to actions [Translator's note: there seems to be a mistake in the Hebrew word – BITSU'IM, actions - which sounds like  the word PITSU'IM, compensations]  due to him for a previous imprisonment. Moreover, in December 2018 and until his arrest, the defendant had consented to join a military cell led by Asem al-Barghuthi.

The parties have presented a plea agreement to me in which they request that I impose on the defendant an  agreed punishment of 20 months' imprisonment to be served as counted from the day of his arrest, and a suspended sentence of 18 months during 5 years for each offense of which he has been convicted and each offense that is founded on support for an unlawful association, other than presence at a march, or founded on the handling of money, and imprisonment subject to the court's discretion for the offense of attendance at a march, and a fine of NIS 3,000 or an alternative of imprisonment that is subject to the court's discretion.

The arrangement is predicated on the distant past of the defendant, on his confession of guilt, and on saving court time. It was also noted to me that the parties took into consideration the limited activity of the cell, and the time that has passed since the offense of contact with the enemy. The defense attorney also contended that the defendant had been unaware that al-Barghuti was behind the cell.

Having weighed the arguments of the parties, I have found the arrangement to be reasonable and to merit being honored.

Therefore, I sentence the defendant to the following punishments:

a.    20 months' imprisonment, to be served as counted from the day of his arrest.

b.    18 months' imprisonment, suspended on condition that during 5 years from the day of his release, the defendant commits no crime of which he was convicted in this case, nor any crime founded on support for an unlawful association, other than presence at a march, nor any crime of handling the money of an enemy.

c.    3 months' imprisonment, suspended on condition that during one year from the day of his release, the defendant commits no crime of presence at a march.

d.    A monetary fine of NIS 3,000 or, alternatively, 3 months' imprisonment. The fine is to be paid before, and as a condition for, the defendant's release from prison. Payment slip no.: 0019104476

**This protocol constitutes documentation for imprisonment (a warrant to imprison) for: Mahdi Abd al-Mu'min Ahmad Abu Rahma, ID no. 850495953.**

**30 days' right to appeal.**
**Delivered and proclaimed today, 21 January 2020, in public and in the presence of the parties.**

_____

Judge

**Israel Defense Forces**
*[symbol]*

**Military Court of Judea**                                                                    **Case no. 2127/19**
**Before the Hon. Judge: Maj. Sebastian Osovsky**

**The Military Prosecutor's Office**

**versus**

**The Defendant: Mahdi Abd al-Mu'min Ahmad Abu Rahma, ID no. 850495953 / Israel Prison Service**
(represented by attorney: Adv. Samara)

Date: 22 January 2020 / Wednesday 25 Tevet 5780

<u>***Notification of a Correction in the Sentence***</u>

1.     By my authority under clause 99a (a) of the Order Regarding Security Provisions, I direct that the verdict be corrected as follows:

The verdict inadvertently omitted the offenses of which the defendant was convicted under the plea arrangement:

(1)    **Forbidden contact with an enemy** — An offense under clauses 237, 199c, and 333 of the Order Regarding Security Provisions [Consolidated Version] (Judea and Samaria) (No. 1651) 5770/2009

(2)    **Membership and activity in an unlawful association** — An offense under clause 85(1)(a) of the Defense (Emergency) Regulations of 1945.

Given the circumstances, and because the omission was inadvertent and is inconsistent with the text that was read to the defendant, I direct that the verdict be corrected by the addition of the offenses detailed above.

**The corrected verdict shall be brought for my signature and presented to the parties.**

**Delivered and proclaimed today, 22 January 2020, at the office.**

_____

Judge

1

צבא ההגנה לישראל



תיק מס׳: 2127/19

בית המשפט הצבאי ביהודה

בפני כב׳ השופט: רס״ן סבסטיאן אוסובסקי          1

2

התביעה הצבאית          3

(באמצעות ב״כ קמיי״ש חיים משעלי )          4

5

נגד          6

הנאשם: מהדי עבד אלמואמן אחמד אבו רחמה , 850495953  / שב״ס – נוכח          7

(באמצעות ב״כ עו״ד סמארה– נוכח)          8

9

רמ״שית: סמל מאי מיכלובסקי          10

מתורגמן: טור׳ איל סעיד          11

ותאריך הדיון: 21/01/20, יום שלישי כ״ד טבת תש״פ          12

## מהלך דיון
13

בית המשפט מזהה את הנאשם.          14

הנאשם מצהיר כי מייצג אותו עו״ד סמארה.          15

16

תוב״צ: הגענו להסדר טיעון, במסגרתו יתוקן כתב האישום, הנאשם יודה בכתב האישום המתוקן          17

בגופו והצדדים יטענו לעונש מוסכם.          18

19

סנגור: אני מאשר את דברי חברי.          20

21

ביהמ״ש מבהיר לצדדים כי אינו כבול להסדר הטיעון שנקשר ביניהם.          22

23

סנגור: הסברנו למרשי את כתב האישום המתוקן, הוא הבין אותו ומודה בו.          24

25

ביהמ״ש מקריא לנאשם את כתב האישום המתוקן.          26

27

נאשם: ביהמ״ש הקריא לי את המיוחס לי בכתב האישום המתוקן, הבנתי אותו ואני מודה בו.          28

## הכרעת – דין
29

30

על יסוד ההודאה באשמה, אני מרשיע את הנאשם במיוחס לו בכתב האישום, דהיינו:          31

32

איסור מגע עם אויב – עבירה לפי סעיפים 237, 199, וג 1 – 333 לצו בדבר הוראות ביטחון [נוסח          33

משולב] (יהודה והשומרון) (מס׳ 1651) התשיי״ע- 2009.          34

חברות ופעילות בהתאחדות בלתי מותרת – עבירה לפי סעיף 85(1) (א) לתקנות ההגנה (שעת          35

חירום), 1945.          36

37

ניתן והודע היום, 21/01/20, בפומבי ובמעמד הצדדים.          38

39

_____          40
שופט          41

42

1

תיק מס' : 2127/19          בית המשפט הצבאי ביהודה          תאריך : 21/01/2020

1   תובי"צ : מגיש פסק דין בתיק 1731/09 של ביהמ"ש הצבאי ביהודה.
2
3   סנגור : אין ראיות לעונש.
4
5   תובי"צ מסכם: במסגרת הסדר הטיעון, אבקש להשית על הנאשם עונש מוסכם של 20 חודשי
6   מאסר לריצוי בפועל מיום מעצר, מאסר מותנה של 18 חודשים למשך 5 שנים בגין כל עבירה בה
7   הורשע וכל עבירה שיש עמה יסוד של תמיכה בהתאחדות בלתי מותרת, למעט נוכחות בתהלוכה
8   או יסוד של עיסוק בכספים, מאסר מותנה לשיקול דעת ביהמ"ש בגין עבירה של נוכחות בתהלוכה
9   וכן קנס בסך 3,000 ₪ או מאסר תמורתו לשיקול דעת ביהמ"ש. הנימוקים להסדר הם עברו
10  הרלוונטי אך ישן של הנאשם, הודאתו באשמה וחיסכון בזמן שיפוטי. העובדה כי מדובר
11  בחוליה מקומית שלא ביצעה פעילות כלשהי ואף לא עלה בידה להשיג נשק. כמו כן, לקחח
12  התובעיעה בחשבון כי עבירה העוסקת במגע עם האויב היא האיש ישנה.
13
14  סנגור מסכם : אני מצטרף לדברי חברי התובע ומבקש לכבד את ההסדר. הנאשם לא היה מודע
15  לכך שעאצם ברגותי היו קשור לחוליייה זאת.
16
17  הנאשם בדברו האחרון : אין לי מה להוסיף.
18
19
20

2

תיק מס': 2127/19     בית המשפט הצבאי ביהודה     תאריך: 21/01/2020

בפני כב' השופט: רס"ן סבסטיאן אוסובסקי    1

2

התביעה הצבאית    3

(באמצעות ב"כ קמ"יש חיים משעלי )    4

5

נגד    6

הנאשם: מהדי עבד אלמואמן אחמד אבו רחמה , 850495953 / שב"ס - נוכח    7

(באמצעות ב"כ עו"ד סמארה– נוכח)    8

9

**ג ז ר - ד י ן**    10

11

הנאשם הורשע על פי הודאתו במסגרת הסדר טיעון, בכך שבשנת 2011 יצר קשר עם הנאשם    12
אסיר אשר הורחק לעזה. בנוגע לביצועים המגיעים לו עבור מאסר קודם. כמו כן, בחודש דצמבר    13
2018 ועד למעצרו הסכים הנאשם להצטרף לחוליית צבאית אשר בראשית עמד עאצם ברגותי.    14

15

הצדדים הציגו לפני הסדר טיעון אשר במסגרתו מבקשים שאשית על הנאשם עונש מוסכם של 20    16
חודשי מאסר לריצוי בפועל מיום מעצרו, מאסר מותנה של 18 חודשים למשך 5 שנים בגין כל    17
עבירה בה הורשע וכל עבירה שיש עמה יסוד של תמיכה בהתאחדות בלתי מותרת, למעט נוכחות    18
בתהלוכה או עיסוק בכספים, מאסר מותנה לשיקול דעת ביהמ"ש בגין עבירה של נוכחות    19
בתהלוכה וכן קנס בסך 3,000 ₪ או מאסר תמורתו לשיקול דעת ביהמ"ש.    20

21

הצדדים נימקו את ההסדר בעברו הישן של הנאשם, הודאתו באשמה וחחיסכון בזמן שיפוטי. עוד    22
ציון לפני כי הצדדים שקלו את הפעילות המצומצמת של החוליה , נשענות העבירה שעניינה מגע    23
עם אויב. עוד טען הסנגור כי הנאשם לא היה מודע לכך שברגותי עומד מאחורי החוליה.    24

25

לאחר ששקלתי את טענות הצדדים מצאתי כי ההסדר סביר וראוי לכבדו.    26

27

על כן, אני גוזר על הנאשם את העונשים הבאים :    28

29

30

א.   20 חודשי מאסר לריצוי בפועל מיום מעצרו.    31

ב.   18 חודשי מאסר על תנאי והתנאי הוא שבמשך 5 שנים מיום שחרורו לא יעבור הנאשם    32
עבירה בה הורשע בתיק זה וכל עבירה שיש עמה יסוד של תמיכה בהתאחדות בלתי    33
מותרת, למעט נוכחות בתהלוכה. כמו כן התנאי יחול על עבירה של עיסוק בכספי אויב.    34

ג.   3 חודשי מאסר על תנאי והתנאי הוא שבמשך שנה מיום שחררו לא יעבור הנאשם עבירה    35
של נוכחות בתהלוכה.    36

ד.   קנס כספי בסך 3,000 ₪ או 3 חודשי מאסר תמורתו. הקנס ישולם עד למועד שחרורו של    37
הנאשם מן המאסר וכתאני לו. מס' שובר: 0019104476.    38

39

פרוטוקול זה מהווה אסמכתא לכפליאה (פקודת מאסר) עבור: מהדי עבד אלמואמן אחמד אבו    40
רחמה , 850495953 .    41

42

זכות ערעור תוך 30 יום.    43
ניתן והודע היום, 21/01/20, בפומבי ובמעמד הצדדים.    44

45

46

47

שופט    48

49

3

צבא ההגנה לישראל



תיק מס': 2127/19

בית המשפט הצבאי ביהודה

בפני כב' השופט: רס"ן סבסטיאן אוסובסקי

התביעה הצבאית

נגד

הנאשם: מהדי עבד אלמואמן אחמד אבו רחמה, 850495953 / שב"ס
(באמצעות ב"כ עו"ד סמארה)

תאריך: 22/01/20, יום רביעי כ"ה טבת תש"ף

## הודעה על תיקון טעות בגזר דין

1. מתוקף סמכותי מכוח סעיף 99א (א) לצו בדבר הוראות ביטחון אני מורה על תיקון פסק דין כדלקמן:

בפסק הדין הושמטו בטעות העבירות בהן הורשע הנאשם במסגרת הסדר טיעון:

(1) איסור מגע עם אויב – עבירה לפי סעיפים 237, 299, ו-333 לצו בדבר הוראות ביטחון [נוסח משולב] (יהודה והשומרון) (מס' 1651) התשע"ע- 2009.

(2) חברות ופעילות בהתאחדות בלתי מותרת – עבירה לפי סעיף 85(1) (א) לתקנות ההגנה (שעת חירום), 1945.

בנסיבות אלה, ומשמדובר בהשמטה שנעשתה בטעות והיא לא תואמת את הדברים אשר הוקראו לנאשם, אני מורה על תיקון פסק הדין כך שיתווספו העבירות אשר פורטו לעיל.

**הכרעת דין מתוקנת תובא לחתימתי ותועבר לצדדים.**

ניתנה והודעה היום, 22/01/20, בלשכה.

שופט

1