UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

------------------------------------------------------x

NATHANIEL FELBER, *et al.*          :

                                              :          **Case No. 19-cv-1027 (ABJ)**

                           Plaintiffs,          :

                                              :

                  -against-          :

                                              :

ISLAMIC REPUBLIC OF IRAN,          :

                                              :

                              Defendant.          :

------------------------------------------------------x

**PLAINTIFFS' PARTIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF THEIR MOTION FOR DEFAULT JUDGMENT**

## TABLE OF CONTENTS

I.    BACKGROUND ........................................................................................................ 1

II.   FINDINGS OF FACT ............................................................................................... 3

    A.    The December 13, 2018 Givat Assaf Attack ................................................... 3

    B.    Evidence of HAMAS's Responsibility for the Givat Assaf Attack ............... 5

        1.    Mr. Spitzen's Credentials ................................................................... 5

        2.    HAMAS Generally .............................................................................. 6

        3.    HAMAS's Identification of Asem al-Barghuthi as a Qassam Brigades Operative ...... 7

        4.    Asem al-Barghuthi's Family's Longtime HAMAS Connections ................. 9

        5.    Asem al-Barghuthi's Prior and Subsequent HAMAS Activities .............. 10

        6.    HAMAS Indicators in the Ofra and Givat Assaf Attacks ......................... 11

    C.    Iran's Material Support for HAMAS ............................................................ 13

        1.    Dr. Clawson's Credentials ................................................................ 13

        2.    Iran's Provision of Material Support to HAMAS ................................ 14

    D.    Family Member Plaintiffs' Injuries ............................................................. 18

        1.    Dr. Strous's Credentials .................................................................... 19

        2.    Psychiatric Disorders ........................................................................ 20

            a.    Post-Traumatic Stress Disorder ("PTSD") .......................... 20

            b.    Adjustment Disorder ........................................................... 21

        3.    Family Member Plaintiffs' Emotional Injuries ................................. 22

            a.    Judi Felber ........................................................................... 22

            b.    Joseph Felber ...................................................................... 26

            c.    Daniel Felber ....................................................................... 30

            d.    Adina Felber ........................................................................ 33

III.   CONCLUSIONS OF LAW: LIABILITY ............................................................. 38

    A.   Legal Standard for FSIA Default Judgment ................................................ 38

    B.   Subject Matter Jurisdiction ........................................................................ 39

    C.   Service of Process and Personal Jurisdiction ............................................. 43

    D.   Theories of Liability .................................................................................. 43

        1.   Solatium ............................................................................................. 44

        2.   Battery ............................................................................................... 45

    E.   Iran's Vicarious Liability for the Torts Committed by HAMAS ................. 46

IV.   CONCLUSIONS OF LAW: DAMAGES ............................................................ 48

    A.   Solatium Damages ...................................................................................... 49

    B.   Prejudgment Interest .................................................................................. 56

    C.   Punitive Damages ....................................................................................... 58

V.   CONCLUSION .................................................................................................. 60

# TABLE OF AUTHORITIES

**Cases**

*Acosta v. Islamic Republic of Iran*,
  574 F. Supp. 2d 15 (D.D.C. 2008).............................................................. 48

*Akins v. Islamic Republic of Iran*,
  332 F. Supp. 3d 1 (D.D.C. 2018)................................................................ 43

*Argentine Republic v. Amerada Hess Shipping Corp.*,
  488 U.S. 428 (1989).................................................................................... 40

*Baker v. Socialist People's Libyan Arab Jamahiriya*,
  775 F. Supp. 2d 48 (D.D.C. 2011).............................................................. 59

*Barot v. Embassy of the Republic of Zambia*,
  785 F.3d 26 (D.C. Cir. 2015)...................................................................... 43

*Ben-Rafael v. Islamic Republic of Iran*,
  540 F. Supp. 2d 39 (D.D.C. 2008).............................................................. 57

*Bettis v. Islamic Republic of Iran*,
  315 F.3d 325 (D.C. Cir. 2003).................................................................... 44

*Blais v. Islamic Republic of Iran*,
  459 F. Supp. 2d 40 (D.D.C. 2006)........................................................ 50, 52

*Bodoff v. Islamic Republic of Iran*,
  424 F. Supp. 2d 74 (D.D.C. 2006)................................................... 46, 47, 48

*Bodoff v. Islamic Republic of Iran*,
  907 F. Supp. 2d 93 (D.D.C. 2012).............................................................. 18

*Braun v. Islamic Republic of Iran*,
  228 F. Supp. 3d 64 (D.D.C. 2017)........................................................ 58, 59

*Brewer v. Islamic Republic of Iran*,
  664 F. Supp. 2d 43 (D.D.C. 2009).............................................................. 50

*Buonocore v. Great Socialist People's Libyan Arab Jamahiriya*,
  No. 06-cv-727 (JMF), 2013 WL 351546 (D.D.C. Jan. 29, 2013) ...................... 56, 57

*Campuzano v. Islamic Republic of Iran*,
  281 F. Supp. 2d 258 (D.D.C. 2003).............................................................. 38

*Cohen v. Islamic Republic of Iran,*
   238 F. Supp. 3d 71 (D.D.C. 2017) ................................................................. 18, 42

*Dammarell v. Islamic Republic of Iran,*
   404 F. Supp. 2d 261 (D.D.C. 2005) ..................................................................... 14

*Eisenfeld v. Islamic Republic of Iran,*
   172 F. Supp. 2d 1 (D.D.C. 2000) ................................................................... 18, 45

*Estate of Botvin v. Islamic Republic of Iran,*
   873 F. Supp. 2d 232 (D.D.C. 2012) ..................................................................... 18

*Estate of Heiser v. Islamic Republic of Iran,*
   659 F. Supp. 2d 20 (D.D.C. 2009) ....................................................................... 45

*Estate of Hirshfeld v. Islamic Republic of Iran,*
   330 F. Supp. 3d 107 (D.D.C. 2018) ..................................................................... 18

*Flanagan v. Islamic Republic of Iran,*
   190 F. Supp. 3d 138 (D.D.C. 2016) ..................................................................... 39

*Flanagan v. Islamic Republic of Iran,*
   87 F. Supp. 3d 93 (D.D.C. 2015) ......................................................................... 59

*Flatow v. Islamic Republic of Iran,*
   999 F. Supp. 1 (D.D.C. 1998) ......................................................................... 47, 55

*Forman v. Korean Air Lines Co.,*
   84 F.3d 446 (D.C. Cir. 1996) ......................................................................... 57, 58

*Fritz v. Islamic Republic of Iran,*
   320 F. Supp. 3d 48 (D.D.C. 2018) ....................................................................... 39

*Gill v. Islamic Republic of Iran,*
   249 F. Supp. 3d 88 (D.D.C. 2017) ................................................................ *passim*

*Griva v. Davison,*
   637 A.2d 830 (D.C. 1994) .................................................................................... 46

*Haim v. Islamic Republic of Iran,*
   425 F. Supp. 2d 56 (D.D.C. 2006) ............................................................... *passim*

*Halberstam v. Welch,*
   705 F.2d 472 (D.C. Cir. 1983) ........................................................................ 46, 48

*Han Kim v. Democratic People's Republic of Korea,*
   774 F.3d 1044 (D.C. Cir. 2014) ..................................................................... 39, 41

*Heiser v. Islamic Republic of Iran*,
    466 F. Supp. 2d 229 (D.D.C. 2006) ................................................................. 40, 49

*Hill v. Republic of Iraq*,
    328 F.3d 680 (D.C. Cir. 2003) ................................................................................ 49

*In re Islamic Republic of Iran Terrorism Litig.*,
    659 F. Supp. 2d 31 (D.D.C. 2009) .......................................................................... 44

*Karcher v. Islamic Republic of Iran*,
    396 F. Supp. 3d 12 (D.D.C. 2019) ............................................................. 41, 42, 43, 47

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
    376 F.3d 1123 (D.C. Cir. 2004) ............................................................................ 50

*Kim v. Democratic People's Republic of Korea*,
    87 F. Supp. 3d 286 (D.D.C. 2015) .......................................................................... 58

*Murphy v. Islamic Republic of Iran*,
    740 F. Supp. 2d 51 (D.D.C. 2010) .......................................................................... 45

*Mwila v. Islamic Republic of Iran*,
    33 F. Supp. 3d 36 (D.D.C. 2014) ..................................................................... 57, 58

*Oldham v. Korean Air Lines Co.*,
    127 F.3d 43 (D.C. Cir. 1997) ................................................................................ 56

*Opati v. Republic of Sudan*,
    140 S. Ct. 1601 (2020) ........................................................................................ 38

*Oveissi v. Islamic Republic of Iran*,
    768 F. Supp. 2d 16 (D.D.C. 2011) .......................................................................... 50

*Oveissi v. Islamic Republic of Iran*,
    879 F. Supp. 2d 44 (D.D.C. 2012) .......................................................................... 58

*Owens v. Islamic Republic of Iran*,
    864 F.3d 751 (D.C. Cir. 2017) .................................................................... 38, 39, 41

*Prevatt v. Islamic Republic of Iran*,
    421 F. Supp. 2d 152 (D.D.C. 2006) ........................................................................ 49

*Pugh v. Socialist People's Libyan Arab Jamahiriya*,
    530 F. Supp. 2d 216 (D.D.C. 2008) ........................................................................ 56

*Roth v. Syrian Arab Republic*,
    No. 14-cv-01946-RCL, 2018 WL 4680270 (D.D.C. Sept. 28, 2018) ..................................... 48

*Salazar v. Islamic Republic of Iran,*
    370 F. Supp. 2d 105 (D.D.C. 2005) ....................................................... 49

*Schertzman Cohen v. Islamic Republic of Iran,*
    No. 17-cv-1214 (JEB), 2019 WL 3037868 (D.D.C. July 11, 2019) ...................... 42, 44, 45, 57

*Spencer v. Islamic Republic of Iran,*
    71 F. Supp. 3d 23 (D.D.C. 2014) .......................................................... 50

*Stern v. Islamic Republic of Iran,*
    271 F. Supp. 2d 286 (D.D.C. 2003) .................................................... 18, 43

*Stethem v. Islamic Republic of Iran,*
    201 F. Supp. 2d 78 (D.D.C. 2002) ......................................................... 45

*Valencia v. Islamic Republic of Iran,*
    774 F. Supp. 2d 1 (D.D.C. 2010) .......................................................... 45

*Valore v. Islamic Republic of Iran,*
    700 F. Supp. 2d 52 (D.D.C. 2010) ................................................. 38, 44, 49

*Weinstein v. Islamic Republic of Iran,*
    184 F. Supp. 2d 13 (D.D.C. 2002) ......................................................... 18

*Weishapl v. Sowers,*
    771 A.2d 1014 (D.C. 2001) ................................................................. 46

*Wultz v. Islamic Republic of Iran,*
    864 F. Supp. 2d 24 (D.D.C. 2012) ......................................................... 46

*Wyatt v. Syrian Arab Republic,*
    908 F. Supp. 2d 216 (D.D.C. 2012) ....................................................... 57

**Statutes**

18 U.S.C. § 2 ................................................................................ 48

18 U.S.C. § 2339A .......................................................................... 40

28 U.S.C. § 1330(b) ........................................................................ 43

28 U.S.C. § 1350 note ...................................................................... 41

28 U.S.C. § 1604 ........................................................................... 39

28 U.S.C. § 1605A .......................................................................... 40

28 U.S.C. § 1605A(a)(1) ................................................................ 40, 46

28 U.S.C. § 1605A(a)(2)(A) ........................................................................... 42

28 U.S.C. § 1605A(c) ............................................................................... 43, 58

28 U.S.C. § 1605A(h)(3) ............................................................................... 40

28 U.S.C. § 1605A(h)(7) ............................................................................... 41

28 U.S.C. § 1608(a) ...................................................................................... 43

28 U.S.C. § 1608(a)(3) ............................................................................... 2, 43

28 U.S.C. § 1608(a)(4) ............................................................................... 2, 43

28 U.S.C. § 1608(e) ...................................................................................... 38

**Rules**

Fed. R. Civ. P. 4(j)(1) .................................................................................. 43

Fed. R. Evid. 703 ......................................................................................... 39

**Regulations**

22 C.F.R. § 126.1(d) (2005) .......................................................................... 14

31 C.F.R. § 596.201 (2005) .......................................................................... 14

Determination Pursuant to Section 6(i) of the Export Administration Act of 1979–Iran,
    49 Fed. Reg. 2836-02 (Jan. 23, 1984) ...................................................... 14

Plaintiffs, by and through undersigned counsel, hereby submit the following proposed findings of fact and conclusions of law as to the Islamic Republic of Iran's ("Iran" or "Defendant") liability for their injuries and Plaintiffs' damages, except for Nathaniel Felber's, which Plaintiffs will file by October 16, 2020. *See* July 16, 2020 Minute Order. These proposed findings of fact and conclusions of law are based on the sworn declarations provided by Plaintiffs and expert witnesses in support of the entry of a default judgment in this action.

This case arises from the personal injuries Plaintiffs suffered as a result of a December 13, 2018 shooting attack at a bus stop outside of Givat Assaf[1] in the West Bank (the "Givat Assaf Attack") materially supported by Iran and committed by the Islamic Resistance Movement ("HAMAS").

Twenty-one-year-old Nathaniel Felber was shot in the head, losing part of his skull and scalp and leaving him in a vegetative state for months.[2] After several surgeries and months of rehabilitation, he gained some rudimentary communication abilities, but his May 2020 cranioplasty surgery reversed some of that progress, causing severe seizures lasting for days. His condition will likely never materially improve, and any further seizure could kill him.

## I.      BACKGROUND

1.      On April 12, 2019, Plaintiffs filed their Complaint in this Court seeking, *inter alia*, compensation for the physical and emotional injuries that they sustained as a result of the Givat Assaf Attack. ECF No. 1.

---

[1]      Given differing spellings of words or phrases transliterated from Hebrew or Arabic in the declarations and Complaint, Plaintiffs have adopted one particular spelling for each in this submission for consistency purposes.

[2]      *See* Declaration of Judi Felber, ¶ 24. Nathaniel Felber's medical condition is based on Plaintiffs' current understanding, and will be supplemented in Plaintiffs' upcoming submission as to his damages by a medical expert.

2.      On May 21, 2019, Plaintiffs filed with the Court affidavits requesting foreign mailing by certified or registered mail, return receipt requested, of the Summons, Complaint, and notice of suit, along with a translation of each into Persian, upon Iran. ECF No. 9.

3.      On May 28, 2019, pursuant to 28 U.S.C. § 1608(a)(3), the Clerk of the Court certified that process was mailed by registered mail, return receipt requested. ECF No. 11.

4.      Defendant refused delivery, and on July 23, 2019, the service package was returned to the Court unexecuted. ECF No. 12.

5.      Plaintiffs then attempted service of process on Iran via diplomatic channels pursuant to 28 U.S.C. § 1608(a)(4). The same day the service package was returned unexecuted—July 23, 2019—Plaintiffs requested the Clerk of Court assist in transmitting the service documents. ECF No. 13. The Clerk transmitted the service documents to the State Department on July 31, 2019. ECF No. 16. The documents were transmitted to Iran's Ministry of Foreign Affairs via the Embassy of Switzerland in Tehran on September 23, 2019, under cover of diplomatic note, number 1089-IE, as described in a State Department letter to Ms. Angela D. Caesar, Clerk of Court, dated October 24, 2019, and stamped received October 29, 2019. Service was thereby effective as of September 23, 2019, per 28 U.S.C. § 1608(a)(4). ECF No. 17.

6.      Defendant's Answer was due on November 22, 2019. *Id.* Defendant failed to answer, move, or otherwise respond by that date or subsequently.

7.      On January 14, 2020, Plaintiffs requested the Clerk enter a default against Iran, ECF No. 18, which was entered by the Clerk on January 24, 2020. ECF No. 19.

8.      In support of the present motion for a default judgment, Plaintiffs proffer sworn declarations from:

- Arieh Dan Spitzen, providing his expert opinion that HAMAS committed the Givat Assaf Attack ("Spitzen Decl.");

- Patrick Clawson, Ph.D., providing his expert opinion that Iran gave significant material support to HAMAS before, during, and immediately after the relevant period for the purpose of encouraging attacks such as the one at issue ("Clawson Decl.");

- Rael Strous, M.D., providing his expert opinion on emotional injuries sustained by Plaintiffs Judi Felber, Joseph Felber, Daniel Felber, and Adina Felber (the "Family Member Plaintiffs") as a result of the Givat Assaf Attack ("Strous Decl."); and

- The Family Member Plaintiffs, setting out their experiences during the aftermath, and the resulting emotional consequences, of the Givat Assaf Attack.

## II.   FINDINGS OF FACT

### A.   The December 13, 2018 Givat Assaf Attack

9.      On December 13, 2018, Plaintiff Nathaniel Felber, an American citizen who was then serving in the Israeli military, was stationed near a bus stop on Route 60, outside the small town of Givat Assaf, with other Israeli soldiers. *See* Spitzen Decl. ¶ 43.

10.     On that day, Asem al-Barghuthi, a HAMAS operative from the West Bank village of Kubar, decided to perpetrate a terrorist attack and become a "*shahid*," or "martyr." *Id.* ¶¶ 36, 43, 72 & n.44, 81–82. The morning of December 13, 2018, al-Barghuthi drove to the junction outside the town of Givat Assaf on Route 60, and saw Israeli soldiers and civilians standing at the bus stop. *Id.* ¶ 43. He drove past, completed a U-turn, proceeded back to the bus stop, stopped the car, got out of the car, and opened fire on the Israeli soldiers and civilians from short range with an AK-47 automatic assault rifle. *Id.* ¶¶ 43, 60.

11.     Plaintiff Nathaniel Felber was shot in the head, two other Israeli soldiers were killed, and an Israeli civilian was also injured. *Id.* ¶ 43.

12.     Al-Barghuthi fled the scene. *Id.*

13.     On January 8, 2019, al-Barghuthi was arrested by Israeli security forces. *Id.* ¶¶ 45, 51.

14.     Al-Barghuthi was indicted on March 11, 2019, by the State of Israel for three counts of murder and multiple counts of attempted murder. *Id.* ¶ 36 (citing Annex 1 (2019 indictment)).

15.     Medics arriving at the scene of the Givat Assaf Attack thought Nathaniel was dead before finding a pulse. Declaration of Judi Felber ("Judi Decl."), ¶ 12. He was rushed into surgery at Hadassah University Hospital in Jerusalem. *Id.* ¶¶ 14, 17. The family did not know whether Nathaniel would survive, and doctors warned that the next 72 hours would be critical. *Id.* ¶ 16. Nathaniel was in a medically-induced coma, followed by a vegetative state, which he remained in for months. *Id.* ¶ 24.

16.     Nathaniel stayed in the ICU for over two months, and was admitted to a rehabilitation center on February 27, 2019, where he still resides currently. *Id.* ¶¶ 15, 25. Nathaniel's left eye started opening for the first time three months after the Givat Assaf Attack, and he moved the toes of his left foot four months after the attack. *Id.* ¶ 24. A ventilator breathed for him for the first two months, after which he needed his lungs to be suctioned through his tracheostomy tube for an additional four months. *Id.* ¶¶ 17, 25.

17.     Surgeons prepared Nathaniel for cranioplasty surgery that had the possibility of improving his neurological function by implanting a "skin expander" under his scalp, which they inflated every week for two months by injecting a saline solution to stretch his skin so that there would be enough skin to cover the new synthetic "skull." *Id.* ¶ 26. Nathaniel could not communicate but would reach for his scalp expander when it was being injected, indicating that the process was painful. *Id.* ¶ 32. Because of the COVID-19 pandemic, the surgery was pushed off. Finally, Nathaniel was admitted back to Hadassah Hospital on May 10, 2020 for the cranioplasty surgery.

18.    At that point, if he were shown two playing cards, he could sometimes indicate which one displayed a higher number—indicating at least some limited level of cognitive function. *Id.* ¶ 26.

19.    After the cranioplasty surgery, Nathaniel suffered from seizures for days. The seizures were so bad that he was anesthetized and intubated again. After he was extubated days later, Nathaniel contracted pneumonia and spiked fevers. Previously unknown until then, Nathaniel is sensitive to certain antibiotics, and one of the antibiotics used to treat the pneumonia caused his platelet levels to drop, requiring him to undergo three transfusions. *Id.* ¶ 27.

20.    Nathaniel was discharged back to the rehabilitation center on June 17, 2020. *Id.* ¶ 28. Much of the progress he had attained before the cranioplasty has been lost and may not return. He continues to be very weak from his month of seizures and transfusions in the ICU. *Id.* He will always be at risk for seizures and will need to take anti-seizure medications for the rest of his life. Another seizure could cause Nathaniel irreversible brain damage or kill him. *Id.* ¶ 27.

**B.    Evidence of HAMAS's Responsibility for the Givat Assaf Attack**

**1.    Mr. Spitzen's Credentials**

21.    To establish HAMAS's responsibility for the Givat Assaf Attack, Plaintiffs submitted the aforementioned sworn declaration from Mr. Spitzen. Mr. Spitzen is an expert in Palestinian terrorist groups, including HAMAS. Among his varied and extensive experience, Mr. Spitzen:

- served in an elite unit of the Israel Defense Forces ("IDF"), including in its Intelligence Unit; established and led the Research Section of the Advisor for Arab Issues in the Military Government in the West Bank (Civil Administration);

- served on the negotiation team for the Oslo Peace Accords;

- served as Department Head for Palestinian Issues in the Administered Territories as the Coordinator of Government Activities in the Territories ("COGAT"), which included writing hundreds of surveys and studies about issues and entities including

HAMAS, encompassing the writing and updating of the fundamental survey regarding HAMAS's civilian infrastructure, known as the *da'wa*; and

- was qualified as an expert witness on HAMAS in ten federal civil terrorism cases in the United States, including in *Linde v. Arab Bank, Plc*, No. 04-cv-2799 (BMC)(PK) (E.D.N.Y.), in which he testified exclusively about HAMAS for 5 days during a 6-week jury trial. Spitzen Decl. ¶¶ 1–6.

22.     Mr. Spitzen relied on his education, training, and experience to arrive at his conclusions. He employed a rigorous methodology similar to other experts in the field, and he carefully reviewed key primary and secondary sources, which he cross-checked and critically examined, without simply accepting their contents at face value. *Id.* ¶ 9.

### 2.     HAMAS Generally

23.     HAMAS is a Palestinian terrorist organization that was established in December 1987, shortly after the outbreak of the First Intifada (December 1987 to September 1993), by Sheikh Ahmed Yassin and other Palestinian Sunni Islamist militants committed to globalizing jihad and destroying the State of Israel. HAMAS's founders were close to, and ideologically aligned with, the Egyptian Muslim Brotherhood organization. Clawson Decl. ¶ 23.[3]

24.     From its inception, HAMAS perpetrated terrorist attacks in Israel and the Palestinian Territories and was the largest and deadliest Palestinian terrorist group. In the Second Intifada (September 2000 through December 2004) in particular, HAMAS perpetrated scores of high-profile terrorist attacks, frequently via suicide bombings. *Id.* ¶ 24.

25.     As a result of the vast number of terrorist attacks that HAMAS perpetrated, and the hundreds of civilians (including American citizens) it killed, the United States designated HAMAS a Specially Designated Terrorist in 1995, a Foreign Terrorist Organization in 1997, and a Specially Designated Global Terrorist in 2001. *Id.* ¶ 25.

---

[3]     Dr. Clawson's credentials are provided below in section II.C.1.

26.     HAMAS perpetrated its attacks through its operational arm known as the *Izz al-Din al-Qassam* Brigades ("Qassam Brigades"). *Id.* ¶ 26.

### 3.     HAMAS's Identification of Asem al-Barghuthi as a Qassam Brigades Operative

27.     According to Mr. Spitzen, Asem al-Barghuthi was the commander of a HAMAS Qassam Brigades cell responsible for the December 13, 2018 Givat Assaf Attack and a terror attack four days prior, on December 9, 2018, outside the town of Ofra (the "Ofra Attack"). Spitzen Decl. ¶¶ 31, 33–34.

28.     In the Ofra Attack, Asem al-Barghuthi and Saleh al-Barghuthi, brother and partner in Asem's Qassam Brigades cell, perpetrated a drive-by shooting, injuring several civilians and killing a baby. *Id.* ¶¶ 33–34. Asem al-Barghuthi, the cell commander, was the gunman and shooter, and Saleh al-Barghuthi drove the car from which the shooting was carried out. *Id.* ¶ 34.

29.     Saleh al-Barghuthi was shot and killed by Israeli security forces on December 12, 2018. *Id.* ¶ 35.

30.     On December 13, 2018, HAMAS issued an official claim of responsibility for the Ofra Attack on its Qassam Brigades website. *Id.* ¶ 39. It also publicly described Saleh al-Barghuthi as a *Qassami* martyr (*i.e.*, a Qassam Brigades operative who was killed while carrying out activities in the framework of the organization), emphasizing his "pivotal" role in the attack. *Id.* ¶ 50. Commemorating the Ofra Attack, HAMAS leader and chairman of its political bureau Ismail Haniyeh honored the mourning tent put up by HAMAS in memory of Saleh al-Barghuthi with his presence. *Id.* ¶¶ 47–48.

31.     Mr. Spitzen noted that HAMAS emphasized the allegedly critical role of an operative who was already deceased (Saleh) to divert attention from the real commander of the cell (Asem) who remained at large and continued to plan and perpetrate additional attacks. *Id.* ¶¶

51–52. While HAMAS has generally claimed responsibility for the terrorist attacks that it has perpetrated, it has been cautious about claiming responsibility for attacks if withholding an announcement could protect operatives who have not yet been captured or who are in jail but have not yet been sentenced by Israeli courts. *Id.* ¶¶ 21, 23 & n.9.

32.     Seeking to avenge his brother's death, Asem decided to carry out the Givat Assaf Attack, which resulted in serious injuries to Plaintiff Nathaniel Felber. *Id.* ¶¶ 36, 38.

33.     In contrast to the Ofra Attack, HAMAS did not initially declare that its operatives committed the Givat Assaf Attack, in line with its organizational policy of giving precedence to the security of its operatives over public relations. Asem al-Barghuthi had gone into hiding after the Ofra Attack until his apprehension on January 8, 2019. *Id.* ¶¶ 21, 23–24, 50–51, 53.

34.     HAMAS strongly insinuated its responsibility for the Givat Assaf Attack, however, and over time it became less guarded in its public statements. Key HAMAS websites, including one of its official websites, described the Givat Assaf Attack as one carried out by the "Resistance," and on the day of al-Barghuthi's arrest published an announcement describing the Givat Assaf Attack as a bold operation carried out by "the Resistance" and the arrest as prosecution of "the Resistance." *Id.* ¶¶ 54–55. The use of the words "the Resistance" is an indirect way by which HAMAS informs its target audience that HAMAS is the one responsible for the attack (HAMAS is "the Islamic **Resistance** Movement"). Mr. Spitzen confirmed that although "resistance" has other meanings, its use in the context of an attack committed by a HAMAS operative is intended to have a very specific meaning. *Id.* ¶ 54.

35.     Indeed, after Asem al-Barghuthi's arrest on January 8, 2019, HAMAS issued an announcement identifying him as one of its operatives, calling him "Muqawim" (the resistor). *Id.* ¶ 98. HAMAS identified him as a "Qassami prisoner" (*i.e.*, a prisoner belonging to the Qassam

Brigades) after his sentencing on June 24, 2020 on both the HAMAS official website and the Qassam Brigades' official website. *Id.* ¶¶ 57, 100. On December 13, 2019, the one-year anniversary of the Givat Assaf Attack, the Qassam Brigades' website again emphasized HAMAS's responsibility for the Ofra Attack. *Id.* ¶ 48.

36.    These announcements are significant because, since the early 2000s, HAMAS increasingly began using its official websites to issue claims of responsibility for attacks that it perpetrated. *Id.* ¶ 27. The websites frequently contained reprints of the suicide bombers' wills, photographs of the perpetrators, and videos of suicide bombers taken before they were dispatched. *Id.* ¶ 28. Mr. Spitzen pointed out that because the perpetrators are often identified, it was possible to compare HAMAS's claims of responsibility to the results of the investigations performed by the Israel Security Agency and the Israel Police as well as judicial determinations regarding the criminal liability of various alleged operatives. Therefore, in many cases, the overwhelming evidence available made it relatively clear whether a terrorist organization was responsible for a particular attack. *Id.* ¶ 30.

37.    On the day that Asem al-Barghuthi's house was demolished by Israel, HAMAS's green flag was raised above its ruins, yet another indicator of his role as a HAMAS operative. *Id.* ¶ 99. In what Mr. Spitzen called "an extremely remarkable gesture," HAMAS leader Haniyeh called al-Barghuthi's mother immediately after the verdict was published to express his and HAMAS's appreciation to Asem al-Barghuthi and the rest of his "holy warrior" family. *Id.* ¶ 57.

### 4.    Asem al-Barghuthi's Family's Longtime HAMAS Connections

38.    The al-Barghuthi family had many connections to HAMAS, as outlined by Mr. Spitzen. Asem trained under the guidance of his father, Ummar al-Barghuthi, who was a senior operative in the Qassam Brigades. *Id.* ¶¶ 70 n.43, 77. Ummar al-Barghuthi indoctrinated all of his

sons and trained them to use firearms with the intention of preparing them to join the Qassam Brigades. *Id.* ¶ 78.

39.     At a young age, Asem approached his father and told him about his desire to carry out a suicide attack. *Id.* ¶ 72 n.44. Asem's brothers were also indoctrinated into the Qassam Brigades. As described below, ¶ 45, Asem recruited his brother Saleh al-Barghuthi into his Qassam Brigades cell prior to the Ofra Attack. *Id.* ¶¶ 65, 77. In addition, a third brother, Asef, was convicted in 2005 for undergoing training with weapons under the guidance of his father. *Id.* ¶ 79 n.52. Asem's uncles are also longtime senior HAMAS operatives. *Id.* ¶¶ 77, 107.

**5.     Asem al-Barghuthi's Prior and Subsequent HAMAS Activities**

40.     Asem's participation in HAMAS's terror operations did not start with the Ofra Attack. In 2005, when he was 19 years old, Asem al-Barghuthi was arrested and confessed to being a member of HAMAS's Islamic Bloc, a student organization HAMAS uses to recruit terrorist operatives for the Qassam Brigades. *Id.* ¶¶ 60 n.35, 82, 85–86. In January 2007, three months after his release from prison, al-Barghuthi joined a Qassam Brigades terrorist cell whose operatives attempted to kidnap Jews to exchange for Palestinian prisoners in Israeli jails. Al-Barghuthi was arrested and sentenced to over eleven years in prison. *Id.* ¶¶ 60 n.35, 88–89 & n.61, 91, 93.

41.     Asem al-Barghuthi was already known to the Palestinian public as a HAMAS operative after his conviction in 2005, *id.* ¶ 141, and after he was released from prison in April 2018, his notoriety grew. *Id.* ¶¶ 94–95. In fact, during a reception following his release from prison in 2018, HAMAS flags were prominently displayed, and al-Barghuthi was recorded giving a speech and confirming that he belonged to HAMAS's Qassam Brigades. *Id.* ¶ 96. When Asem rose to give his speech, he pointed to the HAMAS bandana that was wrapped around his neck and publicly proclaimed: "[I]ndeed, I am a Hamas man." *Id.* ¶ 97.

10

42.     In the months after his release from prison in April 2018, Asem al-Barghuthi began to establish a new Qassam Brigades terrorist cell. *Id.* ¶ 94. He recruited several HAMAS operatives to the cell, including Jaber Abdu, a previously convicted HAMAS operative who had served two years in prison, *id.* ¶¶ 117 & n.76, 119; Musa al-Khatib, a convicted HAMAS operative previously convicted for, among other crimes, transferring HAMAS funds to terror operatives, *id.* ¶¶ 128–30; Khaled Nuibat, a previously convicted HAMAS operative imprisoned for four years for crimes such as attempting to manufacture rockets, *id.*, ¶¶ 132–34; and Mahdi Abu Rahma, a previously convicted HAMAS operative imprisoned in Israeli jails for two years; *id.*, ¶¶ 135, 137–38.

43.     Before the cell could carry out any further attacks, all of these cell participants were charged with joining Asem al-Barghuthi's terror cell. *Id.* ¶¶ 123–26, 128–31, 138.

### 6.     HAMAS Indicators in the Ofra and Givat Assaf Attacks

44.     Mr. Spitzen described how the preparation for, and method of, executing the Ofra and Givat Assaf Attacks themselves demonstrated a level of determination, skill, and professionalism typical of HAMAS's organized terrorist cells, in contrast to the conduct of a "rogue actor or lone wolf." *Id.* ¶¶ 41–42, 44, 58–62, 65, 70. Prior to serving his second prison term, in 2007, Asem buried, under cement, weapons he would use twelve years later in the Ofra and Givat Assaf Attacks. *Id.* ¶ 60. Furthermore, while serving one of his prison sentences preceding these attacks, he contacted another prisoner who offered to assist him in obtaining weapons to carry out attacks against Israel. *Id.* ¶ 61.

45.     Preparations for the Ofra Attack were carefully conducted over a long period of time. A co-conspirator (so as to distance Asem from the preparations) purchased the vehicle used to carry out the attack. Asem recruited his brother, Saleh, as a driver, and Asem scouted the area,

observing that the bus stop in Ofra contained a constant presence of Israeli soldiers and civilians. *Id.* ¶¶ 65, 67, 108.

46.     Even with the Givat Assaf Attack, where preparations were expedited as a result of his brother's death, Asem al-Barghuthi's determination, prior planning, training, and professionalism were evident. *Id.* ¶ 66. Al-Barghuthi noticed the concentration of soldiers and civilians at the stop in Givat Assaf and turned his car around to commit an attack there. *Id.* ¶ 67. While fleeing, he abandoned his car (which had become stuck) and a weapon he had stolen from the scene of the attack so as not to hinder his escape, demonstrating a level of professionalism and restraint that are typical of skillful terrorist operatives who belong to established terrorist cells of organizations like HAMAS. *Id.* ¶ 71. The Givat Assaf Attack also demonstrated Asem al-Barghuthi's devotion to HAMAS, as he carried out an attack targeting armed soldiers despite knowing he was wanted by Israeli security forces. Even after the execution of the Givat Asaf Attack, Asem al-Barghuthi continued to plan other terror attacks while recruiting new members to the HAMAS cell he had established. *Id.* ¶ 72.

47.     Furthermore, the dates of the Ofra and Givat Assaf Attacks were likely linked to a HAMAS narrative. December 9, the day of the Ofra Attack, is the day the First Intifada erupted and is considered to be the day on which HAMAS's founder and first leader, Sheikh Ahmed Yassin, summoned six leaders of the Muslim Brotherhood movement in the Gaza Strip and decided to establish the organization. HAMAS marks December 14, the day after the Givat Assaf Attack, as the official anniversary of its establishment. Throughout the years, these dates and the days surrounding them have been popular dates for HAMAS terrorist operatives to carry out attacks. According to Mr. Spitzen, the choice to carry out the attacks on these specific days "was also made with care." *Id.* ¶ 68.

48.     In sum, Mr. Spitzen concluded in his declaration that the Givat Assaf Attack was planned and executed by Asem al-Barghuthi, a commander of a HAMAS cell and a Qassam Brigades operative; it was the second of two attacks his cell executed, but not the last attack that the cell planned to carry out; among the cell's goals was to murder as many Israelis as possible or to abduct Israelis to use as bargaining chips to gain the release of Palestinian terrorists imprisoned in Israel; and the cell was established in 2018 and operated until the arrest of its members by Israeli security authorities in 2019. *Id.* ¶ 139.

**C.     Iran's Material Support for HAMAS**

**1.     Dr. Clawson's Credentials**

49.     To establish that Iran provided substantial material support to HAMAS before and during the relevant period, Plaintiffs submitted the aforementioned declaration from Patrick L. Clawson, Ph.D. Dr. Clawson is an expert on Iran and has extensively studied and researched Iran and its sponsorship of terrorism, its economy, and its politics. Clawson Decl. ¶ 1. He holds a Ph.D. in economics from the New School for Social Research and a B.A. from Oberlin College. He reads and speaks Persian as well as some Hebrew. *Id.* ¶¶ 12–13.

50.     Dr. Clawson is the Director of Research at the Washington Institute for Near East Policy (the "Washington Institute"), a think tank and 501(c)(3) organization that studies the Middle East, including domestic and international issues relating to the Iranian government. He has been employed there since 1997 and supervises a staff of about twenty senior researchers who study Middle East politics and terrorism, with a considerable focus on Iran. *Id.* ¶¶ 2–4.

51.     Under his supervision, the Washington Institute's researchers have written more than twenty studies about Iran's security apparatus, support for terrorism and terror financing, and political leadership, and U.S. and Western policies to counter Iranian terrorism and terror

financing. Dr. Clawson also regularly briefs and receives briefings from senior U.S. military officials and senior officials of other governments friendly to the United States about the threats from Iran, Iranian support of terrorism, and Iranian strategy regarding terrorism. *Id.* ¶ 4.

52.     Dr. Clawson has previously been qualified by federal courts as an expert witness approximately 30 times on issues relating to Iran, including Iran's support for terrorism and its economy, and has given both live and written testimony in various cases brought against Iran for its sponsorship of terrorism. *Id.* ¶ 6. He has also testified before the House International Relations, National Security, and Banking and Financial Services Committees and the Senate Foreign Relations and Banking Committees about Iran, Iranian terrorism, and the use of economic measures to discourage Iran from supporting terrorism. *Id.* ¶ 7.

53.     Dr. Clawson has made many presentations and written and edited many books, articles, and journals about Iran and its support of terrorism. *Id.* ¶¶ 8–11.

### 2.     Iran's Provision of Material Support to HAMAS

54.     Iran was designated a State Sponsor of Terrorism in 1984 and has been on the State Department's list of State Sponsors of Terrorism since that time. *Id.* ¶ 22. *See Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 273–74 (D.D.C. 2005); *see also* 22 C.F.R. § 126.1(d) (2005); 31 C.F.R. § 596.201 (2005); Determination Pursuant to Section 6(i) of the Export Administration Act of 1979–Iran, 49 Fed. Reg. 2836-02 (Jan. 23, 1984). *See also* U.S. Dep't of State, *State Sponsors of Terrorism* (current), *available at* https://www.state.gov/state-sponsors-of-terrorism/.

55.     For over 30 years, Iran has provided funding and training to HAMAS for terrorism operations that targeted United States and Israeli citizens. *Id.* ¶¶ 28–29.

56.     Even though Iran's support for HAMAS has waned at times during that period, Iran has never cut off its support for HAMAS. And at certain times during that period, Iran's support for HAMAS—including financial and military aid—was very substantial. *Id.* ¶ 30.

57.     From approximately 1993 through the late 1990s, Iran provided substantial support to HAMAS, which included military training, millions of dollars, and exhortations to commit terrorist attacks. *Id.* ¶¶ 31, 34.

58.     After a short period in which Iran's and HAMAS's relationship subsided, it increased again in 2002, and in a July 2003 report, the Israeli government estimated that Iran was providing HAMAS $3 million a year. *Id.* ¶¶ 35–36.

59.     After temporarily cooling thereafter, Iranian support for HAMAS again intensified at the end of 2005, and increased exponentially after HAMAS's legislative success in 2006. Israel's Intelligence and Terrorism Information Center, which is closely aligned with the IDF, published a report noting Iran's pledge of $250 million to HAMAS in 2006 and 2007. Even though the Egyptian authorities reportedly confiscated some of these funds, large sums of Iranian money flowed into the Gaza Strip earmarked for HAMAS. *Id.* ¶¶ 37–39.

60.     Iran's support for HAMAS increased after HAMAS took complete control of the Gaza Strip in 2007. This included financial support, weapons, and training. In particular, the Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF") (Iran's quasi-military division used to perpetrate terrorist attacks outside of Iran) provided strategic assistance to HAMAS. Then-HAMAS leader Khaled Mashal visited Tehran in 2009 and thanked Iran for its assistance in its military conflict with Israel in 2008, which included mortar shells HAMAS fired that were of Iranian design. *Id.* ¶¶ 40–48.

61.     In February 2010, Cyprus seized and searched a ship on which it had found more than 3,000 cases of powder for 120mm and 130mm guns as well as over 800 cases of propellant for 125mm mortars. This materiel was traced to Iran, which led the U.N. Security Council committee responsible for monitoring the Security Council-ordered ban on Iranian arms exports to conclude that Iran had violated the ban. According to Dr. Clawson, there is strong reason to believe that the weapons were headed to the Gaza Strip. *Id.* ¶ 49.

62.     Although the Iran-HAMAS relationship weakened in the early part of 2012, the relationship improved during the fighting between HAMAS and Israeli forces in November 2012. In November, the Iranian Parliament's Speaker, Ali Larijani, told reporters, "We proudly say we support the Palestinians, militarily and financially." Khaled Mashal also thanked Iran for "arms and funding." *Id.* ¶ 50.

63.     The Iran-HAMAS relationship improved further after the Egyptian military's July 2013 overthrow of the Morsi government that had been close to HAMAS, leaving HAMAS quite dependent on Iranian aid. Their relations were further strengthened in 2014 as HAMAS increased its terror activities against Israel, which included kidnappings and rocket attacks. In November 2013, Iranian Supreme Leader Ali Khamenei stated that Iran aids HAMAS. *Id.* ¶¶ 51–52.

64.     In December 2014, a spokesman for HAMAS's Qassam Brigades thanked Iran for supporting HAMAS with money and weapons, such as rockets and anti-tank missiles. *Id.* ¶ 53.

65.     In 2015, Iran continued to provide financial support to HAMAS. *Id.* ¶ 55.

66.     The relationship between Iran and HAMAS remained close from 2016 through 2018. *Id.* ¶¶ 56–59. In November 2016, senior HAMAS leader Osama Hamdan said "[r]elations between Iran and Hamas are currently undergoing revitalization, and are moving in the right direction," and that Iran would "continue to support the resistance" against Israel. *Id.* ¶ 56.

67.     In August 2017, CNBC reported that HAMAS's leader in Gaza, Yehiyeh Sinwar, said HAMAS's relationship with Iran was "excellent, or very excellent," as Iran was "the largest backer financially and militarily" of HAMAS's military wing. Per CNBC's report, Sinwar stressed Iranian aid was for "rebuilding and accumulating" HAMAS's military powers for a larger fight against Israel intended to "liberate Palestine." "Thousands of people work every day to make rockets, (dig) tunnels and train frogmen," Sinwar said. "The relationship with Iran is in this context." *Id.* ¶ 57.

68.     Many HAMAS officials visited Tehran in 2017, including an October visit by a delegation led by deputy chief of HAMAS's Political Bureau, Saleh Al-Arouri. Al-Arouri met with Larijani; Admiral Ali Shamkhani, Secretary of Iran's National Security Council; and Ali Akbar Velayati, advisor to the leader of the Islamic Revolution in Iran. Velayati said: "We are proud of supporting the Palestinian resistance and Hamas Movement. The Iranian leadership and our people will continue to support the resistance led by Hamas and Islamic Jihad." *Id.* ¶ 58.

69.     The relationship further improved in 2018, the year of the Ofra and Givat Assaf Attacks. In a May interview to the Iranian-funded *Al Manar* television network, Sinwar praised Iranian support, such as the provision of missiles used to target Beersheva, an Israeli city. Israeli Defence Minister Avigdor Lieberman said in March most of the $260 million HAMAS invested the year prior in making tunnels and weapons originated in Tehran. *Id.* ¶ 59. And a report by the Israel-based Ynet news site from August 2018, citing Palestinian sources, said Iran's payments to HAMAS at the time amounted to $70 million per year (as quoted in the *Times of Israel*). *Id.* ¶ 59.

70.     In 2018, the *Country Reports on Terrorism*, which is completed by the U.S. Department of State in accordance with a statutory mandate, provided in relevant part: "Iran remains the world's worst state sponsor of terrorism. The regime has spent nearly one billion

dollars per year to support terrorist groups [such as HAMAS] that serve as its proxies and expand its malign influence across the globe." *Id.* ¶ 27.

71.     The relationship between Iran and HAMAS deepened even further in 2019, and Iran has continued to provide support to HAMAS through the present. *Id.* ¶¶ 60-61, 64.

72.     As Dr. Clawson concluded, "the Iran-Hamas relationship has continued consistently from 1993 to the present, with Iranian support more pronounced in some periods than others. There is ample evidence that Iran has supplied substantial material support to Hamas, including in the period immediately before, during, and immediately after the December 13, 2018 attack outside of Givat Assaf in the West Bank in which Nathaniel Felber was grievously wounded and two other Israelis were killed." *Id.* ¶ 64.

73.     Moreover, this Court has repeatedly found Iran liable under the FSIA for sponsoring HAMAS attacks. Specifically, this Court has found that Iran is not only a major source of support for HAMAS, both financially and with respect to terrorist training, but also that Iran fully knew of HAMAS's purposes and objectives and approved of them. *See*, *e.g.*, *Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107 (D.D.C. 2018); *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88 (D.D.C. 2017); *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71 (D.D.C. 2017); *Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93 (D.D.C. 2012); *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232 (D.D.C. 2012); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286 (D.D.C. 2003); *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13 (D.D.C. 2002); and *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1 (D.D.C. 2000).

### D.     Family Member Plaintiffs' Injuries

74.     The Family Member Plaintiffs provided sworn declarations regarding the emotional injuries they suffer from as a result of the Givat Assaf Attack.

75.     The Family Member Plaintiffs were also evaluated by Dr. Rael Strous regarding the nature and degree of psychiatric conditions as codified by the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition ("DSM-5"),[4] that they suffer from, if any, as a result of the Givat Assaf Attack. Strous Decl. ¶ 5.

### 1.     Dr. Strous's Credentials

76.     Dr. Strous is a Medical Doctor specializing in psychiatry. He is currently the Director of the Department of Psychiatry at the Maayenei Hayeshua Medical Center in Bnei Brak, Israel. He also serves as Full Professor, Department of Psychiatry, at the Sackler Faculty of Medicine at Tel Aviv University and maintains a small private practice in clinical psychiatry. *Id.* ¶ 1.

77.     He received his medical degree in 1989 from the University of Witwatersrand in Johannesburg, South Africa. Between 1992 and 1996, Dr. Strous performed his residency in psychiatry at the Albert Einstein College of Medicine in New York City. In 1996, he served as Chief Resident at the Bronx Psychiatric State Hospital. From 1996 through 1998, he performed a clinical research fellowship in psychopharmacology at the Commonwealth Research Center, Massachusetts Mental Health Center, which is affiliated with Harvard Medical School. He served as the director of the inpatient psychiatry department at the Beer Yaakov Mental Health Center from 2003-13, after which he served as the deputy director of the hospital. In 2014, Dr. Strous completed a master's degree in Health Administration at Ben Gurion University in Israel. *Id.* ¶ 3.

78.     Before embarking on his career in psychiatry, Dr. Strous served as an emergency room doctor and as a general physician in pediatrics and trauma. *Id.* ¶ 4.

---

[4]      American Psychiatric Association (2013). *Diagnostic and Statistical Manual of Mental Disorders* (5th ed.). Arlington, VA: American Psychiatric Publishing.

79.     Dr. Strous has approximately 150 peer-reviewed research publications to his name, including several in the field of chronic Post-Traumatic Stress Disorder ("PTSD"). *Id.* ¶ 7. Based on his education, training, and experience, Dr. Strous has provided expert testimony in numerous U.S. federal court cases on behalf of terror victims. *Id.* ¶¶ 8–9.

### 2.     Psychiatric Disorders

80.     In order to better understand the psychological evaluations and diagnoses set forth by Dr. Strous below, he has summarized for the Court two types of psychiatric disorders ███ ████████████████████, as follows:

### a.     Post-Traumatic Stress Disorder ("PTSD")

81.     PTSD is a condition that develops from having been exposed to, or witnessing, life-threatening events. In addition, the traumatic event may be indirect, such as by hearing of a relative or close friend's experience of a life-threatening event that was violent or accidental. *Id.* ¶ 16.

82.     PTSD is characterized by four clusters of symptoms that persist for over a month after the traumatic event occurred. These clusters include symptoms related to intrusion, avoidance, negative alterations in cognitions and mood, and arousal and reactivity. Intrusion relates to recurrent, involuntary, and intrusive distressing memories and/or recurrent distressing dreams of the traumatic event. Avoidance relates to efforts to avoid stimuli, including internal thoughts or external situations, that the PTSD victim associates with the event. Negative alterations in cognitions and mood includes an inability to remember an important aspect of the traumatic event; persistent and exaggerated negative beliefs about oneself, others, or the world; persistent, distorted cognitions about the cause or consequences of the traumatic event; persistent negative emotional state; markedly diminished interest or participation in significant activities; feelings of detachment or estrangement from others; and the persistent inability to experience positive

emotions. Arousal and reactivity includes irritable behavior and angry outbursts with little or no provocation, reckless or self-destructive behavior, hypervigilance, exaggerated startle response, problems with concentration, and sleep disturbance. *Id.*

83.     The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning, and PTSD victims' educational and employment prospects are often diminished. Some have difficulty interacting with others. *Id.* ¶¶ 16, 18.

84.     For those who are married or who are able to marry and have children the stress of childrearing will be compounded. The inability to relax and have a good time is extremely common among PTSD patients. *Id.* ¶ 20.

### b.     Adjustment Disorder

85.     Adjustment Disorder is an emotional and behavioral reaction that develops within three months of a life stress. The response is stronger or greater than what would be expected for the type of event that occurred. For a diagnosis of Adjustment Disorder, a person's symptoms must be severe enough to affect his or her work or social life. Symptoms may vary and include agitation, depressed mood, anxious mood, and physical complaints. *Id.* ¶¶ 22.

86.     The DSM-5 lists six different types of Adjustment Disorders. ████████████████ ███████████████████████████████████████████:

- With depressed mood. Low mood, tearfulness, or feeling of hopelessness.

- With anxiety. Nervousness, worry, jitteriness, or separation anxiety is predominant.

- With mixed anxiety and depressed mood. A combination of depression and anxiety is predominant. *Id.* ¶ 24.

87.     The duration of an individual's Adjustment Disorder can vary. Adjustment Disorders can be acute, where signs and symptoms last six months or less, or persistent (chronic),

where signs and symptoms last more than six months and continue to bother the individual and disrupt their life. *Id.* ¶ 25.

### 3. Family Member Plaintiffs' Emotional Injuries

#### a. Judi Felber

88. Judi Felber is a U.S. citizen. She is Nathaniel Felber's mother. *See* Judi Decl. ¶ 1.

89. Judi suggested that her family try living in Israel, and they moved there in 2006. *Id.* ¶¶ 5–6. Having spent her junior year of college in Israel, she felt "at home" there. *Id.* ¶ 3.

90. Judi described Nathaniel as her "most easygoing child," the one who "never fussed, never fought." *Id.* ¶ 7. His transition to Israel was seamless: He learned and spoke Hebrew better than anyone else in the Felber family and enjoyed his service in the Army the most. *Id.* ¶¶ 8, 10. Nathaniel often called his mother from his base and came home every other weekend. *Id.* ¶ 10.

91. Judi was working from home as an editor of a medical journal when she learned about the Givat Assaf Attack. She received a call from a cousin about the attack, who knew that Nathaniel was stationed in the area. Judi called Nathaniel, and he did not answer, but Judi was not surprised as soldiers cannot answer their cellphones while on duty. *Id.* ¶¶ 12–13.

92. Four hours later, there was a knock at her door. Three soldiers entered the apartment and informed the Felbers that Nathaniel was injured in the Givat Assaf Attack. The soldiers instructed Judi and her husband to pack a bag and go with them to Hadassah Hospital in Jerusalem, where Nathaniel had been taken. Judi recalls how she "could barely think; my mind was a blur." She packed a few shirts and a laptop in case she needed to be there for more than a day or two. *Id.* ¶ 14.

93. Nathaniel stayed at Hadassah Hospital from December 13, 2018 until February 27, 2019. For all but the last few days, he was in the ICU. *Id.* ¶ 15. Judi moved into a hotel on the

hospital's campus, where she and her family lived for over two months until Nathaniel was discharged to a rehabilitation center. *Id.* ¶ 18.

94.     Judi described seeing Nathaniel after his surgery as "very traumatic." His head was swollen, and he was attached to IVs, tubes, head drains, and a ventilator. Machines beeped constantly. *Id.* ¶ 17. Doctors called the first 72 hours after the attack "critical"; no one knew if Nathaniel would survive. *Id.* ¶ 16.

95.     Judi explained that in the hospital, a day "feels like an eon." *Id.* ¶ 19. Even when Nathaniel was in the ICU for less than a week, the Hadassah Hospital social workers considered Judi a veteran. *Id.*

96.     The ICU permitted visiting hours four times a day, and Judi was there for almost every single time slot. *Id.* ¶ 23. Judi spent her days speaking to Nathaniel, having heard that coma patients might be able to hear. *Id.* ¶ 22. She and her daughter moved Nathaniel's limbs to keep them flexible while he lay prone on his hospital bed. She played music for Nathaniel. *Id.* ¶ 23. At night, Judi did not sleep, and when she did, she had nightmares. She received a prescription for sleeping pills, but her daughter's fiancé told her not to take them because they were not good for people. Sometimes, when the sleeplessness became unbearable, she would take a quarter of a pill. *Id.* ¶ 20.

97.     Judi went on walks along the road that circles the hospital campus but frequently stopped to sit on the ground because she was crying so hard. *Id.* ¶ 21.

98.     Judi tracked any and all progress by Nathaniel and posted it on a blog she started so that she would not have to explain Nathaniel's condition "over and over again." When Nathaniel's left eye started opening for the first time three months after the Givat Assaf Attack,

she posted about it. When Nathaniel moved the toes on his left foot four months after the attack, she was happy to announce it. *Id.* ¶ 24.

99.     Over a month after the Givat Assaf Attack, physical therapists moved Nathaniel to a chair for a short time to change his position and help ease his breathing. However, Nathaniel was still in a vegetative state at the time and had been strapped into the chair. *Id.*

100.     Nathaniel was discharged from Hadassah Hospital and admitted to a rehabilitation facility at Tel Hashomer Hospital on February 27, 2019. *Id.* ¶ 25; Strous Decl., Ex. B at 4. He resides there presently and is still weak from the recent seizures and multiple rounds of blood transfusions caused by his May 2020 cranioplasty surgery. Judi Decl. ¶ 27. Judi explained that "[a]ll the work we did to get him to where he was before the cranioplasty appears to be lost for now," and thus, "I don't feel as hopeful now." *Id.* ¶¶ 27–28.

101.     Judi continues to spend her days with Nathaniel ███████████████████████. She and her husband stay in a hotel near the rehabilitation center every weekend and Jewish holiday. *Id.* ¶ 29. In the year and a half since Nathaniel's attack, she has spent only three weekends at home. Strous Decl., Ex. B at 4. ████████████████████████████ Judi is also overwhelmed by the paperwork associated with Nathaniel's care: "There are medical records, insurance forms, and countless other documents I need to collect or complete." Judi Decl. ¶ 37. She is overwhelmed by the decisions that need to be made, stating: "Are there other therapies I should be looking into for Nathaniel? There are so many different kinds of wheelchairs; which one is the best for Nathaniel? What kind of shower do we need for Nathaniel, and what's the best chair or bath bed for him?" *Id.* She describes her "whole new world of disabled living" as one that "we have no idea how to navigate, and which we never wanted to join." *Id.*

102.     █████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████ Her family unit has also changed; Judi

described how it is hard for her to see "Nathaniel's relationship with his siblings completely altered

and diminished." *Id.* ¶ 33. Judi's daughter was married a year after Nathaniel's attack, and Judi

admits that she "couldn't be as involved as I wanted to be." *Id.*

103.     Judi described how she neglects herself now. Strous Decl., Ex. B at 6. "I'm no

longer Judi," she stated. She described her life now as "mother of injured Nathaniel." Judi Decl. ¶

30. She has stopped running, a hobby she used to enjoy, ████████████████████████

████████████████ "Taking care of Nathaniel is my number one priority, and it leaves little

time for anything else." *Id.* ¶ 36.

104.     Judi misses the Nathaniel she could talk to before the Givat Assaf Attack. She

described his smile, the advice he would give her, and how they were "good friends." *Id.* ¶ 32.

Now, she does not know what he feels or if he feels anything at all: "He's silent. He doesn't move

much." *Id.* Judi recalled telling Nathaniel (her youngest child) that he would always be her baby,

but laments that the truth now is even worse: ████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

██████████

105.     Judi plans to move Nathaniel out of the rehabilitation center at the end of

September, a prospect she finds "sad, scary, and stressful." *Id.* ¶¶ 35–36. She will miss the support

of the staff and other parents, as well as the other patients who "make up Nathaniel's social life."

*Id.* ¶ 36. She remains focused on Nathaniel's progress, no matter how minimal: "I look for whether

Nathaniel is able to hold his head up for a little while longer, or how many seconds he can sit before losing control and toppling over." *Id.* ¶ 34. She realizes that Nathaniel will probably never walk and he may never talk. She knows that Nathaniel will never go to college, hold a job, get married, or have children. Judi testified: "The dreams we had for Nathaniel are gone." *Id.* ¶ 38.

106.    Dr. Strous reviewed a report prepared by Judi's treating clinical psychologist and met with Judi and performed his own evaluation of her on July 9, 2020. Strous Decl. ¶ 12 and Ex. B at 5. He noted her report of recurring memories of being informed that Nathaniel had been shot as well as the first few days when she was not sure Nathaniel would survive. Strous Decl., Ex. B at 5. He also noted her recurring nightmares, tactics of avoidance, persistent negative emotional state, diminished interest in social activities, feelings of distancing from others, and problems with concentration. *Id.* at 5–6. ██████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████

107.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████

### b.    Joseph Felber

108.    Joseph Felber is a U.S. citizen. He is Nathaniel Felber's father. *See* Declaration of Joseph Felber ("Joseph Decl."), ¶ 1.

109.     Joseph recalled starting December 13, 2018 on a high, as his daughter, Adina, had gotten engaged a week prior and he was planning to celebrate the following day. *Id.* ¶¶ 10–11. He went to the supermarket to purchase supplies for the celebration and returned home to work "in a great mood." *Id.* ¶ 11. Judi told Joseph what she heard about the Givat Assaf Attack, and Joseph tried to reach Nathaniel, to no avail. Although Joseph knew that soldiers cannot always use their phones while on duty, he worried. He searched online for news of the attack, and saw reports that two male soldiers had been killed and an injured female civilian was taken to the hospital. He then went back to work (which he did from home). *Id.* ¶ 12.

110.     Joseph heard a tapping sound, and realized it was the front door. *Id.* ¶ 13. Upon seeing the soldiers, Joseph screamed. He closed his eyes. He willed time to stand still. *Id.* ¶ 14.

111.     The soldiers delivered the news about Nathaniel having been injured in the Givat Assaf Attack, and Joseph and Judi went with them to the hospital. *Id.* ¶¶ 15–16. "Horrible thoughts" ran through Joseph's head during the ride, which took over an hour. He thought back to the reports he had read about the two dead male soldiers and injured female civilian. He had not seen any report about an injured male soldier. He wondered whether Nathaniel was actually dead, and the Army was just waiting for them to arrive at the hospital to tell them. *Id.* ¶ 16.

112.     Joseph recalled that he "couldn't think straight." *Id.* ¶ 19. When they arrived at the hospital, he saw an elderly religious man standing on the sidewalk and wondered if he was a rabbi sent to tell them that Nathaniel was dead: "[M]y mind was just flooded with less-than-completely-rational thoughts." *Id.*

113.     Joseph and Judi were escorted to a conference room, where one of Nathaniel's surgeons gave them the details of his injuries. Joseph did not want to hear the details. He wanted to know what kind of recovery he could expect, but it was far too early for any such predictions.

27

*Id.* ¶ 20. They were then escorted to see Nathaniel, an experience Joseph described as "awful, just awful." According to Joseph, Nathaniel's head was swollen and wrapped in bandages, with drains attached. "He looked completely different, and yet he was recognizable as Nathaniel." *Id.* ¶ 21. Neighbors started to visit the Felber family at the hospital, but Joseph felt overwhelmed and wanted to escape. He left to the room in the attached hotel. He lived in the hotel room for two and a half months, until Nathaniel was discharged to the rehabilitation center. *Id.* ¶ 22.

114.    Joseph called the first week after Nathaniel's attack "the worst week of my life." *Id.* ¶ 24. He could not stop thinking "horrible thoughts" about Nathaniel. *Id.* Joseph was "intensely sad," and started kayaking, a former hobby, as a distraction. He recalled becoming so emotionally overwhelmed at times that he would freeze in his kayak. He noticed that someone was always designated to keep a close eye on him. *Id.* ¶ 26.

115.    Joseph described how his life now is not "normal," as he thinks about Nathaniel constantly. He feels as if he is treated as someone with special needs. ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

116.    Joseph explained that it causes him "anguish" to hear discussions of long-term care his son "might" need. "I say 'might' because it hurts to say 'will.'" *Id.* ¶ 32. Joseph would excuse himself from meetings with doctors when they started talking about Nathaniel's poor prognosis. On one occasion, Nathaniel was also in the room, and Joseph wheeled him out as well. "I told

Nathaniel that those people's comments were not justified. I explained to him that he has made so much progress and that so many people around the world are still praying for him." *Id.* ¶ 33.

117.    Joseph admits that it is "difficult" for him to maintain positive thoughts. *Id.* ¶ 32.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████ According to Joseph, his sadness stems from comparing his current

situation to what it could have been. ██████████████████████████████████████

██████████████████

118.    ██████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████

119. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

### c.     Daniel Felber

120.    Daniel Felber is a U.S. citizen. He is Nathaniel Felber's older brother. *See* Declaration of Daniel Felber ("Daniel Decl."), ¶ 1.

121.    Daniel remembered bonding with his siblings after they moved to Israel in 2006. The three of them would explore their new neighborhood while walking their dog. Even after they all settled into their new lives in Israel, Daniel and Nathaniel would continue to walk their dog together every Friday night. *Id.* ¶¶ 3–4. The brothers would also ride their bicycles together and, as they grew older, traded Army stories from their service. *Id.* ¶¶ 5–6.

122.    Daniel was making social plans and studying on December 13, 2018 when he received a message from his father to call home. Daniel called his father, who told him that Nathaniel had been injured. Having served in the Army previously, Daniel knew that soldiers are frequently injured during training exercises and figured that Nathaniel had broken a bone. *Id.* ¶ 8.

123.    Daniel's parents initially planned on picking him up on their way to the hospital but subsequently called back and told him to meet them there. Daniel remembered that his mother sounded hysterical, and he could not understand why she was so upset over a broken bone. *Id.* ¶ 9. It was not until Daniel's parents arrived at the hospital after him, both crying, that he realized something was "very wrong." He recalled: "I had never seen them like that before." *Id.* ¶ 11. His parents relayed what the soldiers who had come to their apartment had told them about Nathaniel's

condition, which Daniel understood to mean "mortal." Daniel thought his brother was dying, and they were at the hospital to say goodbye. *Id.* ¶¶ 11–12.

124.     Daniel described how he and his parents were given minimal information regarding Nathaniel's injuries. He knew that his brother had been shot in the head and that the bullet had gone through his brain. What he wanted to know was whether his brother would wake up and talk, but the doctors told him they had no answers. *Id.* ¶ 14. Daniel was escorted to see Nathaniel, which he described as "a terrible sight." *Id.* ¶ 15. Daniel likened the hospital to a "Shiva house," a house of mourning. *Id.* ¶ 22.

125.     Daniel lived with his parents and sister in the hotel attached to Nathaniel's hospital until Nathaniel was discharged to the rehabilitation center two and a half months later. *Id.* He took a month off from work and focused on researching Nathaniel's injury, Googling terms like "bullet," "brain," and "recovery." He read every article he could find about former U.S. Representative Gabby Giffords' shooting and recovery. *Id.* ¶¶ 16, 19. He shared his findings with Nathaniel's doctors, but they would not give him any clear answers. *Id.* ¶ 17. Daniel continued to search for answers, asking a neighborhood doctor if Nathaniel would ever be able to hold any type of job. The doctor said no, and Daniel began to realize how limited Nathaniel's recovery would be. *Id.* ¶ 18.

126.     ███████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████ He stopped biking. ███████
███████████████████████

127.    ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

128.    Daniel wonders if Nathaniel recognizes him. *Id.* ¶ 22. He fears that Nathaniel's

progress will not improve any further than it has—█████████████████████████████████

███████████████████████████████████████     Daniel explained that "This

isn't how brothers are supposed to be. We're supposed to be rough with each other, to bike

together. I want us to do things together as we once did." *Id.* ¶ 25. Though Nathaniel is alive,

Daniel knows, "I've lost my kid brother." *Id.* ¶ 27.

129.    ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

130.    ██████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

131.   ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████

### d.   Adina Felber

132.   Adina Felber is a U.S. citizen. She is Nathaniel Felber's older sister. *See* Declaration of Adina Felber ("Adina Decl."), ¶ 1.

133.   Adina recalled that Nathaniel was happy in Israel: "He made friends from the beginning, which was no surprise. He was always having fun and had lots of energy." *Id.* ¶ 3.

134.   Even though Nathaniel adjusted to Israel quickly, Adina described that he still understood that she did not. *Id.* Adina remembered acting out at her family members at times because she was so upset, but Nathaniel was kind to her. She described specifically how the two of them shared a computer, but Nathaniel let her use it more often because he understood she needed it as an outlet. *Id.* ¶ 4. He also helped her make friends, walking their dog with her by a park where girls Adina's age might be spending time. If the girls started talking to Adina, Nathaniel would continue walking the dog so that she could stay and socialize. *Id.* ¶ 5.

135.   Adina ultimately started to enjoy living in Israel and returned her brother's kindness. When Nathaniel was drafted to the Army, Adina took him shopping and helped him buy

the things he needed. She also gave him some of her old Army gear that she thought would be useful to him. *Id.* ¶¶ 6–7.

136.    On December 13, 2018, Adina, then a flight attendant for El Al Airlines, recalled boarding a 12-hour flight from Hong Kong back to Israel. *Id.* ¶¶ 8, 11. She knows now that the Givat Assaf Attack on Nathaniel had already occurred, but at the time, the Army had ordered her plane to shut off its in-flight WiFi so she would not learn about it until she landed. *Id.* ¶ 11.

137.    One message came through before the Army's order, however. Adina recalled taking a break during the flight and seeing a WhatsApp message from her cousin asking if Nathaniel was okay, as something had happened near his base. *Id.* ¶¶ 11–12. Adina remembered that she did not give the message much thought and took a quick nap in the crew rest. She woke up feeling "very anxious," however, and started crying. She focused on her work, but "could not shake the feeling." *Id.* ¶ 12.

138.    The plane's in-flight manager approached Adina and led her to the captain's crew rest at the front of the plane. Adina recalled her reading a statement that the Army had transmitted that included "your brother was shot in the head." Adina started "wailing." The in-flight manager told Adina she had to calm down so she could read the rest of the statement, and Adina did not fully understand all of the Hebrew phrases. She thought her brother had died, but understood he was still alive when the captain told her Nathaniel was in surgery. *Id.* ¶ 14.

139.    Adina described how, when the plane door opened, her fiancé stood outside. *Id.* ¶ 15. She started crying so hysterically she could not move, and he picked her up and moved her out of the way so that the other passengers could pass. The thought that steadied her was that she had to get to Nathaniel quickly in case he did not survive the surgery. *Id.* ¶ 16.

140.    Adina recalled that she did not recognize her brother in the ICU because he was so swollen. She wondered if it was really him but concluded that the doctors would not have lied to her. *Id.* ¶ 20. Adina tried to speak to her brother, but her words came out as cries. She spent the next few hours trying to rest on a chair in a doctor's office in the ICU but ended up going into Nathaniel's room every few minutes to check on him. *Id.* ¶ 21.

141.    Adina wanted to hear details about the Givat Assaf Attack and Nathaniel's injuries, but her parents did not have much information, and the nurses responded that the doctors would talk to them. *Id.* ¶¶ 22–23. Finally, on Sunday, three days after Nathaniel was admitted, doctors explained his injuries to the Felber family. "It was awful," recalled Adina. "For an hour, they talked about what possible outcomes we could expect '*if*' Nathaniel survived, and '*if*' he woke up from his coma." *Id.* ¶ 25. Adina remembered that her mother could not stop crying. *Id.* ¶ 26.

142.    Adina described the first months as "exhausting." She exercised Nathaniel's limbs with her mother during all the available visiting hours, while "still reeling from the trauma of seeing Nathaniel in his condition." *Id.* ¶¶ 28–29. She began to experience severe stomach pain, which she never had before. She could not eat, and lost a significant amount of weight. *Id.* ¶¶ 29–30; Strous Decl., Ex. D at 4. There were times she could not get out of bed because she was incapacitated by the stomach pain. Adina Decl. ¶ 29.

143.    Adina cancelled her engagement party, which was supposed to be one week after the Givat Assaf Attack, but her mother encouraged her to plan her wedding. *Id.* ¶ 32. Adina described how that planning "was nothing like what it would have been otherwise." *Id.* ¶ 33. She had little free time and limited options. Her mother was not able to help much. *Id.* Adina was certain of one thing: Nathaniel would be at her wedding. If he could not travel, she would get

married in his ICU room. *Id.* ¶ 34. When she hired her photographer, she warned him that a portion of Nathaniel's skull was missing, and to be prepared for what he looked like. *Id.* ¶ 35.

144.     Nathaniel was able to attend Adina's November 25, 2019 wedding, his body strapped to a wheelchair and with two attendants, but he grew tired and was transported back to the rehabilitation center before Adina could dance with him. *Id.* ¶¶ 36–38.

145.     ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████ Her goal is to become an occupational

therapist, █████████████████████████████████

████████████████████████████████████████████

██████████

146.     ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

147. ████████████████████████████████████████████

████████████████████████████████  During Nathaniel's recent admission to the ICU for his

cranioplasty surgery and subsequent complications, Adina's stomach hurt the entire time. *Id.* ¶ 48.

148.    Adina hopes that Nathaniel will get stronger, but she realizes "that he won't get

much better than he is today." *Id.* ¶ 49. He likely will not ever be able to speak, which pains Adina

the most: "Of all of Nathaniel's many, permanent limitations, my not being able to communicate

with him is the worst, and I realize that I may have to live with that for the rest of our lives." *Id.*

¶¶ 50, 52.

149. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

150. ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

151. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████

## III.    CONCLUSIONS OF LAW: LIABILITY

### A.    Legal Standard for FSIA Default Judgment

152.    Plaintiffs are required to establish their claims "by evidence satisfactory to the court," 28 U.S.C. § 1608(e), a standard which may be satisfied "through uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010) (citations and quotations omitted). "This 'satisfactory to the court' standard is identical to the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55(e)," and "[i]n evaluating the plaintiffs' proof, the court may accept as true the plaintiffs' uncontroverted evidence." *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003) (citation, footnote, and quotations omitted). The D.C. Circuit emphasized:

> While both § 1608(e) and Rule 55(d) give an unresponsive sovereign some protection against an unfounded default judgment, neither provision relieves the sovereign from the duty to defend cases. Moreover, § 1608(e) does not require the court to demand more or different evidence than it would ordinarily receive; indeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required.

*Owens v. Islamic Republic of Iran*, 864 F.3d 751, 785 (D.C. Cir. 2017) (citations and quotations omitted), *vac'd on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020).

153.    The § 1608(e) standard is met "when the plaintiff shows her claim has some factual basis, even if she might not have prevailed in a contested proceeding." *Id.* (citation and quotations omitted). The D.C. Circuit in *Owens* observed: "This lenient standard is particularly appropriate for a FSIA terrorism case, for which firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign." *Id.*

154.    In step with the relaxed burden of proof under § 1608(e), "the district court also has an unusual degree of discretion over evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism," and appellate courts "have allowed plaintiffs to prove their claims using evidence that might not be admissible in a trial." *Owens*, 864 F.3d at 785 ("'courts have the authority—indeed, we think, the obligation—to adjust evidentiary requirements to differing situations' and admitting affidavits in a FSIA default proceeding") (quoting *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048–51 (D.C. Cir. 2014)).

155.    To that end, plaintiffs in FSIA cases often rely on expert testimony rather than primary evidence. Courts in this District "[r]ecogniz[e] that expert testimony is not only entirely proper, but often sufficient, and even indispensable in 'terrorism cases... because firsthand evidence of terrorist activities is difficult, if not impossible to obtain.'" *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 57 (D.D.C. 2018) (citing *Owens*, 864 F.3d at 787–88). Plaintiffs have done so here. Experts, in turn, may rely on evidence that might not otherwise be admissible in forming their opinions. *See* Fed. R. Evid. 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."). In fact, "in the terrorism context, experts' reliance on hearsay evidence is often critical." *Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138, 175 (D.D.C. 2016).

156.    Plaintiffs here have provided uncontested, relevant, and highly probative evidence, testimony, and witnesses establishing Iran's liability for their injuries. Defendant Iran has not appeared in this action in order to dispute any of Plaintiffs' claims or evidence.

### B.    Subject Matter Jurisdiction

157.    The Foreign Sovereign Immunities Act establishes a broad rule that foreign states are immune from suits for money damages in United States courts. *See* 28 U.S.C. § 1604. The

statute also sets out certain exceptions to the rule for limited categories of cases. Thus, the FSIA provides the sole basis for asserting jurisdiction over foreign states. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).

158.    The "state-sponsored terrorism" exception, set forth at 28 U.S.C. § 1605A, removed a foreign state's immunity where plaintiffs seek damages against the foreign state for personal injury or death caused by "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources [as defined in Section 2339A of Title 18] for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605A(a)(1). *See also Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 254 (D.D.C. 2006).

159.    The FSIA adopts the definition of "material support or resources" provided in 18 U.S.C. § 2339A. *See* 28 U.S.C. § 1605A(h)(3). That section broadly defines "material support or resources" as:

> [A]ny property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials[.]

18 U.S.C. § 2339A(b)(1).

160.    The "act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources" must be "engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605A(a)(1). The material support alleged herein was provided by Iran and its agents, including the IRGC-QF. *See Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 55 (D.D.C.

2019) ("material support or resources for prohibited actions that are provided through the Qods Force do satisfy the requirements of Section 1605A(a)(1).").

161.     Plaintiffs must establish that Iran's material support or resources were the "proximate cause" of their personal injuries, which requires showing "'some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered.'" *Id.* at 54–55 (quoting *Owens*, 864 F.3d at 794).

162.     Proximate cause in the material support for terrorism context requires showing that "1) 'the defendant's actions [were] a "substantial factor" in the sequence of events that led to the plaintiff's injury,' and 2) 'the plaintiff's injury [was] "reasonably foreseeable or anticipated as a natural consequence" of the defendant's conduct.'" *Id.* at 55 (quoting *Owens*, 864 F.3d at 794). Under this test, plaintiffs need not show that the material support was "*directly* traceable to a particular terrorist act," only that it "went to the terrorist organization that perpetrated the act, and that the support was a proximate cause of the terrorist act." *Id.* (citation and quotations omitted).

163.     The FSIA incorporates the definitions of "torture" and "extrajudicial killing" set forth in the Torture Victims Protection Act ("TVPA"). *See* 28 U.S.C. § 1605A(h)(7) (citing 28 U.S.C. § 1350 note). *See also Han Kim*, 774 F.3d at 1045. The TVPA defines "extrajudicial killing" as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples," and not otherwise "lawfully carried out under the authority of a foreign nation" under international law. *Gill*, 249 F. Supp. 3d at 97 (quoting 28 U.S.C. § 1350 note).

164.     The immunity exception applies even if all of the plaintiffs survived the attack, as here, so long as the attack constituted an *attempted* extrajudicial killing. *See Gill*, 249 F. Supp. 3d at 99 (holding that a terrorist group's "attempted extrajudicial killing of the plaintiff constitutes an

extrajudicial killing under the terrorism exception"). *See also Schertzman Cohen v. Islamic Republic of Iran*, No. 17-cv-1214 (JEB), 2019 WL 3037868, at *3 (D.D.C. July 11, 2019) ("this district's prior rulings hold that the FSIA terrorism exception encompasses *attempted* extrajudicial killings"). Moreover, where a killing of a *non-plaintiff* has occurred, as in the Givat Assaf Attack, "[i]t is not necessary … for one of the plaintiffs [themselves] to have died in the attack in order for the state-sponsor-of-terrorism exception to apply." *Gill*, 249 F. Supp. 3d at 99 (quoting *Cohen*, 238 F. Supp. 3d at 81). *See also Karcher*, 396 F. Supp. 3d at 58 (same).

165.    Section 1605A also conditions subject matter jurisdiction on fulfilling three additional requirements: "The court shall hear a claim under this section if" (1) "the foreign state was designated as a state sponsor of terrorism at the time the" terrorist attack at issue occurred and "remains so designated when the claim is filed," (2) "the claimant or the victim was, at the time [the terrorist attack] occurred[,] a national of the United States," and, if the attack occurred in the foreign state, (3) the foreign state was afforded the opportunity to arbitrate the claim. 28 U.S.C. § 1605A(a)(2)(A).

166.    Plaintiffs here have met all of these requirements. The Givat Assaf Attack including an extrajudicial killing, and an attempted extrajudicial killing of Nathaniel Felber. Iran provided massive amounts of material support in the form of funds and training to HAMAS, which material support substantially and foreseeably caused the Givat Assaf Attack. Iran was designated a State Sponsor of Terrorism at the time and remains one currently. *See supra* ¶ 54.

167.    Finally, the "victim," Nathaniel Felber, was a U.S. citizen "at the time of the attack." *See* Judi Decl. ¶ 1 ("Nathaniel was born in Maryland and is a U.S. citizen. I am a U.S. citizen and a plaintiff in this action."). *See also Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d

1, 33 (D.D.C. 2018) ("[T]he plaintiffs have averred in sworn declarations that they were United States citizens at the time of the attack.… Thus, the second element is firmly established.").

168.     Moreover, all of the Family Member Plaintiffs have averred to their own U.S. citizenship, as necessary under 28 U.S.C. § 1605A(c). *See supra* at ¶¶ 88, 108, 120, 132.

### C.     Service of Process and Personal Jurisdiction

169.     Personal jurisdiction exists over a non-immune sovereign if service of process has been made under section 1608 of the FSIA. *See* 28 U.S.C. § 1330(b); *Stern*, 271 F. Supp. 2d at 298; Fed. R. Civ. P. 4(j)(1). The requirements for serving a foreign state are listed in 28 U.S.C. § 1608(a). That section provides four methods, 28 U.S.C. § 1608(a)(1)–(4), which must be attempted in order, to the extent possible. *See Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015).

170.     In suits against Iran, the first two methods—service through a special arrangement with Iran or through an international convention—are inapplicable. *See Karcher*, 396 F. Supp. 3d at 15 ("Neither special arrangements with Iran nor an international convention signed by Iran was available to facilitate service under Section 1608(a)(1) or (a)(2), so Plaintiffs were permitted to avail themselves of Section 1608(a)(3).").

171.     As set forth above, ¶¶ 2–5, Plaintiffs here therefore first attempted serving process on Iran by mail pursuant to 28 U.S.C. § 1608(a)(3) and when that method failed, attempted service through diplomatic means pursuant to 28 U.S.C. § 1608(a)(4), which succeeded. Accordingly, this Court has *in personam* jurisdiction over Defendant.

### D.     Theories of Liability

172.     The FSIA's private right of action includes claims for "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). However, Plaintiffs must provide *theories* of tort liability, as required for § 1605A claims. *See, e.g.*, *Schertzman Cohen*,

2019 WL 3037868, at *5 ("Although § 1605A provides a private right of action, it requires plaintiffs 'to prove a theory of liability.'") (quoting *Valore*, 700 F. Supp. 2d at 73). Courts in this District in reviewing theories of liability in FSIA claims, "'rely on well-established principles of law, such as those found in Restatement (Second) of Torts,' to determine liability under the FSIA." *Id.* (citing *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009)). *See also Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003) ("using Restatement 'as a proxy for state common law' in determining FSIA liability").

173.   Plaintiffs present below two theories of tort liability:

a.   Solatium (for the Family Member Plaintiffs, *see* First Claim for Relief); and

b.   Battery (for Nathaniel Felber, *see* Second Claim for Relief).

These theories are each discussed below.

## 1.   Solatium

174.   The FSIA cause of action provides a solatium claim for a victim's immediate family members. *See* 28 U.S.C. § 1605A(c). Aside from the family restriction, the solatium claim operates as an Intentional Infliction of Emotional Distress ("IIED") claim. *Valore*, 700 F. Supp. 2d at 85 ("Under the FSIA, a solatium claim is indistinguishable from an IIED claim.").

175.   As explained in *Heiser*, terrorist attacks meet the "extreme and outrageous" test for intentional infliction of emotional distress in the Restatement (Second):

> Terrorism, unique among the types of tortious activities in both its extreme methods and aims, passes this test easily. As the *Stethem* court wrote, "All acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror, in their targeted audience: The more extreme and outrageous, the greater the resulting distress." Indeed, as this Court put it, the "intent to create maximum emotional impact," particularly on third parties, is terrorism's *raison d'etre*.

44

*Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 27 (D.D.C. 2009) (quoting

*Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002) and *Eisenfeld*, 172 F.

Supp. 2d at 9).

176.     In the solatium context, the IIED claim is satisfied even if family members are not

present at the attack:

> [T]he Restatement's caveat "suggests that … [i]f the defendants' conduct is
> sufficiently outrageous and intended to inflict severe emotional harm upon a person
> which is not present, no essential reason of logic or policy prevents liability." As
> this Court has noted, "[t]errorism, unique among the types of tortious activities in
> both its extreme methods and aims, passes this test easily." One therefore need not
> be present at the time of a terrorist attack upon a third person to recover for severe
> emotional injuries suffered as a result.

*Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 75–76 (D.D.C. 2010) (quoting *Heiser*,

659 F. Supp. 2d at 27). *See also Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1, 14 (D.D.C.

2010) ("[T]he function of the presence requirement—to ensure that a plaintiff actually suffered a

high degree of emotional distress—is, in state-sponsored terrorism cases, fulfilled by the horrific

and terrifying nature of terrorism itself ….").

177.     The terrorist attack at issue here—the deliberate shooting of Israeli soldiers and

civilians at a bus stop with an AK-47 automatic assault rifle—is extreme and outrageous. As

further detailed herein, each Family Member Plaintiff provided evidence that he or she suffered

substantial emotional distress as a result of the Givat Assaf Attack.

### 2.     Battery

178.     "[B]attery liability arises when [defendants] acted '[(1) intending to cause a

harmful or offensive contact with, or an imminent apprehension of such a contact by, those

attacked and (2) a harmful contact with those attacked directly or indirectly resulted.'" *Schertzman*

*Cohen*, 2019 WL 3037868, at *5 (quoting *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24,

36 (D.D.C. 2012)). As stated above, in the Givat Assaf Attack, Iran both intended to cause, and its conduct did result in, harmful contact with Nathaniel Felber.

###   E.   Iran's Vicarious Liability for the Torts Committed by HAMAS

179.    Iran (at a minimum) engaged in the "provision of material support and resources" to HAMAS, which carried out the Givat Assaf Attack that caused Plaintiffs' personal injuries. 28 U.S.C. § 1605A(a)(1). The acts of another may render a party liable under § 1605A "under theories of vicarious liability, such as conspiracy, aiding and abetting and inducement." *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 69 (D.D.C. 2006).

180.    Civil conspiracy is recognized under District of Columbia law as a basis for the imposition of vicarious liability for civil torts. It exists when the following elements are present: (1) an agreement between two or more persons or entities (2) to participate in an unlawful act or in an otherwise lawful act in an unlawful manner and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme. *Griva v. Davison*, 637 A.2d 830, 848 (D.C. 1994) (citing *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)).

181.    It is axiomatic that the "agreement" element "may be inferred from conduct." *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 84 (D.D.C. 2006) (citing *Weishapl v. Sowers*, 771 A.2d 1014, 1023 (D.C. 2001)). *See also Haim*, 425 F. Supp. 2d at 69.

182.    As this Court has previously held, "sufficient evidence [exists] for the Court to conclude that Iran's support of Hamas through 'funding and training for terrorism activities that targeted United States and Israeli citizens,' constituted an agreement to commit terrorist acts" and "established the elements of a civil conspiracy between Iran and Hamas, and thus has provided a basis of Iran's vicarious liability." *Gill*, 249 F. Supp. 3d at 101 (citing plaintiff Mati Gill's experts, including Dr. Patrick Clawson).

183.    As in *Gill*, the Declaration of Dr. Patrick Clawson here shows that Iran and HAMAS acted in concert because they agreed to commit terrorist attacks to promote Iran's brand of revolutionary Islamic ideology and to further the goal of destroying the State of Israel and killing Israeli and United States citizens. Such agreement may also be inferred from the substantial financial support and training that Iran provided to HAMAS. *See supra* ¶¶ 55–72. The very "[s]ponsorship of terrorist activities inherently involves a conspiracy to commit terrorist acts." *Bodoff*, 424 F. Supp. 2d at 84 (quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 27 (D.D.C. 1998)).

184.    Iran provided the material support to HAMAS through its officials and its agents. For example, as Plaintiffs showed, Iran's provision of material support included financial support, weapons, and training, and the IRGC-QF provided strategic assistance to HAMAS. *See supra* ¶ 60. The Islamic Revolutionary Guard Corps ("IRGC"), and its Qods Force directorate, is an agent of Iran: "The Court is satisfied that the Qods Force is at least an agent of Iran, if not a part of the government such that individuals working for it would be officials or employees of Iran." *Karcher*, 396 F. Supp. 3d at 55.

185.    Plaintiffs have also established based on evidence submitted to this Court, most notably the Declaration of Arieh Dan Spitzen, that a HAMAS operative and commander committed the Givat Assaf Attack, which resulted in Plaintiffs' injuries. Dr. Clawson's Declaration also demonstrates that the torts alleged by Plaintiffs were carried out in furtherance of the scheme between Iran and HAMAS. For these reasons, each of the four elements of civil conspiracy is established under District of Columbia law, with regard to Iran and HAMAS. *See Gill*, 249 F. Supp. 3d at 101.

186.     Iran is also liable for aiding and abetting the Givat Assaf Attack. *See* 18 U.S.C. § 2 (a), (b). *See also Halberstam*, 705 F.2d at 481–86.[5] The D.C. Circuit in *Halberstam* described the elements of civil aiding and abetting as follows: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." *Id.* at 477. Plaintiffs' evidence establishes each of these elements here.

187.     *First*, Plaintiffs showed that the party that Iran aided—HAMAS—performed a wrongful act (the terrorist attack at issue) that injured Plaintiffs. *See* Spitzen Decl. ¶¶ 53–57.

188.     *Second*, Iran was not only generally aware of its role in HAMAS's tortious activity at the time it provided HAMAS material support, it gave that assistance specifically to encourage acts of terrorism such as the one at issue. *See* Clawson Decl. ¶¶ 28–62.

189.     *Third*, Iran knowingly and substantially assisted the terrorist attack at issue, by providing millions of dollars, weaponry, and other support for HAMAS with the specific intent of causing terrorist attacks in Israel. *See id.*

## IV.   CONCLUSIONS OF LAW: DAMAGES[6]

190.     To obtain damages against a defendant in an FSIA action, the plaintiff must prove that the consequences of the defendant's conduct were "'reasonably certain' (i.e., more likely than

---

[5]     Where courts have analyzed Iran's vicarious liability for terrorist attacks in Israel under § 1605A, some have noted that these theories may apply, but need not be analyzed because of the applicability of conspiracy liability. *Gill*, 249 F. Supp. 3d at 101 n.6 ("Because the Court concludes that Iran is vicariously liable under a theory of civil conspiracy, it need not address these alternative theories."); *Bodoff*, 424 F. Supp. 2d at 84 (same); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 26 (D.D.C. 2008) (same).

[6]     Plaintiffs note that damages in the FSIA context operate according to a *sui generis* set of principles, such as conforming to certain damage frameworks or limiting awards as a matter of law. *See, e.g.*, *Roth v. Syrian Arab Republic*, No. 14-cv-01946-RCL, 2018 WL 4680270, at *15 (D.D.C. Sept. 28, 2018) (acknowledging a "standardized approach" in FSIA cases). These principles do not necessarily reflect the kind of presentation of evidence that would occur or the measure of damages likely determined by a jury following a full trial.

not) to occur, and must prove the amount of damages by a 'reasonable estimate' consistent with this [Circuit]'s application of the American rule on damages." *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005) (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003) (quotations omitted)). Because there have been many cases in this District in which individuals have been injured in terrorist attacks, this Court is not writing on a proverbial "clean slate" in fashioning a damages remedy in this case. To the contrary, this Court is guided by remedial approaches and formulas utilized in similar cases. *See Prevatt v. Islamic Republic of Iran*, 421 F. Supp. 2d 152, 160–61 (D.D.C. 2006); *Haim*, 425 F. Supp. 2d at 71. These remedial approaches and formulas are inevitably imperfect and likely understate the damages that would be assessed against the defendant in most cases, if it contested these actions. However, as set forth below, Plaintiffs have attempted to conform the evidence of their injuries to the preexisting approaches and formulas previously fashioned by judges in this District.

### A.    Solatium Damages

191.    This Court has established a framework for solatium claims (often attributed to *Heiser*, 466 F. Supp. 2d at 269), depending on whether the victim was killed, physically injured, or only emotionally injured, and the relationship of the claimant to the victim.

192.    For instance, relatives of victims who were killed typically receive the following awards: "claims brought by spouses, parents, and siblings … $8 million, $5 million, and $2.5 million each, respectively." *Valore*, 700 F. Supp. 2d at 85 (citing *Heiser,* 466 F. Supp. 2d at 269). Relatives of surviving, but physically injured victims typically receive the following awards: "$4 million for spouses, $2.5 million for parents, and $1.25 million for siblings." *Id.*

193.    The Court may depart upward or downward from the solatium framework given the relevant circumstances such as, *inter alia*, "circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing." *Oveissi v. Islamic Republic of*

*Iran*, 768 F. Supp. 2d 16, 26–27 (D.D.C. 2011). "The Court, however, must also remain mindful of the general equitable principle that claims for pain and suffering 'should be compared to awards in similar cases.'" *Id.* at 30 (quoting *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 55 (D.D.C. 2009)). For instance, in *Oveissi*, the Court awarded a murder victim's grandchild a $7.5 million solatium award, a 50% upward departure from the *Heiser* scale amount of $5 million for parents or children of victims. *Id.*

194.    So long as Iran's conduct proximately caused the circumstances warranting the upward departure, Iran is liable for that departure. The proximate cause requirement is not a high one, as it "normally serves to 'eliminate[] the bizarre.'" *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 29 (D.D.C. 2014) (quoting *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004)). Thus, in *Spencer*, this Court upward departed from the usual $2.5 million award for the parent of an injured victim—a U.S. Marine injured in the 1983 barracks bombing—to $3.5 million where the Marines initially (and erroneously) told the parents their son had died. *Id.* at 29. The Court held that "[i]n the chaos and confusion of the period after the attack, it was foreseeable that military officials tasked with responding to it might misidentify the dead and cause further emotional hardship to those intimately affected by the attack." *Id.* at 30.

195.    Given the horrendous injury Nathaniel suffered, robbing him of not only his personality, but even his most basic functions, the Family Member Plaintiffs are entitled to upward departures. In cases where the victims suffered significant brain damage, but less than Nathaniel's, this Court upward departed 40% from the usual $2.5 million solatium award to $3.5 million for the parent of the victims, and 20% from the usual $1.25 million to $1.5 million for a sibling of one of the victims. *Haim*, 425 F. Supp. 2d at 75–76, *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 60 (D.D.C. 2006).

196.    This Court in *Haim* found that in the ten years since the attack in that case occurred, the direct victim had "settled into a relatively stable physical and mental condition which likely would endure for the rest of [his life]." *Haim*, 425 F. Supp. 2d at 59, 73. The victim, nineteen years old at the time of the attack, was on a bus that was bombed. *Id.* at 59–60. The victim's brain was "seriously damaged" and, like Nathaniel, it was unclear whether he would survive his initial surgery. *Id.* at 62. The *Haim* victim also underwent a cranioplasty surgery, and suffered a post-operative seizure. *Id.* at 63. After several weeks in the hospital, a "few days" of which he spent in the ICU, the victim moved back into his father's house, and over the course of the following year, visited the hospital regularly for follow-up evaluations and treatments. *Id.* at 63, 74.

197.    But a year and a half after the attack, the victim was able to return to school on a part-time basis. With accommodations, he was able to complete high school, sit for college entrance exams, and enroll in some college classes, although it was "highly unlikely that he will ever obtain a job or live independently." *Id.* at 66.

198.    Like here, the victim's father "effectively put his own life on hold in order to care for his son." *Id.* at 67. He lived at a hotel near the hospital during the four weeks his son was admitted. *Id.* at 63. And like here, he described how he suffered extreme emotional distress due to the uncertainty of his son's condition and the sheer trauma of seeing his son in a bloodied and pained state, as well as treatments culminating in a less complete recovery than was previously anticipated. *Id.* at 67. Recognizing the extent of his suffering, while "influenced … by the fortunate fact that Seth remains alive," this Court awarded the victim's father $3.5 million. *Id.* at 76.

199.    This Court also awarded a 20% upward departure to the victim's brother, 15 years old at the time of the attack. Tr. 5:22-6:1, *Haim*, No. 02-cv-1811 (RCL) (D.D.C. Jan. 3, 2006), ECF No. 24-4, *Haim*, 425 F. Supp. 2d at 76. He accompanied his father to the hospital where they

51

witnessed the victim "covered in blood and screaming." *Id.* at 62. He lived with his father in the hotel near the hospital for the four weeks the victim was admitted. *Id.* at 63. He described suffering mental anguish in the days following the attack, as well as emotional distress at the after-effects; his relationship with his brother changed dramatically—he no longer felt that they could talk or enjoy activities together, and it was difficult for him to see his brother as dependent and inactive, when before the attack, he had been the opposite. The victim's brother also felt that his relationship with his father changed as a result of the attack. *Id.* at 67.

200.    Relying on *Haim*'s solatium analysis, this Court in *Blais* also awarded the mother and stepfather of the victim in that case an upward departure to $3.5 million. 459 F. Supp. 2d at 60. The victim, a 26-year-old U.S. Air Force service member, was injured in the 1996 Khobar Towers bombing in Saudi Arabia. *Id.* at 46–48. He was hospitalized for approximately four months. *Id.* at 50. He was initially in a coma and then a vegetative state for about five weeks. After receiving rehabilitation care for months (and other therapies for years following), he had "made remarkable progress." *Id.* at 50. He was able to read and write, but both were very labored and slow, given ongoing problems with speech, balance, coordination, and tolerance for frustration and impulse control, as well as moderate cognitive impairment. *Id.* at 50–51.

201.    Like here, the parents committed themselves to his care. The victim's mother "hardly left his side" for the ten years since his attack, functioning as his "primary caretaker and constant nurse." Both parents grieve for the "vibrant and promising young man he had been before." *Id.* at 52.

**The Felber Family Members**

202.    Nathaniel Felber's condition is far worse than the tragic conditions of the victims in *Haim* and *Blais*. Unlike the family members in those cases, Nathaniel Felber cannot speak to

his parents, or substantially communicate at all. And although Plaintiffs will provide a more complete description of Nathaniel's injuries by October 16, 2020, his prognosis appears dire:

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ He will likely never walk, and he may never talk. *Id.* ¶ 38. His progress now is limited to how many seconds he can hold his head up by himself or sit before losing control and toppling over. *Id.* ¶ 34.

203.    "The dreams we had for Nathaniel are gone," according to Judi. *Id.* ¶ 38. Joseph insists on avoiding conversations about Nathaniel's poor long-term prospects, ████████████

████████████████████████████████ Joseph Decl. ¶ 32, Strous Decl., Ex. C at 3, 5. █████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

204.    Nathaniel's siblings also experience extreme suffering. They each lived in the hotel for two and a half months until Nathaniel was discharged. Adina Decl. ¶ 32, Daniel Decl. ¶ 22. They each took time off from work (Adina, three months; Daniel, one month) and struggled upon returning. Adina Decl. ¶ 43, Daniel Decl. ¶ 19.

205.    ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████ She ██

██████████████████████████████ has dealt with recurring stomach pains that restricted

her movement and appetite. Adina Decl. ¶¶ 29–30, 48. She worries her brother's condition will not improve, and that she has lost her ability to communicate with him or even understand how he is feeling. *Id.* ¶¶ 49–51. "Of all of Nathaniel's many, permanent limitations, my not being able to communicate with him is the worst, and I realize that I may have to live with that for the rest of our lives." *Id.* ¶ 52.

206. 

"I've lost my kid brother. I can't joke around with him about the things we have in common, like our Army service or stories about our childhood. Something funny will happen and I want to tell Nathaniel, but not this Nathaniel." Daniel Decl. ¶ 27.

207. Nathaniel Felber's case represents a relatively unique and appalling circumstance. The victim of the attack is not deceased but his condition is severe even by the tragic standards of most terrorism cases.

208. In addition to the Family Member Plaintiffs having little by way of normal interaction with Nathaniel, they live with the knowledge that he will likely succumb to his injuries at some point in time and that the cause of death will almost certainly remain the HAMAS attack of December 13, 2018. "When death results from terrorism, the fact of death and the cause of death

can become inextricably intertwined, thus interfering with the prospects for anguish to diminish over time." *Flatow*, 999 F. Supp. at 31.

209.   Moreover, whether stricken with pneumonia or seizures or some other complication resulting from his injury, the Family Member Plaintiffs contend with ongoing episodes in which they fear for Nathaniel's life.

210.   Thus, by mechanical operation of law, the damages he and his close family are likely to be awarded will be diminished because he did not die at the scene of the attack, but survived only to face recurring, life-threatening setbacks and the very real risk that future complications brought about by his condition could claim his life at any time.

211.   Although there remains hope that his medical condition will stabilize and potentially improve, that outcome is far from certain, and, in view of his medical history, the anticipated future effects Nathaniel's likely death as a result of the attack will have on the Family Member Plaintiffs is properly before this Court. Just as in cases were the victim died immediately after the attack, "the [solatium] calculation should be based upon the anticipated duration of the injury…." *Id. See also Gill*, 249 F. Supp. 3d at 103 (noting that assessing injuries includes not just the "pain immediately following the injury," but the anticipated "lifelong effects" of injuries).

212.   Without attempting to minimize the fact that Nathaniel Felber is in fact alive and has *some* prospect for (relative) improvement, the Family Member Plaintiffs face circumstances that may be even more horrific than the circumstances of some families whose loved ones were killed at the scene of a terrorist attack because they witness both his ongoing suffering and continually live with the fact that one more seizure could cause even further brain damage or end his life.

213.    Recognizing that within the strictures of existing case law, family members of victims of terrorist attacks who survive almost uniformly receive less compensation (regardless of the severity of injury) than family members of victims of decedents, Plaintiffs respectfully request the following solatium awards for the Felber family members:

- Judi Felber: $4.5 million

- Joseph Felber: $4.5 million

- Adina Felber: $2.25 million

- Daniel Felber: $2.25 million.

**B.    Prejudgment Interest**

214.    Plaintiffs request prejudgment interest for their claims. *See* Complaint, ¶¶ 100–01, ECF No. 1 (presenting a claim for prejudgment interest). "It is within this Court's discretion to award plaintiffs prejudgment interest from the date of the bombing … until the date of final judgment." *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d 216, 263 (D.D.C. 2008). *See also Buonocore v. Great Socialist People's Libyan Arab Jamahiriya*, No. 06-cv-727 (JMF), 2013 WL 351546, at *31 (D.D.C. Jan. 29, 2013) ("The decision to award prejudgment interest, as well as how to compute that interest, rests within the discretion of the court, subject to equitable considerations.").

215.    Courts reviewing requests for prejudgment interest as part of the terrorism exception claims have come to differing results. As the *Pugh* court explained, "courts in this Circuit have awarded prejudgment interest in cases where plaintiffs were delayed in recovering compensation for their injuries—including, specifically, where such injuries were the result of targeted attacks perpetrated by foreign defendants." *Pugh*, 530 F. Supp. 2d at 263 (relying on *Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997) and *Forman v. Korean Air*

*Lines Co.*, 84 F.3d 446, 450 (D.C. Cir. 1996)). *See also Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 59 (D.D.C. 2008) (same).

216.     As the *Buonocore* court explained, "[p]rejudgment interest is . . . necessary to fully compensate the victims for the injuries they sustained as a result of [the state sponsor of terrorism's] material support of the [terrorist group]. Such awards compensate the victims for any delay due to litigation, and prevent [the state sponsor of terrorism] from profiting from its terrorist attacks." 2013 WL 351546, at \*31. As this Court explained in *Mwila v. Islamic Republic of Iran*, "[p]rejudgment interest is appropriate on the whole award, including pain and suffering and solatium," but not economic loss (not claimed here). 33 F. Supp. 3d 36, 46 (D.D.C. 2014) (citations omitted).

217.     Plaintiffs acknowledge that other courts, while recognizing that a prejudgment interest award is within a court's discretion, have "calculate[d their] direct-injury and solatium awards to be fully compensatory," and thus "an award of prejudgment interest no longer has the intended compensatory purpose and should be denied." *Schertzman Cohen*, 2019 WL 3037868, at \*10 (citing *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 232 (D.D.C. 2012), *aff'd*, 554 F. App'x 16 (D.C. Cir. 2014)). The *Schertzman Cohen* court noted that this reasoning is particularly true where the injuries are "psychological and thus ongoing, and the compensation assumes suffering beyond the timeframe of the incident itself." *Id.*

218.     In this case, Plaintiffs respectfully request that the Court award them prejudgment interest on their psychological injuries (solatium). Plaintiffs' suffering and likely difficulties in recovering any judgment they may receive are exacerbated by delays due to litigation and Iran's refusal to participate in cases or pay judgments against it. Particularly as prejudgment interest in

this case will not be a major component of the claimed damages, awarding it is not unreasonable, and Iran should not benefit in any way from its intransigence.

219.    In the FSIA context, "the D.C. Circuit has approved an award of prejudgment interest 'at the prime rate for each year between the accident and the entry of judgment.'" *Mwila*, 33 F. Supp. 3d at 47 (quoting *Forman*, 84 F.3d at 450). *Mwila* calculated prejudgment interest by adding the annual prime rate (multiplied by $1.00), as published on the Federal Reserve website, *id.* at 47 n.8, for each year from the attack to the issuance of the judgment (inclusive), and then multiplied that figure by the relevant portions of the award, *id.* at 47 n.7. For the year the judgment is issued, the Federal Reserve will not have yet posted the annual prime rate, "so the Court will conservatively estimate that rate to be … the rate for the previous six years." *Id.* at 47 n.8. Should the Court decide to award prejudgment interest here, Plaintiffs respectfully request leave to propose calculations of that amount when the Court issues a judgment (if in Plaintiffs' favor).

## C.    Punitive Damages

220.    The private right of action in the terrorism exception explicitly includes "punitive damages." 28 U.S.C. § 1605A(c).

221.    Punitive damages "are awarded not to compensate the victims, but to 'punish outrageous behavior and deter such outrageous conduct in the future.'" *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 86 (D.D.C. 2017) (quoting *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 290 (D.D.C. 2015)). *See also Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 56 (D.D.C. 2012). This Court has credited expert opinion that "the Iranians have shown themselves to be sensitive to punitive damages levied against them"; lesser awards could "be read by Iranian government officials as indicating a significant weakening of U.S. pressure on Iran to end its support for terrorism against Americans," whereas "substantial punitive damages

. . . would be read by Iranian officials as indicating that U.S. policy remains firmly opposed to Iranian support for terrorism against Americans." *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 122 (D.D.C. 2015) (quoting the expert report Dr. Clawson submitted in that case).

222.    As this Court has repeatedly found, "[p]unitive damages are warranted where 'defendants supported, protected, harbored, aided, abetted, enabled, sponsored, conspired with, and subsidized a known terrorist organization whose modus operandi included the targeting, brutalization, and murder of American citizens and others.'" *Braun*, 228 F. Supp. 3d at 86 (quoting *Baker v. Socialist People's Libyan Arab Jamahiriya*, 775 F. Supp. 2d 48, 85 (D.D.C. 2011)). Specifically, this Court has found that Iran's "conduct in supporting Hamas justifies the imposition of punitive damages here." *Id. See also Gill*, 249 F. Supp. 3d at 105 (relying on *Braun* to reach the same conclusion).

223.    Courts have used different models in calculating punitive damages in terrorism exception cases. For instance, in *Flanagan*, the Court explained:

> In calculating an award of punitive damages under section 1605A of the FSIA, courts evaluate four factors: (1) the character of the defendant's act, (2) the nature and extent of harm to the plaintiffs that defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants. Courts have found these factors to be satisfied when a defendant has provided material support to a terrorist organization in carrying out an act of terrorism.

*Flanagan*, 87 F. Supp. 3d at 119 (citation, footnote, and quotations omitted).

224.    Two frequent models include (1) "multiplying the defendant state's annual expenditures on terrorism (the multiplicand) by a factor usually ranging from three to five (the multiplier)" and (2) "impos[ing] a fixed $300 million punitive award." *Id.* at 122–23.

225.    Courts have also used other methods, such as in *Gill*. *Gill* also involved a shooting attack, but no deaths occurred and "the only resulting injuries were the injuries sustained by the plaintiff." Thus, the Court "utilize[d] a multiplicand in the same amount as the compensatory

damages awarded—$7.5 million" and used a multiplier of three. *Gill*, 249 F. Supp. 3d at 105–06 (citations and quotations omitted).

226.    As in *Gill*, the attack here involved a terrorist indiscriminately firing an automatic weapon at people. However, here multiple deaths occurred, and Plaintiff Nathaniel Felber was grievously injured (far more than Mr. Gill). Therefore, if the Court were to use the *Gill* framework, Plaintiffs recommend using a multiplier of five, rather than three, in calculating punitive damages after determining all of Plaintiffs' compensatory damages.

## V.    CONCLUSION

227.    Based on the foregoing, Plaintiffs respectfully request that the Court find Iran liable for all of the Plaintiffs' injuries and award damages to the Family Member Plaintiffs in the following amounts:

- Judi Felber: $4.5 million
- Joseph Felber: $4.5 million
- Daniel Felber: $2.25 million
- Adina Felber: $2.25 million.

228.    Plaintiffs also respectfully request that the Court award Plaintiffs prejudgment interest and punitive damages in amounts to be determined upon determining Nathaniel Felber's damages.

Dated: August 3, 2020

Respectfully submitted,

**OSEN LLC**

By:    /s/ Patrick J. Duprey
Patrick J. Duprey (*pro hac vice*)
Ari Ungar (DC Bar No. NJ008)
Michael J. Radine (DC Bar No. NJ015)
Dina Gielchinsky (DC Bar No. NJ011)
Aaron Schlanger (DC Bar No. NJ007)
2 University Plaza, Suite 402
Hackensack, NJ 07601
Tel.:  (201) 265-6400
Fax:  (201) 265-0303

*Attorneys for Plaintiffs*