UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
-----------------------------------------------------x
NATHANIEL FELBER, *et al.*    :
             :  **Case No. 19-cv-1027 (ABJ)**
        Plaintiffs, :
             :
    -against-    :
             :
ISLAMIC REPUBLIC OF IRAN,  :
             :
        Defendant. :
-----------------------------------------------------x

**PLAINTIFFS' PARTIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF
LAW REGARDING NATHANIEL FELBER'S DAMAGES IN FURTHER SUPPORT OF
<u>THEIR MOTION FOR DEFAULT JUDGMENT</u>**

## **TABLE OF CONTENTS**

I. FINDINGS OF FACT ............................................................................................... 3

    A.    The Givat Assaf Attack ................................................................................. 3

    B.    Nathaniel Felber's Initial Examination at Hadassah University Hospital ...................... 3

    C.    Nathaniel Felber's Initial Surgery at Hadassah University Hospital ............................ 5

    D.    Nathaniel Felber's Stay in Hadassah University Hospital's ICU .................................... 6

    E.    Nathaniel Felber's Cognitive State at Hadassah University Hospital ............................ 8

    F.    Nathaniel Felber's Inpatient Rehabilitation at Sheba Medical Center ............................ 8

    G.    Nathaniel Felber's Readmission to Hadassah University Hospital for Cranioplasty ..... 11

    H.    Nathaniel Felber's Current Status (Including Recent COVID-19 Diagnosis) ............... 13

        i.    Nathaniel Felber's Present Functional Status ............................................... 13

        ii.    Nathaniel Felber's Recent COVID-19 Diagnosis ...................................... 18

    I.    Nathaniel Felber's Prognosis ........................................................................ 20

        i.    Requirements for Living ............................................................................. 20

        ii.    Future Goals ............................................................................................. 21

        iii.    Future Complications and Life Expectancy ................................................ 22

II. CONCLUSIONS OF LAW: DAMAGES ................................................................. 22

    A.    Severity of the Pain Immediately Following the Injury ................................................ 25

    B.    Duration of Hospitalization and Subsequent Treatment .............................................. 25

    C.    Extent of Impairment That Will Remain with the Victim for the Rest of His or Her Life ....................................................................................................................... 26

III.    CONCLUSION ................................................................................................... 32

## **TABLE OF AUTHORITIES**

**Cases**

*Blais v. Islamic Republic of Iran*,
    459 F. Supp. 2d 40 (D.D.C. 2006) ............................................................... *passim*

*Campuzano v. Islamic Republic of Iran*,
    281 F. Supp. 2d 258 (D.D.C. 2003) .............................................................. *passim*

*Haim v. Islamic Republic of Iran*,
    425 F. Supp. 2d 56 (D.D.C. 2006) ............................................................... *passim*

*Mousa v. Islamic Republic of Iran*,
    238 F. Supp. 2d 1 (D.D.C. 2001) ................................................................. *passim*

*Peterson v. Islamic Republic of Iran*,
    515 F. Supp. 2d 25 (D.D.C. 2007) ......................................................................... 23

*Valore v. Islamic Republic of Iran*,
    700 F. Supp. 2d 52 (D.D.C. 2010) ........................................................................ 23

Plaintiffs, by and through undersigned counsel, hereby submit the following Proposed Findings of Fact and Conclusions of Law as to Nathaniel Felber's damages. *See* July 16, 2020 Minute Order. Plaintiffs submitted Proposed Findings of Facts and Conclusions of Law as to the Islamic Republic of Iran's liability for their injuries, and damages for Nathaniel's family members, on August 3, 2020 ("First PFFCL"), ECF Nos. 26, 29, and incorporate the same herein.[1]

In support of their motion for default judgment, Plaintiffs proffer four additional sworn declarations from:

- Eli Reichenthal, M.D., Plaintiffs' neurosurgical consultant, providing his expert opinion on the nature and scope of Nathaniel Felber's traumatic brain injury ("TBI") ("Reichenthal Decl.").

- Harold Weingarden, M.D., a consultant to the Head Trauma Rehabilitation Department at Chaim Sheba Medical Center at Tel HaShomer, Ramat Gan, Israel ("Sheba Medical Center") ("Weingarden Decl.").

- Adi Gidali, DPT, PT, the Physical Therapy Supervisor of the Complex Traumatic Brain Injury Outpatient Department at Sheba Medical Center ("Gidali Decl.").

- Judi Felber, Nathaniel Felber's mother, describing Nathaniel's recent COVID-19 diagnosis ("Supp. Judi Decl.").

## DR. ELI REICHENTHAL

Dr. Reichenthal is a Medical Doctor trained in neurological surgery both in Israel and the United States. Reichenthal Decl., ¶ 1. He is certified to practice medicine in Florida, Maine, and New York, *id.*, and has been a board-certified neurosurgeon in Israel since 1976. *Id.*, ¶ 2. Dr. Reichenthal is currently self-employed as a neurosurgical consultant and serves as an adjunct professor of neurosurgery in the Department of Neurosurgery at Stony Brook University Medical Center, New York. *Id.*, ¶ 7. From 1988-2004, he served as professor in, and chairman of, the

---

[1]     All capitalized, undefined terms herein have the meanings assigned to them in the First PFFCL.

Department of Neurosurgery at Soroka Medical Center and Ben-Gurion University of the Negev in Beer Sheva, Israel. *Id.*, ¶ 3. During his tenure, his department treated numerous neurotrauma cases, including gunshot injuries to the brain. *Id.* Between 1994-2000, he was chairman of all surgical departments at Soroka Medical Center. *Id.*, ¶¶ 3-4. Between 2003-2005, he served as the president of the Israeli Neurosurgical Society, and he continues to be a member of various professional U.S. and Israeli neurological societies. *Id.*, ¶¶ 5-6.

**DR. HAROLD WEINGARDEN**

Dr. Weingarden is a Medical Doctor specializing in Physical Medicine and Rehabilitation. Weingarden Decl., ¶ 1. He received specialty certification by the American Board of Physical Medicine and Rehabilitation in 1978. *Id.*, ¶ 2. Dr. Weingarden has been a Senior Staff Physician in the Department of Neurological Rehabilitation at Sheba Medical Center since 1993. *Id.*, ¶ 4. From 1977-1991, he was in private practice as a member of the Rehabilitation Medical Group of Santa Barbara, in Santa Barbara, California, and he served as a director of various services at the Rehabilitation Institute at Santa Barbara. *Id.*, ¶ 3. After moving to Israel in 1991, he joined the Sheba Medical Center as a Senior Staff Physician in 1993, and between 2001-2017, also served as the Director of the Day Rehabilitation Hospital in the Department of Neurological Rehabilitation. *Id.*, ¶ 4. Nathaniel was admitted to Sheba Medical Center on February 27, 2019 and discharged on September 14, 2020 due to his positive COVID-19 test.[2] *Id.*, ¶ 18; Supp. Judi Decl., ¶¶ 4, 7. Dr. Weingarden visited Nathaniel while he was in the neurosurgical intensive care unit ("ICU") in

---

[2]     As further described in Section I(H)(ii) below, Nathaniel tested positive for COVID-19 on September 12, 2020. In addition, the Government of Israel announced a country-wide lockdown effective September 18, 2020, which is now in effect until at least October 14, 2020. Nathaniel's family and doctors hope that after Israel's lockdown is lifted and Nathaniel recovers from COVID-19, he will be able to return to Sheba Medical Center for outpatient therapy. Supp. Judi Decl., ¶¶ 4-5, 7, 9-10.

Hadassah University Hospital, and also during the course of Nathaniel's hospitalization at Sheba Medical Center. Weingarden Decl., ¶ 7.

**DR. ADI GIDALI**

Dr. Gidali is a Doctor of Physical Therapy with extensive experience treating and rehabilitating patients who have suffered TBIs ranging from mild to severe from a variety of types of trauma, including gunshot wounds, motor vehicle accidents, blunt injuries, and blast injuries. Gidali Decl., ¶ 1. She has been the Physical Therapy Supervisor of the Complex Traumatic Brain Injury Outpatient Department at Sheba Medical Center since September 2014. *Id.*, ¶ 4. She was Nathaniel's physical therapist from February 27, 2019 until his early discharge on September 14, 2020. *Id.*, ¶ 5.

I.    **FINDINGS OF FACT**

A.    **The Givat Assaf Attack**

1.    As set forth in the First PFFCL, Nathaniel was grievously injured in a terrorist attack outside of Givat Assaf in the West Bank that was committed by HAMAS operative Asem al-Barghuthi on December 13, 2018. First PFFCL, ¶¶ 9-10.

2.    Nathaniel, 21 at the time, was shot in the head. *Id.*, ¶ 11; Reichenthal Decl., ¶¶ 24, 26; Weingarden Decl., ¶ 9; Gidali Decl., ¶ 7.

B.    **Nathaniel Felber's Initial Examination at Hadassah University Hospital**

3.    Medics arriving at the scene of the Givat Assaf Attack thought Nathaniel was dead before finding a pulse. Judi Decl., ¶ 12. He was transferred to the Department of Neurosurgery at Hadassah University Hospital and intubated en route. Reichenthal Decl., ¶ 28; Weingarden Decl., ¶ 9; Gidali Decl., ¶ 9.

4.     Dr. Reichenthal explained that the standard of care for any patient suspected of TBI includes serial neurologic examinations, which are often performed by trauma responders at the scene, in the emergency department, and in the acute and critical care units. One of these examinations is the pupillary examination. Nonreactive pupils are often associated with severe increases in intracranial pressure ("ICP") and/or severe brain damage. Reichenthal Decl., ¶ 29.

5.     Patients are also assigned a score on the Glasgow Coma Scale ("GCS"), the current benchmark to assign a TBI rating based on assessment at the time of the injury. The GCS measures a patient's functioning in three areas at the time of the injury: (1) verbal response, (2) eye opening, and (3) motor response. The patient's total GCS score indicates the severity of his TBI, with lower scores representing more severe injury. A GCS score of 13 or higher correlates with a mild brain injury, 9 to 12 a moderate brain injury, and 8 or less a severe brain injury. *Id.*, ¶ 30.

6.     On arrival at the emergency room, Nathaniel was found to be in deep coma. *Id.*, ¶ 31. He was assigned a GCS score of 3, **the lowest possible score**. *Id.*; Weingarden Decl., ¶ 9; Gidali Decl., ¶ 10. His pupils were non-reactive to light and his left pupil was enlarged. Reichenthal Decl., ¶ 31; Weingarden Decl., ¶ 9; Gidali Decl., ¶ 10. These pupillary responses are typically considered signs of severe brain damage and have been strongly associated with poor outcomes. Reichenthal Decl., ¶ 31. Nathaniel's corneal and gag reflexes were found to be present, indicating that Nathaniel may not have experienced brainstem death, or, colloquially, was not "brain dead." *Id.*

7.     Nathaniel's initial CT scan reflected a severe open head wound and right frontal fracture from the bullet's entry point extending past his right eye socket to the right frontal sinus behind his eye. *Id.*, ¶ 32; Weingarden Decl., ¶ 10. Nathaniel also presented with an open fracture and missing skull at the left parietal region of his skull, where the bullet exited, with extruding

4

brain tissue. This fracture extended into the left mastoid bone and middle ear. Reichenthal Decl., ¶ 32; Weingarden Decl., ¶ 10. In addition, both frontal sides of Nathaniel's skull exhibited depressed, comminuted fractures (*i.e.*, bones broken in more than one area, displacing inward to the brain), and shrapnel from Nathaniel's skull was also identified surrounding his left eye socket subcutaneously. Reichenthal Decl., ¶ 33; Weingarden Decl., ¶ 10. Bleeding was identified between every layer of membrane surrounding Nathaniel's brain. Reichenthal Decl., ¶¶ 34-35 and Figure 2; Weingarden Decl., ¶ 10.

8.       Dr. Reichenthal reviewed the CT scans of Nathaniel's skull and opined that the bullet likely entered slightly right of the midline of Nathaniel's frontal bone and brain lobe in his forehead region. Reichenthal Decl., ¶ 32 and Figure 1. It apparently then traveled left, passing through Nathaniel's left frontal lobe, and exited through the left parietal bone on the side of his skull. *Id.* As the bullet traveled, it introduced multiple metallic fragments from the left frontal region of Nathaniel's brain through the right region. *Id.*, ¶ 33; Weingarden Decl., ¶ 10.

**C.       Nathaniel Felber's Initial Surgery at Hadassah University Hospital**

9.       Nathaniel was taken to the operating room immediately following the completion of the CT scan. He was administered Mannitol (an agent that reduces brain swelling) and Keppra (an anti-epileptic medication) and was operated upon by a combined team of surgeons including plastic surgeons and neurosurgeons. Reichenthal Decl., ¶¶ 31, 36; Weingarden Decl., ¶ 11.

10.       Nathaniel underwent debridement (cleaning) of the wound, during which parts of fractured bone and necrotic tissue were removed under irrigation with saline. Reichenthal Decl., ¶ 37; Weingarden Decl., ¶ 11; Gidali Decl., ¶ 12. During surgery, Nathaniel bled extensively and required a transfusion of eight units of blood, eight units of fresh frozen plasma, and five units of platelets. Reichenthal Decl., ¶ 37; Weingarden Decl., ¶ 12.

11.     Surgeons placed an ICP monitor on the left side of Nathaniel's skull to measure the pressure in his skull. Reichenthal Decl., ¶ 37; Weingarden Decl., ¶ 11; Gidali Decl., ¶ 12. They covered Nathaniel's bullet entry wound using remnants from existing tissue and muscle. Reichenthal Decl., ¶ 37. To close the bullet's larger exit wound, surgeons placed a skin graft partly taken from Nathaniel's lower leg over it. *Id.*; Weingarden Decl., ¶ 11; Gidali Decl., ¶ 12. Surgeons placed a nasogastric ("NG") tube into his stomach through his nose for nutrition. Reichenthal Decl., ¶ 37.

**D.     Nathaniel Felber's Stay in Hadassah University Hospital's ICU**

12.     Following this surgery, Nathaniel was transferred to the surgical ICU and continued to be anesthetized in a drug-induced coma and mechanically ventilated. Reichenthal Decl., ¶ 38; Weingarden Decl., ¶ 13. He remained in the ICU for two months until his discharge to the neurosurgery ward on February 18, 2019, Weingarden Decl., ¶ 16, followed by his subsequent discharge to the Sheba Medical Center on February 27, 2019. Reichenthal Decl., ¶ 46; Weingarden Decl., ¶ 18.

13.     Scant progress was noted during Nathaniel's months in the ICU. He displayed motor response to localized pain, improving his GCS score to 8, though still within the range for severe TBI. Reichenthal Decl., ¶¶ 30, 39. He opened his right eye spontaneously (on his own, without external influence) in late December 2018 and his left eye in February 2019. *Id.*, ¶ 39.

14.     Nathaniel's time in the ICU was marked by repeated infection, necessitating rounds of antibiotics and drains placed in his skull to relieve pressure, and removal of necrotic and infected brain tissue. Reichenthal Decl., ¶ 39; Weingarden Decl., ¶ 14 (development of pneumonia in late December 2018 requiring antibiotics); Reichenthal Decl., ¶¶ 41-42; Weingarden Decl., ¶ 15; Gidali Decl., ¶ 13 (swelling at the operative site and fever evidencing necrotic and bacteria-infected

cerebrospinal fluid, necessitating drain placement and antibiotics on December 31, 2018);
Reichenthal Decl., ¶¶ 44-45; Weingarden Decl., ¶ 16 (fluid leakage from bullet exit wound
identified on January 25, 2019 evidencing fungal infection necessitating drain and antifungal
medication); Reichenthal Decl., ¶ 45 (identification of abscess on Nathaniel's brain identified on
February 11, 2019 requiring needle drainage); Weingarden Decl., ¶ 17 (fever in mid-February
2019 necessitating antibiotics).

15.     The repeated infections prevented Nathaniel's bullet exit wound from healing.
Reichenthal Decl., ¶ 44. Surgeons attempted a surgical revision on January 28, 2019 by removing
the necrotic tissue and infected-appearing areas of the wound and rotating the skin flap covering
Nathaniel's exposed brain. *Id.*; Weingarden Decl., ¶ 16; Gidali Decl., ¶ 13.

16.     Surgeons in the ICU also prepared Nathaniel for his long-term hospitalization. On
December 25, 2018, Nathaniel underwent a tracheostomy to replace the intra-tracheal tube inserted
through his mouth with a tube placed directly into his windpipe, because prolonged ventilation
was required. Reichenthal Decl., ¶ 40; Weingarden Decl., ¶ 14. On the same day, surgeons
implanted an inferior vena cava filter to prevent life-threatening pulmonary emboli from forming
in Nathaniel's motionless extremities. Reichenthal Decl., ¶ 40; Weingarden Decl., ¶ 14; Gidali
Decl., ¶ 13. A peripherally inserted central catheter ("PICC") line was placed to deliver
medications and other treatments directly to the large central veins near Nathaniel's heart. (A PICC
line is recommended if the patient's treatment plan requires frequent needle sticks for medicine or
blood draws.) Reichenthal Decl., ¶ 46; Weingarden Decl., ¶ 15; Gidali Decl., ¶ 16. Nathaniel's NG
tube for nutrition was replaced with a percutaneous endoscopic gastrostomy ("PEG") tube on
January 15, 2019 that was placed directly through his abdominal wall and into his stomach for

nutrition, bypassing the mouth and esophagus. Reichenthal Decl., ¶ 43; Weingarden Decl., ¶ 15; Gidali Decl., ¶ 13.

### E.   Nathaniel Felber's Cognitive State at Hadassah University Hospital

17.     As stated above, Nathaniel was in a deep coma upon arrival at Hadassah University Hospital. Reichenthal Decl., ¶ 31; Weingarden Decl., ¶ 9; Gidali Decl., ¶ 10. Dr. Reichenthal explained that a coma is a prolonged state of unconsciousness, during which a person is unresponsive to his environment and cannot be awakened by any stimulation, including pain. Reichenthal Decl., ¶ 21. The coma may be caused when an injury damages specific parts of the brain, preventing the nervous system from sending normal signals to the body. *Id.* A coma can also be medically-induced. Surgeons aim to reduce the metabolic rate of brain tissue, as well as the cerebral blood flow, which relieves ICP. The goal is that, with the swelling relieved, the pressure decreases and some or all brain damage may be averted. A person in a medically-induced coma will regain consciousness once surgeons cease administering the medication inducing the coma, but a person with a severe TBI may not. *Id.*

18.     Patients may then transition from a coma to a vegetative state, during which they are awake but show no outward signs of awareness. In other words, patients may exhibit complex reflexes, including eye movements, yawning, and involuntary movements to noxious stimuli, but show no outward indications of awareness of self or environment. *Id.*, ¶ 22. Nathaniel was in a coma, and then a vegetative state, for over seven months after the Givat Assaf Attack. *Id.*, ¶ 47.

### F.   Nathaniel Felber's Inpatient Rehabilitation at Sheba Medical Center

19.     Nathaniel was still in this vegetative state when he was admitted to Sheba Medical Center on February 27, 2019 with his PEG feeding tube, a tracheal tube to deliver oxygen and to

suction out his lungs, and the PICC. He had no control over his bowel or bladder functions. Weingarden Decl., ¶ 18; Gidali Decl., ¶¶ 15-16.

20.     Nathaniel's rehabilitation program at Sheba Medical Center included physical, occupational, and speech therapy. Weingarden Decl., ¶ 21. His mobility out of bed was limited to being passively seated in a supportive reclining wheelchair, and he displayed no spontaneous movement for months. *Id.*, ¶¶ 18, 21. Nathaniel's TBI manifested in abnormal posturing—he held his right arm and leg straight out, while flexing and clenching his left extremities. His muscles displayed hypertonicity (tightness) and spasticity (exaggerated stiffness and tendon jerks), both of which are caused by disrupted signals from the brain. Gidali Decl., ¶ 17.

21.     Nathaniel was started on Ritalin on June 11, 2019 as a stimulant to increase his level of alertness, Weingarden Decl., ¶ 23, and was assessed to have progressed to a minimally conscious state in July 2019. Reichenthal Decl., ¶ 47. This state, unlike a vegetative state, is characterized by some evidence of awareness of self and/or the environment. *Id.*, ¶ 23. Nathaniel's motions were at first limited to spontaneous left-hand and -leg movements and reflexive right-hand movements; he then started to put his fingers in his mouth and eyes, not realizing that he could harm himself. Gidali Dec., ¶ 19.

22.     During the summer of 2019, Nathaniel's Ritalin dosage was increased, resulting in improvement in his level of alertness for part of the day. Weingarden Decl., ¶ 25. Nathaniel showed better eye contact, would follow simple directions, and could answer (non-verbally) most biographical questions correctly (*i.e.*, if presented in a yes-no manner). *Id.* When certain words were spoken to him, he was able to correctly choose antonyms and select a named person in family photos. *Id.*

23.     Because of concern that Ritalin was causing Nathaniel increased spasticity, the dosage was lowered and later discontinued, and he was started on amantadine, used to treat fatigue in patients with multiple sclerosis by increasing the amounts of dopamine in the body. *Id.*, ¶ 28. However, after a month, doctors decided that Nathaniel was more alert with Ritalin, and he was restarted on that medication on November 19, 2019. *Id.*, ¶ 29.

24.     On March 26, 2020, a year after Nathaniel was admitted to Sheba Medical Center, he drew a circle on request in occupational therapy. *Id.*, ¶ 33. The next month, in April 2020, Nathaniel became more consistent in using finger gestures as well as using head motions for "yes" and "no." *Id.* If handed a playing card, he could place it on another card displaying the same color or number. *Id.*; Gidali Decl., ¶ 32.  Nathaniel's physical therapy notes from that month reflect that he progressed to showing purposeful movements of his right shoulder and right lower leg. Weingarden Decl., ¶ 33. He also displayed spontaneous isolated movements of his left arm and was able to hold his head up for 20 seconds on request. *Id.*

25.     On May 5, 2020, Nathaniel was able to practice playing several notes on a keyboard. *Id.*, ¶ 35.

26.     Nathaniel's speech therapy focused on reviving his swallowing reflex. *Id.*, ¶¶ 23, 25, 29. On March 26, 2020, Nathaniel was noted for the first time to have exhibited a swallow reflex response to taste stimulation. *Id.*, ¶ 33. A month later, on April 30, 2020, he was noted to have improved spontaneous swallowing of saliva with less drooling. *Id.*, ¶ 34. However, Nathaniel made no progress in lip movement or ability to blow out a candle, and still has not spoken since the Givat Assaf Attack. *Id.*, ¶¶ 25, 50; Reichenthal Decl., ¶ 52; Gidali Decl., ¶ 28.

27.     Nathaniel was weaned off his tracheal tube as of June 25, 2019. The stoma (opening) failed to heal independently and had to be closed surgically almost a year later, on March

15, 2020. Weingarden Decl., ¶¶ 20, 32. His bullet exit wound continued to resist healing due to infection, and he returned to Hadassah University Hospital multiple times for reevaluation, wound debridement, and antibiotics. *Id.*, ¶ 24 (June 18, 2019 readmission to Hadassah University Hospital), *id.*, ¶ 27; Gidali Decl., ¶ 18 (October 7, 2019 readmission to Hadassah University Hospital).

> **G.      Nathaniel Felber's Readmission to Hadassah University Hospital for Cranioplasty**

28.      Nathaniel was still in a minimally conscious state when surgeons started preparing him for cranioplasty surgery on December 9, 2019 by implanting a "skin expander" under his scalp. Weingarden Decl., ¶ 31. They inflated this expander every week for two months by injecting a saline solution to stretch his skin so that there would be enough skin to cover the new synthetic "skull" that surgeons planned on fitting over the existing bone defect. *Id.*, ¶ 31; Judi Decl., ¶ 26. The purpose of the surgery was to reduce the atmospheric pressure on Nathaniel's brain caused by this skull defect. Reichenthal Decl., ¶ 48. That pressure causes the brain to shift from the side of the defect to the other side, causing headaches and other brain dysfunctions, including cognitive defects. *Id.*

29.      Nathaniel could not communicate verbally but would reach for his scalp expander when it was being injected, indicating that the process was painful. Judi Decl., ¶ 32. In response to the pain, Nathaniel also exhibited increased spasticity and heart rate, and a low-grade fever. Weingarden Decl., ¶ 31.

30.      Because of the COVID-19 pandemic, the surgery was postponed several times. Judi Decl., ¶ 26. Finally, Nathaniel was admitted back to Hadassah University Hospital on May 10, 2020 for the cranioplasty surgery on May 13, 2020. *Id.*; Weingarden Decl., ¶ 36; Reichenthal Decl., ¶ 48; Gidali Decl., ¶ 20.

31.     Nathaniel was extubated after the surgery, following which his left pupil enlarged and did not respond to light. Reichenthal Decl., ¶ 48. Nathaniel exhibited a seizure on the right side of his brain. *Id.*; Weingarden Decl., ¶ 36; Gidali Decl., ¶ 20. The seizures continued relentlessly despite the administration of anti-seizure medications. Reichenthal Decl., ¶ 49; Weingarden Decl., ¶ 36. Nathaniel was reintubated and placed in a drug-induced coma. Reichenthal Decl., ¶ 49; Weingarden Decl., ¶ 36.

32.     Almost a week after the May 13, 2020 surgery, the seizures were brought under control and Nathaniel was extubated on May 19, 2020. Reichenthal Decl., ¶ 49; Weingarden Decl., ¶ 36. After being extubated, Nathaniel contracted pneumonia, and was administered Tazocin, a Penicillin antibiotic. Reichenthal Decl., ¶ 50; Weingarden Decl., ¶ 36. Previously unknown to doctors and Nathaniel's family, he is allergic to Penicillin, and reacted with an episode of thrombocytopenia, *i.e.*, abnormally low levels of platelets. He received three blood transfusions. Reichenthal Decl., ¶ 50; Weingarden Decl., ¶ 36; Gidali Decl., ¶ 20.

33.     Nathaniel was readmitted to Sheba Medical Center on June 17, 2020, almost a month after he was admitted for his cranioplasty surgery. Reichenthal Decl., ¶ 51; Weingarden Decl., ¶ 38; Gidali Decl., ¶ 21. Dr. Gidali described Nathaniel as having "exhibited a decline in functional, motor, and cognitive status, presenting with decreased endurance, initiation, speed of movement, strength, mobility, sensation, visual tracking, communication, and more." Gidali Decl., ¶ 21. Nathaniel's mother declared as follows:

> All the work we did to get him to where he was before the cranioplasty appears to be lost for now. He's so weak from his terrible month in the ICU full of seizures and transfusions. I look for small improvements – he can swallow a little better, he can move his right side a little more – but he has regressed, and some of the advances he had made may be lost forever.

Judi Decl., ¶ 28.

**H.      Nathaniel Felber's Current Status (Including Recent COVID-19 Diagnosis)**

34.      As described below, Nathaniel has regained some, but not all, of the progress he achieved prior to his cranioplasty. Gidali Decl., ¶¶ 23-24. However, Nathaniel's inability to return to Sheba Medical Center for his daily therapies due to his positive COVID-19 diagnosis and Israel's country-wide lockdown will likely cause a regression in his advances to date. He is in danger of losing the skills he has worked very hard to achieve. *Id.*, ¶ 41.

**i.      Nathaniel Felber's Present Functional Status**

35.      Nathaniel is totally dependent on others for PEG tube feedings and fluids, bathing, hygiene, management of urination and bowel movements, transfers in bathroom and to shower, grooming, upper and lower body dressing, bed to chair transfers, car transfers, wheelchair mobility, community mobility, and bed mobility. Weingarden Decl., ¶ 44; Reichenthal Decl., ¶ 60; Gidali Decl., ¶ 37. He does not have a consistent effective swallow function and does not have control of his saliva. Weingarden Decl., ¶ 45; Reichenthal Decl., ¶ 52. When alert (generally during the hours of the day that he is not napping or taking a rest break, as described in the following paragraph), Nathaniel is able to respond to simple questions with gestures for yes/no with a fair level of consistency. Weingarden Decl., ¶ 46. When his level of alertness is decreased, his responses are not present or reliable. *Id.* He is unable to vocalize or use a communication device to ask for assistance, and he is unable to read or write. *Id.* His status in specific areas is as follows:

36.      **Cognition:** Nathaniel's state is currently emergent from minimal consciousness, and he exhibits a depressed level of alertness. Gidali Decl., ¶ 31; Reichenthal Decl., ¶ 52; Weingarden Decl., ¶ 47. This state was achieved during the late summer of 2020. Gidali Decl., ¶ 31; Reichenthal Decl., ¶ 61. Dr. Reichenthal explained that patients are considered to be in a state of emergence from minimal consciousness when they exhibit some functional communication (*e.g.*, follow instructions) and functional object use (*e.g.*, use a spoon). Reichenthal Decl., ¶ 23.

37.     According to Dr. Gidali, prior to his COVID-19 infection, Nathaniel was mostly alert while awake, and his awake/sleep schedule was as follows: He would wake up at about 7:00 a.m. and nap between 1:30/2:00 p.m. and 4:00/6:00 p.m. He would go to sleep for the night at about 8:00 p.m. In addition to his midday nap, Nathaniel required frequent breaks from his therapy. Gidali Decl., ¶ 31. While awake and not taking such a break, Nathaniel was oriented to place, year, person, and time of day approximately 75% of the time when presented with two options. *Id.* He was able to match cards by color and numbers when presented with two options. *Id.*; Weingarden Decl., ¶ 39. He exhibited decreased processing speed, speed of movement, working memory, and problem solving, and is currently receiving medication for impaired attention. Gidali Decl., ¶ 31. He was unable to initiate purposeful movements without assistance or prompting. *Id.* He was occasionally able to follow simple one-step commands with visual, tactile, and verbal cues. For example, if an iPad was placed in front of Nathaniel with an application open, he required assistance and repetitive prompting to follow the simple command of pressing on the song to which the therapist is pointing. *Id.*

38.     Nathaniel's COVID-19 infection has altered his cognitive status. He is not following his previous schedule and is not often alert. *Id.*

39.     **Bed Mobility:** Prior to Nathaniel's cranioplasty, he was able to roll to his left and right with use of the bed rail, supervision, and minimal verbal and visual cues for technique and hand placement. Following his readmission after the surgery, Nathaniel is no longer able to roll. *Id.*, ¶ 23; Weingarden Decl., ¶ 40.

40.     **Transfers:** Prior to Nathaniel's cranioplasty, he was able to perform sit-to-stand transfers with moderate assistance with bilateral upper extremity support. He was also able to transfer from the wheelchair to the bed (to right and left) with moderate to minimal assistance and

use of his hand. Since his readmission, Nathaniel is no longer able to perform transfers from wheelchair to bed or supine to sitting without moderate to maximal assistance. Gidali Decl., ¶ 24; Weingarden Decl., ¶ 40.

41.　　**Ambulation:** Nathaniel is able to ambulate (walk), for therapeutic purposes only, short distances of 15 meters with bilateral long-leg braces and a forearm walker with maximal assistance of two physical therapists. Stair negotiation is not possible. Gidali Decl., ¶ 25.

42.　　**Balance:** Nathaniel requires "contact guarding" (where the assistance is limited to one or two hands on the patient's body to help steady him) or minimal assistance for static sitting balance while sitting unsupported at the edge of his bed, and demonstrates the ability to sit with close supervision for up to 30-60 seconds. *Id.*, ¶ 26. Nathaniel requires minimal assistance for dynamic sitting balance and reaching outside his base of support with activities such as weight shifting and reaching required for everyday functional activities. Nathaniel requires moderate assistance while standing, using upper extremity support with a forearm support walker. Gidali Decl., ¶ 26 and Figure 1.

43.　　**Endurance:** Nathaniel is able to participate in standing activities (while supported) for 5-7 minutes at a time, and to participate in seated or supine activities for 20-25 minutes, though requiring a rest break to do so. Nathaniel can tolerate positioning in a standing frame that supports him fully (called a "stander") for 1 hour. Gidali Decl., ¶ 27.

44.　　**Communication:** Nathaniel has not spoken since the Givat Assaf Attack. Weingarden Decl., ¶ 50; Gidali Decl., ¶ 28. He also has inconsistent movement of his lips and mouth. Weingarden Decl., ¶ 50. He likely has an apraxia speech disorder, caused by damage to the parts of the brain which control speech. *Id.*; Reichenthal Decl., ¶ 52. It is unlikely that he will be able to develop functional speech, even in a matter of years. Weingarden Decl., ¶ 50; Gidali

Decl., ¶ 39. He cannot communicate his needs or wishes without being asked yes/no questions. Gidali Decl., ¶ 28. He is able to nod his head or press a button on the computer screen to indicate yes or no, but he is not consistently accurate. *Id.* If presented with 2-3 options of objects or prompting of questions he can choose the correct answer 75% of the time. *Id.*

45.      Nathaniel is currently unable to exhibit happiness or sadness via facial and bodily expressions, *i.e.*, smiling, laughing, or crying. *Id.*; Weingarden Decl., ¶ 39; Reichenthal Decl., ¶ 53. His mother reports that he "seems" sad at times, but an outside witness observing Nathaniel would not necessarily pick up on any change in his affect which would indicate sadness. Gidali Decl., ¶ 28. Nathaniel exhibits pain via grimacing and an up-and-down movement of his left leg while moving his trunk forward and backward. *Id.*; Weingarden Decl., ¶ 39; Reichenthal Dec., ¶ 53. Additionally, Nathaniel is able to pull away from painful stimuli. For example, when a therapist is stretching Nathaniel's leg, he will move his leg away from the therapist if the stretching is painful. Gidali Decl., ¶ 28. On isolated occasions when he is in significant pain, tears have been present. *Id.* Nathaniel responds and reacts very well to music; he is calmer when music is playing, and occasionally able to tap to the beat. *Id.*

46.      **Strength:**  Nathaniel has demonstrated limited shoulder and elbow movement on the right side of his body at 50% of the range. Gidali Decl., ¶ 29. These movements are un-isolated and slow. *Id.* No movement in the right wrist or hand has been noted. *Id.* Nathaniel has active, albeit weak, movement on his left side. *Id.*; Reichenthal Decl., ¶ 53. Testing indicates that his movements are against gravity, but not against resistance. Gidali Decl., ¶ 29. His head control when sitting in the "tilt" wheelchair (a wheelchair with a reclining supportive back used to redistribute weight and pressure when a person spends most of his time in a wheelchair, in order to avoid tissue compression and pressure ulcers, Gidali Decl., ¶ 37) continues to improve, although

he fatigues easily. Weingarden Decl., ¶ 47. Nathaniel responds to his mother reminding him to hold his head up. *Id.*

47.    **Range of Motion:** Range of motion ("ROM") refers to the extent of movement of a joint, measured in degrees of a circle. Nathaniel's ROM is intact, *i.e.*, his limbs can be moved in circles. Gidali Decl., ¶ 30.

48.    **Coordination:** Nathaniel's fine motor and gross coordination are impaired, requiring motor, visual, and verbal assistance and increased time to complete motor tasks. Gidali Decl., ¶ 32. Prior to his recent COVID-19 diagnosis, he could pick up a card from a table and place it in a previously designated location, and could build towers using 2-3 blocks. *Id.* He could bring a spoon to his mouth, but without consistency. *Id.* Even prior to his recent COVID-19 diagnosis, he was unable to grasp the armrest of his wheelchair or the bedside rail needed for rolling in bed or transferring to the chair. *Id.*

49.    **Swallowing/Eating:** Nathaniel is currently fed via a PEG tube. *Id.*, ¶ 33. Prior to his recent COVID-19 diagnosis, his speech therapy included encouraging eating partial spoonfuls of soft foods like applesauce, jam, and pudding. *Id.* Nathaniel cannot ingest liquids for risk of aspiration (*i.e.*, breathing liquids into the airway). *Id.* Nathaniel's swallow function is still inconsistent, and his spontaneous swallow of saliva is intermittent. Weingarden Decl., ¶ 41.

50.    **Walking:** Dr. Weingarden opines that "Nathaniel will continue to be wheelchair-bound." *Id.*, ¶ 51. He currently requires a tilt wheelchair. *Id.* Dr. Gidali explained that the reason that walking is not "currently relevant" is because Nathaniel is unable to perform transfers or standing without moderate to maximal assistance, and also cannot roll: "Therefore, the functional treatment goals for now will be focused on improving bed mobility, transfers, and standing." Gidali Decl., ¶ 34.

51.   **Bodily Function Control:** Nathaniel wakes up before he urinates, and he has expressed on a few occasions to his caregivers and family that he needs to have a bowel or bladder movement by moving his body. Currently, however, he wears a diaper and is dependent on caregivers for cleanup. *Id.*, ¶ 35.

52.   **Vision:** Nathaniel's eye movements are impaired: his left eye is abducted (the pupil is shifted away from the nose), and his right eye has motion from left lateral gaze to midline (*i.e.*, can look from the left to forward). Weingarden Decl., ¶ 47. According to Dr. Gidali, Nathaniel's eyesight acuity (sharpness and clarity) might be intact, but what he is seeing may not be "translated" to him by his brain due to his TBI. Gidali Decl., ¶ 36. Because Nathaniel cannot explain what he sees, it is difficult to measure his vision. *Id.*

### ii.   Nathaniel Felber's Recent COVID-19 Diagnosis

53.   Threatening Nathaniel's progress to date is not only his decreased strength due to the seizures, but also his diagnosis of COVID-19 on September 12, 2020. *Id.*, ¶ 41; Supp. Judi Decl., ¶ 4. That diagnosis prevents Nathaniel from being able to resume his rehabilitative therapy for the foreseeable future. Gidali Decl., ¶ 41; Supp. Judi Decl., ¶ 10.

54.   After his diagnosis, Nathaniel had to be transported to an unfurnished apartment (not specially equipped for the handicapped) on September 14, 2020, Supp. Judi Decl., ¶¶ 5, 7, prior to his tentatively-scheduled discharge from Sheba Medical Center in October 2020. *Id.*, ¶ 3. In addition, the Government of Israel announced a country-wide lockdown effective September 18, 2020 which has now been extended until at least October 14, 2020. *Id.*, ¶ 9. Nathaniel will stay in his apartment during that period and cannot return to Sheba Medical Center for any of his therapies until he recovers and the lockdown is lifted. *Id.*, ¶¶ 10-11.

55.     Nathaniel's apartment is currently equipped with a temporary hospital bed that his family made emergency arrangements to rent while in quarantine themselves due to their exposure to Nathaniel. They also coordinated delivery of sheets, blankets, pillows, diapers, a refrigerator, medications, and other necessities. *Id.*, ¶ 5.

56.     Nathaniel's PEG pump was not delivered until a day after he was transported to the apartment, requiring his caretaker to rig a temporary device that dripped nutrition into his PEG tube. *Id.*, ¶ 7. (Two of Nathaniel's caretakers from Sheba Medical Center offered to quarantine with him, but as Nathaniel was being loaded into an ambulance for transport to the apartment, one decided he would not in fact do so. Nathaniel is therefore dependent on one caretaker for his 24-hour care until his parents can hire a second caretaker. *Id.*, ¶ 6.) A shower chair was also not delivered until the evening of September 15, 2020, so when Nathaniel spiked a high fever that morning, his caretaker could not place him under cool water to reduce his temperature. *Id.*, ¶ 7. While deciding whether to take Nathaniel to the emergency room, Nathaniel's caretaker administered a fever reducer, and his temperature decreased to an above normal, although not dangerous, level. *Id.*

57.     Nathaniel's fever continued to spike for a week and a half, and he started to cough. His caregiver continued to administer fever reducers and cold compresses, which kept the fever from reaching dangerous levels. A doctor brought an oxygen tank, which Nathaniel needed, and administered antibiotics used to treat COVID-19 pneumonia. Nathaniel's fever broke on September 25, 2020, but he continued to cough. *Id.*, ¶ 8.

58.     As of this filing, Nathaniel remains in his apartment. He is very weak, and his doctor has ordered a full set of blood tests. His family is currently awaiting the results. *Id.*, ¶ 12.

I.      **Nathaniel Felber's Prognosis**

i.      **Requirements for Living**

59.      As stated above, Judi and Joseph Felber rented an apartment for Nathaniel pending his tentatively scheduled discharge from Sheba Medical Center in October 2020, but it does not yet have the equipment Nathaniel needs, nor has it been rendered handicapped-accessible. *Id.*, ¶ 5. While in quarantine themselves, they made emergency arrangements to rent a few provisional items for Nathaniel. *Id.* Nathaniel's PEG pump has been delivered, as well as a shower chair. *Id.*, ¶ 7.

60.      Because of the country-wide lockdown, Nathaniel's parents are unsure of whether and when they will be able to coordinate purchase and deliveries of the medical equipment Nathaniel still needs. *Id.*, ¶ 9. Nathaniel requires a Hoyer lift, necessary when a person needs 90-100% assistance to get into and out of bed, for transfers. A pad fits under the person's body in the bed and connects with chains to the Hoyer lift frame. A hydraulic pump is used to lift the person off the bed surface. Gidali Decl., ¶ 37 and Figure 2. Nathaniel also needs a more advanced medical bed than the one his family is currently renting, bathroom equipment for toileting and showering, a stander, a tilt wheelchair, a wheelchair tabletop, a mattress and cushion for the bed and chair to prevent pressure ulcers, and additional medical equipment and furniture to be able to provide for Nathaniel's day-to-day needs. Gidali Decl., ¶ 37; Weingarden Decl., ¶ 54; Reichenthal Decl., ¶ 60. His apartment must be rendered handicap-accessible, including widening doorways and installing handrails on the walls and a shower chair. Gidali Decl., ¶ 37; Weingarden Decl., ¶ 54; Reichenthal Decl., ¶ 60.

61.      Nathaniel will need 24-hour nursing assistance, and observation day and night. Reichenthal Decl., ¶ 60.  He will likely need two caregivers for showers for the remainder of his

life. Weingarden Decl., ¶ 55. He will also need access to a vehicle that can transport him in his wheelchair. *Id.* This is particularly important because Nathaniel will likely travel routinely to a rehabilitation center for the long-term future. *Id.*, ¶¶ 53, 55; Gidali Decl., ¶ 40. He will also require additional interventions including follow-up CT scans, swallowing exams, and regular laboratory studies and potential intervention for spasticity. Weingarden Decl., ¶ 53; Gidali Decl., ¶ 40. He will require, and benefit socially, cognitively, physically, and emotionally from, recreational activities which allow for improved quality of life. Such activities may include equestrian therapy, hydrotherapy, and pet therapy. Gidali Decl., ¶ 40.

### ii.      Future Goals

62.      Nathaniel's short-term goals are focused on improving his mobility and decreasing the burden of care on his caregivers. *Id.*, ¶ 38. Special attention is paid to improving:

- bed mobility with minimal assistance to supervision;
- transferring to standing and transferring from the wheelchair with minimal assistance of a caregiver;
- sitting balance to allow Nathaniel to be able to sit without support for extended periods of time;
- standing balance with assistance to improve endurance and strength; and
- mobility and strength of upper and lower extremities.

*Id.*

63.      Goals for Nathaniel also include improved head control and sitting in a standard non-tilt wheelchair, although he will still need a reclining wheelchair for times when he is fatigued. Weingarden Decl., ¶¶ 40, 51.

64.      While Nathaniel will most likely need to continue to receive nutrition by means of the PEG in the foreseeable future, it is possible that he may at some point be able to intake nutrition

orally. *Id.*, ¶ 49. Further speech therapy goals in this regard include improving mouth opening for spoon usage, consistent swallow, and reduced drooling. *Id.*, ¶ 41.

65.     Nathaniel will likely not be able to achieve verbal communication. *Id.*, ¶ 50; Gidali Decl., ¶ 39; Reichenthal Decl., ¶ 52. His care will focus on the goal of improving cognitively enough to allow consistent and consequent (*i.e.*, productive) non-verbal communication, Gidali Decl., ¶ 39, as well as consistent and accurate responses in identifying objects, pictures of people, words, and numbers. Weingarden Decl., ¶ 41. It is not yet determinable whether he will be able to utilize communicative assistive devices such as a communication tablet. Gidali Decl., ¶ 39.

### iii.     Future Complications and Life Expectancy

66.     Drs. Reichenthal and Weingarden estimated a shortened life expectancy for Nathaniel. Reichenthal Decl., ¶ 62 (12 years); Weingarden Decl., ¶ 56 (31 years). These estimates do not account for the possibility of further irreversible decline due to Nathaniel's COVID-19 diagnosis. Weingarden Decl., ¶ 56. They also do not account for death by life-threatening medical complications already experienced by Nathaniel such as pneumonia and infection, or further seizures. Reichenthal Decl., ¶ 62. Nathaniel's brain injury additionally predisposes him to neurodegenerative diseases associated with TBI which have their own shortened mortality rates, such as Parkinson's disease and Alzheimer's disease. *Id.*

## II.     CONCLUSIONS OF LAW: DAMAGES

67.     Courts awarding compensatory damages for pain and suffering are "guided ... by prior decisions awarding damages for pain and suffering." *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 71 (D.D.C. 2006). Courts specifically endeavor to "ensure that individuals with similar injuries receive similar awards." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52,

84 (D.D.C. 2010) (citing *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 54 (D.D.C. 2007)).

68.     Nathaniel Felber's injuries are significantly more severe than those implicated in the four cases the Court in this District has set forth as exemplars of serious TBIs:

- *Mousa v. Islamic Republic of Iran*, 238 F. Supp. 2d 1, 12-13 (D.D.C. 2001) (awarding survivor of bus bombing with cranial fracture $12 million);

- *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 263, 274 (D.D.C. 2003) (awarding survivor of pedestrian mall bombing who suffered a massive skull fracture leaking cerebral spinal fluid $17 million);

- *Haim*, 425 F. Supp. 2d at 62, 75 (awarding survivor of bus bombing with large right occipital lobe brain hematoma caused by broken skull bones and shrapnel $11 million); and

- *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 50, 58-59 (D.D.C. 2006) (awarding pilot in the U.S. Air Force with diagnosis of severe axonal brain injury, anoxic brain injury, and organic encephalopathy as a result of the Khobar Towers bombing $20 million).

69.     As each of these decisions was issued, starting with *Mousa* in 2001, this Court has compared them to each other in assessing TBI-related damages. For instance, in *Haim*, the Court awarded Mr. Haim the lowest amount of damages among the four cases ($11 million) after concluding that while both he and Ms. Mousa "suffer from vision impairments, inability to concentrate, coordination problems, a range of symptoms caused by severe PTSD, and disfiguring scarring … [t]here is some indication that Seth [Haim]'s injuries are not as severe as Ms. Mousa's." *Haim*, 425 F. Supp. 2d at 74. Specifically, the Court noted that Ms. Mousa (awarded $12 million) "was completely blind in one eye, whereas Seth has retained some, albeit limited, vision." *Id.* In addition, "[u]nlike Seth, Ms. Mousa was unable to walk for some time after the attack and remained in more extensive treatment after discharge from the hospital than Seth. … Ms. Mousa also suffered more prominent and severe disfigurement from scarring." *Id.* (citation omitted).

70.     The Court in *Haim* also compared the extent of Mr. Haim's injuries to those of Ms. Campuzano's, finding that Ms. Campuzano (awarded $17 million) was more severely injured than both Mr. Haim and Ms. Mousa:

> As previously noted, Ms. Campuzano was hospitalized for 50% longer than Ms. Mousa. … While [Ms. Campuzano's] brain injury was similar to Seth's, she suffered in addition multiple wounds and severe burns. She has impaired vision, no ability to taste and smell, and her left eardrum and upper sinus cavity were destroyed. Like Ms. Mousa, Ms. Campuzano suffered "startling" disfigurement. Her psychological injuries also prevent her from engaging in healthy human relationships or pursuing former professional and personal interests. These factors indicate that Ms. Campuzano was more severely injured than both Seth and Ms. Mousa.

*Id.* at 74-75 (citations omitted).

71.     The Court in *Campuzano* similarly concluded that while "Ms. Campuzano's severe burns, skull injuries, scarring, permanent vision and hearing impairments, and PTSD symptoms are similar to those of Ms. Mousa," "Ms. Campuzano's pain and suffering is more severe in that Ms. Campuzano's injuries are slightly more serious and she was hospitalized for two weeks longer than Ms. Mousa." *Campuzano*, 281 F. Supp. 2d at 274.

72.     The Court in *Blais*, the last of these four cases to be decided, conducted the same analysis: "Applying the considerations set forth in the *Haim*, *Mousa*, and *Campuzano* cases," the Court found that "Mr. Blais was severely injured by the tragic attack on the Khobar Towers," and awarded him $20 million in pain and mental anguish damages. *Blais*, 459 F. Supp. 2d at 59.

73.     In doing so, the Court in *Blais* grouped the four cases together in the category of "an attack where the victim survives, and where no captivity occurred." *Id.* at 59. *See also id.* (characterizing the plaintiffs in the preceding cases as displaying "similar injuries"). The Court concluded that in this category, it must assess the relative "severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Id.* (citing *Haim*, 425 F. Supp. 2d at 73).

As stated above and demonstrated below, Nathaniel's injuries are even more severe than the injuries described in these four cases.

### A.    Severity of the Pain Immediately Following the Injury

74.    Nathaniel feels, and can display reactions to, pain—even to the point of tears. Weingarden Decl., ¶¶ 16, 30, 31, 39; Gidali Decl., ¶ 28; Reichenthal Decl., ¶ 53. However, because Nathaniel cannot speak, read, or write, he cannot testify on his own behalf regarding the extent of his pain as the plaintiffs in the four preceding cases were able to do.

### B.    Duration of Hospitalization and Subsequent Treatment

75.    Nathaniel's hospitalization substantially exceeds that of the other four plaintiffs, and his (required) future treatment will in all likelihood exceed theirs as well.

76.    Among the plaintiffs in the four preceding cases, Mr. Blais was hospitalized for four months, the longest period. After discharge, he received intensive outpatient rehabilitation care for six months. At the time of the decision 10 years after the attack, Mr. Blais continued to receive medical treatment, rehabilitation, and therapies. *See Blais*, 459 F. Supp. 2d at 50.

77.    Ms. Campuzano was hospitalized for the second-longest period. She was an inpatient for six weeks, and then received outpatient treatment for vision and hearing for an unspecified period, and reconstructive surgery. *See Campuzano*, 281 F. Supp. 2d at 263.

78.    Ms. Mousa was hospitalized for four weeks. She had a home attendant for an additional two weeks, and then attended physical rehabilitation sessions three times a week for six weeks and had weekly blood tests to address clotting issues for a year, and thereafter semi-annual blood tests. *See Mousa*, 238 F. Supp. 2d at 4-6.

79.    With respect to Mr. Haim, "While the record in this case fails to specify the number of days for which Seth was hospitalized, it appears to have been fewer than the four weeks Ms.

Mousa initially spent." *Haim*, 425 F. Supp. 2d at 74. Mr. Haim then continued to visit the hospital regularly for follow-up evaluations and treatments for the following year. *See id.* at 63.

80.    Nathaniel was hospitalized for **21 months** before his early discharge due to his COVID-19 diagnosis. Reichenthal Decl., ¶¶ 27-28, 46; Supp. Judi Decl., ¶¶ 3-5, 7. He will continue to require 24-hour nursing assistance, and observation day and night. Reichenthal Decl., ¶ 60. When Nathaniel hopefully recovers from COVID-19 and Israel ends its country-wide lockdown, he will also receive daily therapy on an outpatient basis at Sheba Medical Center. Supp. Judi Decl., ¶¶ 10-11. He will continue outpatient rehabilitation at least 3-5 times per week for the long-term future. Weingarden Decl., ¶ 55; Gidali Decl., ¶ 40. He will also require additional medical interventions and therapeutic recreational activities. Weingarden Decl., ¶ 53; Gidali Decl., ¶ 40.

### C.    Extent of Impairment That Will Remain with the Victim for the Rest of His or Her Life

81.    Nathaniel's enduring impairments far exceed those of the preceding four plaintiffs.

82.    The permanent impairments of Mr. Blais, who was adjudged to have the most severe injuries of the plaintiffs in the four preceding cases, include:

- diminished motor skills;
- problems with speech;
- lack of coordination;
- profoundly impaired and unstable ambulation;
- moderate right leg weakness;
- impaired short-term memory;
- emotional injuries;
- "labored and slow" writing and reading; and
- optic nerves that showed signs of significant atrophy.

*Blais*, 459 F. Supp. 2d at 50-51, 59.

83.     Nathaniel's impairments are *markedly* more severe than Mr. Blais's.

- His pre-COVID 19 gross motor skills were limited to transferring from wheelchair to bed, and supine to sitting, with moderate to maximal assistance, Gidali Decl., ¶ 24, and occasionally holding his head up for 20 seconds on request. Weingarden Decl., ¶ 33. His fine motor skills were limited to picking up a card from a table and placing it in a previously designated location, and building towers using 2-3 blocks. Gidali Decl., ¶ 32. He could bring a spoon to his mouth, but without consistency, *id.*;

- He is entirely unable to speak, Weingarden Decl., ¶ 50; Gidali Decl., ¶¶ 28, 39; Reichenthal Decl., ¶ 52, and cannot control his saliva or swallowing function, Weingarden Decl., ¶¶ 41, 45; Reichenthal Decl., ¶ 52;

- Apart from the extremely limited motor skills described above, he lacks any coordination, Gidali Decl., ¶ 32;

- His ambulation, limited to 15 meters, is for therapeutic purposes only, and is dependent on special braces, a forearm walker, and physical assistance by two caregivers, *id.*, ¶ 25;

- He appears capable only of limited and slow movements of his right shoulder and elbow, and weak movement on his left side, *id.*, ¶ 29;

- He has severely impaired cognitive functions, *id.*, ¶ 31; Reichenthal Decl., ¶ 52; Weingarden Decl., ¶ 47;

- He clearly experiences pain. Judi Decl., ¶ 32; Weingarden Decl., ¶¶ 31, 39; Gidali Decl., ¶ 28; Reichenthal Dec., ¶ 53;[3]

- He cannot read or write. *Id.*, ¶ 46; and

- His eye movements are impaired, and his eyesight cannot be measured because of his cognitive inability to explain what he sees. *Id.*, ¶ 47; Gidali Decl., ¶ 36.

---

[3]     The four preceding TBI cases discuss the impact of the plaintiffs' emotional injuries, generally diagnosed as depression and post-traumatic stress disorder, on their lives. For instance, PTSD "impair[ed] the ability of [Mr. Haim and Ms. Mousa] to develop and maintain relationships," *Haim*, 425 F. Supp. 2d at 74, and prevented Ms. Campuzano from "resum[ing] full-time employment" or venturing from her neighborhood for more than a few hours, *Campuzano*, 281 F. Supp. 2d at 264. These effects also include changes in personality, *Haim*, 425 F. Supp. 2d at 66; *Campuzano*, 281 F. Supp. 2d at 263, suicide attempts, *Blais*, 459 F. Supp. 2d at 50, and increased risk of "physical consequences" and shortened life-span, *Mousa*, 238 F. Supp. 2d at 9. Here, the TBI Nathaniel sustained renders him unable to express his emotional state outwardly. Gidali Decl., ¶ 28; Weingarden Decl., ¶ 39; Reichenthal Decl., ¶ 53. However, the practical effects of his injuries are in some ways more severe than the effects of PTSD described in the previous four TBI cases—Nathaniel cannot maintain meaningful relationships *at all*, cannot control his swallowing function let alone hold a job of any kind, and cannot move from his bed to a wheelchair let alone leave his home independently. Gidali Decl., ¶¶ 24, 28; Weingarden Decl., ¶¶ 40-41, 45; Reichenthal Decl., ¶ 52. His expected life-span is *drastically* shortened and his personality almost entirely reduced—though, when conscious, he can be oriented to place, time, and person to some degree. Reichenthal Decl., ¶ 62; Weingarden Decl., ¶ 56; Gidali Decl., ¶ 31.

84.     Moreover, Nathaniel will be totally dependent on others for:

- PEG tube feedings and fluids (with the possibility that he may be able to intake nutrition orally at some point);
- bathing;
- hygiene;
- management of urination and bowel movements;
- transfers in bathroom and to shower;
- grooming;
- upper and lower body dressing;
- bed to chair transfers;
- car transfers;
- wheelchair mobility;
- community mobility; and
- bed mobility.

Weingarden Decl., ¶¶ 44, 49, 55; Reichenthal Decl., ¶ 60; Gidali Decl., ¶ 37. As stated above, he cannot read or write, and will likely never be able to speak or walk. Weingarden Decl., ¶¶ 46, 50, 51; Gidali Decl., ¶¶ 28, 34, 39; Reichenthal Decl., ¶ 52.

85.     The other three plaintiffs' impairments are all less serious than Mr. Blais's, and even more remote from what Nathaniel will endure for his lifetime.

86.     Ms. Campuzano's permanent impairments include cataracts and impaired vision, loss of ability to taste and smell, loss of hearing in one ear, cosmetic disfigurement, and psychological injuries. *See Campuzano*, 281 F. Supp. 2d at 263.

87.     Ms. Mousa's permanent impairments include total loss of unaided hearing, blindness in her left eye, which has also shrunk and sunken into an aesthetic disfigurement, nerve damage around her eyes and the left side of her mouth, scarring from burns and lacerations, impairment of breathing caused by lung blast injury, damage to the tendons in her right hand causing chronic pain in that hand and arm, impaired balance and walking, problems with

concentration and short-term memory, psychological injuries, and fatigue. *See Mousa*, 238 F. Supp. 2d at 6-10, 12.

88.    Mr. Haim's permanent impairments include left-sided visual loss, decreased coordination, loss of visual memory and spatial recognition preventing him from remembering how to travel short distances and recognizing peers, family, and friends, frequent and severe headaches, a constantly dilated left pupil preventing him from viewing a computer monitor or television screen for prolonged periods of time, tender scarring, spine weakness, right occipital lobe deficits, limited concentration and reading impairments—"the major factors behind his slow pace in his university studies"—psychological injuries, and constant discomfort on the right side of his head. *See Haim*, 425 F. Supp. 2d at 63-66.

89.    The Court in *Haim* observed that "[b]y the time the cases were adjudged, those plaintiffs, like Seth, had settled into a relatively stable physical and mental condition which likely would endure for the rest of their lives." *Id.* at 73. Similarly, Dr. Reichenthal's expert opinion is that "Nathaniel's current neurological condition, 21 months after injury, appears to be permanent. I conclude, with a high degree of medical certainty, that his severe 100% neurological disability, which is a result of the injuries sustained in the shooting, will persist." Reichenthal Decl., ¶ 63.

90.    The progress made by the plaintiffs in the four aforementioned cases is manifestly better than what is realistically hoped for Nathaniel. Nathaniel will likely not be able to walk, compared to Mr. Blais and Ms. Mousa, who progressed to walking, albeit with difficulty, after their injuries temporarily prevented them from doing so. Weingarden Decl., ¶ 51; Gidali Decl., ¶ 34. *Contra Blais*, 459 F. Supp. 2d at 50; *Mousa*, 238 F. Supp. 2d at 6. Nathaniel's fatigue prevents him from sitting in a standard, as opposed to a tilt, wheelchair, or participating in seated or supine activities for more than 20-25 minutes (including a rest break). Weingarden Dec., ¶ 51; Gidali

Decl., ¶ 27. Comparatively, Ms. Campuzano's and Ms. Mousa's fatigue prevent them from working and socializing at the same level they had before their attacks. *See Campuzano*, 281 F. Supp. 2d at 264; *Mousa*, 238 F. Supp. 2d at 9. Nathaniel's family has been made aware that he will never be able to work any type of job, no matter how menial. Daniel Decl., ¶ 18. Ms. Campuzano and Mr. Haim have been able to attend schooling (even at the university level) and work, albeit with difficulty. *See Campuzano*, 281 F. Supp. 2d at 264; *Haim*, 425 F. Supp. 2d at 66. Mr. Blais, adjudged to be the most severely injured of the four preceding plaintiffs, was forecasted as "unlikely" to be able to "live a fully independent life again" or "hold meaningful gainful employment for any extended period"; he was, however, able to speak, read, write, and walk (again, with difficulty). *See Blais*, 459 F. Supp. 2d at 50-51.

91.    Indeed, the medical goals for Nathaniel demonstrate the enduring severity of his condition. As described above, Nathaniel's medical providers hope he will be able to improve his mobility so as to decrease the burden of care on the 24-hour caregivers he will need indefinitely. Gidali Decl., ¶ 38; Reichenthal Decl., ¶ 60; Weingarden Decl., ¶ 54. Because he may never be able to speak, Nathaniel's medical providers aspire to implement a consistent form of nonverbal communication, while acknowledging that it is unclear whether he might be able to use communicative assistive devices such as a communication tablet. Gidali Decl., ¶¶ 28, 39; Reichenthal Decl., ¶ 52; Weingarden Decl., ¶ 50. It is possible that Nathaniel may at some point in the future be able to intake nutrition orally. Weingarden Decl. ¶ 49.

92.    Nathaniel's dire prognosis is due to the type of TBI he suffered, and the weapon which caused it. Dr. Reichenthal explained that his "perforating" TBI, *i.e.*, where the bullet enters and exits the skull, "is the most devastating of all penetrating traumatic brain injuries and is associated with even higher mortality. For those who do survive, there is a high probability for

permanent neurologic dysfunction." Reichenthal Decl., ¶ 56. This type of perforating TBI is "the result of high-velocity projectiles fired at close range." *Id.* Furthermore, when such projectile exceeds 700 meters per second, such as the projectile of the AK-47 rifle used in this case (which has a muzzle velocity of 715 meters per second), its wounding capacity is significantly increased, resulting in more severe brain damage. *Id.*, ¶ 57. Not only do such high-velocity projectiles produce more bone fragmentation, they also impart energy waves which independently damage the brain. *Id.*, ¶¶ 57-58.

93.     According to Dr. Reichenthal, "[m]ost patients with such high-speed projectile injuries who survive the initial event tend to recover consciousness, but to a very limited extent—depending on how long the vegetative and minimally conscious states have lasted." *Id.*, ¶ 61.

94.     As compared to Mr. Blais, who received a GCS score of 8 upon admission to the hospital, and who was in a coma, followed by a vegetative state for five weeks altogether, *see Blais*, 459 F. Supp. 2d at 49-50, **Nathaniel received the lowest possible GCS score of 3**, was in a coma followed by a vegetative state for approximately *seven months*, and then a minimally conscious state for over a year until about August 2020, at which point he progressed to a state of some emergence. Reichenthal Decl., ¶¶ 31, 47, 52, 61. (There is no indication that any of the other three preceding plaintiffs were unconscious for more than a few days. *See Haim*, 425 F. Supp. 2d at 63 ("Seth was heavily sedated and unconscious for several days following the attack."); *Mousa*, 238 F. Supp. 2d at 5 (describing how "Ms. Mousa was not conscious and was not responsive to the paramedics' instructions," followed by her "first memories in the hospital were of lying in her hospital bed," followed by her transfer to the ICU); *Campuzano*, 281 F. Supp. 2d at 263 (describing Ms. Campuzano as "completely disoriented" upon her arrival to the emergency room)).

95.     Nathaniel's prolonged vegetative state therefore places him in a much narrower category of patients who may eventually recover the ability to communicate and comprehend than Mr. Blais, who endured a much shorter vegetative state.

## III.   CONCLUSION

96.     Although the plaintiffs in the four preceding cases suffered profoundly tragic injuries, they are (with limitations) able to walk, talk, feed themselves, and read and write. Some hold jobs, socialize, and attend school. Nathaniel cannot, and likely will never be able to, do any of those things.

97.     Indeed, Plaintiffs' survey of FSIA cases reveals no case in which a plaintiff suffered a TBI as severe as Nathaniel.

98.     Nathaniel Felber's injuries and prognosis therefore warrant a significant increase from the highest damages award in that series of cases, $20 million.

99.     Plaintiffs respectfully request that the Court award Nathaniel a 50% increase of the damages awarded to Mr. Blais: $30 million.

100.    Plaintiffs also respectfully request that the Court award punitive damages and prejudgment interest as proposed in the First PFFCL. First PFFCL, ¶¶ 218-26.

Dated: October 8, 2020

Respectfully submitted,

**OSEN LLC**

By:    /s/ Dina Gielchinsky
Ari Ungar (DC Bar No. NJ008)
Michael J. Radine (DC Bar No. NJ015)
Dina Gielchinsky (DC Bar No. NJ011)
Aaron Schlanger (DC Bar No. NJ007)
Patrick J. Duprey (DC Bar No. NJ029)
2 University Plaza, Suite 402
Hackensack, NJ 07601
Tel.: (201) 265-6400
Fax: (201) 265-0303