# Exhibit A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATHANIEL FELBER,                              )
*by his legal guardians Joseph*                )
*Felber and Judi Felber, et al.*,              )
                                               )
                    Plaintiffs,                )
                                               )
          v.                                   )          Civil Action No. 19-1027 (ABJ)
                                               )          ***UNDER SEAL***
ISLAMIC REPUBLIC OF IRAN,                      )
                                               )
                    Defendant.                 )
                                               )

## MEMORANDUM OPINION

On April 12, 2019, plaintiff Nathaniel Felber, by his legal guardians Judi and Joseph Felber, filed this action against the Islamic Republic of Iran ("Iran") pursuant to the terrorism exception to sovereign immunity in the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1605A. Compl. [Dkt. # 1] ¶ 1. The Felber family members have also filed claims for damages on their own behalves. Compl. ¶¶ 87–95. Plaintiffs allege that "[d]efendant knowingly provided material support to the U.S.-designated Foreign Terrorist Organization ('FTO') Islamic Resistance Movement ('HAMAS'), which perpetrated the December 12, 2018 terrorist attack . . . in which Nathaniel Felber, a U.S. national, was grievously injured and two others were killed." Compl. ¶ 2. In addition to claims on behalf of Nathaniel, plaintiffs Joseph, Judi, Daniel, and Adina Felber bring claims against the Islamic Republic of Iran for emotional harm they have suffered as a result of the attack on Nathaniel. Compl. ¶¶ 87–95. The Clerk of Court entered default on January 24, 2020. Clerk's Entry of Default [Dkt. # 19]. Before the Court is plaintiffs' motion for default judgment. Pls.' Mot. for J. by Default [Dkt. # 33] ("Pls.' Mot."). The motion is supported

by numerous documents, including proposed findings of fact, declarations from plaintiffs, and declarations of various experts and medical professionals.  Pls.' Partial Proposed Findings of Fact and Conclusions of Law in Supp. of their Mot. [Dkt. # 29] ("Pls.' SOF");[1] Decl. of Patrick L. Clawson, Ph.D. [Dkt. # 27] ("Clawson Decl.");[2] Decl. of Arieh Dan Spitzen [Dkt. # 28] ("Spitzen Decl.");[3] Pls.' Partial Proposed Findings of Fact and Conclusions of Law Regarding Nathaniel Felber's Damages in Further Supp. of their Mot. [Dkt. # 31] ("Pl. Nathaniel's SOF"); Decl. of Eli Reichenthal, M.D. [Dkt. # 31-1] ("Reichenthal Decl."); Decl. of Harold Weingarden, M.D. [Dkt. # 31-2] ("Weingarden Decl."); Decl. of Adi Gidali, DPT, PT [Dkt. # 31-3] ("Gidali Decl."); Suppl. Decl. of Judi Felber [Dkt. # 31-4] ("Suppl. Judi Decl.").

For the below reasons, plaintiffs' motion for default judgment is **GRANTED**.

---

1       Plaintiffs' Proposed Findings of Fact were supported by additional materials, including reports by Rael Strous, M.D, ▓▓▓▓▓▓▓▓▓▓▓▓▓ Nathaniel's mother Judi, Pls.' SOF at 129–37 ("Strous B"); Nathaniel's father Joseph, Pls.' SOF at 139–46 ("Strous C"); Nathaniel's brother Daniel, Pls.' SOF at 148–55 ("Strous D"); and Nathaniel's sister Adina, Pls.' SOF at 157–64 ("Strous E").  Plaintiffs also attach declarations of Judi Felber, Pls.' SOF at 70–80 ("Judi Decl."); Joseph Felber, Pls.' SOF at 81–89 ("Joseph Decl."); Daniel Felber, Pls.' SOF at 90–95 ("Daniel Decl."); and Adina Felber, Pls.' SOF at 96–104 ("Adina Decl.").

2       Clawson, who is "an expert on . . . Iran," is "the Director of Research at the Washington Institute for Near East Policy," and has also worked for the World Bank, the International Monetary Fund, the National Defense University, and the Foreign Policy Research Institute. Clawson Decl. ¶¶ 1–2.

3       Spitzen is a military veteran who has decades of experience working for the Israeli military's Palestinian Affairs Department in the West Bank.  Spitzen Decl. ¶¶ 1–5.  He states that he has "been qualified as an expert witness about Hamas in ten federal civil terrorism cases in the United States."  *Id.* ¶ 6.  In preparing his affidavit, he reviewed more than a dozen court documents and government reports, including case files related to Asem al-Barghuthi's criminal prosecution. *Id.* ¶ 10.

2

# BACKGROUND

## I.     The Attack and Injuries to Plaintiff Nathaniel Felber

Plaintiff Nathaniel Felber is a citizen of both the United States and Israel.  Compl. ¶ 8.  On December 13, 2018, he was serving in the Israeli military and was stationed at a bus stop outside the town of Givat Asaf in the West Bank.  Pls.' SOF ¶ 9.  A man named Asem al-Barghuthi drove his car past this bus stop, saw Nathaniel and other Israeli soldiers and civilians standing there, turned his car around and proceeded back to the stop.  *Id.* ¶ 10.  Asem al-Barghuthi then got out of his car and "opened fire on the Israeli soldiers and civilians from short range with an AK-47 automatic assault rifle." [4]  *Id.*, citing Spitzen Decl. ¶¶ 43, 60.  Nathaniel "was shot in the head, two other Israeli soldiers were killed, and an Israeli civilian was also injured."  *Id.* ¶ 11, citing Spitzen Decl. ¶ 43.

Nathaniel arrived at the emergency room in a coma, and medical personnel determined that he had the most severe possible category of traumatic brain injury.  *See* Pl. Nathaniel's SOF ¶ 6, citing Reichenthal Decl. ¶ 31; Weingarden Decl. ¶ 9; and Gidali Decl. ¶ 10.[5]  A computed

---

[4]     Plaintiffs' counsel and the expert declarations submitted sometimes differ on spelling.  For instance, the complaint spells the assailant's name "Assam Barghouti" and the town's "Givat Assaf."  Where there are differences, the Court has decided to use the experts' spelling.

[5]     Eli Reichenthal is "a Medical Doctor trained in neurological surgery both in Israel and the United States."  Reichenthal Decl. ¶ 1.  His experience includes "serv[ing] as chairman of all surgical departments at Soroka Medical Center," "serv[ing] as the president of the Israeli Neurosurgical Society," and being "a board-certified neurosurgeon in Israel since 1976."  *Id.* ¶¶ 2–6.  Harold Weingarden is "a Medical Doctor specializing in Physical Medicine and Rehabilitation."  Weingarden Decl. ¶ 1.  He worked in private practice in the United States for about fifteen years, *id.* ¶¶ 2–3, and then has served as "a Senior Staff Physician in the Department of Neurological Rehabilitation, [] Sheba Medical Center," as well as the "Director of the Day Rehabilitation Hospital in the Department of Neurological Rehabilitation."  *Id.* ¶ 4.  Adi Gidali is "a Doctor of Physical Therapy with extensive experience treating and rehabilitating patients who have suffered traumatic brain injuries."  Gidali Decl. ¶ 1.  She is "the Physical Therapy Supervisor of the Complex Traumatic Brain Injury Outpatient Department at the . . . Sheba Medical Center."  *Id.* ¶ 4.  She "was Nathaniel Felber's physical therapist from February 27, 2019, when he was

tomography (CT) scan of Nathaniel's skull "reflected a severe open head wound and right frontal fracture from the bullet's entry point extending past his right eye socket to the right frontal sinus behind his eye." *Id.* ¶ 7, citing Reichenthal Decl. ¶ 32; Weingarden Decl. ¶ 10. It also showed "an open fracture and missing skull at the left parietal region of his skill, where the bullet exited with extruding brain tissue." *Id.* ¶ 7, citing Reichenthal Decl. ¶ 32; Weingarden Decl. ¶ 10. Nathaniel underwent surgery and stayed in the ICU under a medically induced coma for two months. *Id.* ¶¶ 9–12.

"Nathaniel was in a coma, and then a vegetative state, for over seven months after the Givat [Asaf] Attack." Pl. Nathaniel's SOF ¶ 18, citing Reichenthal Decl. ¶ 47. In February 2019, Nathaniel was admitted to a rehabilitation facility, where he still resided as of August 2020. Pls.' SOF ¶ 16, citing Spitzen Decl. ¶¶ 15, 25. In the interim, he displayed varying levels of alertness and responsiveness. Pl. Nathaniel's SOF ¶¶ 19–27.

In December 2019, surgeons began preparing Nathaniel for a cranioplasty surgery, which required implanting a "skin expander" under his scalp. *Id.* ¶ 28, citing Weingarden Decl. ¶ 31. "Nathaniel could not communicate verbally but would reach for his scalp expander when it was being injected, indicating that the process was painful . . . . In response to the pain, Nathaniel also exhibited increased spasticity and heart rate, and a low-grade fever." *Id.* ¶ 30, citing Judi Decl. ¶ 32; Weingarden Decl. ¶ 31.

Due to delays caused by the COVID-19 pandemic, Nathaniel did not have his cranioplasty surgery until May 2020. Pl. Nathaniel's SOF ¶ 30, citing Judi Decl. ¶ 26; Weingarden Decl. ¶ 36; Reichenthal Decl. ¶ 48; and Gidali Decl. ¶ 20. While recovering from this surgery, Nathaniel

---

admitted to Sheba Medical Center's Rehabilitation Center, until his discharge on September 14, 2020." *Id.* ¶ 5.

suffered seizures for nearly a week, contracted pneumonia, and contracted an allergic reaction to the medication used to treat the pneumonia. *Id.* ¶¶ 31–32. He was readmitted to the long-term rehabilitation facility in June 2020, about a month after his cranioplasty surgery. *Id.* ¶ 33, citing Reichenthal Decl. ¶ 51; Weingarden Decl. ¶ 38; and Gidali Decl. ¶ 21. Because of the complicated recovery from the surgery, he lost most of the progress that he had made in regaining cognitive function. *Id.*, citing Gidali Decl. ¶ 21; Judi Decl. ¶ 28.

In September 2020, Nathaniel was diagnosed with COVID-19 and had to be quarantined in an unfurnished apartment that was not handicap-accessible, putting his rehabilitative treatment on pause. *Id.* ¶¶ 53–54, citing Gidali Decl. ¶ 41; Judi Decl. ¶¶ 4, 10. His family rented a hospital bed for his stay in the apartment and arranged for the delivery of necessities. *Id.* ¶ 55, citing Judi Decl. ¶ 5.

## II.      Injuries to Family Member Plaintiffs

As a result of the attack, Nathaniel's family members have suffered emotional distress ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████



As for long-term effects, in Judi's words, her son's injury "has come to dominate her entire life," *id.* at 6–7: she no longer exercises even though she used to be an avid runner; ███

███████████████████████████████████████████

███████████████████████

Nathaniel's father does not remember much of what happened in the first few weeks after the shooting, which he believes is due to suppressing the painful memories from that time. Strous C at 3. He does remember suffering sleeplessness and loss of appetite. *Id.* ███████████

███████████████████████████████████████████

███████████████████████████████████████████





████████ not biking, even though he used to love it; ████████

████████ Adina was a flight attendant at the time of Nathaniel's shooting, and was informed of the shooting when the inflight manager called Adina to the front of the plane while working.  Pls.' SOF ¶¶ 136, 138, citing Adina Decl. ¶¶ 8, 11, 14. ████████

## III.    Hamas and Iran

Hamas is a political organization that was founded in the Gaza Strip in December 1987. Spitzen Decl. ¶ 12.  "The name 'Hamas' is an Arabic acronym for 'Islamic Resistance Movement' (Ḥarakat al-Muqāwamah al-Islāmiyah)."  *Id.* ¶ 13.   The United States designated Hamas a Specially Designated Terrorist in 1995, a Foreign Terrorist Organization in 1997, and a Specially Designated Global Terrorist in 2001.  Pls.' SOF ¶ 25, citing Clawson Decl. ¶ 25.  Hamas's operational arm that carries out its terrorist attacks is known as the Qassam Brigades.  *Id.* ¶ 26, citing Clawson Decl. ¶ 26.  And the Court has been provided with an affidavit that states that Asem al-Barghuthi "was the commander of a Hamas Qassam Brigades cell responsible for the December 13, 2018 Givat [Asaf] Attack . . ."  *Id.* ¶ 27, citing Spitzen Decl. ¶¶ 31, 33–34.

Plaintiffs assert that al-Barghuthi carried out the Givat Asaf attack on the day he found out his brother was killed in a clash with the IDF to avenge his brother's death.  Pls.' SOF ¶ 32, citing Spitzen Decl. ¶¶ 36, 38.[6]  Israeli authorities arrested al-Barghuthi on January 8, 2019 for his connection to the Givat Asaf attack and other charges.  Spitzen Decl. ¶¶ 45, 36.  Since then, Hamas has "strongly insinuated its responsibility for the Givat [Asaf] Attack," although it did not initially

---

[6]    Spitzen cites to details in the Judea Military Court's March 11, 2019 indictment against al-Barghuthi for the Givat Asad attack as evidence of this motivation.  Spitzen Decl. ¶ 38.

declare that the attack had been committed by one of its operatives. Pls.' SOF ¶¶ 33–34, citing Spitzen Decl. ¶¶ 21, 23–24, 50–51, 53–55.[7]

Hamas does not operate on its own. Iran has provided funding and training to Hamas for more than 30 years. Pls.' SOF ¶ 55, citing Clawson Decl. ¶¶ 28–29. The United States designated Iran as a State Sponsor of Terrorism in 1984, and that designation remains in place today. Pls.' SOF ¶ 54, citing Clawson Decl. ¶ 22; *see also Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 273–74 (D.D.C. 2005); 22 C.F.R. § 126.1(d)(1); 31 C.F.R. § 596.201; Determination Pursuant to Section 6(i) of the Export Administration Act of 1979–Iran, 49 Fed. Reg. 2836-02 (Jan. 23, 1984); U.S. Dep't of State, State Sponsors of Terrorism (current), available at https://www.state.gov/state-sponsors-of-terrorism.

Mr. Spitzen asserts that the Givat Asaf attack demonstrated the skills and professional training of a terrorist rather than a "rogue actor or lone wolf," *id.* ¶ 44, quoting Spitzen Decl. ¶¶ 41–42, 44, 58–62, 65, 70: al-Barghuthi noticed the concentration of soldiers and civilians at the bus stop and decided to commit the attack there; he abandoned his car and stolen weapon when fleeing the attack so as not to hinder his escape; and he targeted armed soldiers despite knowing that he was wanted by Israeli security forces, showing his dedication to Hamas. *Id.* ¶ 46, citing Spitzen Decl. ¶¶ 66–67, 71–72.

---

[7]    Hamas generally claims responsibility for attacks, but plaintiffs note that "it has been cautious about claiming responsibility for attacks if withholding an announcement could protect operatives who have not yet been captured or who are in jail but have not yet been sentenced by Israeli courts." Pls.' SOF ¶ 31, citing Spitzen Decl. ¶¶ 21, 23, n.9. Hamas claimed responsibility for an attack committed by Asem al-Barghuthi and his brother four days before the Givat Asaf attack, mostly referring to al-Barghuthi's brother after he had been killed. Pls.' SOF ¶ 30, citing Spitzen Decl. ¶ 39. Plaintiffs posit that Hamas did not claim responsibility for the Givat Asaf attack because Asem al-Barghuthi had gone into hiding. Pls.' SOF ¶ 33 (citing Spitzen Decl. ¶¶ 21, 23–24, 50–51, 53).

## LEGAL STANDARD

Federal Rule of Civil Procedure 55(a) provides that the Clerk of the Court must enter a party's default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise."

Under the Foreign Sovereign Immunities Act ("FSIA"), a court may not enter default judgment against a foreign state "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."   28 U.S.C. § 1608(e); *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014) ("[W]hen the defendant State fails to appear and the plaintiff seeks a default judgment, the FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be 'satisfactory to the court.'").  Default judgment under the FSIA is identical to the standard for entry of default judgments against the United States under Federal Rule of Civil Procedure 55(d). *See Hill v. Republic of Iraq*, 328 F.3d 680, 683 (D.C. Cir. 2003), quoting H.R. Rep. No. 94-1487, at 26 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6604, 6625.

Given the considerations of sovereign immunity that pertain notwithstanding the default, a court must carefully "scrutinize the plaintiff's allegations" and "may not unquestioningly accept a complaint's unsupported allegations as true."  *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012), citing *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010).  In a default proceeding under the FSIA, plaintiff may establish proof through testimony, documentation, and affidavits.  *Spencer v. Islamic Republic of Iran*, 922 F. Supp. 2d 108, 109 (D.D.C. 2013), citing *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 53 (D.D.C. 2006).  The Court has applied the requisite level of scrutiny to the entire record in this case.

11

## ANALYSIS

### I.    The Court has jurisdiction over plaintiffs' claims under the FSIA.

At the outset, plaintiffs must demonstrate that the Court has jurisdiction to hear their claims and that Iran is not immune from suit.  *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008).   The FSIA is "the sole basis for obtaining jurisdiction over a foreign state in our courts."  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).   A foreign state is typically immune from jurisdiction in U.S. courts.  *See* 28 U.S.C. § 1604.   But subject matter jurisdiction may exist if the defendant's conduct falls within one of the statutory exceptions set out in the FSIA.  *See id.*; 28 U.S.C. § 1330(a).   If the foreign state is not immune, a plaintiff can establish personal jurisdiction over the defendant if the plaintiff executes service in accordance with 28 U.S.C. § 1608.  *See* 28 U.S.C. § 1330(b).   Here, defendant's conduct falls within the "state sponsor of terrorism" exception to immunity set forth in 28 U.S.C. § 1605(A), and plaintiffs have established personal jurisdiction by serving Iran in accordance with 28 U.S.C. § 1608(a).

#### A.    This Court has subject matter jurisdiction.

Under the FSIA, "a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state."  *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).  "Because 'subject matter jurisdiction turns on the existence of an exception to foreign sovereign immunity, . . . even if the foreign state does not enter an appearance to assert an immunity defense, a District Court still must determine that immunity is unavailable under the Act.'"  *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 65 (D.D.C. 2010), quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 495 n.20 (1983).

The terrorism exception to immunity of the FSIA provides that:

> A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).  Because plaintiffs have demonstrated all of these elements, the Court finds that Iran is not immune from suit.

First, plaintiffs bring this case against the Islamic Republic of Iran, a foreign state, seeking money damages for plaintiffs' injuries.  Compl. ¶¶ 13, 94, 95, 98, 99; Compl. at 16, Prayer for Relief.

Second, plaintiffs have demonstrated the defendant committed an extrajudicial killing and attempted killing when Asem al-Barghuthi shot at Nathaniel Felber, his fellow soldiers, and the civilians at the Givat Asaf attack on December 18, 2018.  Compl. ¶¶ 14, 32–37. While the attack on the bus stop was directed at members of the military, and it was likely motivated, at least in part, by that status as it came on the heels of a deadly attack by the Israeli military, it was not a military operation.  The shooter fired at soldiers and civilians indiscriminately, and the shooter was not a soldier in any nation's armed forces; the record, as discussed further with respect to liability in part II.C. below, supports a finding that he was a Hamas operative. [8]  Plaintiffs have

---

[8]     Although no direct claim of responsibility has been made, on the day al-Barghuthi was arrested, Hamas posted an announcement on their website that "described the arrest as a prosecution of 'the resistance' and described the Givat Asaf attack as a bold operation carried out by 'the Resistance' that hurts 'the occupation.'"  Spitzen Decl. at ¶ 55.  Hamas's coyness about the attack diminished further on the day al-Barghuthi was sentenced to life in prison because it "openly described al-Barghuthi as a 'Qassami prisoner' (i.e., a prisoner belonging to the Qassam Brigades). The Qassam Brigades' website also published an announcement about Asem al-Barghuthi's verdict, referring to him as 'the Qassami prisoner.'"  Spitzen Decl. at ¶ 57.

therefore established this key element to the Court's satisfaction, and Iran has not seen fit to defend this action or claim otherwise.

Third, plaintiffs have adequately shown that defendant caused the attack. Claims brought under the FSIA do not require "but-for" causation. *See In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 42 (D.D.C. 2009), citing *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004). In interpreting a provision under the FSIA, the D.C. Circuit found the causation element "to require only a showing of 'proximate cause.'" *Kilburn*, 376 F.3d at 1128, quoting *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 536–38 (1995). "Proximate cause exists so long as there is 'some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered.'" *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009), quoting *Kilburn*, 376 F.3d at 1128–29.

Here, plaintiffs have sufficiently demonstrated a "reasonable connection" between their damages and defendant's actions. Plaintiffs have put forth evidence to show that Iran has "for over thirty years . . . provided funding and training for terrorism operations that targeted United States and Israeli citizens," which has included support for Hamas. Clawson Decl. ¶¶ 28–29. While support of Hamas has "waxed and waned" over the years, there is "ample evidence that Iran has supplied substantial material support to Hamas, including in the period immediately before, during, and immediately after the December 13, 2018 attack outside of Givat A[]saf" that left Nathaniel Felber permanently injured. *Id.* ¶¶ 30, 64.

More complicated is the connection between Hamas and the attack. Ordinarily, Hamas claims responsibility for attacks, providing a clear link between the organization and the damages claimed. *See, e.g.*, *Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affs.*, 892 F.3d 348,

352 (D.C. Cir. 2018); *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 14 (D.D.C. 2009). Hamas did not do so immediately after the shooting here, but its evolving statements about al-Barghuthi since – particularly after he was finally apprehended – give rise to the necessary inference.

In this case, Asem al-Barghuthi, who was charged with the attack that injured Nathaniel, had familial connections to Hamas, including his father and two uncles who were prominent Hamas figures in the West Bank and spent time in jail for previous attacks.  Spitzen Decl. ¶ 77. Al-Barghuthi himself had documented membership in Hamas and "was previously convicted of being a member in the Hamas student's bloc, Al-Kutla al-Islamiya, and of planning to kidnap Jews to exchange for the release of Palestinian prisoners."  Spitzen Decl. ¶¶ 32, 87.  Hamas claimed responsibility for a prior attack outside the town of Ofra (the "Ofra attack") that Al-Barghuthi and his brother committed on December 9, 2018, and his brother was killed in response by the Israelis four days later, on the morning of the Givat Asaf attack.  Pls.' SOF ¶¶ 27–30, citing Spitzen Decl. ¶ 39.  Publicly acknowledging al-Barghuthi as a Hamas operative at the time, though, "could have jeopardized his efforts to escape the Israeli security forces' search for him . . . and hindered his defense during his trial."  Spitzen Decl. ¶ 51.

On the day al-Barghuthi was arrested, Hamas posted an announcement on its website that "described the arrest as a prosecution of 'the resistance' and described the Givat Asaf attack as a bold operation carried out by 'the Resistance' that hurts 'the occupation.'"  Spitzen Decl. ¶ 55.  On the day Asem al-Barghuthi was sentenced to life in prison, Hamas "openly described al-Barghuthi as a 'Qassami prisoner' (i.e., a prisoner belonging to the Qassam Brigades).  The Qassam Brigades' website also published an announcement about Asem al-Barghuthi's verdict, referring to him as 'the Qassami prisoner.'"  Spitzen Decl. ¶ 57 (footnote omitted).

15

Moreover, there is also evidence that the Givat Asaf attack was professionally and deliberately planned.  In 2007, al-Barghuthi buried the weapons that he later used for both the Ofra attack and the Givat Asaf attack before he went to jail for the second time.  Spitzen Decl. ¶ 60. The Givat Asaf attack took place on December 12, Compl. ¶ 2, and the calendar dates surrounding December 14, "the date Hamas marks as the official anniversary of its establishment," are popular dates for attacks by Hamas.  Spitzen Decl. ¶ 68.  Finally, plaintiffs assert that the attack was carried out with a degree of professional skill; al-Barghuthi "aimed his weapon from short range towards the people who were on the spot, killed two soldiers, injured others and even succeeded in stealing a weapon from one of the soldiers."  Spitzen Decl. ¶ 70.  When the car he was using to escape from the attack got stuck, al-Barghuthi abandoned the car and the weapon he stole, which the expert asserts "demonstrated a high level of professionalism and restraint that are typical of skillful terrorist operatives."  Spitzen Decl. ¶ 71.

This Circuit has "repeatedly sustained jurisdiction or liability or both under the terrorism exception to the FSIA and in other terrorism cases based solely upon expert testimony."  *Owens v. Republic of Sudan*, 864 F.3d 751, 788 (D.C. Cir. 2017), *vacated on other grounds sub nom.*, *Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020), citing *Kilburn*, 376 F.3d at 1132.  Given the expert testimony concerning Iran's support of Hamas in the time period of the Givat Asaf attack, Clawson Decl. ¶ 64, al-Barghuthi's familial connections to Hamas, Spitzen Decl. ¶ 77, and Hamas's announcements when al-Barghuthi was arrested and sentenced, Spitzen Decl. ¶¶ 55, 57, plaintiffs have sufficiently alleged causation and injury.[9]

---

9      Courts in this district have inferred a connection when plaintiffs presented facts supporting the alleged link even in the absence of any statements by Hamas.  *See, e.g.*, *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 346 (D.D.C. 2020) (finding that social media activity, familial connections to Hamas, and the opportunity for the assailant to face fewer counts in an Israeli indictment by having Hamas not claim responsibility was enough to connect the attack to

16

**B.      Additional requirements under the FSIA are met.**

The FSIA lists a set of additional conditions that must be met before a federal district court may hear a claim:  (i) the foreign country must be designated a "state sponsor of terrorism at the time [of] the act" giving rise to the claim, (ii) the "claimant or the victim" must be a "national of the United States," a member of the armed forces, or a government employee at the time of the act, and (iii) the claimant must have "afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration" if the act occurred in the foreign state.  28 U.S.C. § 1605A(a)(2); *see Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 14 (D.C. Cir. 2015).

With respect to the first provision, the FSIA defines a "state sponsor of terrorism" as "a country the government of which the Secretary of State has determined . . . is a government that has repeatedly provided support for acts of international terrorism."  28 U.S.C. § 1605A(h)(6). Iran has been designated a state sponsor of terrorism since 1984.  *See* 49 Fed. Reg. 2836–02 (Jan. 23, 1984) (statement of Secretary of State George P. Shultz) (Iran); *State Sponsors of Terrorism*, U.S. Department of State, https://www.state.gov/j/ct/list/c14151.htm (last visited Oct. 17, 2022).

Second, the definition of a "national of the United States" includes "a citizen of the United States."  8 U.S.C. § 1101(a)(22); 28 U.S.C. § 1605A(h)(5).  Here, the plaintiffs are citizens of the United States.  Compl. ¶¶ 8–12; Pls.' SOF ¶¶ 167–68.

---

Hamas); *Schwartz v. Islamic Republic of Iran*, No. CV 18-1349, 2020 WL 7042842, at *8–*9 (D.D.C. Nov. 30, 2020) (finding sufficient facts to indicate Hamas's responsibility given the attacker's family's public support of Hamas, the fact that no other terrorist organization took responsibility, that the evidence shows the attack was thoroughly planned, and the significance of the date of the attack to Hamas); *Cabrera v. Islamic Republic of Iran*, No. CV 18-2065 & 19-3835, 2022 WL 2817730, at *13 (D.D.C. July 19, 2022) (finding that geography and time period can be enough to attribute an attack to a specific terrorist group).

Finally, plaintiffs in this case need not satisfy the third element because the attack took place in Israel, not Iran, and thus the statutory requirement of "afford[ing] the foreign state a reasonable opportunity to arbitrate the claim" before bringing the action does not apply.  28 U.S.C. § 1605A(a)(2)(A)(iii).

    **C.    This Court has personal jurisdiction.**

 Under 28 U.S.C. § 1330(b), "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title."  The D.C. Circuit requires "strict adherence to the terms of 1608(a)."  *Barot v. Embassy of Zam.*, 785 F.3d 26, 27 (D.C. Cir. 2015).

Because no "special arrangement" existed between the parties, *see* 28 U.S.C. § 1608(a)(1), Iran is not a party to any "international convention on service of judicial documents," *see* § 1608(a)(2), and plaintiffs could not effectuate service within 30 days, *see* § 1608(a)(3), plaintiffs sought to transmit the summons, complaint, and notice of suit through diplomatic channels as prescribed under section 1608(a)(4).  *See* Req. for Service of Process on Def. [Dkt. # 13] at 1.  On July 31, 2019, the Clerk of the Court sent two copies of the summons, complaint, notice of suit, and translations to the U.S. Department of State.  Certificate of Mailing [Dkt. # 16].  These documents were delivered by the Foreign Interests Section of the Embassy of Switzerland in Tehran on September 23, 2019.  Return of Service/Aff. of Summons and Compl. Executed [Dkt. # 17] at 1.  Thus, because service has been made in accordance with section 1608(a)(4), the Court has personal jurisdiction over Iran.  *See* 28 U.S.C. § 1330(b); *see also Valore*, 700 F. Supp. 2d at 70 (explaining that serving Iran via the Swiss embassy was proper service of process, given that "no special arrangements for service exist[ed] between Iran and the plaintiffs" and Iran is not a signatory to any international conventions on service).

Since plaintiffs have satisfied their burden to show that the Court may hear plaintiffs' claim, the Court can proceed to the merits of the motion for default judgment.

## II.     This Court will grant plaintiffs' motion for default judgment.

Default judgment may not be entered against a foreign state "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *Han Kim*, 774 F.3d at 1047. A court can rely upon plaintiff's "uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence." *Valore*, 700 F. Supp. 2d at 59 (alteration in original), quoting *Int'l Road Fed'n v. Embassy of Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 252 n.4 (D.D.C. 2001).

Under section 1605A(c), a foreign state is liable to (1) "a national of the United States" (2) "for personal injury or death" (3) "caused by" (4) "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or provision of material support or resources for such an act" (5) committed by "that foreign state, or an official, employee, or agent of that foreign state" (6) "for which the courts of the United States may maintain jurisdiction under this section for money damages." 28 U.S.C. §§ 1605A(c), (a)(1).

### A.     Plaintiffs are nationals of the United States.

As noted above, all plaintiffs are nationals of the United States because they are U.S. citizens. Compl. ¶¶ 8–12; Pls.' SOF ¶¶ 167–68. Nathaniel Felber was serving in the Israeli military at the time, and the family was living abroad, but neither of these facts change the fact that plaintiffs were U.S. citizens, which is sufficient to be "national[s] of the United States" under 8 U.S.C. § 1101(a)(22).

**B.      Defendant caused grave personal injuries to Nathaniel Felber.**

As explained in Part I.A, *supra*, Iran offers material support to Hamas to conduct its operations, and Hamas carried out the Givat Asaf attack.  As a result of that attack, Nathaniel Felber was gravely injured.

Elements two and three of this statutorily created federal cause of action, "[w]hen viewed together . . . require plaintiffs to prove a theory of liability under which defendants cause[d] the requisite injury or death." *Valore*, 700 F. Supp. 2d at 73.  "[P]laintiffs in § 1605A actions – whether seeking solely punitive damages or pursuing compensatory relief as well – must articulate the justification for such recovery, generally through the lens of civil tort liability." *Rimkus*, 750 F. Supp. 2d at 175–76.

Plaintiffs advance three theories for recovery:  intentional infliction of emotional distress, solatium, and assault and battery.  Compl. ¶¶ 87–99.  Because the FSIA-created federal cause of action does not provide any guidance on the substantive bases for liability to determine plaintiffs' entitlement to damages, courts have applied "general principles of tort law," rather than any particular state law, which "in effect instructs federal judges to find the relevant law, not to make it." *Est. of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 24 (D.D.C. 2009), quoting *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003).  With that instruction, courts in this district have "often looked to sources such as state decisional law, legal treatises, or the Restatements" to determine the relevant law.  *Heiser*, 659 F. Supp. 2d at 24; *see Valore*, 700 F. Supp. 2d at 76.  The Court will analyze plaintiffs' theories of liability through this lens.

**i.      Plaintiffs assert a claim for assault and battery.**

A claim of assault and battery has been brought on Nathaniel Felber's behalf.  Compl. ¶¶ 96–99.  Iran is liable for assault if the Givat Asaf attack was (1) "intend[ed] to cause a harmful

or offensive contact . . . , or an imminent apprehension of such a contact" on the part of the victim

or victims, and (2) those attacked are "thereby put in such imminent apprehension." Restatement

(Second) of Torts § 21. To constitute apprehension, the attacked "must believe that the act may

result in imminent contact unless prevented from so resulting by . . . self-defensive action or by

his flight or by the intervention of some outside force." Restatement (Second) of Torts § 24.

Iran is liable for battery if the Givat Asaf attack (1) "intend[ed] to cause a harmful or

offensive contact . . . , or an imminent apprehension of such a contact" by those attacked and (2) "a

harmful contact with" those attacked "directly or indirectly result[ed]." Restatement (Second) of

Torts § 13. Harmful contact is that which results in "any physical impairment of the condition of

another's body, or physical pain or illness." Restatement (Second) of Torts § 15.

Here, the elements are satisfied because "acts of terrorism are, by their very nature,

intended to harm and to terrify by instilling fear of such harm." *Valore,* 700 F. Supp. 2d at 77.

Given that al-Barghuthi "aimed his weapon from short range" at Nathaniel Felber, Pls.' SOF ¶ 9,

and the shots fired resulted in grave injuries, Pls.' SOF ¶¶ 15–20, Nathaniel Felber experienced

both apprehension of harm and a harmful contact, and Iran is liable for both assault and battery.

### ii.   Plaintiffs assert claims for intentional infliction of emotional distress and solatium.

Nathaniel Felber and his family members assert claims of intentional infliction of

emotional distress ("IIED"). *See* Compl. ¶¶ 87–99. The record supports a finding that all of them

suffer from severe emotional distress resulting from Nathaniel's significant injuries.

Iran is liable for the plaintiffs' IIED and solatium claims if it: (1) engaged in extreme and

outrageous conduct, (2) that was directed at a person or such person's immediate family, (3) which

intentionally or recklessly caused severe emotional distress. *See* Restatement (Second) of Torts

§ 46; *see also Bettis,* 315 F.3d at 333 ("[F]ederal courts in FSIA . . . cases have accepted § 46 of

21

the Restatement (Second) of Torts as a proxy for state common law of intentional infliction of emotional distress.").  The fourth requirement, or the "presence requirement," for third party claims requires that immediate family members are present at the time the conduct occurred. *Bettis*, 315 F.3d at 333.  "Under the FSIA, a solatium claim is indistinguishable from an IIED claim," and it is available for members of a victim's immediate family.  *Valore*, 700 F. Supp. 2d at 85, citing *Heiser*, 659 F. Supp. 2d at 27 n.4.  "Immediate family" is "defined as one's spouse, parents, siblings, and children."  *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 75 (D.D.C. 2010), quoting *Heiser,* 659 F. Supp. 2d at 28.

Plaintiffs have established claims of IIED and solatium.  "Acts of terrorism are by their very definition extreme and outrageous."  *Belkin*, 667 F. Supp. 2d at 22, citing *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002).  Thus, the first element is easily established, as the Givat Asaf attack reflects an act of terrorism as discussed in Part I.A, *supra*. Second, the attack was directed at Nathaniel Felber, which clearly fulfills the second element for Nathaniel.  His parents and siblings also fall within the definition of "immediate family" and thus satisfy the second element.

Third, the attack intentionally caused the plaintiffs severe emotional distress.  *See Stethem*, 201 F. Supp. 2d at 89 (noting that "[a]cts of terrorism . . . intend[] to cause the highest degree of emotional distress").  Nathaniel is unable to speak, Pl. Nathaniel's SOF ¶ 83, citing Weingarden Decl. ¶ 50; Gidali Decl. ¶¶ 28, 39; Reichenthal Decl. ¶ 52, and "cannot control his saliva or swallowing function."  *Id.*, citing Weingarden Decl. ¶¶ 41, 45; Reichenthal Decl. ¶ 52.  He has extremely limited motor skills, lacks any coordination, and can walk fifteen meters at most and only with assistance.  *Id.,* citing Gidali Decl. ¶¶ 25, 32.  Moreover, he experiences pain, cannot read or write, and is completely dependent on others to perform basic life functions, such as

22

bathing, hygiene, and going to the bathroom. *Id.* ¶¶ 83–84. The absence of a personal declaration detailing the ongoing emotional and psychological impact of the attack is of little import since it reflects the severity of his injuries and his inability to verbally communicate. *Id.* ¶ 74. Thus, he is entitled to damages on this basis as well as for assault and battery.

Nathaniel's family members have also suffered from severe emotional distress. ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

Finally, while Nathaniel's relatives were not at the scene at the time of the attack, that does not mean that they cannot establish the presence requirement. Commentators on the Restatement have agreed that "[i]f the defendant's conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person who is not present, no rule, nor any essential reason of logic or policy prevents liability." Dan B. Dobbs, The Law of Torts § 389 (2d ed. 2018). As another court in this district noted, "[t]errorism, unique among the types of tortious activities in both its extreme methods and aims, passes this test easily." *Heiser*, 659 F. Supp. 2d at 27. After all, a terrorist attack is, by definition, an act performed to intimidate or strike fear in the hearts of

governmental officials and civilians alike. *See also Valore*, 700 F. Supp. 2d at 80 (finding that plaintiffs, though not present at the Beirut bombing, could recover for emotional injuries they suffered as a result of the attack).

Thus, the record supports a finding that Nathaniel and his family members have established the requirements for their IIED and solatium claims.

### C. Nathaniel Felber's injuries resulted from an extrajudicial killing attributable to Iran.

Finally, to establish liability under the FSIA, plaintiffs must assert "personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." 28 U.S.C. § 1605A(a)(1). Here, plaintiffs assert that Felber's personal injuries were the result of an act of extrajudicial killing. Compl. ¶ 14.

An extrajudicial killing is defined as the "deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Torture Victim Protection Act 1991, Pub. L. No. 102–256, § 3(a), 106 Stat. 73, 73 (1992); 28 U.S.C. § 1605A(h)(7). Thus, the category "does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation." *Id.*

As another court in this jurisdiction put it, the term "deliberated killing" is meant to refer to an attack "arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." *Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138, 163 (D.D.C. 2016), quoting *People v. Wright*, 39 Cal.3d 576, 217

24

(1985).[10]  Moreover, "the Torture Victim Protection Act's definition of extrajudicial killing allows plaintiffs to assert liability for a defendant's attempted extrajudicial killing, even if no one died as a result of that attempt." *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 99 (D.D.C. 2017); *see also Schertzman Cohen v. Islamic Republic of Iran*, No. 17-cv-1214, 2019 WL 3037868, at *3 (D.D.C. July 11, 2019) ("this district's prior rulings hold that the FSIA terrorism exception encompasses *attempted* extrajudicial killings").

As the Court has discussed above, Nathaniel Felber's attempted killing was not lawful in any way.  It was not authorized by a judgment pronounced by any court.  And, this attempted killing was not lawfully carried out under the authority of the foreign nation pursuant to international law. *See, e.g.*, *Letelier v. Republic of Chile*, 488 F.Supp. 665, 673 (D.D.C. 1980) ("Whatever policy options exist for a foreign country, it has no 'discretion' to perpetrate conduct designed to result in the assassination of an individual or individuals, action that is clearly contrary to the precepts of humanity as recognized in both national or international law.").

At the time of the attack, Nathaniel Felber was serving in the Israeli military.  Compl. ¶ 35.  But this fact does not alter the conclusion that the attack was an extrajudicial killing for purposes of Section 1605A.  Faced with a similar situation, the court in *Est. of Steinberg v. Islamic Republic of Iran*, No. 17-cv-1910, 2019 WL 6117722, at *5 (D.D.C. Nov. 18, 2019) found the attempted killing of a U.S. citizen to be extrajudicial under section 1605A as it was "deliberated and not authorized by any previous judgment" and not "carried out under the authority of a foreign nation," and it found the fact that the victim was serving in the Israeli military at the time to be immaterial.

---

10       *See also Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 325 (D.D.C. 2014) (finding extrajudicial killings occurred where Hezbollah "careful[ly] plan[ed]" the Beirut bombing); *Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 260 (D.D.C. 2016) (finding bombings to be deliberated "it is clear from the careful timing and magnitude of the bombings that the killers planned their actions carefully and intended those actions to result in death.").

Here, plaintiffs have also provided satisfactory evidence to show that the attempted killing of Nathaniel Felber was "deliberated." The expert opines that such an attack reflected "determination and [] long-term planning." Spitzen Decl. ¶ 59. He notes that in 2007, al-Barghuthi buried the weapons that he would later use for both the Ofra attack and the Givat Asaf attack, and the calendar date of the Givat Asaf attack was significant to Hamas. *Id.* ¶¶ 60, 68. But he hid the weapons "before he was jailed by Israel for the second time," *id.* ¶ 60, suggesting that the more likely motivation may have been to conceal evidence of past crimes and evade arrest. And though the calendar date is important context, one cannot ignore the evidence that the timing is consistent with an act of revenge for the killing of al-Barghuthi's brother that day.

There is other evidence of deliberation as well. Al-Barghuthi armed himself that morning, *id.* ¶ 60, and he was a part of a terrorist organization that had been supported by Iran on an ongoing basis. He drove his car past a bus stop, saw Nathaniel and other Israeli soldiers and civilians standing there, and then made the decision to turn his car around, drive back to the bus stop, and aim. Pls.' SOF ¶ 10; Spitzen Decl. ¶ 43. This is satisfactory for the Court's purposes.[11]

## III. The Court awards plaintiffs compensatory damages and punitive damages, but declines to award prejudgment interest.

In creating a private right of action in Section 1605A(c), Congress provided that foreign states are liable for money damages, including "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). "To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct

---

11    The standard jury instructions for courts in this district instruct that the law "does not require that deliberation take any particular amount of time. It can be days, hours or minutes, or it can be as brief as a few seconds." Criminal Jury Instructions for D.C. Instruction 4.204; *see also United States v. Orleans-Lindsay*, 572 F. Supp. 2d 144, 160 (D.D.C. 2008) (applying model instructions).

were reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate consistent with this [Circuit]'s application of the American rule on damages." *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015) (internal quotation marks omitted). In determining a "reasonable estimate," courts may look to expert testimony and prior awards for comparable injury. *See Reed*, 845 F. Supp. 2d at 213–214; *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29–30 (D.D.C. 2008).

The consequences of Iran's actions were certainly known. The government provided support to Hamas, which has claimed responsibility for "numerous terror attacks that have injured and killed thousands of civilians in Israel, including United States citizens." Spitzen Decl. ¶ 13. This attack was a grave, deadly, and tragic assault. Thus, all that remains is an evaluation of the amount of damages.

### A.    The Court awards compensatory damages to plaintiff Nathaniel Felber.

The nature and scope of Nathaniel Felber's injuries are set forth in detail above. *See also* Gidali Decl.; Judi Decl.; Reichenthal Decl.; Spitzen Decl.; and Weingarden Decl. The Court awards $30 million in compensatory damages to Nathaniel.

Defendant is liable to Nathaniel Felber for assault, battery, and intentional infliction of emotional distress, but plaintiff may only recover damages "reflecting the single harm underlying these three torts." *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 84 (D.D.C. 2017). Plaintiffs contend that Nathaniel has experienced extreme pain and suffering as a result of his "severe" injuries and "permanent impairments." Pl. Nathaniel's SOF ¶¶ 68, 74, 82–83. In calculating damages for pain and suffering, this Court is "guided . . . by prior decisions awarding damages for pain and suffering." *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 63, 71 (D.D.C. 2006). There is no formula for calculating such damages, so prior cases have divided

plaintiffs into three categories:  (1) "those in which the victim died, and the pain and suffering is awarded for that endured between the attack and the victim's death;" (2) "those in which the victim was held in captivity;" and (3) "those in which the victim was severely injured but survived, and is awarded pain and suffering both for that endured between the attack and the time of the court's decision as well as that reasonably expected to be endured throughout the rest of the victim's life." *Id.*  Nathaniel falls into the third category.  Courts typically evaluate several factors when calculating damages for awards for victims that have survived:  "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life."  *Id.* at 73.

Survivors with comparatively less severe injuries to Nathaniel have been awarded significant damages for pain and suffering.  *See, e.g.*, *Mousa v. Islamic Republic of Iran*, 238 F. Supp. 2d 1, 12–13 (D.D.C. 2001) (awarding $12 million to survivor of bus bombing with cranial fractures); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 263, 274 (D.D.C. 2003) (awarding $17 million to survivor of bombing who suffered a massive skull fracture leaking cerebral spinal fluid); *Haim*, 425 F. Supp. 2d at 62, 75 (awarding $11 million to survivor of bus bombing with large right occipital lobe brain hematoma); *Blais*, 459 F. at 46, 50, 58–59 (awarding $20 million to U.S. Air Force pilot who survived Khobar Towers bombing and suffers from severe axonal brain injury, anoxic brain injury, and organic encephalopathy).

"Nathaniel was hospitalized for 21 months before his early discharge due to his COVID-19 diagnosis."  Pl. Nathaniel's SOF ¶ 80, citing Reichenthal Decl. ¶¶ 27–28, 46; Supp. Judi Decl. ¶¶ 3–5, 7.  He will continue to require 24-hour nursing assistance, and will receive daily outpatient therapy.  *Id.* citing Reichenthal Decl., ¶ 60.  Long-term, he will need outpatient rehabilitation at least three to five times per week.  *Id.* citing Weingarden Decl. ¶ 55; Gidali Decl., ¶ 40.  Moreover,

his impairments have been particularly severe and will affect him for the rest of his life. Before he was diagnosed with COVID-19, his motor skills were limited to "transferring from wheelchair to bed, and supine to sitting, with moderate to maximal assistance" and "picking up a card from a table and placing it in a previously designated location, and building towers using 2-3 blocks." *Id.* ¶ 83, citing Gidali Decl. ¶¶ 24, 32. He is unable to speak and cannot control his swallowing. *Id.*, citing Weingarden Decl. ¶¶ 41, 45, 50; Gidali Decl. ¶¶ 28, 39; Reichenthal Decl. ¶ 52. His ambulation is "limited to 15 meters . . . for therapeutic purposes only, and is dependent on special braces, a forearm walker, and physical assistance by two caregivers." *Id.*, citing, Gidali Decl. ¶ 25. His cognitive functions are "severely impaired." *Id.*, citing Gidali Decl. ¶ 31; Reichenthal Decl. ¶ 52; Weingarden Decl. ¶ 47. "He cannot read or write." *Id.*, citing Reichenthal Decl. ¶ 46. Furthermore, he will be "totally dependent" on others for nearly all basic functions and activities, including tube feedings and fluids, bathing, going to the bathroom, getting dressed, moving his wheelchair, etc. *Id.* ¶ 84, citing Weingarden Decl., ¶¶ 44, 49, 55; Gidali Decl., ¶ 37; Reichenthal Decl., ¶ 60.

Nathaniel's current condition "appears to be permanent." *Id.* ¶ 89, citing Reichenthal Decl. ¶ 63. Unlike plaintiffs in past cases, Nathaniel will likely never be able to walk. *Id.* ¶ 90. And Nathaniel will not be able to live independently, perform any job, speak, or read. *Id.*

For all of these reasons, the Court will award Nathaniel $30 million in damages for his pain and suffering.

### B.    The Court awards solatium damages to plaintiffs Joseph Felber, Judi Felber, Daniel Felber, and Adina Felber.

Section 1605A explicitly provides for solatium recovery. 28 U.S.C. § 1605A(c). Courts have granted such awards to plaintiffs who experience severe distress over the death of a family member with whom they had a "close personal relationship." *Belkin*, 667 F. Supp. 2d at 22.

29

Solatium claims "are intended to compensate persons for mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience . . . as well as the harm caused by the loss of the decedent's society and comfort." *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72 (D.D.C. 2015) (internal quotation marks omitted).  Solatium damages can also be awarded if the victim of the attack survives, though the amount awarded might be lower. *Valore*, 700 F. Supp. 2d. at 85.

The four family members have described their close relationships with Nathaniel raising him as a child and growing up with him as siblings, and their reactions to the attack and enduring detrimental effects confirm that close relationship. *See generally* Judi Decl.; Joseph Decl.; Daniel Decl.; Adina Decl. (describing thoroughly each family member's experience in learning about the Givat Asaf attack, and their struggles since the attack).

"Solatium damages, like damages for pain and suffering, are by their very nature unquantifiable." *Moradi*, 77 F. Supp. 3d at 72.  However, courts must attempt to do it, and a generally accepted starting point is $2.5 million for parents and $1.25 million for siblings when the victim survived the attack in question. *Valore*, 700 F. Supp. 2d. at 85.  The court can then "deviate in order to compensate for specific circumstances" that made the "suffering particularly more acute and agonizing." *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 51 (D.D.C. 2016) (internal quotation marks omitted); *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 27 (D.D.C. 2011).

Given the grave injuries suffered by Nathaniel Felber that "robb[ed] him of not only his personality, but even his most basic functions," the family members request an upward departure of the baseline award amounts.  Pls.' SOF ¶ 195.  Another court in this district has awarded an upward departure to family members of a bombing victim that suffered brain damage and

30

underwent cranioplasty surgery, like Nathaniel. *See Haim*, 425 F. Supp. 2d at 63, 75–76. In *Haim*, the victim was able to leave the hospital after a few weeks and return to his father's home but continued to visit the hospital frequently for follow-up evaluations and treatments. *Id.* at 63, 74. He returned to his studies on a part-time basis a year and a half after the attack, and with accommodations was able to "complete high school, sit for college entrance exams, and enroll in some college classes." *Id.* However, it was "highly unlikely that he [would] ever obtain a job or live independently." *Id.* at 66. The court awarded $3.5 million to the father and $1.5 million for a sibling in that case. *Id.* at 75–77.

In another case, the court awarded a mother and stepfather an upward departure where the victim injured in a bombing was subsequently hospitalized for four months, originally in a coma, and then a vegetative state. *Blais*, 459 F. Supp. 2d at 46–48, 50. While the victim "made remarkable progress," his reading and writing skills "were very labored and slow"; he continued to face cognitive impairment and "continuing problems with speech, balance, coordination and tolerance for frustration and impulse control," limiting his ability to manage "the functions of daily living." *Id.* at 50–51. The victim's parents stayed by his side for nearly ten years after the attack, and each parent received $3.5 million. *Id.* at 52, 60.

These cases support increasing the damages above the generally accepted starting point, and they serve as a marker. While the Court would not presume to suggest that any of these devoted parents has suffered more than another, the extent of the family member's injuries plays a role in the calculation, and unfortunately, Nathaniel Felber's injuries are particularly severe. Nathaniel cannot read or write, cannot speak, and has hardly any communication capabilities at all. Pls.' SOF ¶ 202. Nathaniel will likely never walk, never talk, and will likely need ongoing assistance for basic daily functions for the rest of his life. *Id.* His family members' lives were

greatly disrupted as they uprooted themselves to stay by his side for months immediately following the attack while he was in the hospital, *id.* ¶¶ 198, 201, 204, ████████████████

████████████████████████████████████████████████

███████ His family "live[s] with the knowledge that he will likely succumb to his injuries at some point in time and that the cause of death will almost certainly remain the [Givat Assaf attack]." *Id.* ¶ 208. While the family acknowledges that his condition may improve, that outcome is "far from certain," and they must live with the ongoing fear for Nathaniel's life when health complications arise. *Id.* ¶¶ 209, 211.

Because of the extreme and grievous nature of Nathaniel's injuries, the Court will award each parent $4 million and each sibling $2 million.

### C. The Court will not award prejudgment interest to plaintiffs.

The Felbers also request prejudgment interest for their psychological injuries (solatium claims). Pls.' SOF ¶ 218. It is within the discretion of the court whether to award prejudgment interest from the date of the attack until the date of the final judgment. *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d 216, 263 (D.D.C. 2008); *Buonocore v. Great Socialist People's Libyan Arab Jamahiriya*, No. 06-cv-727, 2013 WL 351546, at *31 (D.D.C. Jan. 29, 2013). "[C]ourts in this Circuit have awarded prejudgment interest in cases where plaintiffs were delayed in recovering compensation for their injuries—including, specifically, where such injuries were the result of targeted attacks perpetrated by foreign defendants." *Pugh*, 530 F. Supp. 2d at 263. Courts have found prejudgment interest to be appropriate "where an award is 'intended to compensate for injuries sustained over the course of [an extended period].'" *Id.* at 264 (internal citations removed). However, solatium damages "do not typically require prejudgment interest because they are 'designed to be fully compensatory.'" *Thuneibat*, 167 F. Supp. 3d at 54 (internal

citations removed).  Courts have therefore awarded prejudgment interest for solatium damages when there is a stated reason for a long delay between the attack and bringing the suit.  *Id.* at 54–55.

Plaintiffs ask the Court to calculate prejudgment interest here by "adding the annual prime rate (multiplied by $1.00), as published on the Federal Reserve website, . . . for each year from the attack to the issuance of the judgment (inclusive), and then multiplied that figure by the relevant portions of the award."  Pls.' SOF ¶ 219, citing *Mwila v. Islamic Republic of Iran*, 33 F. Supp. 3d 36, 47 nn.7–8 (D.D.C. 2014).

The Court will decline to award prejudgment interest.  While plaintiffs note that they have experienced "delays due to litigation and Iran's refusal to participate in cases or pay judgments," *id.* ¶ 218, the time between the Givat Asaf attack and this judgment is much shorter than the timeframe of delay in instances where district courts have awarded prejudgment interest, and it has been awarded in cases where the plaintiffs were unable to initiate the action, not where defendants declined to respond.  *See Pugh*, 530 F. Supp. 2d at 263 (19 years between attack and final judgment); *Buonocore*, 2013 WL 351546 at *31 (28 years between attack and final judgment); *Owens v. Republic of Sudan*, 71 F. Supp. 3d 252, 262 n.7 (D.D.C. 2014), *aff'd*, 924 F.3d 1256 (D.C. Cir. 2019) (16 years between attack and final judgment).  Here, four years have elapsed since the Givat Asaf attack.  Any delay is surely difficult in these types of cases, but this case has not been unusually slow, and the solatium damages awarded are already substantial.

### D.    The Court awards punitive damages to all plaintiffs.

Section 1605A specifically permits punitive damages.  28 U.S.C. § 1605A(c).  Punitive damages "are awarded not to compensate the victims, but to 'punish outrageous behavior and deter such outrageous conduct in the future.'"  *Braun*, 228 F. Supp. 3d at 86, quoting *Kim v. Democratic*

33

*People's Republic of Korea*, 87 F. Supp. 3d 286, 290 (D.D.C. 2015). Courts in this district have found that punitive damages are "warranted where 'defendants supported, protected, harbored, aided, abetted, enabled, sponsored, conspired with, and subsidized a known terrorist organization whose modus operandi included the targeting, brutalization, and murder of American citizens and others.'" *Id.*, quoting *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 85 (D.D.C. 2011). Courts tend to evaluate four factors to determine the propriety of awarding punitive damages: "(1) the character of the defendant's act, (2) the nature and extent of harm to the plaintiffs that defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 119 (D.D.C. 2015), quoting *Acosta*, 574 F. Supp. 2d at 30 (internal quotations omitted). "Courts have found these factors to be satisfied when a defendant has provided material support to a terrorist organization in carrying out an act of terrorism." *Id.* And, more specifically, courts have found punitive damages appropriate where Iran has supported Hamas. *Braun*, 228 F. Supp. 3d at 86–87; *Gill*, 249 F. Supp. 3d at 105. Thus, punitive damages will be awarded here as this was a terrorist attack by Hamas, which is supported by Iran.

Courts use different models to calculate punitive damages. Two frequently used models are: (1) "multiplying the defendant state's annual expenditures on terrorism (the multiplicand) by a factor usually ranging from three to five (the multiplier)," and (2) "impos[ing] a fixed $300 million punitive award." *Flanagan*, 87 F. Supp. 3d at 122–23. The latter method "limits courts' discretion to tailor a punitive award appropriate for the magnitude of the underlying injury"; the Court finds that using the "multiplicand" and "multiplier" method to be appropriate here given the magnitude of the attack and the request of plaintiffs. *Id.* at 124; *see Gill*, 249 F. Supp. 3d at 105.

34

The "multiplicand" is "either the magnitude of the defendant's annual expenditures on terrorist activities or the amount of compensatory damages already awarded." *Gill*, 249 F. Supp. 3d at 105, quoting *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 50 (D.D.C. 2012) (internal quotations omitted).  The magnitude of Iran's expenditures is reported to be millions of dollars, Clawson Decl. ¶ 27,  "which may result in awards of billions of dollars, [so this method] has been used in the case of exceptionally deadly attacks, such as the 1983 bombing of the Marine barracks in Beirut, which killed 241 American military servicemen." *Gill*, 249 F. Supp. 3d at 105, quoting *Braun*, 228 F. Supp. 3d at 87.  The attack here was deadly and tragic, but there were fewer casualties, as two people were injured and two were killed.  Compl. ¶ 37.  As a result, the Court will use the amount of compensatory damages awarded – $12 million total – as the multiplicand. *See Gill*, 249 F. Supp. 3d at 93, 105–06 (noting that the only known injuries resulting from the attack were to the plaintiff, who was shot and injured).  Multipliers range between "three and, in exceptional cases, five." *Id.* at 106, quoting *Harrison*, 882 F. Supp. 2d at 50 (internal quotations omitted).  Although plaintiffs note that in *Gill*, only one person was injured, whereas here "multiple deaths occurred," Pls.' SOF ¶ 226, courts have found that there were no "exceptional circumstances" in cases with more than one person injured or killed and used the usual multiplier of three. *Harrison*, 882 F. Supp. 2d at 50; *Roth*, 78 F. Supp. 3d at 388, 406 (finding a multiplier of three appropriate for an attack that killed 15 people).  Thus, the Court will use the standard multiplier of three here.

The punitive damages will be awarded as follows:

- Nathaniel Felber:  $90 million

- Judi Felber:  $12 million

- Joseph Felber:  $12 million

35

- Adina Felber:  $6 million

- Daniel Felber:  $6 million

- Total Punitive Damages:  $126 million

## CONCLUSION

For the reasons outlined above, plaintiffs' motion for default judgment will be **GRANTED**.  The plaintiff has established to the Court's satisfaction, pursuant to 28 U.S.C. § 1608(e), that the defendant, the Islamic Republic of Iran, engaged in an act of extrajudicial killing of a United States national by planning and executing the Givat Asaf attack, and is liable to plaintiffs for the resulting injuries.  Plaintiffs are awarded monetary damages in the following amounts:

- **Pain and Suffering – Nathaniel Felber:  $30,000,000**

- **Solatium – Joseph Felber:  $4,000,000**

- **Solatium – Judi Felber:  $4,000,000**

- **Solatium – Daniel Felber:  $2,000,000**

- **Solatium – Adina Felber:  $2,000,000**

- **Punitive Damages:  $126,000,000**

AMY BERMAN JACKSON
United States District Judge

DATE:  October 25, 2022

36